# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MERVYN'S HOLDINGS, LLC, et al. | Case No. 08-11586 (KG) |
| Debtors. | Jointly Administered |
| MERVYN'S LLC, | |
| Plaintiff, | |
| - against - | |
| LUBERT-ADLER AND KLAFF PARTNERS, LP; LUBERT-ADLER REAL ESTATE FUND IV, LP; LUBERT-ADLER REAL ESTATE PARALLEL FUND IV, LP; LUBERT-ADLER CAPITAL REAL ESTATE FUND IV, LP; KLA/MERVYN'S LLC; ACADIA MERVYN'S INVESTOR I, LLC; ACADIA MERVYN'S INVESTOR II, LLC; MERVYN'S KLAFF EQUITY, LLC; MERVYN'S OPPORTUNITIES, LLC; CERBERUS CAPITAL MANAGEMENT, LP; CERBERUS MERVYN'S INVESTORS, LLC; CERBERUS PARTNERS, LP; GABRIEL CAPITAL, LP; CERBERUS ASSOCIATES, LLC; ABLECO FINANCE LLC; MADELEINE LLC; SUN CAPITAL PARTNERS, INC.; SUN CAPITAL SECURITIES FUND, LP; SUN CAPITAL SECURITIES OFFSHORE FUND, LTD.; SCSF MERVYN'S (US), LLC; SCSF MERVYN'S (OFFSHORE), INC.; MDS REALTY HOLDINGS I, LLC; MDS REALTY HOLDINGS II, LLC; MDS REALTY I, LLC; MDS REALTY II, LLC; MDS REALTY III, LLC; MDS REALTY IV, LLC; MDS TEXAS REALTY I, LP; MDS TEXAS REALTY II, LP; MDS TEXAS REALTY I, LLC; MDS TEXAS REALTY II, LLC; MDS TEXAS PROPERTIES I, LLC; MDS TEXAS PROPERTIES II, LLC; GREENWICH CAPITAL FINANCIAL PRODUCTS, INC.; ARCHON FINANCIAL, LP; GOLDMAN SACHS MORTGAGE COMPANY; LASALLE BANK NATIONAL ASSOCIATION; and THE TARGET CORPORATION, | Adv. Proc. No. |
| Defendants. | |

# COMPLAINT

Plaintiff Mervyn's LLC ("Mervyn's"), by its undersigned counsel, alleges, upon knowledge as to its own status, and upon information and belief as to all other matters, as follows:

## Nature of the Action

1.     This is a fraudulent transfer action.  In this case, valuable real estate assets - - owned store locations and below-market leases - - were stripped out of Mervyn's and used to finance the leveraged buyout of Mervyn's by a consortium of private equity players.  Hundreds of millions of dollars of loans were made against those real estate assets, with none of the proceeds going to Mervyn's.  Moreover, by separating Mervyn's real estate assets from its retail operations, the private equity players made sure that any residual value or upside in the real estate assets were reserved for themselves and not for Mervyn's.

2.     Not content to simply cut the real estate assets out of Mervyn's, the private equity players also leased Mervyn's own real estate assets back to it at substantially increased rates, to both service the acquisition debt and to continue to extract over time the significant excess value of the real estate assets over the debt piled onto those assets.

3.     Regardless of whether the multiple interrelated transfers and transactions described below are collapsed into a single transaction, or viewed as a series of steps to a fraudulent conclusion, the 2004 transaction is a transaction that ultimately led to Mervyn's bankruptcy and is a fraudulent transfer that cannot withstand scrutiny.

## The Parties

### Mervyn's

4.  Plaintiff Mervyn's LLC ("Mervyn's) is a limited liability company organized under the laws of the State of California. At all relevant times, Mervyn's has operated retail department stores. On July 29, 2008 (the "Petition Date"), Mervyn's filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, and continues to operate its business as a debtor-in-possession pursuant to Bankruptcy Code Sections 1007 and 1108.

### The Private Equity Sponsors

5.  Defendant KLA/Mervyn's LLC, is a limited liability company, which sponsored and/or participated in the 2004 leveraged buyout of Mervyn's and related transactions.

6.  Defendant Cerberus Mervyn's Investors, LLC, is a limited liability company, which sponsored and/or participated in the 2004 leveraged buyout of Mervyn's and related transactions.

7.  Defendant SCSF Mervyn's (US), LLC, is a limited liability company which sponsored and/or participated in the 2004 leveraged buyout of Mervyn's and related transactions.

8.  Defendant SCSF Mervyn's (Offshore), Inc., is a corporation, which sponsored and/or participated in the 2004 leveraged buyout of Mervyn's and related transactions.

9.  Defendant KLA/Mervyn's LLC; Defendant Cerberus Mervyn's Investors, LLC; Defendant SCSF Mervyn's (US), LLC; and Defendant SCSF Mervyn's

(Offshore), Inc., are collectively referred to as the "PE Sponsors." The PE Sponsors organized Mervyn's Holdings, LLC, a Delaware limited liability company ("MH") for the purpose of acquiring Mervyn's in the transactions described below.

**The Private Equity Owners**

10. Defendant Lubert-Adler Real Estate Fund IV, LP; Defendant Lubert-Adler Real Estate Parallel Fund IV, LP; Defendant Lubert-Adler Capital Real Estate Fund IV, LP; Defendant Acadia Mervyn's Investor I, LLC; Defendant Acadia Mervyn's Investor II, LLC; Defendant Mervyn's Klaff Equity, LLC; and Defendant Mervyn's Opportunities, LLC, own, in the aggregate all of the equity in Defendant KLA/Mervyn's LLC.

11. Defendant Lubert-Adler and Klaff Partners, LP, is the direct or indirect owner of Defendant KLA/Mervyn's LLC; Defendant Lubert-Adler Real Estate Fund IV, LP; Defendant Lubert-Adler Real Estate Parallel Fund IV, LP Defendant Lubert-Adler Capital Real Estate Fund IV, LP; Defendant Acadia Mervyn's Investor I, LLC; Defendant Acadia Mervyn's Investor II, LLC; Defendant Mervyn's Klaff Equity, LLC; and Defendant Mervyn's Opportunities, LLC.

12. Defendant Cerberus Partners, LP; Defendant Gabriel Capital, LP; and/or Defendant Cerberus Associates, LLC, own, in the aggregate, all of the equity in Defendant Cerberus Mervyn's Investors, LLC.

13. Defendant Cerberus Capital Management, LP ("Cerberus"), is the direct or indirect owner of Defendant Cerberus Mervyn's Investors, LLC; Defendant Cerberus Partners, LP; Defendant Cerberus Associates, LLC, Defendant Gabriel Capital, LP, Defendant Ableco (defined below); and Defendant Madeleine (defined below).

14.     Defendant Sun Capital Securities Offshore Fund, Ltd., owns all of the equity in Defendant SCSF Mervyn's (Offshore), Inc.

15.     Defendant Sun Capital Securities Fund, LP, owns all of the equity in Defendant SCSF Mervyn's (US), LLC.

16.     Defendant Sun Capital Partners, Inc., is the direct or indirect owner of Defendant SCSF Mervyn's (US), LLC; Defendant SCSF Mervyn's (Offshore), Inc.; Defendant Sun Capital Securities Offshore Fund, Ltd.; and Defendant Sun Capital Securities Fund, LP.

17.     Defendant Lubert-Adler Real Estate Fund IV, LP; Defendant Lubert-Adler Real Estate Parallel Fund IV, LP; Defendant Lubert-Adler Capital Real Estate Fund IV, LP; Defendant Acadia Mervyn's Investor I, LLC; Defendant Acadia Mervyn's Investor II, LLC; Defendant Mervyn's Klaff Equity, LLC; Defendant Mervyn's Opportunities, LLC; Defendant Lubert-Adler and Klaff Partners, LP; Defendant Cerberus Partners, LP; Defendant Gabriel Capital, LP; Defendant Cerberus Capital Management, LP; Defendant Cerberus Associates, LLC; Defendant Sun Capital Securities Offshore Fund, Ltd.; Defendant Sun Capital Securities Fund, LP; and Defendant Sun Capital Partners, Inc., are collectively referred to as the "PE Owners."

**The MDS Companies**

18.     Defendant MDS Realty Holdings I, LLC ("Holdings I"), is a limited liability company owned and organized by the PE Sponsors in connection with the 2004 leveraged buyout of Mervyn's and related transactions.

19.     Defendant MDS Realty Holdings II, LLC ("Holdings II"), is a limited liability company owned and organized by the PE Sponsors in connection with the 2004 leveraged buyout of Mervyn's and related transactions.

20.     Defendant MDS Realty I, LLC ("Realty I"), is a limited liability company directly or indirectly owned and organized by the PE Sponsors in connection with the 2004 leveraged buyout of Mervyn's and related transactions.

21.     Defendant MDS Realty II, LLC ("Realty II"), is a limited liability company directly or indirectly owned and organized by the PE Sponsors in connection with the 2004 leveraged buyout of Mervyn's and related transactions.

22.     Defendant MDS Realty III, LLC ("Realty III"), is a limited liability company directly or indirectly owned and organized by the PE Sponsors in connection with the 2004 leveraged buyout of Mervyn's and related transactions.

23.     Defendant MDS Realty IV, LLC ("Realty IV"), is a limited liability company directly or indirectly owned and organized by the PE Sponsors in connection with the 2004 leveraged buyout of Mervyn's and related transactions.

24.     Defendant MDS Texas Realty I, LP ("Texas Realty I"), is a limited partnership directly or indirectly owned and organized by the PE Sponsors in connection with the 2004 leveraged buyout of Mervyn's and related transactions.

25.     Defendant MDS Texas Realty II, LP ("Texas Realty II"), is a limited partnership directly or indirectly owned and organized by the PE Sponsors in connection with the 2004 leveraged buyout of Mervyn's and related transactions.

26.     Defendant MDS Texas Realty I, LLC ("TR-I"), is a limited liability company directly or indirectly owned and organized by the PE Sponsors in connection with the 2004 leveraged buyout of Mervyn's and related transactions.

27.     Defendant MDS Texas Realty II, LLC ("TR-II"), is a limited liability company directly or indirectly owned and organized by the PE Sponsors in connection with the 2004 leveraged buyout of Mervyn's and related transactions.

28.     Defendant MDS Texas Properties I, LLC ("Texas Properties I"), is a limited liability company directly or indirectly owned and organized by the PE Sponsors in connection with the 2004 leveraged buyout of Mervyn's and related transactions.

29.     Defendant MDS Texas Properties II, LLC ("Texas Properties II"), is a limited liability company directly or indirectly owned and organized by the PE Sponsors in connection with the 2004 leveraged buyout of Mervyn's and related transactions.

30.     Defendants Holdings I, Holdings II, Realty I, Realty II, Realty III, Realty IV, Texas Realty I, Texas Realty II, TR-I, TR-II, Texas Properties I and Texas Properties II are referred to collectively as the "MDS Companies."

**The Real Estate Secured Lenders**

31.     Defendant Greenwich Capital Financial Products, Inc., is a corporation which, directly and/or through its affiliates, provided secured financing to the MDS Companies for the benefit of the PE Sponsors, the PE Owners, and the MDS Companies in connection with a 2004 leveraged buyout of Mervyn's and related transactions.

32.     Defendant Archon Financial, LP, is a limited partnership which, directly and/or through its affiliates, provided secured financing to the MDS Companies for the benefit of the PE Sponsors and the MDS Companies in connection with a 2004 leveraged buyout of Mervyn's and related transactions.

33.     Defendant Goldman Sachs Mortgage Company is a corporation which, directly and/or through its affiliate Defendant Archon Financial, LP, provided secured financing to the MDS Companies for the benefit of the PE Sponsors, the PE Owners, and the MDS Companies in connection with a 2004 leveraged buyout of Mervyn's and related transactions.

34.     Defendant LaSalle Bank National Association is a trustee or nominee which, directly and/or through its affiliates, provided secured financing to the MDS Companies for the benefit of the PE Sponsors, the PE Owners, and the MDS Companies in connection with a 2004 leveraged buyout of Mervyn's and related transactions.

35.     Defendant Greenwich Capital Financial Products, Inc.; Defendant Archon Financial, LP; Defendant Goldman Sachs Mortgage Company; and Defendant LaSalle Bank National Association are referred to collectively as the "Real Estate Secured Lenders."

**The Selling Shareholder**

36.     Defendant The Target Corporation ("Target") is a corporation which sold Mervyn's to an acquisition vehicle - - MH - - owned by the PE Sponsors (and controlled by the PE Owners) in the 2004 transaction described below and which had

knowledge of, participated in, or acquiesced in all of the arrangements comprising such transaction.

**Other Defendants**

37.      Defendant Ableco Finance LLC ("Ableco") and Defendant Madeleine LLC ("Medeleine") are affiliates of Defendant Cerberus and were potential lenders for the 2004 transaction.

**Jurisdiction and Venue**

38.      The Court has jurisdiction over this action under 28 U.S.C. sections 157(a) and 1334.  This proceeding is a core proceeding within the meaning of 28 U.S.C. Section 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. sections 1408 and 1409.

**Background**

39.      On July 29, 2008 (the "Petition Date"), Mervyn's, Mervyn's Holdings LLC ("MH"), and Mervyn's Brands LLC ("Mervyn's Brands") (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to Bankruptcy Code Sections 1107(a) and 1108.  No trustee or examiner has been appointed in the Debtors' cases.

40.      On August 11, 2008, the United States Trustee for the District of Delaware appointed the statutory committee of unsecured creditors (the "Creditors' Committee").

41.      Mervyn's is a family-friendly, promotional department store that offers trend-right fashion and home décor at affordable prices.

42.     As of the Petition Date, Mervyn's employed more than 18,000 people and operated 177 retail stores in California and six states in the southwestern United States. Mervyn's retail stores average 80,000 retail square feet and are located primarily in community shopping centers, regional malls and freestanding locations. Through these retail stores, Mervyn's sells its extensive selection of national brands and private-label apparel and housewares.

43.     For the fiscal year ended February 2, 2008, Mervyn's recorded net sales of approximately $2,500,000,000 and incurred a net loss of approximately $64,000,000.

44.     Mervyn's and Mervyn's Brands are parties to that certain Loan and Security Agreement, dated September 2, 2004, by and among Mervyn's, as borrower, Mervyn's Brands as guarantor, Wachovia Capital Finance Corporation (Western) (as successor to Congress Financial Corporation (Western)), as administrative agent and collateral agent, the lenders party thereto from time to time (the "Prepetition First Lien Lenders") and other parties thereto, under which the Prepetition First Lien Lenders provided a loan facility of up to $600,000,000 to Mervyn's (the "Prepetition Senior Loan Facility") consisting of a $550,000,000 revolving loan A facility and a $50,000,000 revolving loan B facility, each of which is subject to a borrowing base.

45.     Amounts outstanding under the Prepetition Senior Loan Facility are secured by a first priority security interest in all or substantially all of Mervyn's and Mervyn's Brands' accounts, general intangibles (including, without limitation, intellectual property), goods (including, without limitation, inventory and equipment), commercial tort claims, receivables, real property and fixtures, chattel paper, instruments,

documents and credit card sales drafts, credit card sales slips, charge slips or receipts and other forms of store receipts, deposit accounts, letters of credit, bankers acceptances and similar instruments (including letter of credit rights, supporting obligations and present and future liens, security interests, rights, remedies, title and interest in, to and in respect of receivables and other collateral), investment property, monies, credit balances and other similar property, records, all products and proceeds of the foregoing, and Mervyn's membership interests in Mervyn's Brands (the "Prepetition Collateral"). As of the Petition Date, an aggregate amount of approximately $329,381,571.02, plus interest, costs and expenses, was outstanding under the Prepetition Senior Loan Facility.

46.     In addition to the Prepetition Senior Loan Facility, Mervyn's is party to that certain Subordinated Promissory Note in the aggregate principal amount of $30,000,000, dated as of November 27, 2007 (the "SCSF Note"), by and among Mervyn's, as borrower, and SCSF Mervyn's (Offshore), Inc. and SCSF Mervyn's (US), LLC, as lenders. The SCSF Note is guaranteed by Mervyn's Brands, and the obligations of Mervyn's and Mervyn's Brands thereunder are secured by a second lien in the Prepetition Collateral.

47.     Mervyn's has entered into post-petition financing arrangements with the Prepetition First Lien Lenders pursuant to a Ratification and Amendment Agreement entered into between the Debtors and the Prepetition First Lien Lenders with respect to the Prepetition Senior Loan Facility. The Ratification and Amendment Agreement was approved by the Bankruptcy Court on an interim basis on July 31, 2008, and on a final basis on August 26, 2008.

48.     Prior to the Petition Date, during the first quarter of 2008, Mervyn's instituted a long-term turnaround plan designed to differentiate itself from its competitors, grow sales, and improve store productivity, and thereby improve profitability and cash flow. However, as a result of various factors, including increased occupancy costs and inadequate capital resulting from the 2004 transaction, the ability of Mervyn's to pay its suppliers, to maintain an uninterrupted flow of merchandise into the stores, and to service its own debt was severely negatively impacted. Based upon these and other considerations, Mervyn's and other Debtors elected to seek voluntary relief under Chapter 11 in order to restructure or reorganize their affairs.

49.     Mervyn's traces its roots to a mid-range department store opened by Mervin Morris in San Lorenzo, California in 1949, and has grown over the last 60 years into what is currently a 177-store chain of department stores. Mervyn's was incorporated in 1954 and, in 1978, became a wholly-owned subsidiary of Dayton Hudson Corporation (now known as Target Corporation or Target).

50.     During 2004, Defendant Target decided to sell or otherwise realize upon the value of Mervyn's. To do this, Target engaged Goldman Sachs as its investment banker, prepared a confidential offering memorandum, and eventually accepted a bid from affiliates of Defendant Sun Capital Partners, Inc. ("Sun"); Defendant Cerberus Capital Management, L.P. ("Cerberus") and Defendant Lubert-Adler and Klaff Partners, L.P. ("KLA") to purchase Mervyn's.

51.     On or about August 27, 2004, Target converted Mervyn's from a corporation into a California limited liability company in conjunction with the transaction described herein between Target and MH. As already described, MH is a Delaware

limited liability company that was formed by affiliates of Sun, Cerberus and KLA for the purpose of purchasing Mervyn's from Target. These affiliates -- Defendant SCSF Mervyn's (US), LLC; Defendant SCSF Mervyn's (Offshore), Inc.; Defendant Cerberus Mervyn's Investors, LLC and Defendant KLA/Mervyn's LLC -- are the Defendant PE Sponsors.

### Overview of the 2004 Transaction

52.     The 2004 transaction between MH and Target was a leveraged buyout ("LBO").

53.     In general, an LBO is a method of acquiring a company by which the acquirer borrows against the assets of the target company in order to finance the purchase of the target company's shares from the selling shareholder. Much of the equity in the acquired company is typically replaced by debt, and the company's capital structure changes such that former shareholders of the company are replaced by secured creditors. From the perspective of unsecured creditors, LBO's may be disadvantageous because such creditors bear the increased risk that the LBO will leave the acquired company in a financial condition which leads to bankruptcy.

54.     In 2004, the PE Sponsors, through MH, purchased Mervyn's from Target pursuant to a plan they conceived for a series of simultaneous, integrated transactions that, as a matter of economic substance, were similar to a LBO. In a traditional LBO structure, Mervyn's would have retained its assets and incurred the debt normally associated with a leveraged transaction, and Mervyn's also would have retained, for its own benefit, the residual value of its assets in excess of the debt placed against those assets and, in addition, those assets would have remained with Mervyn's

following repayment of the debt. Here, however, while the financing did not directly result in debt being placed on Mervyn's, its real estate assets and the residual value of those assets were stripped away from Mervyn's and Mervyn's incurred substantial additional obligations (as described below) in order to pay the substantial debt that was incurred to finance the transaction. After repayment of the debt, the assets will not be returned to Mervyn's. Those assets are gone. To effect the complete separation of Mervyn's valuable real estate assets from Mervyn's, the PE Sponsors formed the defendant MDS Companies -- bankruptcy remote entities specially created by the PE Sponsors for delivery of Mervyn's real estate assets -- and, at the closing of the 2004 transaction, caused Mervyn's to transfer virtually all of its real estate assets (leasehold interests and fee interests) to the newly-formed MDS Companies. The MDS Companies, in concurrent and related transactions, encumbered those transferred assets in exchange for loans made by the Real Estate Secured Lenders to the MDS Companies. All or substantially all of the loan proceeds were paid over to Target. None of the loan proceeds were paid or delivered to Mervyn's or used for its benefit. The remaining real estate assets, consisting of certain leases that were not assignable (the "Restricted Leases") stayed with Mervyn's.

55.     As a consequence of the interrelated transfers that were implemented at the closing of the 2004 transaction by and for the benefit of the PE Sponsors (and, consequently, for the benefit of the PE Owners), all of Mervyn's retail store locations (other than the stores subject to the Restricted Leases) were made subject to three (3) Unitary Leases that were created in the 2004 transaction. The Unitary Leases were created by the transfer of all of Mervyn's real estate assets (other than the Restricted

Leases) from Mervyn's to the MDS Companies, the simultaneous bundling of those assets together into the Unitary Leases, and the leasing of the right to occupy those same premises back to Mervyn's. The rents charged to Mervyn's under the Unitary Leases (which also include rents that are now being charged to Mervyn's with respect to properties that prior to the closing had been owned by Mervyn's) are substantially greater than what had been charged to Mervyn's immediately before the transaction. The mark-up of Mervyn's leases "to market" (without any justification for, or consideration paid to Mervyn's on account of, such mark-ups) reflects an increase of the below market rents that Mervyn's had enjoyed by virtue of its leverage as an anchor tenant or because of the age of its leases. The PE Sponsors have stated that Mervyn's occupancy costs have been increased to what they contend are the market rents that Mervyn's would have paid if new leases were entered into for all of Mervyn's stores. With respect to the owned properties that were transferred to the MDS Companies, Mervyn's is now charged rent although before the transfer it did not pay rent because it was the property owner. The foregoing actions were orchestrated by the PE Sponsors for the benefit of themselves and the PE Owners, with the knowledge, participation, or acquiescence of Target and the Real Estate Secured Lenders - - all of whom profited or benefited from such actions.

56.     Under arrangements also put into place in the 2004 transaction, in addition to the rents it pays to its landlords under the Restricted Leases that could not be transferred to the MDS Companies at closing, Mervyn's makes additional payments to MH with respect to the Restricted Leases (sometimes referred to as "notional rent") that is in turn paid by MH to the Real Estate Secured Lenders. These additional payments are in an amount that was intended by the PE Sponsors to reflect the rent mark-up that would

have been imposed by the MDS Companies on Mervyn's had the Restricted Leases been transferred to the MDS Companies for bundling into the Unitary Leases and leased back to Mervyn's at the time of the closing of the 2004 transaction. The notional rent payments are made by Mervyn's to MH as special distributions under the limited liability agreement of Mervyn's and then distributed to the PE Sponsors under the terms of the limited liability agreement for MH. The PE Sponsors, in turn, pay over the notional rent to the Real Estate Secured Lenders. The provisions in the limited liability agreements requiring the notional rent payments were put into effect as part of the formation documents for those entities at the time of the 2004 transaction. As with the transfers of the real estate assets from Mervyn's and the creation of the Unitary Leases, the arrangements for the payment of notional rent on the Restricted Leases were made by the PE Sponsors for the benefit of themselves and the PE Owners, with the knowledge, participation, or acquiescence of Target and the Real Estate Secured Lenders - - all of whom profited or benefited from such arrangements.

57.    Although the rents charged to Mervyn's under the Unitary Leases are alleged by the PE Sponsors to be at "market rates," this statement ignores the facts that before the 2004 transaction, Mervyn's either owned its store locations and paid no rent or it leased its store locations at lease rates that in many instances were below market.

58.    As a result of the increased rent burden imposed upon Mervyn's by reason of the mark-ups embedded in the Unitary Leases and the notional rent payments made with respect to the Restricted Leases, Mervyn's has aggregate annual rent expense in excess of $172,000,000, which far exceeds (by as much as approximately

$80,000,000) what its annual occupancy expenses would have been had its real estate assets not been transferred, bundled and leased back to it at higher rates as described, and had the notional rents not been imposed on it.

## The Equity Purchase Agreement

59.     On or about July 29, 2004, MH, an acquisition vehicle owned and controlled by the PE Sponsors, entered into that certain Equity Purchase Agreement, dated as of July 29, 2004 (the "EPA"), with Target.

60.     The EPA was a stock purchase agreement as opposed to an asset purchase agreement. Pursuant to the EPA, MH acquired all of the outstanding equity securities (the "Securities") of Mervyn's from Target.

61.     Immediately before MH's acquisition of the Securities from Target, as required under the EPA, Target converted Mervyn's from a California corporation to a California limited liability company.

62.     The purchase price paid by MH to Target for the Securities was $1,175,000,000 in cash, subject to adjustments as set forth in the EPA (the "Purchase Price"). The closing of the EPA occurred on September 2, 2004.

## Source of Funds

63.     The funds for the 2004 transaction came from three sources:

- Pursuant to that certain Loan Agreement dated as of September 2, 2004, Greenwich and Archon, as lenders (the "Senior Real Estate Secured Lenders"), advanced $675,000,000 to Realty I, Realty II, Texas Realty I and Texas Realty II. Repayment of these loans was secured by the Unitary Leases held by the listed borrowers, and mortgages, liens, assignments of rents and deeds of trust with respect to the real estate assets that had been transferred to the borrowers by Mervyn's. All or substantially all of the loan

proceeds were used by MH on behalf or for the benefit of the PE Sponsors to pay the Purchase Price under the EPA.

- Pursuant to that certain Mezzanine Loan Agreement dated as of September 2, 2004, Greenwich and GS Mortgages (the "Mezzanine Real Estate Secured Lenders"), advanced $125,000,000 to Holdings I, Holdings II, Texas Properties I and Texas Properties II. Repayment of these loans were secured by the Unitary Leases held by the listed borrowers, and mortgages, liens, assignments of rents, and deeds of trust with respect to the real estate assets that had been transferred to the borrowers by Mervyn's. All or substantially all of the loan proceeds were used by MH on behalf or for the benefit of the PE Sponsors to pay the Purchase Price under the EPA.

- Pursuant to that certain Securities Purchase Agreement, dated as of September 2, 2004, the PE Sponsors purchased 100% of the interests in Holdings I and Holdings II for $429,746,414.84. At the closing of the EPA, these funds were used by MH on behalf or for the benefit of the PE Sponsors to pay the Purchase Price under the EPA.

64. A summary of the sources of uses of cash at closing is as follows:

**(Dollars in $000's)**

| Sources | | | Uses | |
|---|---|---|---|---|
| PE Sponsor Contribution - - Retail Co. | $ | 25,000 | Payment to Target | 1,175,230 |
| PE Sponsor Contribution - - Real Estate Cos. | | 429,746 | Fees and Expenses | 58,623 |
| Real Estate Secured Senior Loan | | 675,000 | Carry Reserve | 30,000 |
| Real Estate Secured Mezz Loan | | 125,000 | | |
| Retail Borrowings (Congress) | | 9,107 | | |
| **Total Sources** | $ | 1,263,853 | **Total Uses** | $1,263,853 |

65. Of the $1,263,853,000 distributed at the closing of the EPA, $1,175,230,000 was paid to Target and only $8,300,000 was paid or allocated to Mervyn's, despite Mervyn's losing all of its real estate assets.[1] More than $58,000,000 was paid to the PE Sponsors, their professionals and others as "fees" at the closing.

---

[1] Source for the $8,300,000 is footnote to the January 29, 2005 Mervyn's LLC and Subsidiaries Consolidated Audited Financial Statements prepared by KPMG LLP.

66.     Since the date of the closing of the EPA, in addition to stripping out Mervyn's valuable real estate assets, the PE Sponsors, for their own benefit and for the benefit of the PE Owners, have taken more than $400,000,000 in payments or distributions from Mervyn's.[2]

67.     In order to obtain the funds to acquire the Securities from Target, the PE Sponsors, through MH, orchestrated a series of related transactions that had the effect of stripping valuable real estate assets from Mervyn's for no consideration and encumbering these assets with $800,000,000 of debt.[3] These actions are outlined below.

**Step 1 - - Formation of MDS Companies**

68.     In order to accomplish the separation of Mervyn's valuable real estate assets from its retail business, the PE Sponsors, through their ownership and control of MH, caused the following special purpose entities -- the MDS Companies -- to be formed to take over Mervyn's real estate and lease it back to Mervyn's, to occur concurrently with MH's acquisition of the Securities:

- MDS Realty Holdings I, LLC, a Delaware limited liability company ("Holdings I"), was formed on August 20, 2004. Its sole equity members at the time of formation were the PE Sponsors.

- MDS Realty Holdings II, LLC, a Delaware limited liability company ("Holdings II"), was formed on August 20, 2004. Its sole equity members at the time of formation were the PE Sponsors.

---

[2] These withdrawals are still under investigation by Mervyn's and it reserves all rights as to the timing, propriety and amounts of these transfers.

[3] The Loan Agreement and Mezzanine Loan Agreement were refinanced in December 2005, following the disposition of certain of the real estate assets from the portfolio transferred to the MDS Companies at the closing. At the time of the refinance, the debt was increased to $950,000,000 even though there were fewer real estate assets to serve as collateral. This fact alone shows the enormous value of Mervyn's real estate assets.

- MDS Realty I, LLC, a Delaware limited liability company ("Realty I"), was formed on August 20, 2004. Its sole equity member at formation was MDS Realty Holdings I, LLC.

- MDS Realty II, LLC, a Delaware limited liability company ("Realty II"), was formed on August 20, 2004. Its sole equity member at formation was MDS Realty Holdings II, LLC.

- MDS Realty III, LLC, a Delaware limited liability company ("Realty III"), was formed on August 20, 2004. Its sole equity member at the time of formation was MDS Realty I, LLC.

- MDS Realty IV, LLC, a Delaware limited liability company ("Realty IV"), was formed on August 20, 2004. Its sole equity member at the time of formation was MDS Realty II, LLC.

- MDS Texas Realty I, LP, a Texas limited partnership ("Texas Realty I"), was formed on September 2, 2004. At formation, the general partner was MDS Texas Realty I, LLC, a Delaware limited liability company, and its limited partner was MDS Texas Properties I, LLC, a Delaware limited liability company.

- MDS Texas Realty I, LLC, a Delaware limited liability company ("TR-I"), was formed on August 20, 2004. Its sole equity member at formation was MDS Realty Holdings I, LLC.

- MDS Texas Properties I, LLC, a Delaware limited liability company ("Texas Properties I"), was formed on August 20, 2004. Its sole equity member at formation was MDS Realty Holdings I, LLC.

- MDS Texas Realty II, LP, a Texas limited partnership ("Texas Realty II"), was formed on September 2, 2004. At formation, it general partner was MDS Texas Realty II, LLC, a Delaware limited liability company, and its limited partner was MDS Texas Properties II, LLC, a Delaware limited liability company.

- MDS Texas Realty II, LLC, a Delaware limited liability company ("TR-II"), was formed on August 20, 2004. Its sole equity member at formation was MDS Texas Properties II, LLC.

- MDS Texas Properties II, LLC, a Delaware limited liability company ("Texas Properties II"), was formed on August 20, 2004. Its sole equity member at formation was MDS Realty Holdings I, LLC.

For convenience, Holdings I and Holdings II are hereinafter referred to as the "Realty Parents;" and Realty I, Realty II, Realty III, Realty IV, Texas Realty I and Texas Realty II are hereinafter each, individually, referred to as a "Realty Owner" and collectively as the "Realty Owners." Together, the Realty Parents and the Realty Owners (along with TR-I and TR-II) comprise the MDS Companies.

69.     Each of the MDS Companies was established as a bankruptcy remote special purpose entity to, among other things, shield those entities from exposure to Mervyn's creditors. A "true lease" legal opinion regarding the intended inviolability of the Unitary Leases in any future bankruptcy filed by Mervyn's was given to the Real Estate Secured Lenders by the attorneys representing the MDS Companies and the PE Sponsors in connection with the closing and funding of the $800,000,000 of loans made under the Loan Agreement and the Mezzanine Loan Agreement to assure those lenders that the scheme being put into place at the integrated closing of the EPA and the secured loans would prevent Mervyn's or its creditors from ever reaching or taking control of the real estate assets that had been stripped away from Mervyn's and transferred to the MDS Companies. The requirement that the MDS Companies be established as bankruptcy-remote entities also demonstrates the intent of the parties to ensure that neither Mervyn's nor its creditors could ever reach the real estate assets stripped out of Mervyn's or the $800,000,000 of loan proceeds carefully siphoned away from Mervyn's, and to prevent Mervyn's from using the real estate assets to avoid bankruptcy or to pay its creditors as its debts became due.

## Step 2 - - The Agency Agreement and the Transfer of the Real Estate Assets

70.     In order to strip the real estate assets out of Mervyn's, MH used the MDS Companies to institute a series of interrelated transfers that occurred at the split-second of the closing of the EPA.  The road map used by MH was the Agency Agreement, dated as of September 2, 2004, between and among MH and each of the MDS Companies.  Pursuant to the Agency Agreement, MH was engaged to function as the "agent" for the MDS Companies to acquire the real estate assets on behalf of and for the benefit of the MDS Companies.  The steps undertaken pursuant to the Agency Agreement were as follows:

- At the direction of the Realty Parents (who were owned, controlled and dominated by the PE Sponsors), contemporaneously with MH's acquisition of the ownership interests in Mervyn's from Target under the EPA, MH (as the duly authorized organizer of Realty I and Realty II) assigned to Mervyn's all the equity interests of Realty I (the owner of all the equity interests of Realty III) and Realty II (the owner of all the equity interest of Realty IV) so that (for a split-second) such entities became wholly-owned subsidiaries of Mervyn's.

- At the direction of the Realty Parents and Realty Owners (who were also owned, controlled and dominated by the PE Sponsors), contemporaneously with MH's acquisition of the ownership interests in Mervyn's from Target under the EPA, MH caused Mervyn's to transfer to the Realty Owners its interests and rights in its owned parcels (the "Fees"), its transferable leases (the "Leases"), and its leases subject to restrictions on transfer (the "Restricted Leases") provided the restrictions had been lifted at the time of the closing of the EPA.

- Certain Fees and Leases as specified by the PE Sponsors were conveyed from Mervyn's to Realty I.

- Certain Fees and Leases as specified by the PE Sponsors were conveyed from Mervyn's to Realty II.

- Certain Leases as specified by the PE Sponsors were assigned from Mervyn's to Realty III.

- Certain Leases as specified by the PE Sponsors were assigned from Mervyn's to Realty IV.

- Certain Fees and Leases as specified by the PE Sponsors were conveyed from Mervyn's to Texas Realty I.

- Certain Fees and Leases as specified by the PE Sponsors were conveyed from Mervyn's to Texas Realty II.

71. Immediately upon making the conveyances and transfers identified above:

- MH caused the equity interests in Realty I to be conveyed back to Holdings I.

- MH caused the equity interests in Realty II to be conveyed back to Holdings II.

72. The Restricted Leases stayed with Mervyn's, but MH was obligated under the Agency Agreement to cause Mervyn's to seek to remove the transfer restrictions and to transfer the Restricted Leases to the Realty Owners upon removal of the restrictions.

73. In sum:

- Mervyn's real estate assets were transferred from Mervyn's to the Realty Owners.

- The Realty Owners are owned and controlled by the Realty Parents.

- The Realty Parents are owned and controlled by the PE Sponsors.

- The PE Sponsors own and control MH.

- MH owns and controls Mervyn's.

- Mervyn's was paid nothing for the transfer.

74. Mervyn's did not receive or retain any consideration for these transfers. All of the funds borrowed by the MDS Companies or contributed by the PE Sponsors to the MDS Companies were paid to Target as part of the Purchase Price for the Securities under the EPA or paid as fees to the PE Sponsors or their professionals.

75. As stated above, the MDS Companies borrowed $800,000,000 from the Real Estate Secured Lenders and made those funds available to MH to purchase the Securities from Target. The Agency Agreement appears to be part of a fictitious or complex web of agreements used by the PE Sponsors to make it appear as though MH had served as the agent of the MDS Companies and acquired Mervyn's real estate assets from Target while acting solely as their agent. Contrary to the fiction and appearance they were seeking to create, the MDS Companies and Target were not in privity of contract - - the EPA was solely between MH and Target. Therefore, the documents used to paper the transaction seem designed to create the appearance of back-to-back assignments in which MH caused the "rights" to the real estate assets under the EPA to be simultaneously assigned from MH to Mervyn's and from Mervyn's to the MDS Companies. This paper trail was apparently designed to make it appear as though the MDS Companies were purchasing the real estate assets from Target through use of their "agent" MH, which was not the economic reality at all, because the real estate assets were owned by Mervyn's and Mervyn's was paid nothing for those assets. These "assignments" were accomplished pursuant to an Agreement of Assignment dated as of September 2, 2004, between MH and Mervyn's and a second Agreement of Assignment dated as of September 2, 2004, between Mervyn's and the MDS Companies. The assignments of the "rights" to the real estate assets under the EPA pursuant to the

foregoing Agreements of Assignment are another fiction because the EPA is a stock purchase agreement not an asset purchase agreement and therefore the EPA does not address Mervyn's real estate assets (or any other assets of Mervyn's) on a particularized basis. The "seller" under the EPA is Target and Target is selling its Securities in the Mervyn's limited liability company to MH. These multiple transfers and transactions are complex machinations that seem to have no purpose or effect other than to attempt to obscure the blatantly fraudulent transfer that occurred at the closing of the 2004 transaction.

76.     Mervyn's began the day of the closing with more than $1,000,000,000 of real estate and, within the blink of an eye, it was gone. Mervyn's received nothing in return.

### Step 3 - - Bundling of the Real Estate Assets and Creation of the Unitary Leases

77.     Concurrently with the transfer of the real estate assets by Mervyn's to the MDS Companies, the real estate assets formerly owned by Mervyn's were bundled by the MDS Companies into three (3) Unitary Leases and leased back to Mervyn's, to enable Mervyn's to continue to occupy the various premises: Unitary Lease by and between Realty II, Texas Realty II, and Realty IV, as landlord, and Mervyn's as tenant ("Unitary Lease I"); Unitary Lease by and between Realty II, as landlord, and Mervyn's, as tenant ("Unitary Lease II"), and Unitary Lease by and between Realty I, Texas Realty I, Realty II, Texas Realty II, Realty III, and Realty IV, as landlord, and Mervyn's, as tenant (the "Unitary Lease III").

78.     The Annual Basic Rent under Unitary Lease I is stated as $46,115,448; the Annual Basic Rent under Unitary Lease II is stated as $2,940,281; and

the Annual Base Rent under Unitary Lease III is stated as $2,137,033. In addition, each Unitary Lease provides for the payment by Mervyn's of percentage rent, CAM charges, and impositions (i.e., taxes) and the payment of all base, fixed and additional rents that are payable pursuant to the terms of all of the "Overleases" (i.e., the original underlying leases between Mervyn's and the original landlords).[4] Based upon just the Annual Base Rent of the Unitary Leases alone, the increased occupancy costs to Mervyn's in excess of Mervyn's occupancy expenses before the 2004 transaction were approximately $50,000,000. This increase consisted of a surcharge representing the amount selected by the PE Sponsors in order to mark-up to "market" the rents provided for in the Overleases - - rent that Mervyn's still had to pay to the underlying landlords in addition to the surcharge imposed by the Unitary Leases - - and the rent that was now being charged to Mervyn's to occupy the fee properties that had been owned by Mervyn's before the transfers and as to which Mervyn's, qua owner, had not had to pay rent in the past. When notional rent for the Restricted Leases and other, additional, charges are added, the increased occupancy expense to Mervyn's was approximately $80,000,000 per year.[5]

### Step 4 - - The Restricted Leases

79.     In order to circumvent transfer restrictions in the Restricted Leases, but at the same time to extract from Mervyn's with respect to these un-transferred leases

---

[4] The Overleases remain in effect. Mervyn's pays rent into a lock box designated by the MDS Companies and controlled by the Real Estate Secured Lenders. Mervyn's rent payments are in an amount equal to the sum of what it owes to its original landlords plus the mark-ups imposed by the Unitary Leases. The MDS Companies make the payments to the underlying landlord and retain the "vig" for the benefit of the PE Sponsors and the PE Owners.

[5] The Unitary Leases were amended and restated in December 2005, and there are currently only two Unitary Leases in effect.

the same economics as the mark-ups on the leases and fee interests that had been transferred to the MDS Companies, the PE Sponsors used MH (as the 100% owner of Mervyn's) to cause Mervyn's to be bound by section 8.5 of its Limited Liability Operating Agreement to distribute to MH "as a priority distribution" from "Retail Net Cash flow" an amount equal to the additional rent that would have been charged to Mervyn's on top of the rent it was already paying for the Restricted Lease store location had the Restricted Lease been transferable on September 2, 2004, and bundled into a Unitary Lease.[6] Mervyn's received no consideration for having this obligation imposed upon it and derived no benefit from being required to pay it.

80.    A parallel provision of the Limited Liability Company Agreement for MH (section 9.5) provides that so long as the Restricted Leases are held by Mervyn's, the distributions made by Mervyn's to MH as required under Section 8.5 of Mervyn's Limited liability Company Agreement would be distributed to the PE Sponsors.  Upon information and belief, the PE Sponsors have executed letters of agreement with the Real Estate Secured Lenders that require the PE Sponsors to pay over those "Special Distributions" related to the Restricted Leases to the Real Estate Secured Lenders.

### Step 5 - - The Leverage

81.    As noted in paragraphs 63 and 77 above, concurrent with the transfer of the real estate assets to the MDS Companies and the creation of the Unitary Leases, the real estate assets were used as collateral security to support $800,000,000 of secured loans borrowed from the Real Estate Secured Lenders.  All or substantially all of

---

[6] In practice, Mervyn's makes the notional rent payments directly to the PE Sponsors.

the proceeds of the loans were used by MH to pay Target for the Securities that MH purchased under the EPA.

82. Mervyn's provided the collateral but received none of the loan proceeds.

### Step 6 - - Final Separation of Real Estate Assets from Mervyn's

83. Also concurrent with the transfers of the real estate assets that occurred on September 2, 2004, the PE Sponsors caused MH to cause Mervyn's to sell, assign, and transfer (i) 100% of its membership interests in Realty I to Holdings I and (ii) 100% of its membership interests in Realty II to Holdings II. As a result of the foregoing transfers of membership interests, Realty I and Realty II were converted from wholly-owned subsidiaries of Mervyn's to wholly-owned subsidiaries of the Realty Parents -- Holdings I and Holdings II. Because Realty I owned 100% of the interests in Realty III, and Realty II owned 100% of the interests in Realty IV, those entities also moved away from Mervyn's and over to the MDS Companies at the time of the closing of the EPA. In fact, it appears that Realty I, II, III, and IV, moved from Holdings I and II to Mervyn's and then back to Holdings I and II at the precise moment of the closing.

84. The amputation of the real estate legs from the body of the retail operations was complete -- and it was all done in a split-second series of concurrent transfers orchestrated by the PE Sponsors for the benefit of themselves and the PE Owners, with the knowledge, participation, or acquiescence of Target and the Real Estate Secured Lenders - - all of whom profited or benefited from such transfers.

## The Negative Effects on Mervyn's

85.     The results for Mervyn's were devastating.  In order to both service the $800,000,000 debt incurred by the MDS Companies to the Real Estate Secured Lenders under the Senior Loan Agreement and the Mezzanine Loan Agreement, and to fully extract the value of the real estate assets from Mervyn's, several adjustments had to be made -- all to the detriment of Mervyn's.

86.     First, the store leases were marked up to "market rates," bundled together, and leased back to Mervyn's through the Unitary Leases.  As a result, the rent that Mervyn's had been paying under the un-bundled leases was increased by the PE Sponsors in an amount sufficient to service the massive debt placed on the MDS Companies to fund MH's acquisition of the Securities and to also generate excess cash flow for the MDS Companies and its owners (the PE Sponsors and their owners, the PE Owners).  This arrangement caused a large and detrimental increase in Mervyn's occupancy costs even though the underlying landlords had no right to increase Mervyn's rent in this manner.  The bundling under the Unitary Leases masks the actual increases because, under each Unitary Lease, Mervyn's has a single monthly basic rent payment (as well as obligations to pay percentage rent, CAM charges, taxes and other impositions).  The real estate assets transferred to the MDS Companies also included Mervyn's owned and mostly unencumbered real estate.  These formerly owned properties were now leased back to Mervyn's at "market rent" rates, likewise increasing Mervyn's occupancy costs, in this case from no rent to "market rent."  Because the Unitary Leases were triple net leases, Mervyn's now had the dual burdens of ownership and tenancy foisted upon it.

87. <u>Second</u>, because certain of Mervyn's store leases were Restricted Leases (<u>i.e.</u>, leases with restrictions on assignment or transfer that could not be transferred to the MDS Companies until the restrictions were lifted), in order to enable the MDS Companies to service the debt that was incurred to enable the PE Sponsors to pay the Purchase Price and to also siphon more value from Mervyn's, MH (as controlled by the PE Sponsors) caused Mervyn's to agree to pay to MH, as a special dividend or distribution, in addition to the rent due to each landlord under each Restricted Lease, an extra amount for each Restricted Lease equal to the mark-up that the MDS Companies would have imposed upon Mervyn's had such Restricted Lease been transferred to the MDS Companies for bundling into the Unitary Leases along with Mervyn's other store leases. This special dividend was required under the terms of Mervyn's limited liability agreement (as designed by and executed at the direction of the PE Sponsors) to be "distributed" by Mervyn's to MH. MH would distribute these payments to its "Restricted Lease Members" (<u>i.e.</u>, to the PE Sponsors) who in turn paid these funds over to the Real Estate Secured Lenders. Mervyn's received no benefit from paying the notional rent to the MDS Companies on account of the Restricted Leases.

88. <u>Third</u>, the bundling the individual Leases and Fees into "unitary" leases prevented Mervyn's from closing stores without the consent of the PE Sponsors or (more importantly) the Real Estate Secured Lenders, and would purport to prevent Mervyn's from rejecting individual store leases in any subsequent bankruptcy case.

89. <u>Fourth</u>, the bundling of the leases and the formerly owned real estate into "unitary" leases delivered massive bargaining power and leverage to the Real Estate Secured Lenders and to the PE Sponsors and left Mervyn's as a helpless pawn.

For example, if Mervyn's struggled to pay rent, a shortage of even $1.00 under a Unitary Lease imperiled all of the stores covered under that lease, while before the bundling, a shortage of $1.00 would only affect a single lease for a single store. Mervyn's was turned into little more than a vehicle to pay debt service for the benefit of the PE Sponsors who had stripped away and leveraged Mervyn's former real estate assets.

90. <u>Fifth</u>, because the PE Sponsors own both the retail operations (through its ownership of MH and Mervyn's) and the real estate assets (through its ownership of the MDS Companies), a conflict of interest exists because whenever a decision has to be made about Mervyn's, the PE Sponsors consider how to best protect the value of the real estate portfolio even if it is to the detriment of Mervyn's. For example, in one instance, in order to transfer a particular Restricted Lease, the subject lease had to be restructured as a capital lease even though the result was the addition of debt to Mervyn's balance sheet.

91. In sum, Mervyn's was disadvantaged in at least the following ways -- for the benefit of the PE Sponsors, solely to enable the PE Sponsors to leverage their purchase of the Securities using Mervyn's most valuable assets:

- Valuable real estate assets were stripped out of Mervyn's.

- Store occupancy costs were increased for no reason other than to support the debt heaped onto the MDS Companies and to line the pockets of the owners of the MDS Companies (i.e., the PE Sponsors), who (as the owners of MH) were also the ultimate owners of Mervyn's.

- Because there was excess value in the real estate assets above the debt owed to the Real Estate Secured Lenders, by physically stripping the real estate assets out of Mervyn's, the excess value was no longer part of Mervyn's capital and was not available to Mervyn's or its creditors.

- With respect to the Unitary Leases, improper distributions under the guise of rent mark-ups were required by the PE Sponsors to be made by Mervyn's to MH for the benefit of the PE Sponsors each month to enable the MDS Companies to meet debt service and to make distributions to the owners of the MDS Companies.

- With respect to the Restricted Leases, improper distributions in the form of notional rent were required by the PE Sponsors to be made by Mervyn's to MH for the benefit of the PE Sponsors each month for delivery to the MDS Companies to enable the MDS Companies to meet debt service.

92. Through their control of MH, the PE Sponsors used Mervyn's most valuable assets - - its real estate leases (many of which were below market due, in part, to Mervyn's status as an anchor tenant and due, in part, to the age of the leases) and its valuable owned real estate (mostly unencumbered) - - to borrow $800,000,000 of the Purchase Price from the Real Estate Secured Lenders.

93. Rather than simply maintaining Mervyn's retail operations and the integrated real estate assets at which the retail stores were operated intact within Mervyn's and leveraging the real estate assets as would have been done under a traditional LBO transaction, instead, the PE Sponsors insisted upon physically separating the real estate assets from Mervyn's at the moment of the closing of the EPA thereby converting Mervyn's from a retailer with valuable below market leases and valuable owned real estate into a shrunken operating company whose remaining capital consisted largely of inventory, cash, credit card receipts, and intellectual property.

94. To do this, MH caused Mervyn's to transfer its real estate assets to the newly-formed MDS Companies for no consideration and those entities simultaneously bundled the real estate assets into the Unitary Leases, leased the affected properties back to Mervyn's at increased rates, and hypothecated the Unitary Leases and

other real estate assets to the Real Estate Secured Lenders as collateral security for the repayment of $800,000,000 of loans used by MH to purchase the Securities from Target.

95.     The result of the foregoing was to bleed Mervyn's dry in the years following the closing of the EPA.

**The PE Sponsors and the Real Estate Secured Lenders Fully Understood that the Separation of the Real Estate Assets from Mervyn's Took Away Mervyn's Most Valuable Assets**

96.     The affiliates of the PE Sponsors were required to deliver a legal opinion to the Real Estate Secured Lenders in connection with the Real Estate Secured Loans made to the MDS Companies.  The opinion was a "true lease" opinion and its apparent purpose was to assure the Real Estate Secured Lenders that the Unitary Leases would be treated as unexpired leases under Bankruptcy Code Section 365 in any future chapter 11 case of Mervyn's.

97.     The opinion letter highlights some of the economic aspects of the 2004 transaction and the Unitary Leases and demonstrates both the unfairness and absence of consideration to Mervyn's.  These provisions, set forth verbatim from the full text of the opinion letter, are as follows (emphasis added):

> Each of the MDS Entities is a single-purpose entity whose sole business consists of the ownership, operation, development and sale of the fee or leasehold estates in the Properties[7] held by such MDS Entity[8], subject, in all events, to the terms of the applicable Unitary Lease.

---

[7] Defined as Mervyn's former fee and leasehold interests.

[8] Referring to the MDS Companies.

Pursuant to Section 1.3 of the Agency Agreement, Mervyn's Holdings[9] has caused New Mervyn's[10] to simultaneously sell, assign, transfer and convey all of the Properties (other than New Mervyn's leasehold interest in the Restricted Leases) to the MDS Entities. **The proceeds arising from the sale of the Properties to the MDS Entities by New Mervyn's (including the proceeds of the Acquisition Loan, which will be used to finance the MDS Entities' acquisition of such Properties) will be distributed to Target by Mervyn's Holdings, such that New Mervyn's (and Mervyn's Holdings, as the new owner of New Mervyn's) will not retain any of the proceeds of such sale (or such financing).**

The Properties, upon being acquired by the MDS Entities, will be simultaneously leased (or subleased, as the case may be) to New Mervyn's, the former owner of the Properties, pursuant to three separate but related Unitary Leases. **Each such Unitary Lease will demise more than one Property but will, by its terms, be treated as a single lease and the monthly rent payable thereunder will be a single, aggregate monthly amount (i.e., there will not be a separately identified monthly rent allocable to each location demised under such Unitary Lease and the tenant's failure to pay any portion of the monthly rent could result in the termination of the entire lease by the landlord thereunder).**

**Each of the Unitary Leases will be a so-called "triple net" lease pursuant to which the tenant will have sole responsibility for the payment of all costs and expenses (including, without limitation, real estate taxes, insurance premiums and maintenance costs) associated with the premises demised pursuant to such lease.**

The initial term of one of the Unitary Leases (the "Ten Year Lease") will be ten years and five months and **New Mervyn's will have the right, at its option, to renew the lease, at the greater of (x) the then prevailing market rental rate, or (y) 110% of the lease rate in effect at the**

---

[9] Referring to MH.

[10] Referring to Mervyn's.

**beginning of the extension term,** pursuant to two consecutive five year extension options.

New Mervyn's has no obligation to pay any monies to Lender, on account of the Unitary Leases or otherwise, and, pursuant to the instructions of the applicable MDS Entities, **all amounts due, from time to time, pursuant to the Unitary Leases, are payable directly to an account of the applicable MDS Entity (the "Designated Account").**

As a consequence of the divergent economic interests of the parties, the terms of the Unitary Leases were negotiated on an arm's-length basis and **the rent payable pursuant thereto reflects the current fair market rental value of the Properties** covered by the Unitary Lease with a Ten Year term. In this regard, we note that Cushman & Wakefield has performed certain investigations with respect to the rental markets in which the Properties are located and has concluded that (i) the rent payable for the Properties demised pursuant to the **Ten Year Lease**, taken as a whole, is within the reasonable range of current fair market rental values for such Properties, and (ii) **there is material residual value in the Properties subject to such lease.** The rent payable for the Properties demised pursuant to the Seventeen Month Lease and the Three Year Lease, while not capable of being evaluated in terms of a "market" rent that would apply to longer term leases, is not inconsistent with provisions to be expected in a short-term lease of "big box" retail space.

**According to Cushman & Wakefield, the residual value of the Properties demised pursuant to the Seventeen Month Lease and the Three Year Lease is greater, on a percentage basis, than the residual value of the Properties demised pursuant to the Ten Year Lease.**[11]

---

[11] The reference to Cushman & Wakefield is to an appraisal letter from Cushman & Wakefield attached to the opinion letter as an exhibit. In that letter, Cushman & Wakefield states its belief that the residual value of the Properties contained within the short term Unitary Leases -- Unitary Leases II and III -- will have "even greater" residual value than the Properties subject to the Ten Year [Unitary] Lease. The reason is obvious. After the expiration of the Unitary Lease, the underlying owned real estate and the underlying long-term below market leases will revest to the MDS Companies to capitalize upon, not to Mervyn's. These locations can be re-let by the MDS Companies to Mervyn's at still higher rates or leased to third parties.

**The MDS Entities acquired the Properties with the expectation that the Properties would have significant residual equity value at the expiration or earlier termination of the Unitary Leases.**

**The aggregate monthly rent payable pursuant to the three Unitary Leases is significantly in excess of the scheduled monthly debt service owed to Lender on account of the Acquisition Loan.**

Accordingly, **all monthly rent received in excess of monthly debt service** owed to Lender on account of the Acquisition Loan **will belong solely to the applicable MDS Entities.**

**Title to all improvements at the Properties (including all alterations and additions installed or constructed by New Mervyn's during the term of the Unitary Leases) will belong to the applicable MDS Entity at the expiration or earlier termination of the Unitary Leases without any reimbursement or other compensation to New Mervyn's.**

The MDS Entities project that **the aggregate monthly rent payable** pursuant to the Unitary Leases **will exceed the aggregate monthly amount payable to Lender** with respect to the Acquisition Loan. Absent a default under the Acquisition Loan or the events giving rise to the Cash Trap referred to above, **the MDS Entities will be permitted to receive and retain such excess rental proceeds without restriction.**

**The MDS Entities retain a reversionary interest in the Properties that has significant value** and the MDS Entities bear the economic risk of fluctuations in that value.

Upon the occurrence of an event of default under the Unitary Leases, the applicable MDS Entity, as lessor, will have the right to enter the demised premises, dispossess the lessee therefrom and otherwise exercise all of the rights and remedies available to a landlord under applicable law.

Upon the expiration or earlier termination of the Unitary Leases, **New Mervyn's, as lessee, must surrender the demised premises to the applicable MDS Entity, free**

and clear of all liens other than those specifically permitted by the applicable Unitary Lease.

The Acquisition, the Unitary Leases and the Acquisition Loan are being entered into contemporaneously and were planned and are being implemented as related transactions.

The Sponsors control the MDS Entities and New Mervyn's.

Although New Mervyn's has no legal obligation to make any payments to or for the benefit of the Lender, **New Mervyn's is committed, under its Operating Agreement, to make certain mandatory dividends to Mervyn's Holdings for the exclusive benefit of the "Real Estate" series of membership interests in Mervyn's Holdings, and the Sponsors have directed Mervyn's Holdings, in writing, to remit all such dividends, upon receipt, to MDS Realty Holdings I, LLC for the benefit of Borrowers.**

**Each Unitary Lease is a "triple net" lease** pursuant to which the lessee will pay or perform a significant number of obligations relating to the applicable Properties which would typically be paid or performed by the owner of the Properties.

**The most significant factors creating risk that the Unitary Leases could be recharacterized as financing pertain, in our view, to the fact that the Sponsors, as a group, own and control New Mervyn's and each of the MDS Entities, the fact that the Acquisition, the Unitary Leases and the Acquisition Loan constitute a related series of transactions, and the fact that New Mervyn's, as a "net" lessee, will be obligated to pay or perform a significant number of obligations relating to the Properties which would typically be paid or performed by the owner of the Properties.**

We note, for example, the parties' unambiguously expressed intent to create a lease; **the MDS Entities' ownership of a valuable residual interest in the Properties; the absence of any purchase option in favor of New Mervyn's;** the fact that the Unitary Leases will be treated as an operating lease for tax and financial reporting

purposes by New Mervyn's and each of the MDS Entities; **the fact that the MDS Entities will receive and retain a significant amount of net excess rent under the Unitary Leases during the term of the Acquisition Loan**; and the fact that the rents payable pursuant to the Unitary Leases are at market or are otherwise reflective of an arm's-length, negotiated leasing arrangement.

98. The foregoing admissions by the PE Sponsors confirm that:

- The proceeds from the loans made by the Real Estate Secured Lenders were distributed to Target by MH (thus disregarding the fiction of the Agency Agreement).

- The Unitary Lease structure puts Mervyn's in harm's way because a payment default imperils the multiple stores bundled into that lease.

- The repeated references to using the Unitary Lease to effectively raise the rents under Mervyn's existing leases to "market rates" underscores the undeniable fact that when Mervyn's below market leases and fee properties were leased back to it at "market rates," Mervyn's was placed at a competitive disadvantage with other retailers because its advantage of low occupancy costs was gone.

- The residual values for the real estate assets are repeatedly identified as significant. This makes it clear that Mervyn's was deprived of the opportunity or ability to realize that value for itself, particularly if its liquidity were to become constrained.

- The "excess" rent burden represented by the difference between Mervyn's occupancy costs pre-transaction and its occupancy costs post-transaction is stated to exceed the debt service payments to the Real Estate Secured Lenders. This further demonstrates the unfairness of the overall transaction to Mervyn's -- whose occupancy costs were increased by even more than what was required to service the debt.

- The Unitary Leases permit the landlords to dispossess Mervyn's at the end of the lease terms even though the terms of the Unitary Leases are not coterminous with the underlying leases. This could result in Mervyn's losing its right to occupy premises including premises that had been <u>owned</u> by it before the 2004 transaction.

- The absolute control of the PE Sponsors over Mervyn's and the payment of the notional rent for the Restricted Leases is repeatedly emphasized.

- The integrated nature of the multiple transfers and transactions is repeatedly emphasized.

- The triple net lease aspect of the Unitary Lease -- which puts the full economic burden of ownership on Mervyn's with none of the benefits -- is repeatedly emphasized.

99.     The "true lease" legal opinion also demonstrates the actual intent of the parties to separate Mervyn's real estate assets from its creditors. The opinion establishes the intent of the parties to make a valid and binding transfer of Mervyn's real estate assets. The structure of the Unitary Leases as "true" leases was intended to prevent the MDS Companies and the Real Estate Secured Lenders from getting entangled in Mervyn's Chapter 11 case. As lessors of commercial real property, the MDS Companies could insist upon timely payment of rent and other items due under the Unitary Leases and avoid the adequate protection and cram down issues that would exist if the Unitary Leases were found to be disguised financings.

**Transaction Fees Paid by Mervyn's**

100.    Although the 2004 transaction provided no benefits to Mervyn's and substantial detriments, at the closing of 2004 transaction, the PE Sponsors caused Mervyn's to pay $58,622,427 of transaction fees of various kinds to the PE Sponsors and/or on their behalf or for their benefit. For example:  $16,000,000 was paid to Cerberus or its affiliates (including $2,500,000 of sponsor-related fees to Cerberus or its affiliates, and $1,500,000 to Ableco and $12,000,000 to Madeleine for break-up fees or commitment fees relating to proposed real estate financing), $2,500,000 was paid to KLA

or its affiliates, $2,500,000 was paid to Sun or its affiliates, $4,000,000 was paid to the

Real Estate Secured Senior Lenders and $4,000,000 was paid to the Real Estate Secured

Mezzanine Lenders (in both cases, exclusive of legal fees also paid). In addition, direct

payments were made of professional fees incurred by the PE Sponsors and their affiliates

of approximately $5,000,000. A chart based upon the closing schedule (and therefore

subject to adjustment) is attached hereto as Exhibit A and is incorporated herein by this

reference.

101. Mervyn's received no benefit from the payment of the foregoing

fees.

### Effect of 2004 Transaction on Mervyn's Financial Condition

102. According to Mervyn's audited financial statements, only

$8,300,000 of the $1,175,000,000 purchase price was allocated to the retail operations.[12]

After the PE Sponsors stripped the real estate from it, Mervyn's was left with only

$673,503,000 of assets and $664,203,000 of liabilities. Included in the assets were

$48,939,000 of "Intangibles" (comprised of brand names, license agreements and credit

card program); $59,506,000 of "Property, Plant and Equipment" (including certain costs

related to the acquisition and development of software, construction in progress and store

fixtures); and $18,581,000 of "Other Current Assets" (prepaid expenses and deposits).

Mervyn's solvency as of September 2, 2004, is questionable because the fair saleable

value of the foregoing assets is not readily apparent given the nature of those assets and

---

[12] Mervyn's LLC Consolidated Financial Statements January 28, 2006 and January 29, 2005 with the Independent Auditors (KPMG LLP) Report dated June 9, 2006.

because liability under outstanding letters of credit (under Mervyn's then-existing revolving credit agreement) do not appear to be considered or reflected. In this regard, as of January 29, 2005, Mervyn's had outstanding letters of credit of $74,500,000. Given the seasonality of Mervyn's business, the amount of outstanding letter of credit on September 2, 2004 was probably even higher than at the end of January 2005.

103. More alarmingly, Mervyn's was left with *negative* working capital (current assets, less current liabilities, which is a barometer for the ability of an entity to pay debts as they become due) of over $22,200,000.

104. Despite Mervyn's small equity and lack of working capital, the transaction obligated Mervyn's to approximately $80,000,000 of additional annual expenses and increased distribution requirements to its PE Sponsors. Significant assets, which could have been utilized for working capital purposes, were no longer available to Mervyn's or its creditors.

## Count I

**(Avoidance of Transfer of Real Property Assets or Recapture of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against MDS Companies, PE Sponsors, PE Owners and Target)**

105. Plaintiff realleges its allegations in paragraphs 1 through 104 herein.

106. All of the participants and lenders involved in Target's sale of Mervyn's to the Private Equity Sponsors intended and planned that all transactions involved in that buyout and the financing of that sale - - including the sale of Mervyn's, the transfer of Mervyn's real estate assets to the MDS Companies, the borrowing of funds

from the Real Estate Secured Lenders and pledging of liens to those Lenders in order to partially finance the purchase, the payment of the purchase price to Target and all other related transactions - - would occur simultaneously and were interdependent, related transactions. All of those transactions should be collapsed into a single, integrated transaction for purposes of determining whether those transactions were fraudulent as to unsecured creditors of Mervyn's.

107.    The $1,175,000,000 Purchase Price that the PE Sponsors paid to Target was allocated almost entirely to the value of Mervyn's real estate assets - - all but $8,300,000 of the Purchase Price was so allocated. In addition, Mervyn's real estate assets were collateral for loans by the MDS Companies from the Real Estate Secured Lenders in the aggregate amount of $800,000,000. It is unlikely that the Real Estate Secured Lenders loaned to the MDS Companies an amount equal to 100 percent of the value of the real estate assets. Thus, the value of the real estate assets transferred by Mervyn's to the MDS Companies was no less than $800,000,000, and more likely in the range of $1,680,000,000.

108.    Mervyn's did not receive reasonably equivalent value or fair consideration in exchange for transferring its real property fee interests and lease interests to the MDS Companies.

109.    At the time of Mervyn's transfer of its real property fee interests and lease interests to the MDS Companies, Mervyn's: (a) was engaged or was about to engage in a business for which its remaining assets and/or capital were unreasonably small in relation to the business; (b) intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due; and/or (c) was

insolvent or would be rendered insolvent by the transactions undertaken in connection with the 2004 buyout.

110.     At all relevant times, Mervyn's had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

111.     The transfer of Mervyn's real property assets to the MDS Companies was made with actual intent to hinder, delay or defraud creditors of Mervyn's. From the perspective of the PE Sponsors, a primary purpose of the buyout was to separate Mervyn's from its real estate assets in so-called "bankruptcy-remote" entities such that the PE Sponsors could exploit those assets for their own benefit without having those assets be available to, and reachable by, creditors of Mervyn's or a Mervyn's bankruptcy trustee.

112.     The Uniform Fraudulent Transfer Act lists eleven, non-exclusive factors that may be considered, although none need be present, in determining whether to infer fraudulent intent from the circumstances of a transfer. At least six of those so-called "badges of fraud" would apply to the transfers of Mervyn's real property assets to the MDS Companies: (i) the transfer was to an "insider" as both Mervyn's and the MDS Companies were owned by the PE Sponsors; (ii) Mervyn's retained possession of the properties after the transfer pursuant to the unitary leases simultaneously leasing the transferred properties back to Mervyn's; (iii) Mervyn's transfer to the MDS Companies of its real estate assets was disguised and concealed by the Agency Agreement which created the appearance that, when MH purchased Mervyn's, it did not actually acquire Mervyn's real estate assets because those assets were somehow funneled directly to the

MDS Companies by MH as their "agent;" (iv) the transfer was of substantially all of Mervyn's assets as evidenced by the fact that, of the $1,175,000,000 purchase price, the parties to the sale of Mervyn's allocated all but $8,300,000 of that amount to its real estate assets; (v) Mervyn's did not receive any value or consideration at all in exchange for transferring its valuable real estate assets; and (vi) Mervyn's was or became insolvent at the time of the transfers.

113. Mervyn's transfers to the MDS Companies of its real property fee interests and lease interests should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

114. Mervyn's transfer to the MDS Companies of its real property fee interests and lease interests was made for the benefit of Target, as the seller of Mervyn's, and for the benefit of the PE Sponsors and PE Owners, as the buyers of Mervyn's. Under Bankruptcy Code section 550, plaintiff may recover the value of the real property transferred from those defendants. Because the series of transfers and transactions comprising the 2004 transaction are interrelated and can be collapsed into a single transaction, as an alternate claim for relief against Target, as the transferee of the proceeds of the "sale" of Mervyn's real estate assets as part of the 2004 transaction or of the proceeds of the loans made by the Real Estate Secured Lenders that were secured by Mervyn's real estate assets as part of the 2004 transaction, the avoidance and recovery from Target of an amount equal to either the Purchase Price or the proceeds of the loans made by the Real Estate Secured Lenders, as appropriate.

## Count II

**(Avoidance of Liens or Recapture of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against Real Estate Secured Lenders, MDS Companies, PE Sponsors, PE Owners and/or Target)**

115.     Plaintiff realleges its allegations in paragraphs 1 through 114 herein.

116.     All of the participants and lenders involved in Target's sale of Mervyn's to the Private Equity Sponsors intended and planned that all transactions involved in that buyout and the financing of that sale - - including the sale of Mervyn's, the transfer of Mervyn's real estate assets to the MDS Companies, the borrowing of funds from the Real Estate Secured Lenders and pledging of liens to those Lenders in order to partially finance the purchase, the payment of the purchase price to Target and all other related transactions - - would occur simultaneously and were interdependent, related transactions. All of those transactions should be collapsed into a single, integrated transaction for purposes of determining whether those transactions were fraudulent as to unsecured creditors of Mervyn's.

117.     Mervyn's did not receive reasonably equivalent value or fair consideration in exchange for the liens pledged to the Real Estate Secured Lenders as security for the acquisition financing loaned to the MDS Companies.

118.     At the time the Real Estate Secured Lenders obtained liens on the real property assets pledged as security for the acquisition financing, Mervyn's: (a) was engaged or was about to engage in a business for which its remaining assets and/or capital were unreasonably small in relation to the business; (b) intended to incur, or

reasonably should have believed that it would incur, debts beyond its ability to pay as they became due; and/or (c) was insolvent or would be rendered insolvent by the transactions undertaken in connection with the 2004 buyout.

119.    At all relevant times, Mervyn's had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

120.    The pledging of liens on Mervyn's real property assets to the Real Estate Secured Lenders was part of an overall plan to implement the 2004 buyout and related transactions with actual intent to hinder, delay or defraud creditors of Mervyn's. From the perspective of the PE Sponsors, a primary purpose of the buyout was to separate Mervyn's from its real estate assets in so-called "bankruptcy-remote" entities such that the PE Sponsors could exploit those assets for their own benefit without having those assets be available to, and reachable by, creditors of Mervyn's or a Mervyn's bankruptcy trustee.

121.    The Uniform Fraudulent Transfer Act lists eleven, non-exclusive factors that may be considered, although none need be present, in determining whether to infer fraudulent intent from the circumstances of a transfer. At least six of those so-called "badges of fraud" would apply to the overall plan to implement the 2004 buyout, including the pledging of liens on Mervyn's real property assets to the Real Estate Secured Lenders in order to obtain financing of the purchase price for Mervyn's: (i) the transfer of real estate assets was to an "insider" as both Mervyn's and the MDS Companies were owned by the PE Sponsors; (ii) Mervyn's retained possession of the properties after the transfer pursuant to the unitary leases simultaneously leasing the

transferred properties back to Mervyn's; (iii) Mervyn's transfer to the MDS Companies of its real estate assets was disguised and concealed by the Agency Agreement which created the appearance that, when MH purchased Mervyn's, it did not actually acquire Mervyn's real estate assets because those assets were somehow funneled directly to the MDS Companies by MH as their "agent;" (iv) the transfer was of substantially all of Mervyn's assets as evidenced by the fact that, of the $1,175,000,000 purchase price, the parties to the sale of Mervyn's allocated all but $8,300,000 of that amount to its real estate assets; (v) Mervyn's did not receive any value or consideration at all in exchange for transferring its valuable real estate assets or the pledging of liens to secure borrowings against those assets; and (vi) Mervyn's was or became insolvent at the time of the transfers.

122. The liens pledged to the Real Estate Secured Lenders as security for the acquisition financing should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

123. The liens pledged to the Real Estate Secured Lenders as security for the acquisition financing were transferred for the benefit of the MDS Companies, the PE Sponsors, the PE Owners and/or Target. Under Bankruptcy Code section 550, Plaintiff may recover the value of the liens from those defendants. At a minimum, plaintiff should be entitled to recover the $800,000,000 borrowed from the Real Estate Secured Lenders and paid to Target on the basis of those liens.

124. The $1,175,000,000 purchase price that the Private Equity Sponsors paid to Target was allocated almost entirely to the value of Mervyn's real estate

assets - - all but $8,300,000 of the purchase price was so allocated. In addition, Mervyn's real estate assets were collateral for loans from the Real Estate Secured Lenders in the aggregate amount of $800,000,000. It is unlikely that the Real Estate Secured Lenders loaned to the MDS Companies an amount equal to 100 percent of the value of the real estate assets. Thus, the value of the real estate assets transferred by Mervyn's to the MDS Companies, and the liens on those assets, was no less than $800,000,000, and more likely in the range of $1,680,000,000.

### Count III

**(Avoidance of Transaction and Other Fees Under 11 U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against Target, PE Sponsors, and PE Owners Ableco, and Madeleine)**

125.　Plaintiff realleges the allegations in paragraphs 1 through 124 herein.

126.　As alleged herein, at the time of and in connection with the 2004 buyout, Mervyn's paid transaction and other fees and expenses to, or for the benefit or on behalf of, the PE Sponsors and to Ableco and Madeleine in the amount of at least $58,000,000.

127.　Mervyn's did not receive reasonably equivalent value or fair consideration in exchange for its payment of transaction and other fees and expenses to, or for the benefit or on behalf of, the PE Sponsors, or to Ableco and Madeleine.

128.　At the time of Mervyn's payment of such fees and expenses, Mervyn's: (a) was engaged or was about to engage in a business for which its remaining assets and/or capital were unreasonably small in relation to the business; (b) intended to

incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due; and/or (c) was insolvent or would be rendered insolvent by the transactions undertaken in connection with the 2004 buyout.

129.    At all relevant times, Mervyn's had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

130.    The payment of transaction and other fees and expenses to, or for the benefit or on behalf of, the PE Sponsors, and to Ableco and Madeleine, was part of an overall plan to implement the 2004 buyout and related transactions with actual intent to hinder, delay or defraud creditors of Mervyn's. From the perspective of the PE Sponsors, a primary purpose of the buyout was to separate Mervyn's from its real estate assets in so-called "bankruptcy-remote" entities such that the PE Sponsors could exploit those assets for their own benefit without having those assets be available to, and reachable by, creditors of Mervyn's or a Mervyn's bankruptcy trustee.

131.    The Uniform Fraudulent Transfer Act lists eleven, non-exclusive factors that may be considered, although none need be present, in determining whether to infer fraudulent intent from the circumstances of a transfer. At least six of those so-called "badges of fraud" would apply to the overall plan to implement the 2004 buyout: (i) the transfer of real estate assets was to an "insider" as both Mervyn's and the MDS Companies were owned by the Private Equity Sponsors; (ii) Mervyn's retained possession of the properties after the transfer pursuant to the unitary leases simultaneously leasing the transferred properties back to Mervyn's; (iii) Mervyn's transfer to the MDS Companies of its real estate assets was disguised and concealed by

the Agency Agreement which created the appearance that, when MH purchased Mervyn's, it did not actually acquire Mervyn's real estate assets because those assets were somehow funneled directly to the MDS Companies by MH as their "agent;" (iv) the transfer was of substantially all of Mervyn's assets as evidenced by the fact that, of the $1,175,000,000 purchase price, the parties to the sale of Mervyn's allocated all but $8,300,000 of that amount to its real estate assets; (v) Mervyn's did not receive any value or consideration at all in exchange for transferring its valuable real estate assets or the pledging of liens to secure borrowings against those assets or from the payment of the fees and expenses as described; and (vi) Mervyn's was or became insolvent at the time of the transfers.

132. Mervyn's payments of transaction and other fees and expenses to, or for the benefit or on behalf of, the PE Sponsors, and to Ableco and Madeleine, should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

133. Mervyn's payments of transaction and other fees to, or for the benefit or on behalf of, the PE Sponsors, including the payments to Ableco and Madeleine, were also for the benefit of the PE Owners. Under Bankruptcy Code section 550, plaintiff may recover the value of the payments made from those defendants.

## Count IV

**(Avoidance of "Notional" Rent Payments, Occupancy Cost Increases, and Other Payments, Transfers, Distributions, or Dividends Under 11 U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against MDS Companies, PE Sponsors and PE Owners)**

134.    Plaintiff realleges the allegations in paragraphs 1 through 133 herein.

135.    Mervyn's did not receive reasonably equivalent value or fair consideration in exchange for transferring to the MDS Companies (through MH) and/or to the PE Sponsors, payments, transfers, dividends or distributions in the amounts of "notional" rent payments that would have been charged to Mervyn's if it had transferred the Restricted Leases to the MDS Companies.

136.    Mervyn's did not receive reasonably equivalent value or fair consideration in exchange for the payments or transfers required to be made by it under the Unitary Leases to the MDS Companies and/or directly to MH or the PE Sponsors to the extent that such payments or transfers reflected an increase of Mervyn's rent payments and other occupancy costs for its stores and other premises above what Mervyn's had been paying to its third party landlords or paying with respect to fee properties that had been owned by Mervyn's before the creation of such Unitary Leases (the "Occupancy Cost Increases").

137.    Mervyn's did not receive reasonably equivalent value or fair consideration in exchange for other payments, transfers, dividends, or distributions (the "Other Transfers") made to the PE Sponsors (through MH) and/or to the PE Sponsors.

138. The foregoing payments, transfers, distributions, or dividends aggregate at least $400,000,000.

139. Certain of the foregoing payments, transfers, dividends, or distributions with respect to the notional rent payments, the Occupancy Cost Increases, or the Other Transfers to MH (for the benefit of the PE Sponsors and PE Owners), to the MDS Companies, and/or to the PE Sponsors were made when Mervyn's: (a) was engaged or was about to engage in a business for which its remaining assets and/or capital were unreasonably small in relation to the business; (b) intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due; and/or (c) was insolvent or would be rendered insolvent by the transactions undertaken in connection with the 2004 buyout. To the extent such payments or distributions were made, those transfers should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code section 544(b).

140. At all relevant times, Mervyn's had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

141. Mervyn's payments, transfers, distributions or dividends (as described above) to the MDS Companies were made for the benefit of the PE Sponsors and the PE Owners. Mervyn's payments or transfers (as described above) to the PE Sponsors was made for the benefit of the PE Owners. Under Bankruptcy Code section 550, plaintiff may recover the value of the real property transferred from those defendants.

## Count V

## (Breach of Fiduciary Duty; Against the PE Owners, PE Sponsors and Target)

142.     Plaintiff realleges the allegations in paragraphs 1 through 141 herein.

143.     At all relevant times prior to Target's sale of Mervyn's, Target was the owner of all of the equity of Mervyn's. As the sole and controlling owner of Mervyn's, Target owed to Mervyn's fiduciary obligations of good faith, care and loyalty.

144.     Upon Target's sale of Mervyn's, MH became the Managing Member of Mervyn's. The PE Sponsors owned all of the equity of MH in varying percentages, and the PE Sponsors each had two of their designees appointed as managers of the governing boards of MH. The PE Owners, in turn, had and exercised the ability to control the PE Sponsors. Because the PE Sponsors and PE Owners had the ability to control Mervyn's, they owed to Mervyn's fiduciary obligations of good faith, care and loyalty.

145.     At the time Target sold Mervyn's to MH, Mervyn's: (a) was engaged or was about to engage in a business for which its remaining assets and/or capital were unreasonably small in relation to the business; (b) intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due; and/or (c) was insolvent or would be rendered insolvent by the transactions undertaken in connection with the 2004 buyout. Because Mervyn's would be rendered insolvent, or be in the zone of insolvency, as a result of the 2004 buyout, Target had a fiduciary obligation to Mervyn's and its unsecured creditors to protect the interests of such creditors.

146. Target had a large financial interest in the sale of Mervyn's because it stood to obtain the purchase price of approximately $1,175,000,000. The PE Sponsors and PE Owners had a correspondingly large financial interest in acquiring Mervyn's because they hoped and planned to profit from the transaction by exploiting Mervyn's real estate assets.

147. Target had knowledge, and participated and/or acquiesced in the plan developed by the PE Sponsors to strip out all of Mervyn's real estate assets, and pledge those assets as security in order to obtain secured loans to finance the purchase price.

148. Target breached its fiduciary duty by approving, participating in, consummating and acquiescing in a buyout and related transactions whereby Mervyn's transferred away its valuable real estate assets and paid approximately $58,000,000 in transaction-related fees without receiving any benefit from those transactions.

149. The PE Sponsors and PE Owners breached their fiduciary duties by planning, approving and executing a buyout and related transactions whereby Mervyn's transferred away its real estate assets and paid at least $58,000,000 in transaction-related fees without receiving any benefit from those transactions.

150. The PE Sponsors and PE Owners also breached their fiduciary duties by causing Mervyn's to make payments, transfers, dividends, or distributions representing "notional" rent, the Occupancy Cost Increases, and the Other Transfers when such payments, transfers, dividends, or distributions were fraudulent as to Mervyn's unsecured creditors.

151. Mervyn's and its unsecured creditors incurred substantial damages as a result of the buyout and related transactions planned, approved, and executed by Target and the PE Sponsors, and by the transfer, payment, dividend, or distribution of notional rent, Occupancy Cost Increases, and the Other Transfers to the extent alleged above.

## Prayer for Relief

**WHEREFORE**, plaintiff demands that judgment be entered as follows:

A. On Count I, awarding plaintiff judgment against the MDS Companies, PE Sponsors, PE Owners and Target avoiding Mervyn's transfer of its real estate assets to the MDS Companies, or, alternatively, awarding plaintiff judgment against the MDS Companies, PE Sponsors, PE Owners and Target, jointly and severally, for the value of the real estate assets transferred by Mervyn's in an amount to be determined at trial, or, alternatively, as to Target, awarding an amount equal to the Purchase Price or the proceeds of the loans made by the Real Estate Secured Lenders that were borrowed using Mervyn's real estate assets as collateral;

B. On Count II, awarding plaintiff judgment against the Real Estate Secured Lenders avoiding the transfer to those Lenders of liens on Mervyn's real property assets, or, alternatively, awarding plaintiff judgment against the Real Estate Secured Lenders, the MDS Companies, the PE Sponsors, the PE Owners and Target, jointly and severally, for the value of those liens in an amount to be determined at trial;

C. On Count III, awarding plaintiff judgment against the PE Sponsors and PE Owners avoiding the transfer of fees and other expenses paid to, or for the benefit of, those defendants in connection with the 2004 buyout of Mervyn's and related

transactions, or, alternatively, awarding plaintiff judgment against the PE Sponsors and PE Owners, jointly and severally, for the value of the fees and other expense in an amount to be determined at trial;

D. On Count IV, awarding plaintiff judgment against the PE Sponsors and PE Owners avoiding the transfer of "notional rent" and other dividend payments paid to, or for the benefit of, those defendants to the extent those payments were fraudulent as to unsecured creditors, or, alternatively, awarding plaintiff judgment against the PE Sponsors and PE Owners, jointly and severally, for the value of such payments.

E. On Count V, awarding plaintiff judgment against Target, the PE Sponsors and the PE Owners for damages in amounts to be determined at trial;

F. Awarding plaintiff interest, costs, and its attorney's fees; and

*[Balance of Page Intentionally Left Blank]*

G.   Granting plaintiff such other and further relief as the Court deems just and proper.

Dated:   September 2, 2008

BAYARD, P.A.

*Neil B. Glassman*

By:   Neil B. Glassman (No. 2087)
        Ashley B. Stitzer (No. 3891)
        Mary E. Augustine (No. 4477)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19899
(302) 655-5000

- and -

FRIEDMAN KAPLAN SEILER &
    ADELMAN LLP
By:  Andrew W. Goldwater
        William P. Weintraub
        Niketh Velamoor
1633 Broadway
New York, NY 10019-6708
(212) 833-1100

*Proposed Attorneys for Plaintiff*