## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MERVYN'S HOLDINGS, LLC, et al. | Case No. 08-11586 (KG) |
| Debtors. | Jointly Administered |
| MERVYN'S LLC, | |
| Plaintiff, | |
| - against - | Adv. Proc. No. 08-51402 KG |

LUBERT-ADLER GROUP IV, LLC; LUBERT-ADLER
GROUP IV, L.P.; LUBERT-ADLER REAL ESTATE
FUND IV, L.P.; LUBERT-ADLER REAL ESTATE
PARALLEL FUND IV, L.P.; LUBERT-ADLER
CAPITAL REAL ESTATE FUND IV, LP;
KLA/MERVYN'S, L.L.C.; ACADIA MERVYN
INVESTORS I, LLC; ACADIA MERVYN INVESTORS
II, LLC; ACADIA REALTY TRUST;
MERVYN'S/KLAFF EQUITY, L.L.C.; MERVYN'S
OPPORTUNITIES, L.L.C.; CERBERUS CAPITAL
MANAGEMENT, L.P.; CERBERUS MERVYN'S
INVESTORS, LLC; CERBERUS PARTNERS, L.P.;
GABRIEL CAPITAL, L.P.; CERBERUS ASSOCIATES,
L.L.C.; ABLECO FINANCE LLC; MADELEINE L.L.C.;
SUN CAPITAL PARTNERS, INC.; SUN CAPITAL
SECURITIES FUND, LP; SUN CAPITAL SECURITIES
OFFSHORE FUND, LTD.; SCSF MERVYN'S (US),
LLC; SCSF MERVYN'S (OFFSHORE), INC.; MDS
REALTY HOLDINGS I, LLC; MDS REALTY
HOLDINGS II, LLC; MDS REALTY I, LLC; MDS
REALTY II, LLC; MDS REALTY III, LLC; MDS
REALTY IV, LLC; MDS TEXAS REALTY I, LP; MDS
TEXAS REALTY II, LP; MDS TEXAS REALTY I,
LLC; MDS TEXAS REALTY II, LLC; MDS TEXAS
PROPERTIES I, LLC; MDS TEXAS PROPERTIES II,
LLC; GREENWICH CAPITAL FINANCIAL
PRODUCTS, INC.; ARCHON FINANCIAL LP;
GOLDMAN SACHS COMMERCIAL MORTGAGE
CAPITAL, L.P., fka ARCHON FINANCIAL, LP;
GOLDMAN SACHS MORTGAGE COMPANY;
LASALLE BANK NATIONAL ASSOCIATION; BANK
OF AMERICA CORPORATION as successor to
LASALLE BANK NATIONAL CORPORATION and
TARGET CORPORATION,

Defendants.

## FIRST AMENDED COMPLAINT

Plaintiff Mervyn's LLC ("Mervyn's"), by its undersigned counsel, alleges, upon knowledge as to its own status, and upon information and belief as to all other matters, as follows:

### Nature of the Action

1.      This is a fraudulent transfer action.  In this case, valuable real estate assets - - owned store locations and below-market leases - - were stripped out of Mervyn's and used to finance the leveraged buyout of Mervyn's by a consortium of private equity players.  Hundreds of millions of dollars of loans were made against those real estate assets, with none of the proceeds going to Mervyn's.  Moreover, by separating Mervyn's real estate assets from its retail operations, the private equity players made sure that any residual value or upside in the real estate assets were reserved for themselves and not for Mervyn's and its creditors.

2.      Not content to simply cut the real estate assets out of Mervyn's, the private equity players also leased Mervyn's own real estate assets back to it at substantially increased rates, to both service the acquisition debt and to continue to extract over time the significant excess value of the real estate assets over the debt piled onto those assets.

3.      Regardless of whether the multiple interrelated transfers and transactions described below are collapsed into a single or dual transaction, or viewed as a series of steps to a fraudulent conclusion, the 2004 transaction is a fraudulent transfer that cannot withstand scrutiny.

## The Parties

**Mervyn's**

4.  Plaintiff Mervyn's LLC ("Mervyn's) is a limited liability company organized under the laws of the State of California. At all relevant times, Mervyn's has operated retail department stores. On July 29, 2008 (the "Petition Date"), Mervyn's, Mervyn's Holdings LLC ("MH"), and Mervyn's Brands LLC ("Mervyn's Brands") (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business as debtors-in-possession pursuant to Bankruptcy Code Sections 1007 and 1108.

**The Private Equity Sponsors**

5.  Defendant KLA/Mervyn's L.L.C., is a limited liability company, which sponsored and/or participated in the 2004 leveraged buyout of Mervyn's and related transactions.

6.  Defendant Cerberus Mervyn's Investors, LLC, is a limited liability company, which sponsored and/or participated in the 2004 leveraged buyout of Mervyn's and related transactions.

7.  Defendant SCSF Mervyn's (US), LLC, is a limited liability company which sponsored and/or participated in the 2004 leveraged buyout of Mervyn's and related transactions.

8.  Defendant SCSF Mervyn's (Offshore), Inc., is a corporation, which sponsored and/or participated in the 2004 leveraged buyout of Mervyn's and related transactions.

9. Defendant KLA/Mervyn's L.L.C.; Defendant Cerberus Mervyn's Investors, LLC; Defendant SCSF Mervyn's (US), LLC; and Defendant SCSF Mervyn's (Offshore), Inc., are collectively referred to as the "PE Sponsors." The PE Sponsors organized Mervyn's Holdings, LLC, a Delaware limited liability company ("MH") for the purpose of acquiring Mervyn's in the transactions described below.

## The Private Equity Owners

10. Defendant Lubert-Adler Real Estate Fund IV, L.P.; Defendant Lubert-Adler Real Estate Parallel Fund IV, L.P.; Defendant Lubert-Adler Capital Real Estate Fund IV, LP; Defendant Acadia Mervyn Investors I, LLC; Defendant Acadia Mervyn Investors II, LLC; Defendant Mervyn's/Klaff Equity, L.L.C.; and Defendant Mervyn's Opportunities, L.L.C., own, in the aggregate all of the equity in Defendant KLA/Mervyn's L.L.C.

11. Defendant Lubert-Adler Group IV, LLC, is the general partner of Defendant Lubert-Adler Group IV, L.P.

12. Defendant Lubert-Adler Group IV, L.P. is the general partner of Defendant Lubert-Adler Real Estate Fund IV, L.P., Defendant Lubert-Adler Real Estate Parallel Fund IV, L.P., and Defendant Lubert-Adler Capital Real Estate Fund IV, L.P.

13. Defendant Acadia Realty Trust is the direct or indirect owner of Defendant Acadia Mervyn Investors I, LLC, and Defendant Acadia Mervyn Investors II, LLC.

14.     Defendant Cerberus Partners, L.P.; Defendant Gabriel Capital, L.P.; and/or Defendant Cerberus Associates, L.L.C., own, in the aggregate, all of the equity in Defendant Cerberus Mervyn's Investors, LLC.

15.     Defendant Cerberus Capital Management, L.P., is the direct or indirect owner of Defendant Cerberus Mervyn's Investors, LLC; Defendant Cerberus Partners, L.P.; Defendant Cerberus Associates, L.L.C., Defendant Gabriel Capital, L.P., Defendant Ableco (defined below); and Defendant Madeleine (defined below).

16.     Defendant Sun Capital Securities Offshore Fund, Ltd., owns all of the equity in Defendant SCSF Mervyn's (Offshore), Inc.

17.     Defendant Sun Capital Securities Fund, LP, owns all of the equity in Defendant SCSF Mervyn's (US), LLC.

18.     Defendant Sun Capital Partners, Inc., is the direct or indirect owner of Defendant SCSF Mervyn's (US), LLC; Defendant SCSF Mervyn's (Offshore), Inc.; Defendant Sun Capital Securities Offshore Fund, Ltd.; and Defendant Sun Capital Securities Fund, LP.

19.     Defendant Lubert-Adler Group IV, LLC; Defendant Lubert-Adler Group IV, L.P.; Defendant Lubert-Adler Real Estate Fund IV, L.P.; Defendant Lubert-Adler Real Estate Parallel Fund IV, L.P.; Defendant Lubert-Adler Capital Real Estate Fund IV, L.P.; Defendant Acadia Mervyn Investors I, LLC; Defendant Acadia Mervyn Investors II, LLC; Defendant Acadia Realty Trust; Defendant Mervyn's/Klaff Equity, L.L.C.; Defendant Mervyn's Opportunities, L.L.C.; Defendant Cerberus Partners, L.P.; Defendant Gabriel

Capital, L.P.; Defendant Cerberus Capital Management, L.P.; Defendant Cerberus Associates, L.L.C.; Defendant Sun Capital Securities Offshore Fund, Ltd.; Defendant Sun Capital Securities Fund, LP; and Defendant Sun Capital Partners, Inc., are collectively referred to as the "PE Owners."

**The MDS Companies**

20.     Defendant MDS Realty Holdings I, LLC ("Holdings I"), is a limited liability company owned and organized by the PE Sponsors in connection with the 2004 leveraged buyout of Mervyn's and related transactions.

21.     Defendant MDS Realty Holdings II, LLC ("Holdings II"), is a limited liability company owned and organized by the PE Sponsors in connection with the 2004 leveraged buyout of Mervyn's and related transactions.

22.     Defendant MDS Realty I, LLC ("Realty I"), is a limited liability company directly or indirectly owned and organized by the PE Sponsors in connection with the 2004 leveraged buyout of Mervyn's and related transactions.

23.     Defendant MDS Realty II, LLC ("Realty II"), is a limited liability company directly or indirectly owned and organized by the PE Sponsors in connection with the 2004 leveraged buyout of Mervyn's and related transactions.

24.     Defendant MDS Realty III, LLC ("Realty III"), is a limited liability company directly or indirectly owned and organized by the PE Sponsors in connection with the 2004 leveraged buyout of Mervyn's and related transactions.

25.     Defendant MDS Realty IV, LLC ("Realty IV"), is a limited liability company directly or indirectly owned and organized by the PE Sponsors in connection with the 2004 leveraged buyout of Mervyn's and related transactions.

26.     Defendant MDS Texas Realty I, LP ("Texas Realty I"), is a limited partnership directly or indirectly owned and organized by the PE Sponsors in connection with the 2004 leveraged buyout of Mervyn's and related transactions.

27.     Defendant MDS Texas Realty II, LP ("Texas Realty II"), is a limited partnership directly or indirectly owned and organized by the PE Sponsors in connection with the 2004 leveraged buyout of Mervyn's and related transactions.

28.     Defendant MDS Texas Realty I, LLC ("TR-I"), is a limited liability company directly or indirectly owned and organized by the PE Sponsors in connection with the 2004 leveraged buyout of Mervyn's and related transactions.

29.     Defendant MDS Texas Realty II, LLC ("TR-II"), is a limited liability company directly or indirectly owned and organized by the PE Sponsors in connection with the 2004 leveraged buyout of Mervyn's and related transactions.

30.     Defendant MDS Texas Properties I, LLC ("Texas Properties I"), is a limited liability company directly or indirectly owned and

organized by the PE Sponsors in connection with the 2004 leveraged buyout of Mervyn's and related transactions.

31.    Defendant MDS Texas Properties II, LLC ("Texas Properties II"), is a limited liability company directly or indirectly owned and organized by the PE Sponsors in connection with the 2004 leveraged buyout of Mervyn's and related transactions.

32.    Defendants Holdings I and Holdings II are sometimes referred to as the "Realty Parents" and Defendants Realty I, Realty II, Realty III, Realty IV, Texas Realty I, and Texas Realty II are sometimes referred to, individually, as a "Realty Owner" and, collectively, as the "Realty Owners." In addition, Defendants Holdings I, Holdings II, Realty I, Realty II, Realty III, Realty IV, Texas Realty I, Texas Realty II, TR-I, TR-II, Texas Properties I, and Texas Properties II are referred to collectively as the "MDS Companies."

**The Real Estate Secured Lenders**

33.    Defendant Greenwich Capital Financial Products, Inc. ("Greenwich"), is a corporation which, directly and/or through its affiliates, provided secured financing to the MDS Companies for the benefit of the PE Sponsors, the PE Owners, and the MDS Companies in connection with a 2004 leveraged buyout of Mervyn's and related transactions.

34.    Defendant Archon Financial LP ("Archon") is a limited partnership which, directly and/or through affiliates, provided secured financing to MDS Companies for the benefit of the PE Sponsors and the MDS Companies in connection with a 2004 leveraged buyout of Mervyn's and related transactions.

35. Defendant Goldman Sachs Commercial Mortgage Capital, L.P. ("GSCMC"), is the successor to Defendant Archon Financial, LP ("Archon").

36. Defendant Goldman Sachs Mortgage Company ("GS Mortgage") is a corporation which either, directly and/or through its then affiliate Archon, provided secured financing to the MDS Companies for the benefit of the PE Sponsors, the PE Owners, and the MDS Companies in connection with a 2004 leveraged buyout of Mervyn's and related transactions, or accepted an assignment of all the loans made by Defendant Archon in connection with the 2004 leveraged buyout of Mervyn's and related transactions.

37. Defendant LaSalle Bank National Association ("LaSalle") is a trustee or nominee which, directly and/or through its affiliates, accepted an assignment of the loans made by Greenwich in connection with the 2004 leveraged buyout of Mervyn's and related transactions. Defendant Bank of America Corporation is the successor to LaSalle.

38. Defendant Greenwich; Defendant Archon; Defendant GSCMC; Defendant GS Mortgage; Defendant LaSalle; and Defendant Bank of America Corporation are referred to collectively as the "Real Estate Secured Lenders."

**The Selling Shareholder**

39. Defendant Target Corporation ("Target") is a corporation which sold Mervyn's to an acquisition vehicle - - MH - - owned by the PE Sponsors (and controlled by the PE Owners) in the 2004 transaction described

below and which had knowledge of, participated in, or acquiesced in all of the arrangements comprising such transaction.

**Other Defendants**

40.     Defendant Ableco Finance LLC ("Ableco") and Defendant Madeleine LLC ("Madeleine") are affiliates of Defendant Cerberus and were potential lenders for the 2004 transaction.

**Jurisdiction and Venue**

41.     The Court has jurisdiction over this action under 28 U.S.C. sections 157(a) and 1334.  This proceeding is a core proceeding within the meaning of 28 U.S.C. Section 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. sections 1408 and 1409.

**Background**

42.     At all relevant times, Mervyn's has been a family-friendly, promotional department store offering fashion and home décor at affordable prices.  Mervyn's traces its roots to a mid-range department store opened by Mervin Morris in San Lorenzo, California in 1949.  Over the last 60 years, Mervyn's grew into a retail chain that, as of the Petition Date, employed more than 18,000 people and operated 177 retail stores in California and six states in the southwestern United States.  Mervyn's retail stores average 80,000 retail square feet and are located primarily in community shopping centers, regional malls and freestanding locations.  For the fiscal year ended February 2, 2008, Mervyn's recorded net sales of approximately $2,500,000,000 and incurred a net loss of approximately $64,000,000.

43.     In or about 1978, Mervyn's became a wholly-owned subsidiary of Dayton Hudson Corporation (now known as Target Corporation or Target). In or about 2004, Defendant Target decided to sell or otherwise realize upon the value of Mervyn's. To do this, Target engaged Goldman Sachs as its investment banker, and eventually accepted a bid from the PE Sponsors (acting for the benefit of themselves and the PE Owners) to purchase Mervyn's.

44.     On or about August 27, 2004, Target converted Mervyn's from a corporation into a California limited liability company in conjunction with the transaction described herein between Target and MH. As described herein, MH is a Delaware limited liability company that was formed by affiliates of Sun, Cerberus and KLA for the purpose of purchasing Mervyn's from Target. These affiliates -- Defendant SCSF Mervyn's (US), LLC; Defendant SCSF Mervyn's (Offshore), Inc.; Defendant Cerberus Mervyn's Investors, LLC and Defendant KLA/Mervyn's LLC -- are the Defendant PE Sponsors.

### Overview of the 2004 Transaction

45.     The 2004 transaction between MH and Target was similar to a leveraged buyout ("LBO"). In general, an LBO is a method of acquiring a company by which the acquirer borrows against the assets of the target company in order to finance the purchase of the target company's shares from the selling shareholder. Much of the equity in the acquired company is typically replaced by debt, and the company's capital structure changes such that former shareholders of the company are replaced by secured creditors. From the perspective of unsecured creditors, LBO's may be disadvantageous because such creditors bear

the increased risk that the LBO will leave the acquired company in a financial condition which leads to bankruptcy.

46.     In 2004, the PE Sponsors, through MH, purchased Mervyn's from Target pursuant to a plan they conceived for a series of simultaneous, integrated transactions that, as a matter of economic substance, were similar to a LBO.  In a traditional LBO structure, Mervyn's would have retained its assets and incurred the debt normally associated with a leveraged transaction.  In that scenario, Mervyn's also would have retained for its own benefit the residual value of its assets in excess of the debt placed against them, and those assets would have remained with Mervyn's following repayment of the debt.  Here, however, Mervyn's real estate assets and the residual value of those assets were stripped away completely from Mervyn's, while Mervyn's incurred substantial additional obligations (as described below) in order to help service the debt incurred to finance the transaction.  In the transaction as structured, Mervyn's has no residual interest in its real estate; those assets are gone.

47.     To effect the complete separation of Mervyn's valuable real estate assets from Mervyn's, the PE Sponsors formed the defendant MDS Companies -- bankruptcy remote entities specially created by the PE Sponsors. At the closing of the 2004 transaction, the PE Sponsors caused Mervyn's to transfer virtually all of its real estate assets (leasehold interests and fee interests) to the newly-formed MDS Companies.  The MDS Companies, in concurrent and related transactions, encumbered those transferred assets in exchange for loans made by the Real Estate Secured Lenders to the MDS Companies.  All or

substantially all of the loan proceeds were paid over to Target. None of the loan proceeds were paid or delivered to Mervyn's or used for its benefit. The remaining real estate assets, consisting of certain leases that were not assignable (the "Restricted Leases") stayed with Mervyn's.

48.     As a consequence of the interrelated transfers that were implemented at the closing of the 2004 transaction by and for the benefit of the PE Sponsors (and, consequently, for the benefit of the PE Owners), all of Mervyn's retail store locations (other than the stores subject to the Restricted Leases) were made subject to three (3) Unitary Leases that were created in the 2004 transaction. The Unitary Leases were created by the transfer of all of Mervyn's real estate assets (other than the Restricted Leases) from Mervyn's to the MDS Companies, the simultaneous bundling of those assets together into the Unitary Leases, and the leasing of the right to occupy those same premises back to Mervyn's.

49.     The rents charged by the MDS Companies to Mervyn's under the Unitary Leases (which also included rents that were newly imposed upon Mervyn's for the occupancy of properties that, prior to the closing, had been owned by Mervyn's) were substantially greater than what had been charged to Mervyn's immediately before the transaction. The PE Sponsors increased, or used their ownership, domination and control of Mervyn's through MH to cause the increase of, Mervyn's occupancy costs to what they contended were "market" rents that Mervyn's would have paid if it had entered into new leases for all of its stores. The mark-up of Mervyn's leases "to market" (without any justification

for, or consideration paid to Mervyn's on account of, such mark-ups) were imposed upon Mervyn's by the PE Sponsors and deprived Mervyn's of the benefit of below market rents it had enjoyed by virtue of its leverage as an anchor tenant or the age of its leases. With respect to properties that Mervyn's had owned prior to their transfer to the MDS Companies, Mervyn's was now charged rent that it formerly did not have to pay. The foregoing actions were orchestrated by the PE Sponsors for the benefit of themselves and the PE Owners, with the knowledge, participation, or acquiescence of Target and the Real Estate Secured Lenders - - all of whom profited or benefited from such actions.

50.     Under arrangements also put into place in connection with the 2004 transaction, in addition to the rent that Mervyn's pays to its landlords under the Restricted Leases that could not be transferred to the MDS Companies at closing, Mervyn's was caused by the PE Sponsors to make additional payments to MH referred to as "notional rent." These additional payments are amounts intended by the PE Sponsors to reflect the rent mark-up that the MDS Companies would have imposed on Mervyn's had the Restricted Leases been transferred to the MDS Companies and leased back to Mervyn's at the closing of the 2004 transaction. Mervyn's was required to make notional rent payments to MH as special distributions under Mervyn's limited liability company agreement, and MH, under its own limited liability company agreement, then distributed the payments to the PE Sponsors. The PE Sponsors, in turn, paid over the notional rent to the Real Estate Secured Lenders. The provisions in the limited liability agreements regarding the notional rent payments were put into the formation

documents for Mervyn's and MH in connection with the 2004 transaction. As with the transfers of real estate assets from Mervyn's and the creation of the Unitary Leases, the arrangements for the payment of notional rent on the Restricted Leases were imposed upon Mervyn's by the PE Sponsors for the benefit of themselves and the PE Owners, with the knowledge, participation, or acquiescence of Target and the Real Estate Secured Lenders - - all of whom profited or benefited from such arrangements.

51.     Although the rents charged to Mervyn's under the Unitary Leases are alleged by the PE Sponsors to be at "market rates," this does not take into account that before the 2004 transaction, Mervyn's either owned its store locations and paid no rent or it leased its store locations at lease rates that in many instances were below market. Nor does this take into account that the PE Sponsors imposed increased rents on Mervyn's in order to use Mervyn's real estate assets to finance their purchase of the Securities from Target and to later sell those assets for considerable profit.

52.     The rent markups imposed upon Mervyn's by the PE Sponsors, in the form of "base rent" under the Unitary Leases and notional rent with respect to the Restricted Leases -- done without any input from Mervyn's management -- increased Mervyn's occupancy costs to amounts that far exceeded what Mervyn's had been paying, and left Mervyn's at a competitive disadvantage. These increases left no margin for error and impaired Mervyn's ability to weather economic downturns or combat increased competition. In the 2004 transaction and in the subsequent 2005 refinancing (described below) where further rent

increases were imposed on Mervyn's, the PE Sponsors (as owners of Mervyn's through MH) sacrificed the health and well being of Mervyn's retail operations for the financial advantage and benefit of the MDS Companies - - companies that were separately owned by the PE Sponsors as a result of 2004 transaction.

53.     As a result of the increased rent burden imposed upon Mervyn's by reason of the mark-ups embedded in the Unitary Leases and the notional rent payments made with respect to the Restricted Leases, following the closing of the 2004 transaction, Mervyn's had aggregate annual rent expense in excess of $172,000,000, which far exceeds (by as much as approximately $80,000,000) what its annual occupancy expenses would have been had its real estate assets not been transferred, bundled and leased back to it at higher rates as described, and had the notional rents not been imposed on it. The burden on Mervyn's retail operations was increased further when, as part of the 2005 refinancing, the PE Sponsors acting through MH imposed another $77 million of rent increases on Mervyn's.

### The Equity Purchase Agreement

54.     On or about July 29, 2004, MH, an acquisition vehicle owned and controlled by the PE Sponsors, entered into that certain Equity Purchase Agreement, dated as of July 29, 2004 (the "EPA"), with Target.

55.     The EPA was a stock purchase agreement as opposed to an asset purchase agreement. Pursuant to the EPA, MH acquired all of the outstanding equity securities (the "Securities") of Mervyn's from Target.

56.     Immediately before MH's acquisition of the Securities from Target, as required under the EPA, Target converted Mervyn's from a California corporation to a California limited liability company.

57.     The purchase price paid by MH to Target for the Securities was $1,175,000,000 in cash, subject to adjustments as set forth in the EPA (the "Purchase Price"). The closing of the EPA occurred on September 2, 2004.

## Source of Funds

58.     The funds for the 2004 transaction came from three sources:

- Pursuant to that certain Loan Agreement dated as of September 2, 2004, Greenwich and Archon, as lenders (the "Senior Real Estate Secured Lenders"), advanced $675,000,000 to Realty I, Realty II, Texas Realty I and Texas Realty II. Repayment of these loans was secured by the Unitary Leases held by the listed borrowers, and mortgages, liens, assignments of rents and deeds of trust with respect to the real estate assets that had been transferred to the borrowers by Mervyn's. All or substantially all of the loan proceeds were used by MH on behalf or for the benefit of the PE Sponsors to pay the Purchase Price under the EPA.

- Pursuant to that certain Mezzanine Loan Agreement dated as of September 2, 2004, Greenwich and GS Mortgage (the "Mezzanine Real Estate Secured Lenders"), advanced $125,000,000 to Holdings I, Holdings II, Texas Properties I and Texas Properties II. Repayment of these loans were secured by certain pledges and security interests provided by such borrowers. All or substantially all of the loan proceeds were used by MH on behalf or for the benefit of the PE Sponsors to pay the Purchase Price under the EPA.

- Pursuant to that certain Securities Purchase Agreement, dated as of September 2, 2004, the PE Sponsors purchased 100% of the interests in Holdings I and Holdings II for $429,746,414.84. At the closing of the EPA, these funds

were used by MH on behalf or for the benefit of the PE Sponsors to pay the Purchase Price under the EPA.

59.     Of the $1,263,853,000 distributed at the closing of the EPA, $1,175,230,000 was paid to Target and only $8,300,000 was paid or allocated to Mervyn's, despite Mervyn's losing all of its real estate assets.[1]   More than $58,000,000 was paid to the PE Sponsors, their professionals and others as "fees" at the closing.

60.     Since the date of the closing of the EPA, in addition to stripping out Mervyn's valuable real estate assets, the transfers and transactions caused by the PE Sponsors or imposed upon Mervyn's by the PE Sponsors have resulted in more than $400,000,000 in payments, transfers, or distributions by Mervyn's in the form of increased occupancy expenses, dividends and other transfers or distribution that have benefited the PE Sponsors and the PE Owners without corresponding benefit to Mervyn's.

61.     In order to obtain the funds to acquire the Securities from Target, the PE Sponsors, through MH, orchestrated a series of related transactions that had the effect of stripping valuable real estate assets from Mervyn's for no consideration and encumbering these assets with $800,000,000 of debt.  These actions are outlined below.

---

[1] Source for the $8,300,000 is footnote to the January 29, 2005 Mervyn's LLC and Subsidiaries Consolidated Audited Financial Statements prepared by KPMG LLP.

## Step 1 - - Formation of MDS Companies

62.     In order to accomplish the separation of Mervyn's valuable real estate assets from its retail business, the PE Sponsors, through their ownership and control of MH, caused the following special purpose entities -- the MDS Companies -- to be formed to take over Mervyn's real estate and lease it back to Mervyn's, to occur concurrently with MH's acquisition of the Securities:

- MDS Realty Holdings I, LLC, a Delaware limited liability company ("Holdings I"), was formed on August 20, 2004. Its sole equity members at the time of formation were the PE Sponsors.

- MDS Realty Holdings II, LLC, a Delaware limited liability company ("Holdings II"), was formed on August 20, 2004. Its sole equity members at the time of formation were the PE Sponsors.

- MDS Realty I, LLC, a Delaware limited liability company ("Realty I"), was formed on August 20, 2004. Its sole equity member at formation was MDS Realty Holdings I, LLC.

- MDS Realty II, LLC, a Delaware limited liability company ("Realty II"), was formed on August 20, 2004. Its sole equity member at formation was MDS Realty Holdings II, LLC.

- MDS Realty III, LLC, a Delaware limited liability company ("Realty III"), was formed on August 20, 2004. Its sole equity member at the time of formation was MDS Realty I, LLC.

- MDS Realty IV, LLC, a Delaware limited liability company ("Realty IV"), was formed on August 20, 2004. Its sole equity member at the time of formation was MDS Realty II, LLC.

- MDS Texas Realty I, LP, a Texas limited partnership ("Texas Realty I"), was formed on September 2, 2004. At formation, the general partner was MDS Texas Realty I, LLC, a Delaware limited liability company, and its limited partner was MDS Texas Properties I, LLC, a Delaware limited liability company.

- MDS Texas Realty I, LLC, a Delaware limited liability company ("TR-I"), was formed on August 20, 2004. Its sole equity member at formation was MDS Realty Holdings I, LLC.

- MDS Texas Properties I, LLC, a Delaware limited liability company ("Texas Properties I"), was formed on August 20, 2004. Its sole equity member at formation was MDS Realty Holdings I, LLC.

- MDS Texas Realty II, LP, a Texas limited partnership ("Texas Realty II"), was formed on September 2, 2004. At formation, it general partner was MDS Texas Realty II, LLC, a Delaware limited liability company, and its limited partner was MDS Texas Properties II, LLC, a Delaware limited liability company.

- MDS Texas Realty II, LLC, a Delaware limited liability company ("TR-II"), was formed on August 20, 2004. Its sole equity member at formation was MDS Texas Properties II, LLC.

- MDS Texas Properties II, LLC, a Delaware limited liability company ("Texas Properties II"), was formed on August 20, 2004. Its sole equity member at formation was MDS Realty Holdings I, LLC.

For convenience, Holdings I and Holdings II are hereinafter referred to as the "Realty Parents;" and Realty I, Realty II, Realty III, Realty IV, Texas Realty I and Texas Realty II are hereinafter each, individually, referred to as a "Realty Owner" and collectively as the "Realty Owners." Together, the Realty Parents and the Realty Owners (along with TR-I and TR-II) comprise the MDS Companies.

63.    Each of the MDS Companies was established as a bankruptcy remote special purpose entity to, among other things, shield those entities from exposure to Mervyn's creditors. The attorneys representing the MDS Companies and the PE Sponsors in connection with the closing of $800,000,000 of loans under the Loan Agreement and the Mezzanine Loan Agreement gave the Real Estate Secured Lenders a "true lease" legal opinion regarding the Unitary Leases to assure those lenders that the scheme put into place at the integrated closing of the EPA and the secured loans would prevent

Mervyn's or its creditors from ever reaching the real estate assets stripped away from Mervyn's and transferred to the MDS Companies. The requirement that the MDS Companies be established as bankruptcy-remote entities also demonstrates the intent of the PE Sponsors, who exercised control over Mervyn's, to ensure that neither Mervyn's nor its creditors could ever reach the real estate assets stripped out of Mervyn's or the $800,000,000 of loan proceeds borrowed against those assets.

**Step 2 - - The Agency Agreement and the Transfer of the Real Estate Assets**

64.     In order to strip the real estate assets out of Mervyn's, MH used the MDS Companies to institute a series of interrelated transfers that occurred at the closing of the EPA. The road map used by MH was the Agency Agreement, dated as of September 2, 2004, between and among MH and each of the MDS Companies. According to the Agency Agreement, the MDS Companies engaged MH to function as their "agent" to acquire the real estate assets on behalf of and for the benefit of the MDS Companies. The steps undertaken pursuant to the Agency Agreement were as follows:

- At the direction of the Realty Parents (who were owned, controlled and dominated by the PE Sponsors), contemporaneously with MH's acquisition of the ownership interests in Mervyn's from Target under the EPA, MH (as the duly authorized organizer of Realty I and Realty II) assigned to Mervyn's all the equity interests of Realty I (the owner of all the equity interests of Realty III) and Realty II (the owner of all the equity interest of Realty IV) so that (for a split-second) such entities became wholly-owned subsidiaries of Mervyn's.

- At the direction of the Realty Parents and Realty Owners (who were also owned, controlled and dominated by the PE Sponsors), contemporaneously with MH's acquisition

of the ownership interests in Mervyn's from Target under the EPA, MH caused Mervyn's to transfer to the Realty Owners its interests and rights in its owned parcels (the "Fees"), its transferable leases (the "Leases"), and its leases subject to restrictions on transfer (the "Restricted Leases") provided the restrictions had been lifted at the time of the closing of the EPA.

- Certain Fees and Leases as specified by the PE Sponsors were conveyed from Mervyn's to Realty I.

- Certain Fees and Leases as specified by the PE Sponsors were conveyed from Mervyn's to Realty II.

- Certain Leases as specified by the PE Sponsors were assigned from Mervyn's to Realty III.

- Certain Leases as specified by the PE Sponsors were assigned from Mervyn's to Realty IV.

- Certain Fees and Leases as specified by the PE Sponsors were conveyed from Mervyn's to Texas Realty I.

- Certain Fees and Leases as specified by the PE Sponsors were conveyed from Mervyn's to Texas Realty II.

65.    Immediately upon making the conveyances and transfers identified above:

- MH caused the equity interests in Realty I to be conveyed back to Holdings I.

- MH caused the equity interests in Realty II to be conveyed back to Holdings II.

66.    The Restricted Leases stayed with Mervyn's, but MH was obligated under the Agency Agreement to cause Mervyn's to seek to remove the transfer restrictions and to transfer the Restricted Leases to the Realty Owners upon removal of the restrictions.

67.    In sum:

- Mervyn's real estate assets were transferred from Mervyn's to the Realty Owners.

- The Realty Owners are owned and controlled by the Realty Parents.

- The Realty Parents are owned and controlled by the PE Sponsors.

- The PE Sponsors own and control MH.

- MH owns and controls Mervyn's.

- Mervyn's was paid nothing for the transfer.

68.     Mervyn's did not receive or retain any consideration for these transfers. All of the funds borrowed by the MDS Companies or contributed by the PE Sponsors to the MDS Companies were paid to Target as part of the Purchase Price for the Securities under the EPA or paid as fees to the PE Sponsors or their professionals.

69.     The Agency Agreement appears to be part of a fictitious or complex web of agreements used by the PE Sponsors to make it appear as though MH had served as the agent of the MDS Companies and acquired Mervyn's real estate assets from Target while acting solely as their agent. However, the MDS Companies and Target were not in privity of contract - - the EPA was solely between MH and Target. The documents used to paper the transaction create the appearance of back-to-back assignments in which MH caused the "rights" to the real estate assets under the EPA to be simultaneously assigned from MH to Mervyn's and from Mervyn's to the MDS Companies. This paper trail was apparently designed to make it appear as though the MDS Companies were purchasing the real estate assets from Target through use of their "agent" MH,

when, in reality, the real estate assets were owned by Mervyn's and Mervyn's was paid nothing for transferring those assets.

70.     The foregoing "assignments" were accomplished pursuant to an Agreement of Assignment dated as of September 2, 2004, between MH and Mervyn's and a second Agreement of Assignment dated as of September 2, 2004, between Mervyn's and the MDS Companies.  The assignments of the "rights" to the real estate assets under the EPA pursuant to the foregoing Agreements of Assignment are another fiction because the EPA is a stock purchase agreement, and does not address Mervyn's real estate assets (or any other assets of Mervyn's) on a particularized basis.  These multiple transfers and transactions have no apparent purpose or effect other than to attempt to obscure the fraudulent transfers that occurred at the closing of the 2004 transaction.

71.     Mervyn's began the day of the closing with more than $1,000,000,000 of real estate and, within the blink of an eye, it was gone. Mervyn's received nothing in return.

### Step 3 - - Bundling of the Real Estate Assets and Creation of the Unitary Leases

72.     Concurrently with the transfer of the real estate assets by Mervyn's to the MDS Companies, the real estate assets formerly owned by Mervyn's were bundled by the MDS Companies into three (3) Unitary Leases and leased back to Mervyn's:  Unitary Lease by and between Realty II, Texas Realty II, and Realty IV, as landlord, and Mervyn's as tenant ("Unitary Lease I"); Unitary Lease by and between Realty II, as landlord, and Mervyn's, as tenant ("Unitary Lease II"), and Unitary Lease by and between Realty I, Texas Realty I,

Realty II, Texas Realty II, Realty III, and Realty IV, as landlord, and Mervyn's, as tenant (the "Unitary Lease III").

73.     The Annual Basic Rent under Unitary Lease I is stated as $46,115,448; the Annual Basic Rent under Unitary Lease II is stated as $2,940,281; and the Annual Base Rent under Unitary Lease III is stated as $2,137,033. In addition, each Unitary Lease provides for the payment by Mervyn's of percentage rent, CAM charges, and impositions (i.e., taxes) and the payment of all base, fixed and additional rents that are payable pursuant to the terms of all of the "Overleases" (i.e., the original underlying leases between Mervyn's and the original landlords). Based upon just the Annual Basic Rent of the Unitary Leases alone, the increased occupancy costs to Mervyn's in excess of Mervyn's occupancy expenses before the 2004 transaction were approximately $50,000,000. This increase consisted of amounts selected by the PE Sponsors to mark up to "market" the rents in the Overleases - - that Mervyn's still had to pay to the underlying landlords - - and the rent that was now being charged to Mervyn's to occupy the fee properties that it had owned before the transfers. When notional rent for the Restricted Leases and other, additional, charges are added, the increased occupancy expense to Mervyn's was at least $80,000,000 per year. This increase was acknowledged by special counsel to the PE Sponsors to be 130% of the aggregate monthly debt service on the acquisition debt owed to the Real Estate Secured Lenders.

### Step 4 - - The Restricted Leases

74.     In order to extract from the Restricted Leases the same value that the PE Sponsors captured from Mervyn's assignable leases and fee properties, the PE Sponsors used MH (as 100% owner of Mervyn's) to cause Mervyn's to adopt a Limited Liability Operating Agreement that forced Mervyn's to pay a surcharge to MH for each Restricted Lease. Specifically, pursuant to section 8.5 of Mervyn's Limited Liability Operating Agreement, Mervyn's was required to make "priority distribution(s)" to MH from "Retail Net Cash flow" in amount(s) equal to the additional rent that would have been charged to Mervyn's on top of the rent it was already paying for each Restricted Lease store location the same as if each such Restricted Lease been transferred to the MDS Companies on September 2, 2004, bundled into the Unitary Leases and leased back to Mervyn's.[2] As with the rents set under the Unitary Leases, the notional rents were imposed without any input from Mervyn's. Moreover, Mervyn's received no consideration for having this additional obligation imposed upon it and it derived no benefit from paying such distributions.

75.     A parallel provision of the Limited Liability Company Agreement for MH (section 9.5) provides that so long as the Restricted Leases are held by Mervyn's, the distributions made by Mervyn's to MH as required under Section 8.5 of Mervyn's Limited liability Company Agreement would be distributed to the PE Sponsors. The PE Sponsors executed letters of agreement

---

[2] In practice, Mervyn's makes the notional rent payments directly to the PE Sponsors.

with the Real Estate Secured Lenders as part of the 2004 transaction that require the PE Sponsors to "direct and cause Mervyn's Holdings LLC (x) to enforce the obligations of Mervyn's to distribute [to Mervyn's Holdings the notional rent] as and when required under Section 8.5 of the Mervyn's LLC Agreement and (y) upon receipt of [such notional rent], to immediately pay the same directly to [Senior Real Estate Secured Lenders]," and to cause Mervyn's to transfer to the MDS Companies the ground leases and space leases that are Restricted Leases as soon as "it is prudent to do so."

## Step 5 - - The Leverage

76.     As noted in paragraphs 58 and 72 above, concurrent with the transfer of the real estate assets to the MDS Companies and the creation of the Unitary Leases, the real estate assets were used as collateral security to support $800,000,000 of secured loans from the Real Estate Secured Lenders. All or substantially all of the proceeds of the loans were used by MH to pay Target for the Securities that MH purchased under the EPA.

77.     In substance, Mervyn's provided the collateral but received none of the loan proceeds.

## Step 6 - - Final Separation of Real Estate Assets from Mervyn's

78.     Concurrent with the transfers of the real estate assets that occurred on September 2, 2004, the PE Sponsors caused MH to cause Mervyn's to sell, assign, and transfer (i) 100% of its membership interests in Realty I to Holdings I and (ii) 100% of its membership interests in Realty II to Holdings II. As a result of the foregoing transfers of membership interests, Realty I and

Realty II were converted from wholly-owned subsidiaries of Mervyn's to wholly-owned subsidiaries of the Realty Parents -- Holdings I and Holdings II. Because Realty I owned 100% of the interests in Realty III, and Realty II owned 100% of the interests in Realty IV, those entities also moved away from Mervyn's and over to the MDS Companies at the time of the closing of the EPA. In fact, it appears that Realty I, II, III, and IV made instantaneous round-trips, moving from Holdings I and II to Mervyn's and then back to Holdings I and II at the precise moment of the closing.

79.     The amputation of the real estate legs from the body of the retail operations was complete -- and it was all done in a split-second series of concurrent transfers orchestrated by the PE Sponsors for the benefit of themselves and the PE Owners, with the knowledge, participation, or acquiescence of Target and the Real Estate Secured Lenders - - all of whom profited or benefited from such transfers.

**The Negative Effects on Mervyn's**

80.     The results for Mervyn's were devastating. In order to both service the $800,000,000 debt incurred by the MDS Companies to the Real Estate Secured Lenders, and to fully extract the value of the real estate assets from Mervyn's, the PE Sponsors caused several adjustments to be made -- all to the detriment of Mervyn's and its creditors.

81.     First, the store leases were marked up to "market rates," bundled together, and leased back to Mervyn's through the Unitary Leases. As a result, the rent that Mervyn's had been paying under the un-bundled leases was

increased by the PE Sponsors in an amount sufficient to service the debt placed on the MDS Companies to fund MH's acquisition of the Securities, and to generate excess cash flow for the MDS Companies and its owners (the PE Sponsors and their owners, the PE Owners). This arrangement caused a large and detrimental increase in Mervyn's occupancy costs even though the underlying landlords had no right to increase Mervyn's rent in this manner. The bundling under the Unitary Leases masks the actual increases because, under each Unitary Lease, Mervyn's has a single monthly basic rent payment (as well as obligations to pay percentage rent, CAM charges, taxes and other impositions). The real estate assets transferred to the MDS Companies also included Mervyn's owned and mostly unencumbered real estate. These formerly owned properties were now leased back to Mervyn's at "market rent" rates, increasing Mervyn's occupancy costs for such stores from no rent to "market rent." Because the Unitary Leases were triple net leases, Mervyn's now had the dual burdens of ownership and tenancy foisted upon it.

82. Second, because certain of Mervyn's store leases were Restricted Leases, in order to enable the MDS Companies to service the debt that was incurred to enable the PE Sponsors to pay the Purchase Price, MH (as controlled by the PE Sponsors) caused Mervyn's to agree to pay to MH, as a special dividend or distribution, in addition to the rent due to the landlord under each Restricted Lease, an extra amount for each Restricted Lease equal to the additional mark up that the MDS Companies would have imposed upon Mervyn's had such Restricted Lease been transferred to the MDS Companies for bundling

into the Unitary Leases along with Mervyn's other store leases. This special

dividend was required under the terms of Mervyn's limited liability agreement (as

designed by and executed at the direction of the PE Sponsors) to be "distributed"

by Mervyn's to MH. MH would distribute these payments to its "Restricted

Lease Members" (i.e., to the PE Sponsors) who in turn paid these funds over to

the Real Estate Secured Lenders. Mervyn's received no benefit from paying the

notional rent to the MDS Companies on account of the Restricted Leases.

83.     Third, the bundling the individual Leases and Fees into

"unitary" leases prevented Mervyn's from closing stores without the consent of

the PE Sponsors or (more importantly) the Real Estate Secured Lenders, and

would purport to prevent Mervyn's from rejecting individual store leases in any

subsequent bankruptcy case.

84.     Fourth, the bundling of Mervyn's leases and the formerly

owned real estate into "unitary" leases delivered massive bargaining power and

leverage to the Real Estate Secured Lenders and to the PE Sponsors and left

Mervyn's as a helpless pawn. For example, if Mervyn's struggled to pay rent, a

shortage of even $1.00 under a Unitary Lease imperiled all of the stores covered

under that lease, while before the bundling, a shortage of $1.00 would only affect

a single lease for a single store. Mervyn's was turned into little more than a

vehicle to pay debt service for the benefit of the PE Sponsors who had stripped

away and leveraged Mervyn's former real estate assets.

85.     Fifth, because the PE Sponsors own both the retail

operations (through its ownership of MH and Mervyn's) and the real estate assets

(through its ownership of the MDS Companies), the PE Sponsors have a conflict of interest whenever they make a decision affecting Mervyn's interests with respect to such real estate assets. On occasions such as those described in paragraphs 109 and 110 below, the PE Sponsors have made decisions affecting Mervyn's with regard for how to best protect the value of the real estate portfolio even though such decisions were not in the best interests of Mervyn's.

86. In sum, Mervyn's was disadvantaged in at least the following ways -- for the benefit of the PE Sponsors:

- Valuable real estate assets were stripped out of Mervyn's.

- Store occupancy costs were increased to support the debt heaped onto the MDS Companies and to generate cash for the owners of the MDS Companies (i.e., the PE Sponsors), who (as the owners of MH) were also the ultimate owners of Mervyn's.

- Although there was excess value in the real estate assets above the debt owed to the Real Estate Secured Lenders, by stripping the real estate assets out of Mervyn's, that excess value was no longer part of Mervyn's capital and unavailable to Mervyn's or its creditors.

- With respect to the Unitary Leases, distributions under the guise of rent mark-ups were required by the PE Sponsors to be made by Mervyn's to MH for the benefit of the PE Sponsors each month to enable the MDS Companies to meet debt service and to make distributions to the owners of the MDS Companies.

- With respect to the Restricted Leases, distributions in the form of notional rent were required by the PE Sponsors to be made by Mervyn's to MH for the benefit of the PE Sponsors each month for delivery to the MDS Companies to enable the MDS Companies to meet debt service.

- The PE Sponsors' separation of the real estate from Mervyn's created conflicts of economic interest for MH as the owner and managing member of Mervyn's because the ultimate owners of MH and the ultimate owners of the MDS Companies were one and the same - - the PE Owners acting through the PE Sponsors.

87. Through their control of MH, the PE Sponsors used Mervyn's most valuable assets - - its real estate leases (many of which were below market due, in part, to Mervyn's status as an anchor tenant and due, in part, to the age of the leases) and its valuable owned real estate (mostly unencumbered) - - to borrow $800,000,000 of the Purchase Price from the Real Estate Secured Lenders.

88. Rather than simply maintaining Mervyn's retail operations and the integrated real estate assets at which the retail stores were operated intact within Mervyn's and leveraging the real estate assets as would have been done under a traditional LBO transaction, the PE Sponsors separated the real estate assets from Mervyn's at the closing of the EPA. The PE Sponsors thereby converted Mervyn's from a retailer with valuable below market leases and valuable owned real estate into a shrunken operating company whose remaining capital consisted largely of inventory, cash, credit card receipts, and intellectual property.

89. To do this, MH caused Mervyn's to transfer its real estate assets to the newly-formed MDS Companies for no consideration and those entities simultaneously bundled the real estate assets into the Unitary Leases, leased the affected properties back to Mervyn's at increased rates, and hypothecated the Unitary Leases and other real estate assets to the Real Estate Secured Lenders as collateral security for the repayment of $800,000,000 of loans used by MH to purchase the Securities from Target.

90.    The result of the foregoing was to disadvantage Mervyn's

tremendously in the years following the closing of the EPA.

**The PE Sponsors and the Real Estate Secured Lenders Acknowledged, Knew and Intended that Mervyn's Would Be Separated from Its Valuable Real Estate Assets**

91.    The affiliates of the PE Sponsors delivered a "true lease"

opinion to the Real Estate Secured Lenders in connection with the Real Estate

Secured Loans made to the MDS Companies.  The apparent purpose of that legal

opinion was to assure the Real Estate Secured Lenders that the Unitary Leases

would be treated as unexpired leases in any future bankruptcy case of Mervyn's.

92.    The opinion letter highlights some of the economic aspects

of the 2004 transaction and the Unitary Leases and demonstrates the

interrelatedness of the 2004 transfers and transactions, and the absence of

consideration to and the detrimental impact upon, Mervyn's.  These provisions,

set forth verbatim from the full text of the opinion letter, are as follows (emphasis

added):

> Each of the MDS Entities is a single-purpose entity
> whose sole business consists of the ownership,
> operation, development and sale of the fee or
> leasehold estates in the Properties[3] held by such
> MDS Entity[4], subject, in all events, to the terms of
> the applicable Unitary Lease.
>
> Pursuant to Section 1.3 of the Agency Agreement,
> Mervyn's Holdings[5] has caused New Mervyn's[6] to

---

[3]  Defined as Mervyn's former fee and leasehold interests.

[4]  Referring to the MDS Companies.

[5]  Referring to MH.

[6]  Referring to Mervyn's.

simultaneously sell, assign, transfer and convey all of the Properties (other than New Mervyn's leasehold interest in the Restricted Leases) to the MDS Entities. **The proceeds arising from the sale of the Properties to the MDS Entities by New Mervyn's (including the proceeds of the Acquisition Loan, which will be used to finance the MDS Entities' acquisition of such Properties) will be distributed to Target by Mervyn's Holdings, such that New Mervyn's (and Mervyn's Holdings, as the new owner of New Mervyn's) will not retain any of the proceeds of such sale (or such financing).**

The Properties, upon being acquired by the MDS Entities, will be simultaneously leased (or subleased, as the case may be) to New Mervyn's, the former owner of the Properties, pursuant to three separate but related Unitary Leases. **Each such Unitary Lease will demise more than one Property but will, by its terms, be treated as a single lease and the monthly rent payable thereunder will be a single, aggregate monthly amount (i.e., there will not be a separately identified monthly rent allocable to each location demised under such Unitary Lease and the tenant's failure to pay any portion of the monthly rent could result in the termination of the entire lease by the landlord thereunder).**

**Each of the Unitary Leases will be a so-called "triple net" lease pursuant to which the tenant will have sole responsibility for the payment of all costs and expenses (including, without limitation, real estate taxes, insurance premiums and maintenance costs) associated with the premises demised pursuant to such lease.**

The initial term of one of the Unitary Leases (the "Ten Year Lease") will be ten years and five months and **New Mervyn's will have the right, at its option, to renew the lease, at the greater of (x) the then prevailing market rental rate, or (y) 110% of the lease rate in effect at the beginning of the extension term,** pursuant to two consecutive five year extension options.

New Mervyn's has no obligation to pay any monies to Lender, on account of the Unitary Leases or otherwise, and, pursuant to the instructions of the applicable MDS Entities, **all amounts due, from time to time, pursuant to the Unitary Leases, are payable directly to an account of the applicable MDS Entity (the "Designated Account").**

As a consequence of the divergent economic interests of the parties, the terms of the Unitary Leases were negotiated on an arm's-length basis and **the rent payable pursuant thereto reflects the current fair market rental value of the Properties** covered by the Unitary Lease with a Ten Year term. In this regard, we note that Cushman & Wakefield has performed certain investigations with respect to the rental markets in which the Properties are located and has concluded that (i) the rent payable for the Properties demised pursuant to the **Ten Year Lease,** taken as a whole, is within the reasonable range of current fair market rental values for such Properties, and (ii) **there is material residual value in the Properties subject to such lease.** The rent payable for the Properties demised pursuant to the Seventeen Month Lease and the Three Year Lease, while not capable of being evaluated in terms of a "market" rent that would apply to longer term leases, is not inconsistent with provisions to be expected in a short-term lease of "big box" retail space.

**According to Cushman & Wakefield, the residual value of the Properties demised pursuant to the Seventeen Month Lease and the Three Year Lease is greater, on a percentage basis, than the residual value of the Properties demised pursuant to the Ten Year Lease.[7]**

---

[7] The reference to Cushman & Wakefield is to an appraisal letter from Cushman & Wakefield attached to the opinion letter as an exhibit. In that letter, Cushman & Wakefield states its belief that the residual value of the Properties contained within the short term Unitary Leases -- Unitary Leases II and III -- will have "even greater" residual value than the Properties subject to the Ten Year [Unitary] Lease. The reason is obvious. After the expiration of the Unitary Lease, the underlying owned real estate and the underlying long-term below market leases will revest to

**The MDS Entities acquired the Properties with the expectation that the Properties would have significant residual equity value at the expiration or earlier termination of the Unitary Leases.**

**The aggregate monthly rent payable pursuant to the three Unitary Leases is significantly in excess of the scheduled monthly debt service owed to Lender on account of the Acquisition Loan.**

Accordingly, **all monthly rent received in excess of monthly debt service** owed to Lender on account of the Acquisition Loan **will belong solely to the applicable MDS Entities.**

**Title to all improvements at the Properties (including all alterations and additions installed or constructed by New Mervyn's during the term of the Unitary Leases) will belong to the applicable MDS Entity at the expiration or earlier termination of the Unitary Leases without any reimbursement or other compensation to New Mervyn's.**

The MDS Entities project that **the aggregate monthly rent payable** pursuant to the Unitary Leases **will exceed the aggregate monthly amount payable to Lender** with respect to the Acquisition Loan. Absent a default under the Acquisition Loan or the events giving rise to the Cash Trap referred to above, **the MDS Entities will be permitted to receive and retain such excess rental proceeds without restriction.**

**The MDS Entities retain a reversionary interest in the Properties that has significant value** and the MDS Entities bear the economic risk of fluctuations in that value.

Upon the occurrence of an event of default under the Unitary Leases, the applicable MDS Entity, as lessor, will have the right to enter the demised

---

the MDS Companies to capitalize upon, not to Mervyn's. These locations can be re-let by the MDS Companies to Mervyn's at still higher rates or leased to third parties.

premises, dispossess the lessee therefrom and otherwise exercise all of the rights and remedies available to a landlord under applicable law.

Upon the expiration or earlier termination of the Unitary Leases, **New Mervyn's, as lessee, must surrender the demised premises to the applicable MDS Entity, free and clear of all liens other than those specifically permitted by the applicable Unitary Lease.**

**The Acquisition, the Unitary Leases and the Acquisition Loan are being entered into contemporaneously and were planned and are being implemented as related transactions.**

**The Sponsors control the MDS Entities and New Mervyn's.**

Although New Mervyn's has no legal obligation to make any payments to or for the benefit of the Lender, **New Mervyn's is committed, under its Operating Agreement, to make certain mandatory dividends to Mervyn's Holdings for the exclusive benefit of the "Real Estate" series of membership interests in Mervyn's Holdings, and the Sponsors have directed Mervyn's Holdings, in writing, to remit all such dividends, upon receipt, to MDS Realty Holdings I, LLC for the benefit of Borrowers.**

**Each Unitary Lease is a "triple net" lease** pursuant to which the lessee will pay or perform a significant number of obligations relating to the applicable Properties which would typically be paid or performed by the owner of the Properties.

**The most significant factors creating risk that the Unitary Leases could be recharacterized as financing pertain, in our view, to the fact that the Sponsors, as a group, own and control New Mervyn's and each of the MDS Entities, the fact that the Acquisition, the Unitary Leases and the Acquisition Loan constitute a related series of transactions, and the fact that New Mervyn's, as a "net" lessee, will be obligated to pay or perform a significant number of obligations**

**relating to the Properties which would typically be paid or performed by the owner of the Properties.**

We note, for example, the parties' unambiguously expressed intent to create a lease; **the MDS Entities' ownership of a valuable residual interest in the Properties; the absence of any purchase option in favor of New Mervyn's**; the fact that the Unitary Leases will be treated as an operating lease for tax and financial reporting purposes by New Mervyn's and each of the MDS Entities; **the fact that the MDS Entities will receive and retain a significant amount of net excess rent under the Unitary Leases during the term of the Acquisition Loan**; and the fact that the rents payable pursuant to the Unitary Leases are at market or are otherwise reflective of an arm's-length, negotiated leasing arrangement.

93.     The foregoing admissions by the PE Sponsors confirm that:

- The proceeds from the loans made by the Real Estate Secured Lenders were distributed to Target by MH (thus disregarding the fiction of the Agency Agreement).

- The Unitary Lease structure is contrary to Mervyn's best interests because a payment default imperils the multiple stores bundled into that lease.

- The Unitary Leases effectively raised the rents under Mervyn's existing leases to what the PE Sponsors determined to be "market rates," and thereby deprived Mervyn's of its former competitive advantage of low occupancy costs.

- The loss of significant residual values for the real estate assets deprived Mervyn's of the opportunity or ability to realize that value for itself, particularly if its liquidity were to become constrained.

- The "excess" rent burden represented by the difference between Mervyn's pre-transaction and post-transaction occupancy costs exceeds even the debt service payments to the Real Estate Secured Lenders.

- The Unitary Leases permit the landlords to dispossess Mervyn's at the end of the lease terms even though the terms of the Unitary Leases are not coterminous with the underlying leases. This could result in Mervyn's losing its right to occupy its store premises, including premises it had <u>owned</u> before the 2004 transaction.

- The PE Sponsors had absolute control over Mervyn's, as evidenced by the requirement that Mervyn's pay notional rent for the Restricted Leases.

- The multiple transfers and transactions were integrated and interdependent.

- The triple net lease aspect of the Unitary Lease puts the full economic burden of ownership on Mervyn's with none of the benefits.

94.     The "true lease" legal opinion also demonstrates the actual intent of the parties to separate Mervyn's real estate assets from its creditors. The PE Sponsors who exercised control over Mervyn's intended that the "true" lease structure of the Unitary Leases would prevent the MDS Companies and the Real Estate Secured Lenders from getting entangled in a bankruptcy case by Mervyn's. As lessors of commercial real property, the MDS Companies could insist upon timely payment of rent and other items due under the Unitary Leases and avoid the issues that would exist if the Unitary Leases were found to be disguised financings.

### Transaction Fees Paid by Mervyn's

95.     Although the 2004 transaction provided no benefits to Mervyn's and substantial detriments, at the closing of 2004 transaction, the PE Sponsors caused Mervyn's to pay $58,622,427 of transaction fees of various kinds to the PE Sponsors and/or on their behalf or for their benefit. For example:

$16,000,000 was paid to Cerberus or its affiliates (including $2,500,000 of sponsor-related fees to Cerberus or its affiliates, and $1,500,000 to Ableco and $12,000,000 to Madeleine for break-up fees or commitment fees relating to proposed real estate financing), $2,500,000 was paid to KLA or its affiliates, $2,500,000 was paid to Sun or its affiliates, $4,000,000 was paid to the Real Estate Secured Senior Lenders and $4,000,000 was paid to the Real Estate Secured Mezzanine Lenders (in both cases, exclusive of legal fees also paid). In addition, direct payments were made of professional fees incurred by the PE Sponsors and their affiliates of approximately $5,000,000. A chart based upon the closing schedule (and therefore subject to adjustment) is attached hereto as Exhibit A and is incorporated herein by this reference.

96.     Mervyn's received no benefit from the payment of the foregoing fees.

**The PE Sponsors Completely Dominated Mervyn's With Respect to the Transfers and Transactions at Issue**

97.     At all relevant times, following MH's acquisition of the Securities, the PE Sponsors completely dominated Mervyn's with respect to the transfers and transactions at issue. As of the closing and thereafter, the PE Sponsors owned all of the equity of MH, and MH owned all of the equity of Mervyn's. The PE Sponsors installed their designees as members of the Board of Managers of MH. The MH Board of Managers, who were charged with overseeing Mervyn's affairs, represented the interests of the PE Sponsors. The PE Sponsors selected employees and/or consultants to oversee Mervyn's and advance the interests of the PE Sponsors with respect to Mervyn's.

98. The PE Sponsors caused Mervyn's to transfer its real estate assets to the MDS Companies for no consideration. The PE Sponsors arranged for liens to be granted to the Real Estate Secured Lenders on such real estate assets in exchange for loans of $800,000,000. The PE Sponsors caused the proceeds of such loans to be conveyed to Target. The PE Sponsors caused Mervyn's to enter into the Unitary Leases at substantially increased rents, and to pay "notional rent" in the form of distributions to MH for the benefit of the PE Sponsors. And, the PE Sponsors caused Mervyn's to pay transaction fees to, or for the benefit of, the PE Sponsors.

99. Mervyn's transfers of real property assets, Mervyn's entry into the Unitary Leases, Mervyn's payment of "notional rent," and Mervyn's payment of transaction fees were not the product of any arms'-length negotiation between Mervyn's and any other entity. Rather, they were self-dealing transfers and transactions imposed upon Mervyn's by the PE Sponsors, acting through MH. Such transfers and transactions benefited the PE Sponsors, who stood on all sides of such transfers and transactions, because they were the sole owners of the MDS Companies, and the beneficiaries of the proceeds of the loans by the Real Estate Secured Lenders, and transaction fees paid by Mervyn's. However, Mervyn's transfers of its real estate assets for no consideration, Mervyn's entry into the Unitary Leases, Mervyn's payment of "notional rent," and Mervyn's payment of transaction fees, all on terms dictated to Mervyn's by the PE Sponsors acting through MH, were plainly contrary to the best interests of Mervyn's.

## Effect of 2004 Transaction on Mervyn's Financial Condition

100.    According to Mervyn's audited financial statements, only $8,300,000 of the $1,175,000,000 purchase price was allocated to the retail operations.[8] After the PE Sponsors stripped the real estate from it, Mervyn's balance sheet reflected only $673,503,000 of assets and $664,203,000 of liabilities. Included in the assets were $48,939,000 of "Intangibles" (comprised of brand names, license agreements and credit card program); $59,506,000 of "Property, Plant and Equipment" (including certain costs related to the acquisition and development of software, construction in progress and store fixtures); and $18,581,000 of "Other Current Assets" (prepaid expenses and deposits). Mervyn's was insolvent as of September 2, 2004, because, given the nature of Mervyn's assets, the fair value of its assets did not exceed the fair value of its liabilities, some of which were not reflected on its balance sheet.

101.    Mervyn's was also left with ***negative*** working capital (current assets, less current liabilities, which is a barometer for the ability of an entity to pay debts as they become due) of over $22,200,000.

102.    Notwithstanding the fact that Mervyn's only source of working capital was to incur debt, the transaction burdened Mervyn's with at least $80,000,000 of <u>additional</u> annual expenses and increased distribution requirements to its PE Sponsors. Significant assets, which could have been

---

[8] Mervyn's LLC Consolidated Financial Statements January 28, 2006 and January 29, 2005 with the Independent Auditors (KPMG LLP) Report dated June 9, 2006.

utilized for working capital purposes, were no longer available to Mervyn's or its creditors.

### The Common Ownership of Mervyn's and the MDS Companies Created Conflicts of Interest

103.    The Limited Liability Company Agreement for MH divides the ownership of MH and the operation and management of MH's businesses between the retail business operated by Mervyn's (the "Retail Business") and the handling of the Restricted Leases (the "Restricted Leases Business"). Among the prime purposes of the Restricted Lease Business was the capture of the notional rent so that it could be paid over to the Real Estate Secured Lenders and the prompt transfer of the Restricted Leases to the MDS Companies.

104.    The ownership of MH is divided between those members of the limited liability company holding "Retail Percentage Interests" and "Restricted Lease Percentage Interests." The Restricted Lease Interests are further divided between common and preferred interests.

105.    Mervyn's is set up in a similar manner under its Limited Liability Company Agreement, with ownership, operation and management split between the Retail Business and the Restricted Leases Business. MH holds 100% of the Retail Percentage Interests and 100% of the Restrictive Lease Percentage Interests. Once again, among the prime purposes of the Restricted Lease Business was the capture of the notional rent so that it could be paid over to the Real Estate Secured Lenders and the prompt transfer of the Restricted Leases to the MDS Companies.

106. Because both the Retail Percentage Interests and the Restrictive Lease Percentage Interests of Mervyn's are held by MH, and MH has a split in its internal ownership percentages (with some of the PE Sponsors more heavily vested in the Retail Business and others more heavily vested in the Restricted Lease Business), this resulted in a conflict of interest between Mervyn's Retail Business and the Restricted Lease Business. There were also conflicts that resulted from the PE Sponsors owning MH and also owning Mervyn's former real estate assets through the MDS Companies. Because MH was the sole member and sole manager of Mervyn's, the PE Sponsors could use their ownership of MH to cause Mervyn's to act in ways that enhanced the value of the real estate assets owned by the MDS Companies.

107. The foregoing conflicts of interest have been manifested in several instances in addition to -- or perhaps as a consequence of -- the excessive rents that have been imposed upon Mervyn's by the PE Sponsors.

108. At the time of the 2004 transaction and thereafter, the cash flow multiples generally used to value real estate assets were much higher than the cash flow multiples generally used to value a retail operating company. This difference provided an incentive to the PE Sponsors to maximize the income of the MDS Companies at the expense of Mervyn's. If every additional dollar of income at the MDS Companies was worth a multiple of $10.00 to $12.00, while a corresponding reduction of $1.00 at Mervyn's resulted in a loss of only $5.00 to $6.00 of value, then, taking a dollar from Mervyn's was more than offset by adding a dollar to the MDS Companies. In addition to imposing excessive rents

on Mervyn's in order to enhance the value of the real estate portfolio owned by the PE Sponsors through the MDS Companies, other examples of how this conflict harmed Mervyn's are as follows:

### Valencia Lease

109.    In order to evade the restrictions on transfer contained in the Restricted Lease for the Valencia store, the PE Sponsors caused MH to cause Mervyn's to agree to a transaction structure that required the resulting lease to be treated by Mervyn's as a capital lease, thus adding $10 million of debt to Mervyn's balance sheet. This transaction was done to benefit the PE Sponsors because, as a result of the restructuring of the lease, the Valencia Lease was sold to a third party and the proceeds were paid to the Realty Owner - - an entity owned by the PE Sponsors. There was no benefit to Mervyn's, only a burden.

### Headquarters Sale

110.    In order to sell Mervyn's headquarters building, the property -- itself a converted department store -- was taken from Mervyn's in the 2004 transaction, put into a Unitary Lease, and leased back to Mervyn's at "market" rent for an initial 20 year term. This unattractive long-term lease was imposed upon Mervyn's to enable the headquarters building to be sold by the Realty Owner to a third party who would have Mervyn's tied up as a tenant for the same 20 year term. In addition, the rent that the PE Sponsors forced Mervyn's to agree to pay to the new third party owner was even greater than the rent that had been imposed upon Mervyn's under the Unitary Lease. The new lease also contained a penalty clause that required Mervyn's to pay up to an additional $25

million to the new owner if the Mervyn's chain was sold and the headquarters was no longer needed by the buyer. As with the Valencia Lease, this transaction was done to benefit the PE Sponsors because, as the owners of the Realty Owner of the subject real estate asset, the proceeds that were paid to the Realty Owner benefited the PE Sponsors. There was no benefit to Mervyn's, only a burden.

### Third Party Sale Transactions

111.    Following the closing of the 2004 transaction, the PE Sponsors  began to realize upon the valuable real estate they had stripped out of Mervyn's.  To that end, during 2005 and 2006, the MDS Companies entered into a series of sales transactions with third parties (the "Third Party Sales Transactions") pursuant to which one or more of the Realty Owners sold, assigned, and transferred real estate assets acquired in the 2004 transaction to new owners such as affiliates of Developers Diversified Realty, Inland Western Real Estate Trust, Inc., The Macerich Company, and to other buyers (the "Third Party Purchasers").

112.    In the Third Party Sale Transactions, the MDS Companies that were the Realty Owners, acting for the benefit of the PE Sponsors (as the owners of the Realty Owners) and for the benefit of the PE Owners (as the owners of the PE Sponsors), sold real estate assets formerly owned by Mervyn's to various buyers for more than $1 billion dollars. The Third Party Sale Transactions were possible because the economic benefits of the increased rent obligations imposed upon Mervyn's under the Unitary Leases were transferred to the purchasers. In exchange, the purchasers paid large premiums to the Realty

Owners in order to be able to continue to collect the increased rents from Mervyn's and also to gain control of the valuable development and other real estate rights formerly owned by Mervyn's. In this manner, the PE Sponsors used the rents and other occupancy costs imposed on Mervyn's in the 2004 transaction (and later in the 2005 refinancing) to exploit Mervyn's real estate assets by, among other things, locking Mervyn's long term rent obligations that made Mervyn's real estate assets more saleable to the Third Party Real Estate Purchasers who paid premiums to the Realty Owners and the other MDS Companies for the benefit of the PE Sponsors and the PE Owners - - with no consideration or corresponding benefit to Mervyn's.

113.    In some instances, the Third Party Real Estate Purchasers owned or operated the shopping centers where the Mervyn's stores were located. In almost every instance, new individual leases (the "New Leases") were entered into between Mervyn's and the "new" owner of the transferred fee property or transferred leasehold interest and, as to purchasers of multiple fee or leasehold interests, the New Leases were cross-defaulted in favor of such purchaser, in order to maintain the same type of unequal bargaining power over Mervyn's that existed under the Unitary Leases.

114.    As a result of the Third Party Sale Transactions and the New Leases that resulted from those transactions, Mervyn's continued to be obligated to pay rent at least equivalent to the increased rents that had been imposed upon it under the Unitary Leases, but now the increased rents were paid to the transferees of the Realty Owners under New Leases that captured the

economics and other attributes of the Unitary Leases.[9] The purpose and effect of the New Leases was to facilitate the Third Party Sales Transactions by locking Mervyn's into long term obligations as the tenant of the purchaser, thus enabling the MDS Companies, acting on behalf and for the benefit of the PE Sponsors and the PE Owners, to realize hundreds of millions of dollars for Mervyn's former real estate assets while it became increasingly difficult for Mervyn's to operate its retail business and pay its occupancy costs.

115. None of the hundreds of millions of dollars of proceeds paid to the Realty Owners for the benefit of the PE Sponsors and the PE Owners were shared with Mervyn's and the PE Sponsors caused MH to cause Mervyn's to cut back on operating expenses other than rent, to the detriment of its retail operations, so that Mervyn's could continue to service its burdensome lease obligations.

### The 2005 Refinancing of the Real Estate Debt

116. On or about December 22, 2005, the Senior Real Estate Secured Lenders and the Mezzanine Real Estate Secured Lenders refinanced the indebtedness under the Loan Agreement and the Mezzanine Loan Agreement described in paragraph 58.

117. Pursuant to that certain Loan Agreement, dated as of December 22, 2005, by and among Greenwich, Goldman Sachs Commercial

---

[9] In some instances Mervyn's was required to agree to new rents that were under the New Leases greater than the rent Mervyn's had been paying under the Unitary Leases in order to facilitate the sale.

Mortgage Capital, L.P., and Citigroup Global Markets Realty Corp., as senior lenders, and Realty I, Realty II, Texas Realty I, and Texas Realty II, as borrowers, the foregoing senior lenders advanced $575 million to the foregoing borrowers. In addition, pursuant to that certain Mezzanine Loan Agreement, dated as of December 22, 2005, by and between Greenwich, GS Mortgage, and Citigroup Global Markets Realty Corp., as mezzanine lenders, and Holdings I, Holdings II, Texas Properties I, and Texas Properties II, as borrowers, the foregoing mezzanine lenders advanced $375 million to the foregoing borrowers.

118.    As a result of the refinancing, the original loans of $800 million borrowed by the MDS Companies as part of the 2004 transaction - - that had been paid down to some extent with proceeds of Third Party Sales Transactions - - were replaced with $950 million of indebtedness.

119.    Also in connection with the 2005 refinancing, Unitary Lease I, Unitary Lease II, and Unitary Lease III were amended and restated (the "Amended and Restated Unitary Leases").

120.    Because of the sales of Mervyn's former real estate assets by the Realty Owners pursuant to the Third Party Sales Transactions, by the time of the 2005 refinancing, the MDS Companies owned fewer real estate assets than they acquired when the 2004 transaction closed. As a result, the Amended and Restated Unitary Leases covered fewer store locations than the original Unitary Leases. Consequently, although in absolute dollars the basic rents under the Amended and Restated Unitary Leases were lower than the basic rents under the original Unitary Leases, the basic rents on a per store basis were actually higher

under the Amended and Restated Unitary Leases than under the original Unitary Leases. This imbalance represented a further increase in Mervyn's occupancy costs, even though the Amended and Restated Unitary Leases covered fewer stores than the original Unitary Leases.

121. By the time of the 2005 refinancing, if the occupancy costs attributable to the stores transferred to new owners/landlords under the Third Party Sales Transactions are added to the occupancy costs attributable to the stores covered by the Amended and Restated Unitary Leases and to the notional rents still paid under the Restricted Leases, the annual occupancy costs for all of Mervyn's stores increased by at least $77 million per annum from its occupancy costs immediately following the rent increases attributable to the 2004 transaction. And if the rent increases imposed on Mervyn's at or following the 2004 transaction are also taken into account, Mervyn's occupancy expenses increased by a remarkable $157 million per annum from its occupancy costs immediately before the 2004 transaction.

122. The increased occupancy costs under the Amended and Restated Unitary Leases were used in part to cover debt service on the $950 million borrowed by the MDS Companies in the 2005 refinancing and harmed Mervyn's because the increased costs (coupled with declining sales in 2006) restricted Mervyn's ability to do property maintenance and capital improvements and because Mervyn's was compelled by its owners - - who also separately owned the real estate interests they had severed from Mervyn's - - to reduce or curtail its store operations (and thus customer service and satisfaction) in order to

support the increased rent and other occupancy payments imposed upon Mervyn's by the PE Sponsors.

<h3 style="text-align:center"><b><u>Special $60 Million Dividend</u></b></h3>

123.     In 2006 the PE Sponsors, as the owners of MH, caused Mervyn's to borrow money on its lines of credit in order to pay a special dividend to themselves in a lump sum payment even though the original calculation supporting that dividend was acknowledged to be an error and even though members of Mervyn's management stated that the payment should be spread out over time.

<h3 style="text-align:center"><b><u>The Domination and Control of Mervyn's by the PE Sponsors Harmed Mervyn's</u></b></h3>

124.     The PE Sponsors owned and completely dominated and controlled Mervyn's and used such domination and control to impose the transactions described herein upon Mervyn's for their own benefit and for the benefit of the PE Owners.  These transactions included the transfer of Mervyn's real estate assets to the MDS Companies, the creation of the Unitary Leases and later the Amended and Restated Unitary Leases, the imposition of increased occupancy costs on Mervyn's through such leases, the imposition of the notional rents upon Mervyn's, the incorporation of the notional rents into Mervyn's charter documents, the Valencia Lease transaction, the Headquarters Lease transaction, and the Third Party Sale Transactions.  The foregoing transactions all benefited the PE Sponsors - - who owned and controlled Mervyn's through their ownership and control of MH and who concurrently owned and controlled the MDS Companies.  The MDS Companies were the vehicles through which the PE

Sponsors realized upon many of the foregoing benefits. These benefits included the value of the real estate assets transferred to the MDS Companies, the rents and notional rents paid to the MDS Companies, and the proceeds of the Third Party Sales Transaction paid to the MDS Companies, none of which benefited Mervyn's or its creditors.

## The PE Sponsor's Fraudulent Intent Can Be imputed to Mervyn's

125.     Mervyn's real estate assets were transferred to the MDS Companies by the PE Sponsors and bundled into the Unitary Leases (and later the Amended and Restated Unitary Leases) in order to impose occupancy costs on Mervyn's in excess of what it had been paying immediately before the 2004 transaction. The bundling of separate properties into the Unitary Leases (and later into Amended and Restated Unitary Leases) was intended by the PE Sponsors to prevent Mervyn's from closing stores or missing rent payments without imperiling multiple store locations. The "true lease" opinion obtained by the PE Sponsors for the MDS Companies demonstrates that the PE Sponsors, acting as the owners of the MDS Companies, wanted assurance that the leases would receive favorable treatment - - ahead of unsecured creditors - - in any bankruptcy case of Mervyn's and assurance that the value of the leases and the underlying real estate would not be subject to the claims of Mervyn's creditors.

126.     The structure of the Unitary Leases and the Amended and Restated Unitary Leases was part of an overall plan by the PE Sponsors to impair Mervyn's ability to pay its other creditors as opposed to the payment of its obligations under the Unitary Leases, the Amended and Restated Unitary Leases,

and the leases transferred as part of the Third Party Sale Transactions, and to elevate the rights and enhance the leverage of the MDS Companies and other lessors against Mervyn's as compared to other creditors. The obligations created under the Unitary Leases and the Amended and Restated Unitary Leases, and thus the payments made by Mervyn's to the MDS Companies under those leases, or under any successor leases to those leases, were made with actual intent to hinder, delay, or defraud creditors.

127.    Mervyn's was dominated and controlled by the PE Sponsors who, while acting for their own benefit and for the benefit of the PE Owners, imposed the transactions described herein upon Mervyn's and caused Mervyn's to enter into such transactions and to make the transfers described herein. The PE Sponsors and the PE Owners took the actions described herein in bad faith. As a result of such domination and control by the PE Sponsors, any requisite intent for actual or constructive fraud is implied, imputed, inferred, or transferred from the PE Sponsors to Mervyn's because the PE Sponsors, as insiders in control of Mervyn's, supply any intent required on the part of the transferor or obligor.

## Count I

**(Avoidance of Transfer of Real Property Assets or Recapture of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against MDS Companies, PE Sponsors, PE Owners and Target)**

128.    Plaintiff realleges its allegations in paragraphs 1 through 127 herein.

129.     All of the participants and lenders involved in Target's sale of Mervyn's to the PE Sponsors intended and planned that all transactions involved in that buyout and the financing of that sale - - including the sale of Mervyn's, the transfer of Mervyn's real estate assets to the MDS Companies, the borrowing of funds from the Real Estate Secured Lenders and pledging of liens to those Lenders in order to partially finance the purchase, the payment of the purchase price to Target and all other related transactions - - would occur simultaneously and were interdependent, related transactions. All of those transactions should be collapsed into a single, integrated transaction, or into two separate transactions (the sale of Target's equity in Mervyn's and the stripping of the real estate assets by the PE Sponsors), for purposes of determining whether those transactions were fraudulent as to unsecured creditors of Mervyn's.

130.     The $1,175,000,000 Purchase Price that the PE Sponsors paid to Target was allocated almost entirely to the value of Mervyn's real estate assets - - all but $8,300,000 of the Purchase Price was so allocated. In addition, Mervyn's real estate assets were collateral for loans by the MDS Companies from the Real Estate Secured Lenders in the aggregate amount of $800,000,000. It is unlikely that the Real Estate Secured Lenders loaned to the MDS Companies an amount equal to 100 percent of the value of the real estate assets. Thus, the value of the real estate assets transferred by Mervyn's to the MDS Companies was no less than $800,000,000, and more likely in the range of $1,000,000,000.

131. Mervyn's did not receive reasonably equivalent value or fair consideration in exchange for transferring its real property fee interests and lease interests to the MDS Companies.

132. At the time of Mervyn's transfer of its real property fee interests and lease interests to the MDS Companies, Mervyn's: (a) was engaged or was about to engage in a business for which its remaining assets and/or capital were unreasonably small in relation to the business; (b) intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due; and/or (c) was insolvent or would be rendered insolvent by the transactions undertaken in connection with the 2004 buyout.

133. At all relevant times, Mervyn's had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

134. The transfer of Mervyn's real property assets to the MDS Companies was made with actual intent to hinder, delay or defraud creditors of Mervyn's. The requisite intent is supplied by the PE Sponsors through their domination and control of Mervyn's. From the perspective of the PE Sponsors, who completely dominated Mervyn's with respect to such transfers, a primary purpose of the buyout was to separate Mervyn's from its real estate assets in so-called "bankruptcy-remote" entities such that the PE Sponsors could exploit those assets for their own benefit without having those assets be available to, and reachable by, creditors of Mervyn's or a Mervyn's bankruptcy trustee.

135.     The Uniform Fraudulent Transfer Act lists eleven, non-exclusive factors that may be considered, although none need be present, in determining whether to infer fraudulent intent from the circumstances of a transfer.  At least six of those so-called "badges of fraud" would apply to the transfers of Mervyn's real property assets to the MDS Companies: (i) the transfer was to an "insider" as both Mervyn's and the MDS Companies were owned by the PE Sponsors; (ii) Mervyn's retained possession of the properties after the transfer pursuant to the unitary leases simultaneously leasing the transferred properties back to Mervyn's; (iii) Mervyn's transfer to the MDS Companies of its real estate assets was disguised and concealed by the Agency Agreement which created the appearance that, when MH purchased Mervyn's, it did not actually acquire Mervyn's real estate assets because those assets were somehow funneled directly to the MDS Companies by MH as their "agent;" (iv) the transfer was of substantially all of Mervyn's assets as evidenced by the fact that, of the $1,175,000,000 purchase price, the parties to the sale of Mervyn's allocated all but $8,300,000 of that amount to its real estate assets; (v) Mervyn's did not receive any value or consideration at all in exchange for transferring its valuable real estate assets; and (vi) Mervyn's was or became insolvent at the time of the transfers.

136.     Mervyn's transfers to the MDS Companies of its real property fee interests and lease interests should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

137.    Mervyn's transfer to the MDS Companies of its real property fee interests and lease interests was made for the benefit of Target, as the seller of Mervyn's, and for the benefit of the PE Sponsors and PE Owners, as the buyers of Mervyn's. Under Bankruptcy Code section 550, plaintiff may recover the value of the real property transferred from those defendants. Such value is at least the Purchase Price paid to Target or the amounts paid to the MDS Companies by the Third Party Real Estate Purchasers in the Third Party Sale Transactions. Because the series of transfers and transactions comprising the 2004 transaction are interrelated and can be collapsed into a single transaction, as an alternate claim for relief against Target, as the transferee of the proceeds of the "sale" of Mervyn's real estate assets as part of the 2004 transaction or of the proceeds of the loans made by the Real Estate Secured Lenders, plaintiff may recover from Target an amount equal to either the Purchase Price or the proceeds of the loans made by the Real Estate Secured Lenders, as appropriate.

## Count II

**(Avoidance of Liens or Recapture of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against Real Estate Secured Lenders, MDS Companies, PE Sponsors, PE Owners and/or Target)**

138.    Plaintiff realleges its allegations in paragraphs 1 through 137 herein.

139.    All of the participants and lenders involved in Target's sale of Mervyn's to the Private Equity Sponsors intended and planned that all transactions involved in that buyout and the financing of that sale - - including the sale of Mervyn's, the transfer of Mervyn's real estate assets to the MDS

Companies, the borrowing of funds from the Real Estate Secured Lenders and pledging of liens to those Lenders in order to partially finance the purchase, the payment of the purchase price to Target and all other related transactions - - would occur simultaneously and were interdependent, related transactions. All of those transactions should be collapsed into a single, integrated transaction, or into two separate transactions (the sale of Target's equity in Mervyn's and the stripping of the real estate assets by the PE Sponsors), for purposes of determining whether those transactions were fraudulent as to unsecured creditors of Mervyn's.

140.    Mervyn's did not receive reasonably equivalent value or fair consideration in exchange for the liens pledged to the Real Estate Secured Lenders as security for the acquisition financing loaned to the MDS Companies.

141.    At the time the Real Estate Secured Lenders obtained liens on the real property assets pledged as security for the acquisition financing, Mervyn's: (a) was engaged or was about to engage in a business for which its remaining assets and/or capital were unreasonably small in relation to the business; (b) intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due; and/or (c) was insolvent or would be rendered insolvent by the transactions undertaken in connection with the 2004 buyout.

142.    At all relevant times, Mervyn's had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

143.    The pledging of liens on Mervyn's real property assets to the Real Estate Secured Lenders was part of an overall plan to implement the 2004 buyout and related transactions with actual intent to hinder, delay or defraud creditors of Mervyn's. The requisite intent is supplied by the PE Sponsors through their domination and control of Mervyn's. From the perspective of the PE Sponsors, who completely dominated Mervyn's with respect to the transfers and transactions at issue, a primary purpose of the buyout was to separate Mervyn's from its real estate assets in so-called "bankruptcy-remote" entities such that the PE Sponsors could exploit those assets for their own benefit without having those assets be available to, and reachable by, creditors of Mervyn's or a Mervyn's bankruptcy trustee.

144.    The Uniform Fraudulent Transfer Act lists eleven, non-exclusive factors that may be considered, although none need be present, in determining whether to infer fraudulent intent from the circumstances of a transfer. At least six of those so-called "badges of fraud" would apply to the overall plan to implement the 2004 buyout, including the pledging of liens on Mervyn's real property assets to the Real Estate Secured Lenders in order to obtain financing of the purchase price for Mervyn's: (i) the transfer of real estate assets was to an "insider" as both Mervyn's and the MDS Companies were owned by the PE Sponsors; (ii) Mervyn's retained possession of the properties after the transfer pursuant to the unitary leases simultaneously leasing the transferred properties back to Mervyn's; (iii) Mervyn's transfer to the MDS Companies of its real estate assets was disguised and concealed by the Agency Agreement which

created the appearance that, when MH purchased Mervyn's, it did not actually acquire Mervyn's real estate assets because those assets were somehow funneled directly to the MDS Companies by MH as their "agent;" (iv) the transfer was of substantially all of Mervyn's assets as evidenced by the fact that, of the $1,175,000,000 purchase price, the parties to the sale of Mervyn's allocated all but $8,300,000 of that amount to its real estate assets; (v) Mervyn's did not receive any value or consideration at all in exchange for transferring its valuable real estate assets or the pledging of liens to secure borrowings against those assets; and (vi) Mervyn's was or became insolvent at the time of the transfers.

145.    The liens pledged to the Real Estate Secured Lenders as security for the acquisition financing should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

146.    The liens pledged to the Real Estate Secured Lenders as security for the acquisition financing were transferred for the benefit of the MDS Companies, the PE Sponsors, the PE Owners and/or Target. Under Bankruptcy Code section 550, Plaintiff may recover the value of the liens from those defendants. At a minimum, plaintiff should be entitled to recover the $800,000,000 borrowed from the Real Estate Secured Lenders and paid to Target on the basis of those liens.

147.    The $1,175,000,000 purchase price that the Private Equity Sponsors paid to Target was allocated almost entirely to the value of Mervyn's real estate assets - - all but $8,300,000 of the purchase price was so allocated. In

addition, Mervyn's real estate assets were collateral for loans from the Real Estate

Secured Lenders in the aggregate amount of $800,000,000. It is unlikely that the

Real Estate Secured Lenders loaned to the MDS Companies an amount equal to

100 percent of the value of the real estate assets. Thus, the value of the real estate

assets transferred by Mervyn's to the MDS Companies, and the liens on those

assets, was no less than $800,000,000, and more likely in the range of

$1,000,000,000.

### Count III

**(Avoidance of Transaction and Other Fees and Recapture of Value Under 11
U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer
Act or Uniform Fraudulent Conveyance Act; Against Target, PE Sponsors,
and PE Owners Ableco, and Madeleine)**

148.    Plaintiff realleges the allegations in paragraphs 1 through

147 herein.

149.    As alleged herein, at the time of and in connection with the

2004 buyout, Mervyn's paid transaction and other fees and expenses to, or for the

benefit or on behalf of, the PE Sponsors and to Ableco and Madeleine in the

amount of at least $58,000,000.

150.    Mervyn's did not receive reasonably equivalent value or

fair consideration in exchange for its payment of transaction and other fees and

expenses to, or for the benefit or on behalf of, the PE Sponsors, or to Ableco and

Madeleine.

151.    At the time of Mervyn's payment of such fees and

expenses, Mervyn's: (a) was engaged or was about to engage in a business for

which its remaining assets and/or capital were unreasonably small in relation to

the business; (b) intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due; and/or (c) was insolvent or would be rendered insolvent by the transactions undertaken in connection with the 2004 buyout.

152.    At all relevant times, Mervyn's had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

153.    The payment of transaction and other fees and expenses to, or for the benefit or on behalf of, the PE Sponsors, and to Ableco and Madeleine, was part of an overall plan to implement the 2004 buyout and related transactions with actual intent to hinder, delay or defraud creditors of Mervyn's. The requisite intent is supplied by the PE Sponsors through their domination and control of Mervyn's. From the perspective of the PE Sponsors, who completely dominated Mervyn's with respect to these transfers and transactions, a primary purpose of the buyout was to separate Mervyn's from its real estate assets in so-called "bankruptcy-remote" entities such that the PE Sponsors could exploit those assets for their own benefit without having those assets be available to, and reachable by, creditors of Mervyn's or a Mervyn's bankruptcy trustee.

154.    The Uniform Fraudulent Transfer Act lists eleven, non-exclusive factors that may be considered, although none need be present, in determining whether to infer fraudulent intent from the circumstances of a transfer. At least six of those so-called "badges of fraud" would apply to the overall plan to implement the 2004 buyout: (i) the transfer of real estate assets

was to an "insider" as both Mervyn's and the MDS Companies were owned by the Private Equity Sponsors; (ii) Mervyn's retained possession of the properties after the transfer pursuant to the unitary leases simultaneously leasing the transferred properties back to Mervyn's; (iii) Mervyn's transfer to the MDS Companies of its real estate assets was disguised and concealed by the Agency Agreement which created the appearance that, when MH purchased Mervyn's, it did not actually acquire Mervyn's real estate assets because those assets were somehow funneled directly to the MDS Companies by MH as their "agent;" (iv) the transfer was of substantially all of Mervyn's assets as evidenced by the fact that, of the $1,175,000,000 purchase price, the parties to the sale of Mervyn's allocated all but $8,300,000 of that amount to its real estate assets; (v) Mervyn's did not receive any value or consideration at all in exchange for transferring its valuable real estate assets or the pledging of liens to secure borrowings against those assets or from the payment of the fees and expenses as described; and (vi) Mervyn's was or became insolvent at the time of the transfers.

155. Mervyn's payments of transaction and other fees and expenses to, or for the benefit or on behalf of, the PE Sponsors, and to Ableco and Madeleine, should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

156. Mervyn's payments of transaction and other fees to, or for the benefit or on behalf of, the PE Sponsors, including the payments to Ableco and Madeleine, were also for the benefit of the PE Owners. Under Bankruptcy

Code section 550, plaintiff may recover the value of the payments made from those defendants.

### Count IV

**(Avoidance of "Notional" Rent Payments, Occupancy Cost Increases, and Other Payments, Transfers, Distributions, or Dividends and Recapture of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against MDS Companies, PE Sponsors and PE Owners)**

157.    Plaintiff realleges the allegations in paragraphs 1 through 156 herein.

158.    Mervyn's did not receive reasonably equivalent value or fair consideration in exchange for transferring to the MDS Companies (through MH) and/or to the PE Sponsors, payments, transfers, dividends or distributions in the amounts of "notional" rent payments that would have been charged to Mervyn's if it had transferred the Restricted Leases to the MDS Companies.

159.    Mervyn's did not receive reasonably equivalent value or fair consideration in exchange for the payments or transfers required to be made by it to the MDS Companies under the Unitary Leases and under the Amended and Restated Unitary Leases, and/or directly to MH, the PE Sponsors, or the Real Estate Secured Lenders with respect to notional rent payments under the Restricted Leases, and/or to the Third Party Purchasers under the New Leases, to the extent that such payments or transfers reflected an increase of Mervyn's rent payments and other occupancy costs for its stores and other premises above what Mervyn's had been paying to its third party landlords or paying with respect to fee

properties that had been owned by Mervyn's immediately before the closing of the 2004 transaction (the "Occupancy Cost Increases").

160. The Occupancy Cost Increases were made to or for the benefit of the PE Sponsors and the PE Owners because those payments either were retained by the PE Sponsors or PE Owners or were used or imposed upon Mervyn's by the PE Sponsors or PE Owners to facilitate or effect the sale of Mervyn's real estate assets by the Realty Owners through the Third Party Sales Transactions.

161. Mervyn's did not receive reasonably equivalent value or fair consideration in exchange for other payments, transfers, dividends, or distributions (the "Other Transfers") made to the PE Sponsors (through MH) and/or to the PE Sponsors.

162. The foregoing payments, transfers, distributions, or dividends aggregate at least $400,000,000.

163. Certain of the foregoing payments, transfers, dividends, or distributions with respect to the notional rent payments, the Occupancy Cost Increases, or the Other Transfers, and the obligations undertaken by Mervyn's when such liabilities were imposed upon it, to MH (for the benefit of the PE Sponsors and the PE Owners), to the MDS Companies (for the benefit of the PE Sponsors and the PE Owners), to the landlords under the New Leases, and/or to the PE Sponsors (for the benefit of the PE Sponsors and the PE Owners) were made by Mervyn's, or imposed on or undertaken by Mervyn's, at times or on dates when Mervyn's: (a) was engaged or was about to engage in a business for

which its remaining assets and/or capital were unreasonably small in relation to the business; (b) intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due; and/or (c) was insolvent or would be rendered insolvent either by the transactions undertaken in connection with the 2004 buyout, by the rent increases imposed on it in connection with the 2005 refinancing, or as a result of making such payments, transfers, dividends or distributions. To the extent such payments, transfers, or distributions were made, or such obligations were incurred, those transfers and payments should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code section 544(b).

164. At all relevant times, Mervyn's had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

165. The foregoing payments, transfers, dividends, or distributions with respect to the notional rent payments, the Occupancy Cost Increases, or the Other Transfers as described herein, and the obligations undertaken by Mervyn's when such liabilities were imposed upon it, to MH (for the benefit of the PE Sponsors and the PE Owners), to the MDS Companies (for the benefit of the PE Sponsors and the PE Owners), to the landlords under the New Leases, and/or to the PE Sponsors (for the benefit of the PE Sponsors and the PE Owners) were made by Mervyn's, or imposed on or undertaken by Mervyn's, with actual intent to hinder, delay or defraud creditors of Mervyn's.

The relevant intent with respect to these transfers is that of the PE Sponsors because of their domination and control of Mervyn's. From the perspective of the PE Sponsors, who completely dominated Mervyn's with respect to the foregoing transfers, they intended to continue to exploit Mervyn's regardless of the consequences to Mervyn's, its retail business operations or its creditors.

166. The Uniform Fraudulent Transfer Act lists eleven, non-exclusive factors that may be considered, although none need be present, in determining whether to infer fraudulent intent from the circumstances of a transfer. At least several of those so-called "badges of fraud" would apply to Mervyn's transfers, dividends, or distributions with respect to notional rent payments, Occupancy Cost Increases or Other Transfers: (i) the transfers were to or for the benefit of an "insider" as Mervyn's, MH, and the MDS Companies were all owned by the PE Sponsors; (ii) Mervyn's did not receive any value or consideration at all in exchange for paying notional rent, Occupancy Cost Increases, or dividends to MH, or to or for the benefit of the MDS Companies, or for the benefit of the PE Sponsors, or from the proceeds of the Third Party Sale Transactions that were facilitated due to the Occupancy Cost Increases; (iii) Mervyn's was or became insolvent at the time and/or as a result of the transfers; (iv) the PE Sponsors retained control of the transfers made to MH and the MDS Companies; and (v) the PE Sponsors caused Mervyn's to make its 2006 dividend payment shortly after they caused Mervyn's to incur substantially increased occupancy costs in connection with the 2005 re-financing.

167. Mervyn's payments, transfers, dividends, and distributions as described above should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550. The transfers or their value are recoverable under Bankruptcy Code sections 550 from the MDS Companies, the PE Sponsors, and the PE Owners as the entities for whose benefit the transfers were made.

168. Mervyn's payments, transfers, distributions or dividends (as described above) to the MDS Companies, to the landlords under the New Leases, or to the PE Sponsors, and the corresponding obligations undertaken by or imposed upon Mervyn's with respect thereto, were made, undertaken or imposed for the benefit of the MDS Companies, PE Sponsors, and/or the PE Owners. Mervyn's payments or transfers (as described above) to the MDS Companies, to the landlords under the New Leases, or to the PE Sponsors were made for the benefit of the MDS Companies, the PE Sponsors, and/or the PE Owners. Under Bankruptcy Code section 550, plaintiff may recover the property transferred or its value from those defendants.

## Count V

### (Breach of Fiduciary Duty; Self-Dealing Against the PE Owners, PE Sponsors and Target)

169. Plaintiff realleges the allegations in paragraphs 1 through 168 herein.

170. At all relevant times prior to Target's sale of Mervyn's, Target was the owner of all of the equity of Mervyn's. As the sole and

controlling owner of Mervyn's, Target owed to Mervyn's fiduciary obligations of good faith, care and loyalty.

171.　Upon Target's sale of Mervyn's, MH became the Managing Member of Mervyn's. The PE Sponsors owned all of the equity of MH in varying percentages, and the PE Sponsors each had two of their designees appointed as managers of the governing boards of MH. The PE Owners, in turn, had and exercised the ability to control the PE Sponsors. Because the PE Sponsors and PE Owners had the ability to control Mervyn's, they owed to Mervyn's fiduciary obligations of good faith, care and loyalty.

172.　At the time Target sold Mervyn's to MH, Mervyn's: (a) was engaged or was about to engage in a business for which its remaining assets and/or capital were unreasonably small in relation to the business; (b) intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due; and/or (c) was insolvent or would be rendered insolvent by the transactions undertaken in connection with the 2004 buyout. Because Mervyn's would be rendered insolvent as a result of the 2004 buyout, Target had a fiduciary obligation to Mervyn's and its unsecured creditors to protect the interests of such creditors. Even if Mervyn's was not insolvent or did not have unreasonably small capital, the PE Owners, the PE Sponsors and Target had duties of loyalty and other duties to Mervyn's.

173.　Target had a large financial interest in the sale of Mervyn's because it stood to obtain the purchase price of approximately $1,175,000,000. The PE Sponsors and PE Owners had a correspondingly large financial interest in

acquiring Mervyn's because they hoped and planned to profit from the transaction by exploiting Mervyn's real estate assets.

174. Target had or should have had knowledge of, or it participated or acquiesced in, the plan developed by the PE Sponsors to strip out all of Mervyn's real estate assets, and pledge those assets as security in order to obtain secured loans to finance the Purchase Price.

175. Target breached its fiduciary duty by approving, participating in, consummating and acquiescing in a buyout and related transactions whereby Mervyn's transferred away its valuable real estate assets and paid approximately $58,000,000 in transaction-related fees without receiving any benefit from those transactions.

176. Because the PE Sponsors owned and controlled Mervyn's (through their ownership of MH) and owned and controlled the MDS Companies (through their ownership of the Realty Parents), the PE Sponsors had conflicts of interest when balancing the interests of Mervyn's and its creditors against interests of the MDS Companies.

177. The ownership structure created by the PE Sponsors and their owners, the PE Owners, put the PE Sponsors in a position to engage in self-dealing that enabled the PE Sponsors to enhance the value of the MDS Companies and the real estate assets held by those companies for the benefit of the PE Sponsors and the PE Owners at the expense of Mervyn's and its creditors.

178. The PE Sponsors and PE Owners engaged in self-dealing, acted in bad faith, and breached their fiduciary duties (including the duty of

loyalty), and took undue advantage of Mervyn's, by planning, approving and executing a buyout and related transactions whereby, Mervyn's transferred away its real estate assets and paid at least $58,000,000 in transaction-related fees without receiving any benefit from those transactions.

179. The PE Sponsors and PE Owners also engaged in self-dealing, acted in bad faith, and breached their fiduciary duties (including the duty of loyalty), and took undue advantage of Mervyn's, by causing Mervyn's to make payments, transfers, dividends, or distributions representing "notional" rent, the Occupancy Cost Increases, and the Other Transfers when such payments, transfers, dividends, or distributions were fraudulent as to Mervyn's unsecured creditors.

180. The PE Sponsors and the PE Owners also engaged in self-dealing, acted in bad faith, and breached their fiduciary duties (including the duty of loyalty), and took undue advantage of Mervyn's, by using their position as the owners and managers of MH to cause MH to cause Mervyn's to enter into disadvantageous or uneconomic transactions, such as the Valencia transaction, the headquarters building transaction, the Unitary Leases, the Amended and Restated Unitary Leases, and the New Leases, that enhanced the interests of the PE Sponsors and the PE Owners as the owners of the MDS Companies at the expense and to the detriment of Mervyn's and its creditors.

181. The PE Sponsors and the PE Owners also engaged in self-dealing, acted in bad faith, and breached their fiduciary duties (including the duty of loyalty), and took undue advantage of Mervyn's, by using their position as the

owners and managers of MH to cause MH to cause Mervyn's to enter into the
Unitary Leases and the Amended and Restated Unitary Leases with respect to the
real estate assets stripped out of Mervyn's in the 2004 transaction, by locking
Mervyn's into long term rent obligations and other occupancy costs in excess of
what it had been paying immediately before the 2004 transactions, by failing to
act to remedy the negative effects on Mervyn's of the obligations imposed upon
Mervyn's by such defendants as Mervyn's retail operations struggled, by using
the debilitating obligations that were hindering Mervyn's to facilitate the Third
Party Sale Transactions, and by not delivering any of the proceeds of those
transactions to Mervyn's even though Mervyn's was the true owner of the assets
that were being sold.

182.     Mervyn's and its unsecured creditors incurred substantial
damages as a result of the buyout and related transactions planned, approved, and
executed by Target and the PE Sponsors, and by the transfer, payment, dividend,
or distribution of notional rent, Occupancy Cost Increases, the Other Transfers,
and the Third Party Sale Transactions to the extent alleged above.

## Prayer for Relief

**WHEREFORE**, plaintiff demands that judgment be entered as
follows:

A.     On Count I, awarding plaintiff judgment against the MDS
Companies, PE Sponsors, PE Owners and Target avoiding Mervyn's transfer of
its real estate assets to the MDS Companies, or, alternatively, awarding plaintiff
judgment against the MDS Companies, PE Sponsors, PE Owners and Target,

jointly and severally, for the value of the real estate assets transferred by Mervyn's in an amount to be determined at trial but not less than the amounts paid by the Third Party Real Estate Purchasers in the Third Party Sale Transactions, or, alternatively, as to Target, awarding an amount equal to the Purchase Price or the proceeds of the loans made by the Real Estate Secured Lenders that were borrowed using Mervyn's real estate assets as collateral;

B.      On Count II, awarding plaintiff judgment against the Real Estate Secured Lenders avoiding the transfer to those Lenders of liens on Mervyn's real property assets, or, alternatively, awarding plaintiff judgment against the Real Estate Secured Lenders, the MDS Companies, the PE Sponsors, the PE Owners and Target, jointly and severally, for the value of those liens in an amount to be determined at trial;

C.      On Count III, awarding plaintiff judgment against the PE Sponsors and PE Owners avoiding the transfer of fees and other expenses paid to, or for the benefit of, those defendants in connection with the 2004 buyout of Mervyn's and related transactions, or, alternatively, awarding plaintiff judgment against the PE Sponsors and PE Owners, jointly and severally, for the value of the fees and other expense in an amount to be determined at trial;

D.      On Count IV, awarding plaintiff judgment against the MDS Companies, PE Sponsors, and the PE Owners avoiding the transfer of the Occupancy Cost Increases, the "notional rent" payments, and the Other Transfers paid to, or for the benefit of, those defendants to the extent those payments were fraudulent as to unsecured creditors, or, alternatively, awarding plaintiff judgment

against the MDS Companies, the PE Sponsors, and the PE Owners, jointly and severally, for the value of such payments.

        E.      On Count V, awarding plaintiff judgment against Target, the PE Sponsors and the PE Owners for damages in amounts to be determined at trial;

        F.      Awarding plaintiff interest, costs, and its attorney's fees; and

        G.      Granting plaintiff such other and further relief as the Court deems just and proper.

Dated:   December 22, 2008
          Wilmington, Delaware

BAYARD, P.A.

Neil B. Glassman (No. 2087)
Ashley B. Stitzer (No. 3891)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19899
Telephone: (302) 655-5000

- and -

FRIEDMAN KAPLAN SEILER &
ADELMAN LLP

Andrew W. Goldwater
William P. Weintraub
1633 Broadway
New York, New York 10019-6708
Telephone: (212) 833-1100

*Attorneys for Plaintiff*