## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| MERVYN'S HOLDINGS, LLC, et al., | : | Case No. 08-11586 (KG) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |
| MERVYN'S LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| - against - | : | Adv. Proc. No. |
| | : | 08-51402 KG |
| LUBERT-ADLER GROUP IV, LLC, et al., | : | |
| | : | |
| Defendants. | : | |

**DEFENDANT TARGET CORPORATION'S**
**APPENDIX IN SUPPORT OF MOTION TO DISMISS**

# INDEX

| Description | Reference |
|---|---|
| Affidavit of Brian Downs | |
| Press release issued by Target Corporation dated March 10, 2004 | Tar.A001-002 |
| Press release issued by Target Corporation dated July 29, 2004 | Tar.A003-004 |
| Press release issued by Target Corporation dated July 30, 2004 | Tar.A005 |
| Equity Purchase Agreement dated July 29, 2004 Relating to the Purchase and Sale of Mervyn's | Tar.A006-084 |
| Commitment Letters dated July 29, 2004, Exhibit D to the Equity Purchase Agreement | Tar.A085-096 |
| Operating Agreement of Mervyn's LLC | Tar.A097-109 |
| Closing/Funds Flow Statement for Equity Purchase Agreement | Tar.A110-114 |
| Wire information for incoming money transfers to Target on September 2, 2004 | Tar.A115 |

## AFFIDAVIT OF BRIAN DOWNS

STATE OF MINNESOTA )
                 ) SS.
COUNTY OF HENNEPIN )

       **BRIAN DOWNS,** being duly sworn upon oath, deposes and states as follows:

       1.   I am Senior Paralegal in the Law Department of Target Corporation ("Target"), one of the defendants in the above-described action. I make this affidavit in support of Target's motion to dismiss the First Amended Complaint. The facts set forth herein are based upon my personal knowledge, information and belief, unless otherwise stated.

       2.   The documents contained in Target's Appendix in support of Target's motion to dismiss are true and correct copies of the documents described in the Index to Target's Appendix.

       Further affiant sayeth naught.

                              _____
                               Brian Downs

Subscribed and sworn to before
me this 2nd day of April, 2009.

_____
Notary Public
fb.us.3828324.01

TERESA D. MORGAN
NOTARY PUBLIC- MINNESOTA
MY COMMISSION EXPIRES 1-31-2010

- 3 -

# Target Corporation to Review Strategic Alternatives for Mervyn's, Marshall Field's

03/10/04

MINNEAPOLIS, March 10 /PRNewswire-FirstCall/ -- Target Corporation (NYSE: TGT) announced today that it will review strategic alternatives for its Mervyn's and Marshall Field's divisions. Goldman Sachs has been engaged to advise the Corporation in this review.

Mervyn's is a promotional, middle-market department store, based in the San Francisco Bay area with 266 stores in 14 states, primarily in the west and south. In 2003, Mervyn's generated $3.6 billion in revenue and $160 million in pretax segment profit.

Marshall Field's is a traditional department store that emphasizes fashion leadership, quality merchandise and superior guest service. It is headquartered in Minneapolis and operates 62 stores in 8 states in the upper Midwest. In 2003, Marshall Field's produced revenues of $2.6 billion and pretax segment profit of $107 million.

Bob Ulrich, chairman and chief executive officer of Target Corporation, said, "We have dedicated significant effort to increasing sales and profits at Mervyn's and Marshall Field's over many years. As responsible stewards of the corporation's assets, we believe that it is appropriate at this time to identify and evaluate possible strategic alternatives and our Board of Directors concurs with this direction. While we remain committed to the creation of shareholder value over time as our primary performance objective, our evaluation of potential alternatives will also weigh the effect on our guests, our team members and the communities we serve."

The alternatives to be evaluated include, but are not limited to, the possible sale of one or both of these divisions as ongoing businesses to existing retailers or other qualified buyers. Because the company is still in the early stages of this process, it is not yet certain that any transactions will occur as a result of this review. Additionally, if this review results in one or more transactions, it is possible that a meaningful accounting gain or loss would result.

A pre-recorded message describing all information that is currently available will be accessible later this evening by calling 612-761-1005. A transcript of this pre-recorded message is also available on our web site at www.target.com/investor information/presentations. As we reach important milestones in this process and/or additional information becomes available, the company will broadly disseminate updates.

Forward-looking statements in this release should be read in conjunction with the cautionary statements in Exhibit (99)C to the company's 2002 Form 10-K.

In addition to Mervyn's and Marshall Field's, Target Corporation operates Target Stores, a large-store, general-merchandise, discount format consisting of 1,249 stores in 47 states, as well as a direct mail and on-line business called target.direct.

Target Corporation news releases are available at www.target.com or www.prnewswire.com .

SOURCE Target Corporation

CONTACT:
investors,
Susan Kahn,
1-612-761-6735,
financial media,
Cathy Wright,

**Tar.A001**

+1-612-696-6557,
all of Target Corporation

© 2009 Target.com. All
Design and Target are r
Brands, Inc.

**Tar.A002**

# Target Corporation to Sell Mervyn's

07/29/04

MINNEAPOLIS, Jul 29, 2004 /PRNewswire-FirstCall via COMTEX/ -- Target Corporation (NYSE: TGT) announced today that it has reached definitive agreements to sell its Mervyn's business unit to an investment consortium for an aggregate consideration of approximately $1.65 billion in cash. Mervyn's is a promotional, middle-market department store, based in the San Francisco Bay area with 257 stores in 13 states, primarily in the west and south. In 2003, Mervyn's generated $3.6 billion in revenue and $160 million in pretax segment profit.

Under the terms of the agreements, Target Corporation will sell its Mervyn's retail subsidiary, including 257 Mervyn's stores and four distribution centers, to an investment consortium including Sun Capital Partners, Inc., Cerberus Capital Management, L.P., Lubert-Adler/ Klaff and Partners, L.P. Additionally, Target Corporation will sell Mervyn's credit card receivables, totaling approximately $475 million, to GE Consumer Finance, a unit of General Electric Company. Mervyn's will continue to operate from its headquarters in Hayward, California as an independent company.

The transaction is subject to regulatory approval and is expected to be completed shortly after approval is obtained. The sale is expected to result in an estimated gain in the range of $270 million pre-tax, or approximately $0.18 per share, in the third quarter.

Bob Ulrich, chairman and chief executive officer of Target Corporation, said, "We believe that the sale of Mervyn's as an ongoing business reflects our long-term commitment to create substantial value for our shareholders over time and enhances the opportunity for all of our stakeholders, including our team members, guests and communities, to enjoy continued success for many years."

Sun Capital Partners, Inc. is a private investment firm with more than $1 billion of capital under management. With this transaction, Mervyn's becomes the most recent addition to Sun Capital's extensive portfolio of retail investments which include Sam Goody, SunCoast, Media Play, Anchor Blue, Wicke's Furniture, and Bruegger's Bagels, among others.

Headquartered in New York City, Cerberus Capital Management, L.P. and its affiliated entities manage funds and accounts with capital in excess of $14 billion.

Lubert-Adler Management, Inc. manages four funds with $2.5 billion in equity capital under management and makes real estate investments in retail businesses through its joint venture with Klaff Realty, L.P.

A pre-recorded message describing all information that is currently available will be accessible later this evening by calling 612-761-6500. A transcript of this pre-recorded message is also available on our web site at http://www.targetcorp.com (Click on "investor information," then select "presentations").

Forward-looking statements in this release should be read in conjunction with the cautionary statements in Exhibit (99)C to the company's 2003 Form 10-K.

Following the completion of the sale transactions for both Mervyn's and Marshall Field's, Target Corporation will continue to operate Target Stores, a large-store, general-merchandise, discount format, currently consisting of 1,272 stores in 47 states, as well as an on-line business called Target.com. Target Corporation news releases are available at http://www.target.com or http://www.prnewswire.com .

SOURCE Target Corporation

Investor, Susan Kahn, +1-612-761-6735, financial media, Cathy Wright, +1-612-761-6627 or +1-312-781-2979, or media, Carolyn Brookter, +1-612-696-6557, all of Target Corporation

**Tar.A003**

© 2009 Target.com. All

Design and Target are registered trademarks of Target Brands, Inc.

**Tar.A004**



## Financial News Release
Investors | Financial News Release

# Target Corporation Completes Sale of Marshall Field's to May Department Stores

07/30/04

MINNEAPOLIS, July 30 /PRNewswire-FirstCall/ -- Target Corporation (NYSE: TGT) announced today that it has completed the sale of its Marshall Field's business unit to The May Department Stores Company for approximately $3.2 billion in cash. Substantially all of the assets directly involved in its Marshall Field's business unit, including 62 Marshall Field's stores, three distribution centers and approximately $600 million of Marshall Field's credit card receivables were included in the transaction. All current Marshall Field's team members were offered employment by The May Department Stores Company.

Marshall Field's is a traditional department store that emphasizes fashion leadership, quality merchandise and superior guest service. It is headquartered in Minneapolis, operates 62 stores and employs approximately 25,000 team members in 8 states in the upper Midwest. In 2003, Marshall Field's produced revenues of $2.6 billion and pretax segment profit of $107 million.

Following the sale of Marshall Field's and the pending sale of Mervyn's, Target Corporation will continue to operate Target Stores, a large-store, general-merchandise, discount format currently consisting of 1,272 stores in 47 states, as well as an on-line business called Target.com.

Target Corporation news releases are available at http://www.target.com or http://www.prnewswire.com .

SOURCE Target Corporation
-0- 07/30/2004
/CONTACT: Susan Kahn, investors, +1-612-761-6735, Cathy Wright, financial media, +1-612-761-6627 or +1-312-781-2979, or Carolyn Brookter, media, +1-612-696-6557, all of Target Corporation/
/Web site: http://www.target.com/
(TGT)

© 2009 Target.com. All rights reserved. The Bullseye Design and Target are registered trademarks of Target Brands, Inc.

Tar.A005

# EQUITY PURCHASE AGREEMENT

between

## TARGET CORPORATION

and

## MERVYN'S HOLDINGS, LLC

Dated as of July 29, 2004

Relating to the Purchase and Sale of
Mervyn's

Tar.A006

# TABLE OF CONTENTS

1. PURCHASE AND SALE OF THE SECURITIES; PURCHASE PRICE. ........................1
    (a) Generally. ........................................................................1
    (b) Purchase Price. ................................................................1

2. CLOSING; PURCHASE PRICE ADJUSTMENT. ................................2
    (a) Closing Date; Effective Time. ..............................................2
    (b) Closing Deliveries. ..........................................................2
    (c) Purchase Price Adjustment ..................................................2
    (d) Certain Assets. ..............................................................2
    (e) Section 1031 Like-Kind Exchange ..........................................5

3. CONDITIONS TO CLOSING. ......................................................6
    (a) Buyer's Obligation. ..........................................................6
    (b) Target's Obligation. ..........................................................6
                       9

4. REPRESENTATIONS AND WARRANTIES OF TARGET. ........................10
    (a) Organization and Authority. ................................................10
    (b) The Shares and Securities. ................................................10
    (c) Capitalization. ..............................................................11
    (d) Non-Contravention. ..........................................................11
    (e) Financial Statements. ........................................................12
    (f) Nonforeign Certification. ....................................................13
    (g) Taxes ........................................................................13
    (h) Personal Property. ..........................................................13
    (i) Real Property. ..............................................................16
    (j) Condition of Assets. ........................................................17
    (k) Intellectual Property. ........................................................19
    (l) Contracts. ....................................................................19
    (m) Litigation; Decrees. ..........................................................21
    (n) Insurance. ....................................................................24
    (o) Employee Benefits; ERISA. ................................................24
    (p) Absence of Changes or Events. ............................................25
    (q) Compliance with Laws. ......................................................27
    (r) Environmental Matters. ......................................................27
    (s) Employee and Labor Relations. ............................................28
    (t) Absence of Undisclosed Liabilities. ........................................28
    (u) Mervyn's, Inc. ..............................................................29

5. COVENANTS OF TARGET. ......................................................29
    (a) Access. ......................................................................29
    (b) Ordinary Conduct. ..........................................................29
    (c) Confidentiality. ..............................................................32

Tar.A007

   (d)  Insurance and Insurance Proceeds..............................................................32
   (e)  Exclusivity ..............................................................................................32
   (f)  Real Estate..............................................................................................33
   (g)  Indebtedness...........................................................................................34
   (h)  No Post-Conversion Tax Election.............................................................34

  6.    REPRESENTATIONS AND WARRANTIES OF BUYER.........................34
   (a)  Organization and Authority of Buyer. ......................................................34
   (b)  Non-Contravention..................................................................................35
   (c)  Litigation.................................................................................................35
   (d)  Commitment Letters.................................................................................35
   (e)  Securities Laws. ......................................................................................35

  7.    COVENANTS OF BUYER..........................................................................36
   (a)  Confidentiality Agreement........................................................................36
   (b)  No Representations or Warranties. ............................................................36
   (c)  Certain Claims........................................................................................36
   (d)  Commitment Letters.................................................................................36

  8.    MUTUAL COVENANTS.............................................................................36
   (a)  Consents..................................................................................................36
   (b)  Cooperation; Further Assurances.............................................................36
   (c)  Certain IP Matters...................................................................................37
   (d)  Publicity. ................................................................................................38
   (e)  Reasonable Best Efforts...........................................................................41
   (f)  Antitrust Notification...............................................................................42
   (g)  Intercompany Accounts............................................................................42
   (h)  Transition Services..................................................................................42
   (i)  Certain Contracts....................................................................................42
   (j)  Intercompany Agreements ........................................................................43
   (k)  Guarantee Arrangements..........................................................................44
   (l)  Disclosure Supplements...........................................................................44
   (m) Minnesota Stores.....................................................................................45
   (n)  Software Issues........................................................................................45
   (o)  Customer Date.........................................................................................46
   (p)  Third-Party Confidentiality Agreements....................................................46
   (q)  Conversion Documents.............................................................................47

  9.    EMPLOYEES AND EMPLOYEE BENEFITS ............................................47
   (a)  Offers of Employment...............................................................................47
   (b)  Buyer's Employee Benefit Plans Generally.................................................48
   (c)  Severance Benefits...................................................................................49
   (d)  Vacation Pay and Personal Holidays ........................................................50

Tar.A008

   (e)   Disability Benefits and Leaves..................................................................50
   (f)   Medical and Dental Plan Liabilities.........................................................50
   (g)   COBRA Coverage....................................................................................50
   (h)   Retiree Medical Obligations.....................................................................51
   (i)   Flexible Spending Accounts .....................................................................51
   (j)   Qualified Retirement and 401(k) Plans...................................................51
   (k)   Other Retained Plans................................................................................52
   (l)   Retiree Merchandise Discount Programs..................................................52
   (m)  Workers' Compensation Liabilities..........................................................52
   (n)   No Third-Party Beneficiaries ...................................................................53

10.  TAX MATTERS....................................................................................................53
   (a)   Tax Payments and Returns.......................................................................53
   (b)   Transfer Taxes..........................................................................................53
   (c)   Refunds and Carrybacks ..........................................................................53
   (d)   Cooperation..............................................................................................54
   (e)   Termination of Tax-Sharing Agreement...................................................54
   (f)   Purchase Price Allocation ........................................................................55
   (g)   Tax Indemnification..................................................................................55
   (h)   Procedures Relating to Indemnification of Tax Claims ...........................56

11.  INDEMNIFICATION............................................................................................57
   (a)   Indemnification by Target........................................................................58
   (b)   Indemnification by Buyer.........................................................................58
   (c)   Adjustments; Remedial Actions...............................................................59
   (d)   Termination of Indemnification................................................................60
   (e)   Procedures Relating to Indemnification....................................................61
   (f)   Tax Indemnification..................................................................................61

12.  ASSIGNMENT.......................................................................................................63

13.  NO THIRD-PARTY BENEFICIARIES. ...............................................................63

14.  TERMINATION.....................................................................................................64

15.  SURVIVAL OF REPRESENTATIONS.................................................................65

16.  EXPENSES.............................................................................................................65

17.  AMENDMENTS.....................................................................................................65

18.  NOTICES................................................................................................................65

19.  INTERPRETATION...............................................................................................67

20.  COUNTERPARTS.................................................................................................68

Tar.A009

21. ENTIRE AGREEMENT...........................................................................68

22. BROKERAGE FEES...............................................................................68

23. SEVERABILITY....................................................................................68

24. GOVERNING LAW...............................................................................68

25. SPECIFIC PERFORMANCE...................................................................69

26. DISCLOSURE SCHEDULE...................................................................69

27. WAIVER................................................................................................69

28. KNOWLEDGE......................................................................................69

EXHIBIT A   —    May 29, 2004 Trial Balance
EXHIBIT B   —    Portfolio Purchase Agreement
EXHIBIT C   —    Private Label Credit Card Program Agreement
EXHIBIT D   —    Debt and Equity Commitment Letters
EXHIBIT E   —    Form of Private Label Product License (i.e., the Sprockets - High Sierra License Agreement)
EXHIBIT F   —    Form of "In Due Time" License
EXHIBIT G   —    Form of Intellectual Property License (i.e., the License Agreement between Mervyn's Brands LLC and Mervyn's LLC)
EXHIBIT H   —    Form of Transition Services Agreement
EXHIBIT I   —    Third Party Software to be Kept by Mervyn's
EXHIBIT J   —    Form of Grantback Software License Agreement
EXHIBIT K   —    Target Software to be Assigned to Mervyn's

Tar.A010

# INDEX OF DEFINED TERMS

| TERM | REFERENCE |
|---|---|
| Adjusted Purchase Price | § 2(c)(v) |
| affiliate | § 19(c) |
| Affiliated Group | § 4(g)(i) |
| Aggregate Flex Plan Balances | § 9(i) |
| Arbitrator | § 2(c)(iii) |
| Bid Net Assets | § 2(c)(v) |
| Brands | Recitals |
| Brands Conversion | § 3(a)(xi) |
| business day | § 19(d) |
| Buyer | Preamble |
| Buyer's DC Plan | § 9(j) |
| Buyer's Flex Plans | § 9(i) |
| Buyer's Plans | § 9(b) |
| Closing | § 2(a) |
| Closing Date | § 2(a) |
| Closing Date Interest | § 1(b) |
| COBRA | § 9(g) |
| Code | § 4(g)(i) |
| Commitment Letters | § 6(d) |
| Companies | Recitals |
| Company Intellectual Property | § 4(k)(ii) |
| Confidentiality Agreement | § 7(a) |
| Covered Persons | § 9(b)(i) |
| Cut Off Date | § 2(a) |
| Disclosure Schedule | § 4 |
| DOJ | § 8(f) |
| Effective Time | § 2(a) |
| Environmental Claim | § 4(r)(i) |
| Environmental Laws | § 4(r)(i) |
| Environmental Permits | § 4(r)(i) |
| Environmental Reports | § 4(r)(i) |
| ERISA | § 4(o)(i) |
| Escrowed Purchase Price | § 2(e) |
| Exchange Assets | § 2(e) |
| Exchange Transaction | § 2(e) |
| Exclusivity Period | § 5(e) |
| Expense Reimbursement | § 14(d) |
| Final Net Assets | § 2(c)(i) |
| Financial Statements | § 4(e) |

Tar.A011

| TERM | REFERENCE |
|---|---|
| FIRPTA Affidavit | § 3(a)(vi) |
| FTC | § 8(f) |
| Hazardous Substance | § 4(r)(i) |
| HSR Act | § 3(a)(v) |
| including | § 19(b) |
| Income Taxes | § 4(g)(i) |
| Indebtedness | § 5(g) |
| indemnified party | § 11(e)(i) |
| indemnifying party | § 11(e)(i) |
| Intellectual Property | § 4(k)(i) |
| Interim Statement of Net Assets | § 4(e) |
| IP License | § 4(l)(i) |
| Knowledge | § 28 |
| Leased Permitted Exceptions | § 4(i)(ii) |
| Leased Real Estate | § 4(i)(ii) |
| Leases | § 4(i)(vii) |
| Licenses | § 4(h)(i) |
| Marks | § 4(k)(i) |
| Material Adverse Effect | § 3(a)(i) |
| Material Contracts | § 4(l)(iii) |
| Mervyn's | Recitals |
| Mervyn's Conversion | § 3(a)(xi) |
| Mervyn's Severance Practices | § 9(c) |
| Minnesota Stores | § 8(m) |
| Net Assets | § 2(c)(vi) |
| Non-Prevailing Party | § 2(c)(iv) |
| Notice of Disagreement | § 2(c)(ii) |
| Owned Permitted Exceptions | § 4(i)(i) |
| Owned Real Estate | § 4(i)(i) |
| Permitted Exceptions | § 4(i)(ii) |
| Permitted Liens | § 4(h) |
| person | § 19(e) |
| Plans | § 4(o)(i) |
| Portfolio Buyer | §3 (a)(x) |
| Portfolio Purchase Agreement | §3 (a)(x) |
| Pre-Cut-Off Tax Period | § 4(g)(i) |
| Price Allocation | § 10(f) |
| Private Label Credit Card Program Agreement | § 3(a)(x) |
| Purchase Price | § 1(b) |
| Real Estate | § 4(i)(ii) |
| Real Estate Agreement | § 4(i)(i) |
| Required Consents | § 8(a) |

Tar.A012

| TERM | REFERENCE |
|------|-----------|
| Retained Employees | § 9(a) |
| Retained Names and Marks | § 8(c)(i) |
| Retained Software Agreement | § 8(i)(v) |
| Securities | Recitals |
| Shares | Recitals |
| Statement | § 2(c)(i) |
| Straddle Period | § 4(g)(i) |
| Target | Preamble |
| Target Affiliate | Recitals |
| Target Flex Plans | § 9(i) |
| Target-Mervyn's License | § 8(c)(xv) |
| Target Retirement Plans | § 9(j) |
| Target Taxes | § 4(g)(i) |
| Target's Medical Plans | § 9(h) |
| Tax Claim | § 10(h)(i) |
| Tax Return | § 4(g)(i) |
| Taxes | § 4(g)(i) |
| Taxing Authority | § 4(g)(i) |
| Terminable at Will | § 4(l)(vi) |
| Third-Party Claim | § 11(e)(i) |
| Third-Party Confidentiality Agreements | § 8(p) |
| Title Commitments | § 4(i)(i) |
| Transaction Adjustments | § 2(c)(vi) |
| Transfer Taxes | § 10(b) |
| Transition Services Agreement | § 8(h) |
| Treasury Regulation | § 4(g)(i) |
| Year-End Statements | § 4(e) |

Tar.A013

# EQUITY PURCHASE AGREEMENT

This Equity Purchase Agreement, dated as of July 29, 2004, is made between Target Corporation, a Minnesota corporation ("Target"), and Mervyn's Holdings, LLC, a Delaware limited liability company ("Buyer").

## Recitals

A.    Target owns all of the outstanding capital stock (the "Shares") of Mervyn's, a California corporation ("Mervyn's").

B.    Mervyn's owns all of the outstanding capital stock of Mervyn's Brands, Inc., a Minnesota corporation ("Brands" and, together with Mervyn's, referred to as the "Companies"), which owns intellectual property used by Mervyn's in the operation of its business.

C.    For purposes of this Agreement, "Target Affiliate" means Target or any affiliate of Target (other than the Companies).

D.    Prior to the Closing, Target shall cause Mervyn's to be converted from a California corporation to a California limited liability company and Brands to be converted from a Minnesota corporation to a Minnesota limited liability company.

E.    Target desires to sell, and Buyer desires to purchase, all of the outstanding equity securities of Mervyn's (the "Securities") on the terms and subject to the conditions of this Agreement.

## Agreement

The parties hereby agree as follows:

1.    Purchase and Sale of the Securities; Purchase Price.

    (a)    Generally. On the terms and subject to the conditions of this Agreement, at the Closing, Target will sell, transfer, and deliver the Securities to Buyer as of the Effective Time (as defined in Section 2(a)), and Buyer will purchase the Securities from Target, free and clear of all liens, claims, options, charges, encumbrances, security interests, rights of third parties, and restrictions of any kind.

    (b)    Purchase Price. The aggregate purchase price for the Securities is $1,175,000,000 in cash (the "Purchase Price"), payable as set forth in Section 2(b), and subject to adjustment as set forth in Section 2(c). To compensate Target for the Closing occurring after the Cut-Off Date (as defined in Section 2(a)), Buyer shall pay Target at Closing an additional amount (the "Closing Date Interest") equal to interest on the Purchase Price, calculated on the basis of the number of days (excluding the

Closing Date) by which the Closing follows the Cut-Off Date and otherwise in accordance with the provisions of Section 2(c)(v).

2.    Closing; Purchase Price Adjustment.

(a)    Closing Date; Effective Time. The closing (the "Closing") of the purchase and sale of the Securities shall be held at the offices of Kirkland & Ellis LLP, Citigroup Center, 153 East 53rd Street, New York, New York 10022, at 10:00 a.m. New York time on August 30, 2004 (or, if the conditions to Closing set forth in Section 3 shall not have been satisfied or waived by the appropriate party by such date, subject to the provisions of Section 14, at 10:00 a.m. New York time on the first Monday that is a business day to occur following the date on which all of the conditions to Closing set forth in Section 3 shall have been satisfied or waived), or at such other place, time and day as the parties may agree. The date on which the Closing shall occur is referred to as the "Closing Date," although the transfer of the Securities shall be effective as of 11:59 p.m. Minneapolis time (the "Effective Time") on the first Saturday immediately preceding the Closing Date (such Saturday being referred to herein as the "Cut-Off Date").

(b)    Closing Deliveries. At the Closing:

(i)    Buyer shall pay the Purchase Price, plus the Closing Date Interest, to Target;

(ii)    Target shall deliver to Buyer (A) a stock certificate representing the Shares, marked cancelled, and (B) a unit certificate representing the Securities, duly endorsed or accompanied by a duly executed assignment separate from certificate in form suitable for transfer of the Securities to Buyer, effective as of the Effective Time; and

(iii)    each party shall deliver the documents required to be delivered by it under Section 3.

(c)    Purchase Price Adjustment.

(i)    Within 60 days after the Closing Date, Target shall prepare and deliver to Buyer a statement (the "Statement") setting forth Net Assets (as defined below) as of the close of business on the Cut-Off Date (the determination of Net Assets, as it may be adjusted under this Section 2(c) in the event of a Notice of Disagreement, is referred to as "Final Net Assets"). Buyer shall reasonably assist Target and its representatives in the preparation of the Statement and shall provide Target and its representatives reasonable access at all reasonable times to the personnel, properties, and books and records of the Companies for such purpose.

-2-

Tar.A015

(ii)     The Statement shall become final and binding upon the parties on the 30th day following receipt thereof by Buyer unless Buyer gives written notice of its disagreement ("Notice of Disagreement") to Target before such date. A Notice of Disagreement pursuant to this Section 2(c)(ii) may be submitted only if, assuming all of Buyer's assertions therein were sustained, an adjustment to the Purchase Price would be required under Section 2(c)(v), and the Notice of Disagreement must set forth Buyer's determination of Final Net Assets and specify in reasonable detail the nature of any disagreement with Target's determination. The only disagreements that may be set forth in the Notice of Disagreement pursuant to this Section 2(c)(ii) are those that relate to any claimed inconsistencies between the principles used in the preparation of the Statement and the principles used in the preparation of the Interim Statement of Net Assets (as defined in Section 4(e)) that are not provided for in the definition of Net Assets in Section 2(c)(vi) or errors in mathematical computation. Notwithstanding anything to the contrary in this Section 2(c), no disagreement set forth in the Notice of Disagreement may relate to the principles used in the preparation of the Statement and the Interim Statement of Net Assets so long as those principles are consistently applied. If a valid Notice of Disagreement is received by Target in a timely manner, then the Statement and the Final Net Assets (as finally determined in accordance with clause (A) or (B) below) shall become final and binding upon the parties on the earlier of (A) the date the parties resolve in writing any differences they have with respect to all matters specified in the Notice of Disagreement or (B) the date any disputed matters are finally resolved in writing by the Arbitrator (as defined below).

(iii)     During the 30-day period following the delivery of a Notice of Disagreement, Target and Buyer shall seek in good faith to resolve in writing any differences that they may have with respect to any matter specified in the Notice of Disagreement. If, at the end of such 30-day period, Target and Buyer have not reached agreement on all such matters, then the matters that remain in dispute shall be promptly submitted to an arbitrator (the "Arbitrator") for review and resolution. The Arbitrator shall be a nationally recognized independent public accounting firm as shall be agreed upon by the parties in writing, provided that the Arbitrator will not be an accounting firm used by either Target or Buyer for audit or valuation purposes. The procedures for the arbitration shall be determined by the Arbitrator. The Arbitrator shall render a decision resolving the matters in dispute within 30 days following completion of the submissions to the Arbitrator. Any item not specifically referred to in the Notice of Disagreement shall be deemed final and binding on Buyer and Target in the manner set forth in the Statement. The Arbitrator shall determine Final Net Assets based solely on presentations made by Target and Buyer (and not by independent review).

-3-

Tar.A016

(iv)     The Non-Prevailing Party (as defined below) in any arbitration before the Arbitrator shall pay its own expenses incurred with respect to the arbitration and shall pay a percentage of (A) the fees and expenses of the Arbitrator plus (B) the reasonable out-of-pocket expenses (including reasonable attorneys' fees) of the other party incurred with respect to the arbitration, which percentage shall be calculated by dividing (1) an amount equal to the difference between the Non-Prevailing Party's determination of Final Net Assets, as submitted to the Arbitrator, and the Arbitrator's determination of Final Net Assets by (2) an amount equal to the difference between the parties' respective determinations of Final Net Assets, as submitted to the Arbitrator. The other party shall pay the remainder of the fees and expenses of the Arbitrator and its own expenses not required to be paid by the Non-Prevailing Party hereunder. A party is the "Non-Prevailing Party" if the Arbitrator's determination of Final Net Assets is closer to the other party's determination of Final Net Assets, as submitted to the Arbitrator, than it is to that party's determination of Final Net Assets, as submitted to the Arbitrator. In resolving any matter specified in the Notice of Disagreement, the Arbitrator shall not assign a value to any item greater than the greatest value for such item claimed by either party or less than the smallest value for such item claimed by either party.

(v)     For purposes of this Agreement, "Bid Net Assets" means $904,421,474. The Purchase Price shall be increased by the amount by which Final Net Assets exceed 102% of the Bid Net Assets, or the Purchase Price shall be decreased by the amount by which Final Net Assets are less than 98% of the Bid Net Assets (the Purchase Price as increased or decreased by the adjustment provided for in this sentence is referred to as the "Adjusted Purchase Price"; if no such adjustment is required, then the Adjusted Purchase Price shall equal the Purchase Price). If the Purchase Price is less than the Adjusted Purchase Price, Buyer shall, and if the Purchase Price is more than the Adjusted Purchase Price, Target shall, within 5 business days after the Statement becomes final and binding on the parties, make payment to the other party of the amount of such difference, together with interest thereon at an annual rate equal to the three-month LIBOR rate in effect as of the Friday before the Closing Date, calculated on the actual number of days elapsed from the Cut-Off Date to the date of payment divided by 365.

(vi)     The term "Net Assets" means (A) the book value (net of appropriate reserves) of the assets of the Companies that would be required to be included on a consolidated balance sheet prepared in accordance with the principles used in the preparation of the Interim Statement of Net Assets, provided that the book value of all fixed assets and all intangible assets as of the Cut-Off Date shall be determined without regard to any depreciation or

-4-

**Tar.A017**

amortization thereof after the date of the Interim Statement of Net Assets. less (B) the book value of the liabilities of the Companies that would be required to be included on a consolidated balance sheet prepared in accordance with the principles used in the preparation of the Interim Statement of Net Assets, calculated on the same basis as reflected in the relevant line items on the Interim Statement of Net Assets. Without limiting the generality of the foregoing, the computation of Net Assets will be done in a manner consistent with the methods used in the preparation of the Interim Statement of Net Assets, and if disagreements arise with respect to individual items of inclusion and/or exclusion, the governing principle will be that the adjustment contemplated by this Section 2(c) is intended to analyze the economic effects of a change in Net Assets from the date of the Interim Statement of Net Assets through the Cut-Off Date, and such change can be appropriately measured only when the Bid Net Assets and the Final Net Assets are computed on the same basis, except as provided above. Notwithstanding anything to the contrary in this Agreement, all receipts by Mervyn's on or before the Cut-Off Date, including cash, checks and bank drafts (whether cleared before or after the Effective Time), and proceeds from third-party credit card or debit card transactions (whether posted before or after the Effective Time) shall be excluded from the Statement, and Buyer shall cause payment in an aggregate amount equal to such receipts to be made by Buyer or Mervyn's to Target immediately after Target makes demand therefor; provided that this sentence shall not affect Target's covenant regarding register cash set forth in Section 5(b)(iii). Net Assets shall not include as assets any assets transferred by Mervyn's to a Target Affiliate before the Effective Time and shall not include as liabilities any Target Taxes (as defined in Section 4(g)(i)) or Transfer Taxes (as defined in Section 10(b)). For the avoidance of doubt, Net Assets shall not include any assets or liabilities of the type that are excluded from the Interim Statement of Net Assets due to the "transaction adjustments" set forth on Exhibit A.

(d)     Certain Assets. If Buyer is prevented from acquiring the indirect ownership of, or leasehold interest in, one or more parcels of Real Estate or indirect ownership of other assets of the Companies due to an injunction or court order, then (i) all assets and liabilities relating to any such parcel or such other assets shall be excluded from the calculations of Bid Net Assets and Final Net Assets, (ii) the parcel or other asset will be transferred out of the Companies to Target or its designee and (iii) the parties shall negotiate a mutually acceptable reduction to the Adjusted Purchase Price equal to the fair market value of such ownership or leasehold interest. If the parties cannot agree on the such fair market value, then the parties shall resolve their differences pursuant to the procedures set forth in Sections 2(c)(iii) and (iv), provided that the Arbitrator shall be a mutually acceptable real estate appraisal firm rather than an accounting firm.

-5-

Tar.A018

(e)  <u>Section 1031 Like-Kind Exchange</u>.  Notwithstanding any other provision of this Agreement, Target may elect to effectuate, directly or indirectly, the sale of one or more of the parcels of Owned Real Estate (the "Exchange Assets") by means of an exchange of "like-kind" property that will qualify under Section 1031 of the Code and the Treasury Regulations thereunder (each, an "Exchange Transaction"); Buyer shall at Target's sole cost and expense use commercially reasonable efforts to cooperate in an Exchange Transaction arranged by Target. Mervyn's and a qualified exchange intermediary (as such term is used in the Treasury Regulations promulgated under Section 1031 of the Code) designated by Target. Target shall provide written notice to Buyer of Target's election to effect an Exchange Transaction no later than 10 days prior to Closing.  Neither Mervyn's nor Buyer shall incur any Tax liability, any expenses or any liability of any nature in connection with any Exchange Transaction.  Neither Buyer nor Mervyn's shall be obligated to take title to any exchange property under any circumstances.  No Exchange Assets shall be transferred or deeded out of Mervyn's.  Target shall indemnify and save and hold harmless Buyer and Mervyn's from any and all liabilities arising out of or related to any Exchange Transaction. Buyer shall, upon Target's request, and Target may, notwithstanding any other provision of this Agreement, cause Mervyn's to, execute and deliver such documents and agreements as are reasonably necessary for the purpose of facilitating an Exchange Transaction, and Buyer shall pay the portion of the Purchase Price attributable to the Exchange Assets (the "Escrowed Purchase Price") at the Closing to Target's designated qualified exchange intermediary.  Target's right to receive the Escrowed Purchase Price shall be limited as required by Section 1031 of the Code and the Treasury Regulations thereunder.  If a tax-deferred exchange cannot be effected by Target for any reason other than a breach by Buyer, Target shall still be obligated to close this transaction pursuant to the terms of this Agreement.  Under no circumstances shall Target's right or election to exchange any Exchange Assets, delay closing, require Buyer or Mervyn's to incur any expense it would not have otherwise incurred (unless paid or reimbursed by Target as provided above) or otherwise adversely affect Buyer's rights hereunder. The Escrowed Purchase Price for any parcel of Owned Real Estate shall be the amount allocated to such Owned Real Estate as determined under Section 10(f) below.

3.  <u>Conditions to Closing</u>.

(a)  <u>Buyer's Obligation</u>.  The obligation of Buyer to purchase and pay for the Securities is subject to the satisfaction (or waiver by Buyer) as of the Closing of the following conditions:

(i)  The representations and warranties of Target made in Section 4 shall be true and correct as of the date hereof and (except as they may be affected by transactions contemplated hereby and except for representations and

-6-

**Tar.A019**

warranties that by their terms are made only as of an earlier date) immediately before the Closing, as though made immediately before the Closing, except (A) to the extent any inaccuracy in any such representation or warranty does not materially impair the ability of Target to consummate the transactions contemplated by this Agreement and does not have a Material Adverse Effect (as defined below) (provided that, solely for purposes of this Section 3(a)(i), any representation or warranty in Section 4 that is qualified by materiality or Material Adverse Effect language shall be read as if such language were not present) and (B) that such update shall be based on the assumption that, except with respect to Sections 4(a), (b) and (c), the Companies are each corporations, and not limited liability companies, immediately prior to Closing. As used in this Agreement, "Material Adverse Effect" means any change or effect that, individually or in the aggregate, has or is reasonably likely to have a material adverse effect on the operations, results of operations, properties, or financial condition of the Companies, as a whole (other than any such change or effect resulting from (1) any change, event, or occurrence generally affecting the industry in which Mervyn's operates, (2) general economic or securities market conditions in the United States, (3) the public announcement or existence of this Agreement and the transactions contemplated hereby, (4) acts of terrorism or war (whether or not declared), or (5) any change, event, or occurrence resulting from or relating to compliance with the terms of, or the taking of any action required by, this Agreement).

(ii)     Target shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by it by the Closing.

(iii)     Target shall have delivered to Buyer a certificate dated the Closing Date and signed by an executive officer of Target on behalf of Target confirming the satisfaction of the conditions set forth in Sections 3(a)(i) and (ii).

(iv)     No injunction or order of any court or administrative agency of competent jurisdiction shall be in effect that restrains or prohibits the purchase or sale of the Securities; provided that an injunction or court order that prohibits the transfer of indirect ownership of, or leasehold interests in, one or more parcels of Real Estate or other assets of the Companies shall not be deemed to restrain or prohibit the purchase or sale of the Securities unless the failure of Buyer to acquire ownership of, or leasehold interests in, such parcels or other assets has a Material Adverse Effect.

-7-

Tar.A020

(v)     The waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), shall have expired or terminated.

(vi)     Target shall have delivered to Buyer an affidavit (a so-called "FIRPTA affidavit") duly executed by Target, certifying facts that would exempt the transactions contemplated hereby from the provisions of the Foreign Investment in Real Property Tax Act.

(vii)     Target shall cause to be delivered to Buyer duly signed resignations, effective as of the Closing Date, of all directors of the Companies.

(viii)     There shall have been no Material Adverse Effect since May 29, 2004.

(ix)     Target shall have executed and delivered to Buyer the Transition Services Agreement (as defined in Section 8(h)), and such Transition Services Agreement shall be in full force and effect.

(x)     The transactions contemplated by that certain Portfolio Purchase Agreement, dated as of the date hereof, among Target, Mervyn's, Target National Bank, Target Receivables Corporation, and Monogram Credit Card Bank of Georgia ("Portfolio Buyer") in substantially the form attached hereto as Exhibit B (the "Portfolio Purchase Agreement") shall have been consummated and Portfolio Buyer shall have executed and delivered to Buyer a Private Label Credit Card Program Agreement in substantially the form attached hereto as Exhibit C (the "Private Label Credit Card Program Agreement") and such Private Label Credit Card Program Agreement shall be in full force and effect unless terminated as a result of a breach thereof by Buyer (or if such transactions have not been consummated, (A) transactions have been consummated pursuant to a portfolio purchase agreement no less favorable to Buyer, and a private label credit card program no less favorable to Buyer shall be in full force and effect, each with an alternative portfolio buyer selected by Target and reasonably acceptable to Buyer, or (B) Target shall have delivered to Buyer an amendment to the amended and restated agreement dated February 1, 2004, between Target National Bank and Mervyn's executed by Target National Bank in a form reasonably satisfactory to Buyer and such amended and restated merchant services agreement dated February 1, 2004, as amended, shall be in full force and effect).

(xi)     Target shall have caused Mervyn's to be converted from a California corporation to a California limited liability company in accordance with the California General Corporation Law (the "Mervyn's Conversion"), and

-8-

Tar.A021

Brands to be converted from a Minnesota corporation to a Minnesota limited liability company in accordance with the Minnesota Business Corporation Act (the "Brands Conversion"), and Target shall not have made any election for Mervyn's or Brands, in connection with or following the conversions, to be treated as a corporation for any Tax purposes.

(xii)  Buyer shall have received (A) certified copies of the resolutions duly adopted by Target (in its capacity as the sole shareholder of Mervyn's) and the board of directors of Target authorizing the execution, delivery and performance of this Agreement and each of the agreements contemplated hereby, and the consummation of all transactions contemplated hereby and thereby, (B) certified copies of the charter and bylaws of Target and the Companies, (C) certified copies of Mervyn's Limited Liability Company Articles of Organization -- Statement of Conversion filed with the California Secretary of State and plan of conversion, (D) certified copies of Brands' Articles of Conversion filed with the Minnesota Secretary of State and plan of conversion, and (E) certified copies of the resolutions duly adopted by Mervyn's (in its capacity as the sole shareholder of Brands) authorizing the Brands Conversion.

(xiii)  Buyer shall have received good standing certificates of the secretary of state of the jurisdiction in which each of the Companies is incorporated.

(b)  <u>Target's Obligation</u>.  The obligation of Target to sell and deliver the Securities to Buyer is subject to the satisfaction (or waiver by Target) as of the Closing of the following conditions:

(i)  The representations and warranties of Buyer made in Section 6 shall be true and correct in all material respects as of the date hereof and (except as they may be affected by transactions contemplated hereby and except for representations and warranties that by their terms are made only as of an earlier date) immediately before the Closing, as though made immediately before the Closing; Buyer shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by Buyer by the Closing; and Buyer shall have delivered to Target a certificate dated the Closing Date and signed by an executive officer of Buyer on behalf of Buyer confirming the foregoing.

(ii)  No injunction or order of any court or administrative agency of competent jurisdiction shall be in effect that restrains or prohibits the purchase or sale of the Securities; provided that an injunction or court order that prohibits the transfer of indirect ownership of, or leasehold interests in, one or more

Tar.A022

parcels of Real Estate or other assets of the Companies shall not be deemed to restrain or prohibit the purchase or sale of the Securities unless the failure of Buyer to acquire ownership of, or leasehold interests in, such parcels or other assets has a Material Adverse Effect.

(iii)    The waiting period under the HSR Act shall have expired or terminated.

(iv)    The transactions contemplated by the Portfolio Purchase Agreement shall have been consummated unless the failure to consummate results from a breach of the Portfolio Purchase Agreement by Target or the Companies.

4.    Representations and Warranties of Target.    Except as set forth in the disclosure schedule delivered by Target to Buyer concurrently with the execution of this Agreement (the "Disclosure Schedule"), Target hereby represents and warrants to Buyer as follows:

(a)    Organization and Authority.    Each of Target and, prior to the Mervyn's Conversion and the Brands Conversion, the Companies is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation. All corporate and stockholder acts and proceedings required to be taken to authorize the execution, delivery, and performance by Target of this Agreement and all agreements, instruments and other documents referred to herein to be entered into by Target and the consummation by Target of the transactions contemplated hereby and thereby have been duly and properly taken. Prior to the Mervyn's Conversion and the Brands Conversion, each Company is duly qualified and in good standing to do business as a foreign corporation in each jurisdiction in which the nature of its business or the ownership, leasing, or holding of its properties requires it to be so qualified, except where the failure to be so qualified or in good standing does not have a Material Adverse Effect. Target has all requisite corporate power and authority to enter into this Agreement and all agreements, instruments and other documents referred to herein to be entered into by Target, to consummate the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder. This Agreement has been duly executed and delivered by Target and, assuming due authorization, execution, and delivery of this Agreement by Buyer, constitutes a valid and binding obligation of Target, enforceable against Target in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium, and other similar laws affecting creditors' rights generally and by general principles of equity. As of the Closing, all agreements, instruments and other documents referred to herein to be entered into by Target shall have been duly executed and delivered by Target and, assuming due authorization, execution, and delivery of all agreements, instruments and other documents referred

-10-

Tar.A023

to herein by Buyer, constitute valid and binding obligations of Target enforceable against Target in accordance with their terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium, and other similar laws affecting creditors' rights generally and by general principles of equity.

(b) The Shares and Securities. Prior to the Mervyn's Conversion. Target has good and valid title to the Shares and, after the Mervyn's Conversion. Target has good and valid title to the Securities, in either case free and clear of any claims, liens, encumbrances, security interests, options, charges, rights of third parties, and restrictions whatsoever and will transfer and deliver to Buyer at Closing good and valid title to the Securities free and clear of any liens, claims, options, charges, encumbrances, security interest, rights of third parties, and restrictions of any kind, except those created by Buyer and restrictions upon transfer of the Securities other than in compliance with federal and state law. Neither the Shares nor the Securities are subject to any voting trust agreement or other contract, agreement, arrangement, commitment, or understanding, including any such contract, agreement, arrangement, commitment, or understanding restricting or otherwise relating to the voting, dividend rights, or disposition of the Shares or Securities, other than this Agreement.

(c) Capitalization. Prior to the Mervyn's Conversion, the authorized capital stock of Mervyn's consisted of 20 million shares of common stock, $1.00 par value per share, 100 of which were duly authorized, validly issued and outstanding, and fully paid and nonassessable. After the Mervyn's Conversion, the authorized equity securities of Mervyn's consists of 20 million common units, 100 of which are duly authorized, validly issued and outstanding, and fully paid and nonassessable. Prior to the Brands Conversion, the authorized capital stock of Brands consisted of 1,000 shares of common stock, $1.00 par value per share, all of which were duly authorized, validly issued and outstanding, and fully paid and nonassessable. After the Brands Conversion, the authorized equity securities of Brands consists of 1,000 common units, all of which are duly authorized, validly issued and outstanding, and fully paid and nonassessable. Prior to the Brands Conversion, Mervyn's was the sole holder of all of the issued and outstanding shares of Brands. After the Brands Conversion, Mervyn's is the sole holder of all of the issued and outstanding equity securities of Brands. Prior to the Mervyn's Conversion, the Shares constituted all of the issued and outstanding shares of capital stock of Mervyn's. After the Mervyn's Conversion, the Securities constitute all of the issued and outstanding equity securities of Mervyn's. Prior to the Mervyn's Conversion, Target was the sole holder of the Shares. After the Mervyn's Conversion, Target is the sole holder of the Securities. Neither the Shares nor Securities nor any shares of issued and outstanding equity securities of Brands have been issued in violation of, or are subject to, any preemptive or subscription rights. There are no outstanding or authorized preemptive, stock appreciation, phantom stock or similar rights with respect to any of the Companies. Other than as described in this Section 4(c), there are no shares of

-11-

Tar.A024

capital stock or other equity securities of the Companies outstanding. There are no outstanding warrants, options, agreements, convertible or exchangeable securities, or other commitments pursuant to which Target or any of the Companies is or may become obligated to issue, sell, or otherwise dispose of, purchase, return, redeem, or otherwise acquire any shares of capital stock or other securities of the Companies other than this Agreement, and there are not any equity securities of any of the Companies reserved for issuance for any purpose. Other than Mervyn's ownership of Brands, the Companies do not directly or indirectly own any capital stock of, or other equity interest in, any person.

(d) <u>Non-Contravention</u>. Subject to Section 4(i)(vii), the execution, delivery, and performance by Target of this Agreement and all agreements, instruments and other documents referred to herein to be entered into by Target do not, and the consummation by Target of the transactions contemplated hereby and thereby will not, (i) conflict with, or result in any violation of, any provision of the articles of incorporation or by-laws of Target or any of the Companies, or (ii) conflict with, result in any violation of, or constitute a default under, or create a lien on any assets of the Companies under, or result in the acceleration or termination of, or result in a material increase in payment obligations (including, without limitation, any change of control payments) under, any instrument, contract, commitment, agreement or arrangement to which Target or any of the Companies is a party or by which Target or any of the Companies or any assets of the Companies are bound, or any judgment, order, writ, injunction, or decree to which Target or any of the Companies has been specifically identified as subject, or result in any violation of any statute, law, ordinance, rule, or regulation applicable to Target, any of the Companies, or any assets of the Companies (except where such conflict, violation, default, lien, acceleration, termination, or increased obligations would not materially impair the ability of Target to consummate the transactions contemplated hereby or have a Material Adverse Effect). No material consent, approval, license, permit, order, or authorization of, or registration, declaration, or filing with, any court, administrative agency, or commission or other governmental authority or instrumentality, domestic or foreign, is required to be obtained or made by or with respect to Target or any of the Companies in connection with the execution, delivery, and performance by Target of this Agreement or the consummation by Target of the transactions contemplated hereby other than compliance with and filings under the HSR Act and filings with the Secretaries of State of California and Minnesota required to effect the Mervyn's Conversion and the Brands Conversion; provided, however, that no representation is made as to whether any new governmental consents, approvals, licenses, permits, orders, authorizations, registrations, declarations, or filings will be required as a result of the sale of the Securities to Buyer in order for Buyer to continue to conduct Mervyn's business following the Cut-Off Date in the manner in which such business was conducted on or before the Cut-Off Date.

**Tar.A025**

(e)  Financial Statements.  Section 4(e) of the Disclosure Schedule sets forth (i) audited consolidated balance sheets of Mervyn's as of January 31, 2004 and February 1, 2003 and audited consolidated statements of income of Mervyn's for each of the fiscal years ended January 31, 2004, February 1, 2003, and February 2, 2002 (the "Year-End Statements") and (ii) an unaudited consolidated statement of financial position of Mervyn's as of May 29, 2004 (the "Interim Statement of Net Assets") and an unaudited consolidated statement of income of Mervyn's for the four-month period then ended (the statements listed in clauses (i) and (ii) are referred to as the "Financial Statements").  The Financial Statements (including in all cases the notes thereto, if any) fairly present, in all material respects, the assets, liabilities, and financial condition of the Companies at their respective dates and the results of operations of the Companies for the respective periods covered thereby.  The Year-End Statements have been prepared in accordance with United States generally accepted accounting principles consistently applied throughout the periods covered thereby, and the Interim Statement of Net Assets has been prepared on a basis consistent with the principles applied in the preparation of the balance sheet for Target's Mervyn's segment included in Target's Quarterly Report on Form 10-Q for the quarter ended May 1, 2004, in each case except as described in the notes thereto; provided, however, that the Interim Statement of Net Assets does not include any assets or liabilities of the type that are listed as "transaction adjustments" on Exhibit A.  Except as expressly provided in this Section 4(e) or as otherwise specifically provided in this Agreement, no representation is made by Target as to any financial information of the Companies provided to Buyer, including any financial information provided to Buyer in its due diligence investigation of the Companies or set forth in the Confidential Information Memorandum regarding Mervyn's provided to Buyer by Goldman, Sachs & Co.  Without limiting the generality of the foregoing, no representation is made as to the accuracy, fairness, or reasonableness of any projections provided to Buyer or the assumptions used in preparing the same, or as to the likelihood that such projections will be achieved.

(f)  Nonforeign Certification.  Target is not a "foreign person" within the meaning of Section 1445 of the Code (as defined in Section 4(g)).

(g)  Taxes.

(i)  For purposes of the Agreement:

(A)  "Target Taxes" means Income Taxes of the Companies for any Pre-Cut-Off Tax Period and any Income Taxes of the Companies for the period beginning immediately after the Effective Time and ending immediately before the Closing to the extent attributable to actions, other than in the ordinary course of business, taken by Target to the extent such actions cause the amount of Income

-13-

Tar.A026

Taxes for such period to exceed the amount of Income Taxes for such period in the absence of such actions by Target; provided, however, that Target Taxes shall not include, and Target shall not be responsible for, Income Taxes that Buyer has agreed to pay under any provision of this Agreement.

(B)     "Pre-Cut-Off Tax Period" means any Tax period ending on or before the Cut-Off Date, and with respect to a Straddle Period, any portion thereof ending on, and including, the Cut-Off Date.

(C)     "Affiliated Group" means the affiliated group of corporations within the meaning of Section 1504 of the Code of which Target is the common parent that files a federal consolidated Income Tax Return.

(D)     "Tax Return" means any return, statement, report, or form, including in each case any amendments thereto, required to be filed with any Taxing Authority by or with respect to Taxes or any claim for refund.

(E)     "Straddle Period" means any complete Tax period of the Companies relating to Income Taxes that includes but does not end on the Cut-Off Date.

(F)     "Taxes" means all federal, state, local, or foreign income, profits, franchise, gross receipts, net receipts, capital, capital stock, net worth, sales, use, withholding, turnover, value added, ad valorem, registration, general business, employment, social security, disability, occupation, real property, personal property (tangible and intangible), recording, stamp, transfer (including real property transfer or gains), conveyance, severance, production, excise, and other taxes, withholdings, duties, levies, imposts, license and registration fees, and other similar charges and assessments (including all fines, penalties, and additions attributable to or otherwise imposed on or with respect to any such taxes, charges, fees, levies, or other assessments, and interest thereon) imposed by or on behalf of any Taxing Authority and including any liability arising pursuant to the application of Treasury Regulation section 1.1502-6 or any similar provision of any applicable state, local, or foreign Tax law.

(G)     "Income Taxes" means all Taxes (other than sales, use, property, Transfer, recording, and similar Taxes) based upon or measured by gross or net receipts or gross or net income (including Taxes in the nature of minimum taxes, tax preference items, and

-14-

Tar.A027

alternative minimum taxes) and including any liability arising pursuant to the application of Treasury Regulation section 1.1502-6 or any similar provision of any applicable state, local, or foreign Tax law.

(H)     "Taxing Authority" means any governmental or regulatory authority, body or instrumentality exercising any authority to impose, regulate, or administer the imposition of Taxes.

(I)     "Transfer Taxes" has the meaning assigned thereto in Section 10(b).

(J)     "Code" means the Internal Revenue Code of 1986, as amended.

(K)     "Treasury Regulation" means the U.S. Treasury Regulations promulgated pursuant to the Code.

(ii)     The Companies have filed or caused to be filed in a timely manner (within any applicable extension periods) all Tax Returns required to be filed by applicable federal, state, local, or foreign Tax laws, except where the failure to file such federal, state, local, or foreign Tax Returns does not have a Material Adverse Effect. All Taxes shown to be due on such Tax Returns have been paid in full or will be paid in full by Target or the Companies before the Effective Time, except to the extent that they are accrued on the Statement.

(iii)     Neither Company is a party to any Tax-allocation or Tax-sharing agreement or arrangement with respect to Taxes or is under any contractual obligation to indemnify any other person with respect to Taxes (other than, in each case, real estate taxes and assessments or an agreement or arrangement to be terminated pursuant to this Agreement).

(iv)     Each Company is a member of the Affiliated Group filing a consolidated Income Tax Return having Target as its common parent for U.S. federal Income Tax purposes and will be a member of such Affiliated Group immediately prior to the Mervyn's Conversion and the Brands Conversion.

(v)     Since January 1, 1997, neither Company has been a member of an Affiliated Group filing a federal consolidated Income Tax Return (other than a group the common parent of which was Target).

Tar.A028

(h)    Personal Property.

(i)    Mervyn's has good title to, or valid leasehold interests in, all material tangible personal property assets reflected on the Interim Statement of Net Assets or thereafter acquired, except for those tangible personal property assets sold or otherwise disposed of in the ordinary course of business, in each case free and clear of all liens, security interests, and other encumbrances, other than (a) mechanics', materialmen's, carriers', workmen's, warehousemen's, repairmen's, landlord's, or other like liens securing obligations that are incurred in the ordinary course of business for sums not yet due or, if due, the payment of which is being contested in good faith; (b) liens for Taxes and other governmental charges that are not yet due or, if due, the payment of which is being contested in good faith; (c) liens, security interests, and other encumbrances evidenced by any security agreement, financing statement, purchase money agreement, conditional sales contract, capital lease, or operating lease, or by any license, coexistence agreement, undertaking, declaration, limitation of use, or consent to use (collectively,  "Licenses"), in each case that is described in Section 4(l) of the Disclosure Schedule or the non-disclosure of which therein does not constitute a misrepresentation under Section  4(l); and (d) minor imperfections of title and encumbrances that do not, individually or in the aggregate, materially impair the value or the continued use and operation substantially in the current manner of the business of Mervyn's (the liens, security interests, and other encumbrances described in clauses (a) through (d) above being referred to collectively as "Permitted Liens").

(ii)    The assets, properties and rights held by the Companies, together with the assets, properties and rights specifically provided or made available to Buyer and its affiliates under the Transition Services Agreement, include all of material assets, properties and rights of every type and description, whether real, personal, tangible or intangible and wherever located, that are reasonably necessary or adequate for the Companies immediately after the Closing to conduct in all material respects the business of each of the Companies as conducted as of the date hereof except for the following: (a) assets, properties and rights that have been specifically assigned to or retained by Target under another provision of this Agreement, (b) items identified in Schedule A of the Transition Services Agreement as being excluded, (c) assets,  properties and rights that are contemplated to be sold to the Portfolio Buyer pursuant to the Portfolio Purchase Agreement, (d) assets, properties and rights relating to any Plan, (e) rights under contracts or Real Estate Agreements to the extent any consents have not been obtained prior to Closing, provided that nothing in this clause (ii) shall be construed to limit Target's obligations under the Transition Services Agreement even in the

-16-

Tar.A029

absence of such consents, (f) software with respect to which Target has exercised its rights of removal in accordance with Section 8(n)(ii) hereof, (g) governmental consents, approvals, licenses, permits, orders, authorizations, registrations, declarations, or filings that may be required as a result of the sale of the Securities to Buyer in order for Buyer to continue to conduct Mervyn's business following the Cut-Off Date in the manner in which such business was conducted on or before the Cut-Off Date, and (h) insurance policies and rights to proceeds of insurance policies except as contemplated by Section 5(d). Nothing in this Section 4(h)(ii) constitutes an additional representation or warranty with respect to title to or the condition of any assets or properties (whether real or personal, tangible or intangible, owned, leased or held under license), any and all representations or warranties with respect to which are set forth in other sections of this Section 4.

(i)     Real Property.

(i)     Section 4(i)(i) of the Disclosure Schedule sets forth a true and complete list of all real property owned by Mervyn's other than as set forth in Section 8(m) (the "Owned Real Estate"). Mervyn's owns good and marketable fee simple title to the Owned Real Estate, free and clear of all mortgages, liens, security interests, easements, restrictive covenants, rights-of-way, encroachments, and other encumbrances created by Mervyn's or any party claiming through Mervyn's, except (A) Permitted Liens; (B) easements, Real Estate Agreements (as defined below), restrictive covenants, rights-of-way, encroachments,   purchase options, rights of first refusal or first offer and other encumbrances and matters that are included in or disclosed by the documents relating to each parcel of Real Estate made available to Buyer prior to the date hereof, shown (whether or not deleted or insured over) on any title insurance commitment made available to Buyer prior to the date hereof (collectively, the "Title Commitments"), or of record; (C) any conditions that may be shown by a current, accurate survey or physical inspection of the Owned Real Estate; and (D) (1) platting, subdivision, zoning, building, and other similar restrictions, (2) easements, restrictive covenants, rights- of- way, encroachments, and other similar encumbrances not of record, and (3) reservations of coal, oil, gas, minerals, and mineral or water interests; provided, however, none of the items set forth in clause (D) individually or in the aggregate materially interfere with the continued use, occupancy and/or operation of the Owned Real Estate substantially in the manner in which the Owned Real Estate is currently used, occupied and operated (collectively, "Owned Permitted Exceptions"). The marketability of title to the Owned Real Estate shall be subject to the Owned Permitted Exceptions. For purposes of this Agreement, "Real Estate Agreement" means any lease or sublease under which Mervyn's is the landlord or tenant, reciprocal easement or operating agreement, agreement supplemental

Tar.A030

thereto, easement, purchase or lease termination, option, right of first refusal or first offer, subordination, non-disturbance or attornment agreement, or other similar agreement that runs with the land and is appurtenant to the Real Estate. Notwithstanding anything in this Agreement to the contrary, the Owned Real Estate is not encumbered by any mortgages, deeds of trust, or security agreements created by Mervyn's or any party claiming through Mervyn's.

(ii)    Section 4(i)(ii) of the Disclosure Schedule sets forth a true and complete list of all real property leased to Mervyn's other than as set forth in Section 8(m) (the "Leased Real Estate" and, together with the Owned Real Estate, the "Real Estate"). Assuming good and marketable fee title vested in the landlord, and subject to any defects in or other matters affecting the landlord's title, Mervyn's has good and marketable leasehold interests in all Leased Real Estate leased to it, in each case free and clear of all mortgages, liens, security interests, easements, restrictive covenants, rights-of-way encroachments, and other encumbrances created by Mervyn's or any party claiming through Mervyn's, except (A) Permitted Liens; (B) easements, Real Estate Agreements, restrictive covenants, rights-of-way, encroachments, purchase options, lease termination options, rights of first refusal or first offer and other encumbrances and matters that are included in or disclosed by the documents relating to each parcel of Real Estate made available to Buyer prior to the date hereof, shown (whether or not deleted or insured over) on any Title Commitment, or of record; (C) any conditions that may be shown by a current, accurate survey or physical inspection of the Leased Real Estate; (D) mortgages, liens, security interests or encumbrances that have been placed by any developer, landlord or other third party on any Leased Real Estate; and (E) (1) platting, subdivision, zoning, building, and other similar restrictions, and (2) easements, restrictive covenants, rights-of-way, encroachments, and other similar encumbrances not of record; provided, however, none of the items set forth in clause (E) individually or in the aggregate materially interferes with the continued use, occupancy and/or operation of the Leased Real Estate substantially in the manner in which the Leased Real Estate is currently used and operated (the "Leased Permitted Exceptions," and, together with the Owned Permitted Exceptions, the "Permitted Exceptions"). The marketability of title to the Leased Real Estate is subject to the Leased Permitted Exception. Except as set forth in Section 4(i) of the Disclosure Schedule, with respect to each of the Leases: (i) Mervyn's has not given or received a written notice of default under any Real Estate Agreement which remains uncured, and no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a breach or default under any such Real Estate Agreement which, with respect to such written notices or events, individually or in the aggregate, would have a Material Adverse Effect; and (ii) the other party to such Lease is not a Target Affiliate. Notwithstanding

-18-

anything in this Agreement to the contrary, Mervyn's interest in the Leased Real Estate is not encumbered by any mortgages, deeds of trust, or security agreements created by Mervyn's or any party claiming through Mervyn's.

(iii) The Real Estate comprises all of the real property owned or leased by the Companies and used in Mervyn's business.

(iv) There are no eminent domain proceedings pending (with respect to which any Target Affiliate or any Company has been notified).

(v) Brands neither owns nor leases any real property.

(vi) "Leases" means all leases, subleases, licenses, concessions and other agreements (written or oral) pursuant to which Mervyn's or any Company holds any Leased Real Estate.

(vii) Notwithstanding anything to the contrary in this Agreement or in any certificate or instrument delivered pursuant hereto, no representation or warranty is made herein as to whether any consents, approvals, waivers, agreements, or actions of, or (with or without lapse of time) notice to, third parties (including governmental authorities), or fulfillment of any conditions, are needed in respect of the Real Estate, including the Real Estate Agreements and the Permitted Exceptions, in connection with the purchase and sale of the Securities pursuant to this Agreement or the direct or indirect ownership of the Real Estate after the Effective Time.

(j) <u>Condition of Assets</u>. Except as expressly provided in Section 4(r), no representation or warranty, direct or indirect, by implication or otherwise, is made concerning or based upon the physical condition of the Real Estate or any other tangible assets of the Companies, all of which are being accepted "AS IS AND WHERE IS" by Buyer (including as to all environmental aspects thereof, except as otherwise provided in Section 4(r)). EXCEPT AS SET FORTH EXPRESSLY IN THIS AGREEMENT, TARGET DISCLAIMS ANY EXPRESS OR IMPLIED WARRANTY WITH RESPECT TO THE ASSETS, TANGIBLE OR INTANGIBLE, OF THE COMPANIES, INCLUDING IMPLIED WARRANTIES OF FITNESS, NONINFRINGEMENT, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE.

(k) <u>Intellectual Property</u>.

(i) Section 4(k)(i) of the Disclosure Schedule sets forth a true and complete list of all of the Companies' material patents, patent applications, trademark applications, trademark registrations, Internet domain names, service mark applications, service mark registrations and copyright

-19-

Tar.A032

registrations. "Intellectual Property" means all: (A) inventions and issued or pending patents; (B) trademarks, service marks, trade dress, logos, slogans, trade names, designs, and Internet domain names, together with all goodwill, registrations, applications and renewals related to the foregoing (collectively, "Marks"); (C) copyrightable works and copyrights, including all applications, registrations and renewals for the foregoing; (D) trade secrets and confidential business information (including know-how and supplier lists); (E) any of the foregoing rights related to any computer software or related documentation; (F) rights of publicity and privacy relating to the use of the names, likenesses, voices, signatures and biographical information of real persons; and (G) other proprietary and intellectual property rights.

(ii)    To the Knowledge of Target, one of the Companies owns or will own at the Closing Date (free and clear of all liens, security interests, and other encumbrances other than Permitted Liens) or has the right to use without payment of a royalty, license fee, or similar fee to any other party (other than pursuant to a License described in Section 4(l) of the Disclosure Schedule or the non-disclosure of which therein would not constitute a misrepresentation under Section 4(l)), the patents, trademarks, trade names, service marks, copyrights and other Intellectual Property used by the Companies in the operation of their businesses (collectively, and together with all Intellectual Property owned by any of the Companies, the "Company Intellectual Property"), except where the failure of either Company to own or have the right to use any such patent, trademark, trade name, service mark, or copyright does not have a Material Adverse Effect. The Company Intellectual Property set forth in Section 4(k)(i) of the Disclosure Schedule is subsisting and in full force and effect and, to the Knowledge of Target, is valid, except as would not have a Material Adverse Effect.

(iii)    To the Knowledge of Target, (A) no outstanding claims or other adversarial proceedings against either Company have been made in writing since January 1, 2001 by any other person challenging or questioning either the right of either Company to use, or the validity or enforceability of, any patent, trademark, service mark, copyright or other Intellectual Property described in Section 4(k)(i) of the Disclosure Schedule in any jurisdiction, domestic or foreign (other than claims, challenges, or questions by governmental intellectual property office examiners as part of the application process), (B) since January 1, 2001, no other person has claimed in writing and continues to claim the right to use in an infringing manner any such patent, trademark, service mark, copyright or other Intellectual Property other than pursuant to a License described in Section 4(l) of the Disclosure Schedule or the non-disclosure of which therein would not constitute a misrepresentation under Section 4(l), and (C) no outstanding claims of patent, trademark, trade

Tar.A033

name, service mark, or copyright infringement or any other violation of any Intellectual Property have been made in writing since January 1, 2001 by any person against either Company with respect to the right of either Company to continue to sell any product or service or otherwise operate the Companies' businesses without payment of a royalty, license fee, or similar fee to such person (other than payments that are currently subject to a License described in Section 4(l) of the Disclosure Schedule or the non-disclosure of which therein would not constitute a misrepresentation under Section 4(l)), except in the case of clauses (A) through (C) as does not have a Material Adverse Effect.

(iv)     To the Knowledge of Target, the conduct of the Companies' businesses as currently conducted does not infringe or otherwise violate any third-party Intellectual Property, except as would not have a Material Adverse Effect.

(v)     To the Knowledge of Target, no third party is infringing or otherwise violating any Company Intellectual Property owned by the Companies and, since January 1, 2001, no claims or other adversarial proceedings have been brought or threatened in writing against any third party regarding Company Intellectual Property by Target, a Target Affiliate, or either of the Companies, except as would not have a Material Adverse Effect.

(vi)     Neither Target nor either Company has received any written notice that any patent, trademark, service mark, or copyright described in Section 4(k)(i) of the Disclosure Schedule has been declared unenforceable or otherwise invalid by any court or governmental authority.

(l)     Contracts.

(i)     Section 4(l)(i) of the Disclosure Schedule lists the following written agreements or contracts (other than Real Estate Agreements) in effect as of the date of this Agreement to which either Company is a party:

(A)     each employment agreement (other than those that are or at the Closing Date will be terminable at will by either Company without any liability or penalty to either Company except with respect to services rendered prior to Closing);

(B)     each covenant not to compete that materially restricts the operation of either Company as presently conducted;

(C)     each operating lease (as lessor or lessee) of tangible personal property (other than any such lease calling for payments of less than $250,000 per year);

-21-

Tar.A034

(D)     each material License of any patents, trademarks, trade names, service marks, copyrights, or other Intellectual Property received from or granted to third parties other than licenses with Target Affiliates that terminate at or prior to Closing (each, an "IP License") (other than Retained Software Agreements (as defined in Section 8(i), non-negotiated licenses for Company Intellectual Property embedded in equipment or fixtures and non-exclusive implied licenses and non-exclusive, non-negotiated licenses for the use of third-party Intellectual Property in connection with the sale of products or services);

(E)     each management, personal service, consulting, or other similar type of contract under which there exists an aggregate future liability in excess of $250,000 per contract (other than those that are or at the Closing Date will be terminable at will or upon not more than 90 days' notice by either Company without any liability or penalty to either Company except with respect to services rendered prior to Closing and other than those entered into in connection with a license);

(F)     each material radio, television or newspaper advertising agreement (other than those that are or at the Closing Date will be terminable at will or upon not more than 90 days' notice by either Company without any liability or penalty to either Company except with respect to services rendered or products sold prior to Closing);

(G)     each agreement for the purchase by either of the Companies of supplies or products that calls for performance over a period of more than one year (other than those that are or at the Closing Date will be terminable at will or upon not more than 90 days' notice by either Company without any liability or penalty to either Company except with respect to services or products purchased prior to Closing);

(H)     each mortgage agreement, deed of trust, security agreement, purchase money agreement, conditional sales contract, or capital lease created or assumed by, or permitted to be created by written instrument made or accepted by, either Company (other than (1) any purchase money agreement, conditional sales contract, or capital lease evidencing liens only on tangible personal property under which there exists an aggregate future liability not in excess of $250,000 per contract or lease, (2) protective filings of financing statements under the Uniform Commercial Code, and (3) agreements evidencing liens on the Real Estate covered by a Title Commitment that are shown on a Title Commitment or are otherwise of record);

-22-

**Tar.A035**

(I)     any contract under which either Company has advanced or loaned any other person amounts in the aggregate exceeding $250,000;

(J)     any agreement, except with the other Company, with respect to the lending or investing of funds, including, without limitation, agreements to purchase, redeem or otherwise acquire any ownership interest in or other security of, or, except with respect to depository accounts, to provide funds to, lend or make any investment (in the form of a loan, capital contribution or otherwise) in, any other person;

(K)     any outstanding power of attorney executed on behalf of either Company (other than those entered into in the ordinary course of business in connection with intellectual property or Tax matters);

(L)     each other agreement or contract not made in the ordinary course of business (other than an agreement or contract calling for payments by either Company of less than $250,000 per year).

(ii)     Section 4(l) of the Disclosure Schedule sets forth each written agreement or contract (excluding the IT Agreements, as defined in the Transition Services Agreement) in effect as of the date of this Agreement or immediately prior to the Closing that relates primarily to the operation of Mervyn's business or the ownership of its assets to which Target but not Mervyn's is a party and the termination of which, after giving effect to the Transition Services Agreement, would have a Material Adverse Effect.

(iii)     To the Knowledge of Target, each agreement and contract required to be listed in Section 4(l) of the Disclosure Schedule (collectively, "Material Contracts") is valid, binding and in full force and effect, except as such enforceability may be limited by bankruptcy, insolvency, moratorium, and other similar laws affecting creditors' rights generally and by general principles of equity.

(iv)     No Company is (with or without the lapse of time or the giving of notice, or both) in breach of or in default under any Material Contract, and, to the Knowledge of Target, no other party to any Material Contract is (with or without the lapse of time or the giving of notice, or both) in breach of or in default under any Material Contract, except for, in either case, defaults that do not have a Material Adverse Effect.

-23-

Tar.A036

(v)     A true and complete copy of each Material Contract has been made available to Buyer, together with all written amendments. waivers and other changes thereto.

(vi)     For purposes of this Section 4(l), agreements or contracts "terminable at will" mean agreements or contracts that do not provide for specified terms of completion, expiration, or termination or are expressly made terminable at will, regardless of whether any covenant of good faith and fair dealing may be implied, as a matter of law, in connection with the termination thereof.

(m)     Litigation; Decrees.  No action, lawsuit, proceeding, or governmental investigation is pending (with respect to which Target or either Company has been served or otherwise notified) or, to the Knowledge of Target, threatened against Target or either Company as of the date of this Agreement (other than (A) workers' compensation claims, (B)  actions, lawsuits, proceedings, or investigations set forth in the Environmental Reports (as defined in Section  4(r)), and (C)  challenges by governmental intellectual property office examiners as part of the application process) that, if decided adversely to such person, (i) would have a Material Adverse Effect or (ii) would materially impair the ability of Target to consummate the transactions contemplated hereby.  As of the date of this Agreement, no Company is specifically identified as a party subject to any material restrictions or limitations under any judgment, order, or decree of any court, administrative agency, or commission, or other governmental authority or instrumentality, domestic or foreign.  The representations in this Section 4(m) do not relate to Taxes or environmental matters, all representations with respect to which are the subject of Sections 4(g) and 4(r), respectively.

(n)     Insurance.  True and complete copies or accurate summaries of all insurance policies in force relating to the Companies or their respective businesses or assets have been made available to Buyer.

(o)     Employee Benefits; ERISA.

(i)     Section 4(o) of the Disclosure Schedule identifies each employee pension, profit sharing, retirement, stock bonus, stock option, stock purchase, deferred compensation, medical, dental, vacation, insurance, sick pay, disability, severance, or other material plan, incentive plan, fund, program, policy, contract, or arrangement (including any "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) providing employee benefits that is maintained or contributed to by Target or either Company in which any employees of Mervyn's are participating or under which any current or former employees of Mervyn's have accrued any benefits while employed by Mervyn's to which

-24-

they remain entitled or with respect to which either Company has any liability (collectively, the "Plans"). True and complete copies or accurate summaries (where written Plan documents do not exist) of all Plans have been made available to Buyer. Except as described on Section 4(o) of the Disclosure Schedule, no Plan provides post-employment medical or life insurance benefits to current or future retired or terminated employees of Mervyn's. Each Plan listed on Section 9(b)(i) of the Disclosure Schedule has been maintained in accordance with applicable laws, including, without limitation, ERISA and the Code and each Plan that is intended to be qualified under the Code Section 401(a) is so qualified and nothing has occurred that would adversely affect such qualified status. All premiums or other payments under the Plans listed on Section 9(b)(i) of the Disclosure Schedule have been made on a timely basis and, except as expressly provided under Section 9, no Company is liable for any material unfunded liability under any Plan.

(ii)     Buyer will not have after the Closing Date any liability or obligation for benefits payable under any Plan to or with respect to any individual who is not a Covered Person (as defined in Section 9(b)(i)), and will not have after the Closing Date any liability to any individual to the extent such liability or obligation is retained by Target as described in Sections 9(e), (j), and (k). In addition, Buyer will not have after the Closing Date any liability of any kind with respect to any similar plan, fund, program, policy, contract, or arrangement maintained by Target, or by any of its affiliates that is aggregated with Target under Code Section 414 or ERISA Section 4001, that is not a Plan but that would be a Plan if it provided benefits to employees or former employees of Mervyn's.

(iii)     Brands employees are concurrently employed by Target Brands, Inc. and, as of the Closing Date, will be exclusively employed by Target Brands, Inc.

(p)     Absence of Changes or Events. Except as contemplated by this Agreement, from the date of the Interim Statement of Net Assets to the date of this Agreement, the Companies have conducted their respective businesses in the ordinary course substantially consistent with past practice. Without limiting the generality of the immediately preceding sentence, except as contemplated by this Agreement, from the date of the Interim Statement of Net Assets to the date of this Agreement, neither Company has:

(i)     suffered any damage to or destruction of any properties or assets or other event or occurrence that has a Material Adverse Effect;

(ii)     amended its articles of incorporation or by-laws;

-25-

Tar.A038

(iii)    redeemed or otherwise acquired any shares of its capital stock or issued any shares of capital stock or any option, warrant, or right relating thereto;

(iv)    granted to any officer or director- level employee any increase in compensation or other material benefits, except as required under existing agreements or in the ordinary course of business consistent with past practice, and except for retention agreements not extending past the Closing Date;

(v)    granted any mortgage, pledge, lien, or encumbrance on, or agreed to the imposition of any restriction or charge of any kind with respect to, any material asset, other than pursuant to purchase money agreements, conditional sales contracts, capital leases, operating leases, or IP Licenses disclosed in Section 4(l)(i)(D) of the Disclosure Schedule or the non-disclosure of which in Section 4(l) of the Disclosure Schedule would not constitute a misrepresentation under Section 4(l);

(vi)    purchased, licensed or otherwise acquired any assets or made any capital expenditures that are material, individually or in the aggregate, to the Companies taken as a whole (other than (A) purchases of inventory in the ordinary course of business consistent with past practice, and (B) capital expenditures consistent with Mervyn's past practices);

(vii)    sold, licensed or otherwise disposed of any assets that are material, individually or in the aggregate, to the Companies as a whole (other than sales of inventory in the ordinary course of business consistent with past practices);

(viii)    materially adversely modified or amended any Material Contract or Real Estate Agreement;

(ix)    made any material change in accounting methods, principles or credit policies or procedures, cash management practices, or materially delayed or postponed the payment of any accounts payable or other accrued expenses (other than those being contested in good faith) beyond the date such expenses would have customarily been paid;

(x)    accelerated the collection of, or discounted, any accounts receivable or deferred revenue or otherwise accelerated cash collections of any type, or taken any actions or omitted to take any actions, in any of such events with the intent or the purpose of increasing the Net Assets as of the Closing Date; or

(xi)    other than this Agreement, agreed to do any of the foregoing.

-26-

Tar.A039

(q)    Compliance with Laws.  Each Company is in compliance with all applicable statutes, laws, ordinances, rules, orders, and regulations of any governmental authority or instrumentality, domestic or foreign, except for noncompliance that does not have a Material Adverse Effect.  As of the date of this Agreement, neither Target nor the Companies have received written notice of any violation of any applicable statutes, laws (domestic or foreign), ordinances, rules, orders, or regulations of any governmental authority or instrumentality, which has not otherwise been remedied to the extent the failure to remedy such violation has a Material Adverse Effect.  This Section 4(q) does not relate to Taxes or compliance with Environmental Laws, all representations with respect to which are the subject of Sections 4(g) and 4(r), respectively.

(r)    Environmental Matters.

(i)    As used in this Agreement:

(A)    "Environmental Claim" means any written notice to Target or either Company by a person or entity alleging potential material liability of either Company (including potential material liability for investigatory costs or governmental response costs) arising out of, based on, or resulting from (1) the presence, or release into the environment, of any Hazardous Substance at any Real Estate or (2) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law;

(B)    "Environmental Laws" means all applicable federal, state, and local statutes, regulations, laws, or ordinances, and all common law relating to the protection of human health or the environment;

(C)    "Environmental Permits" means all permits, licenses, or authorizations required to operate Mervyn's business as presently operated pursuant to any Environmental Law;

(D)    "Environmental Reports" means those environmental reports described in Section 4(r) of the Disclosure Schedule; and

(E)    "Hazardous Substance" means contaminants, hazardous wastes, petroleum, asbestos, and other hazardous materials listed in, regulated by, or identified in any Environmental Law.

(ii)    Except as disclosed by the Environmental Reports or where noncompliance does not have a Material Adverse Effect, the operation of the

-27-

Tar.A040

businesses of the Companies is in compliance with all applicable Environmental Laws and Environmental Permits.

(iii)     Except as disclosed by the Environmental Reports, and except for Environmental Claims that do not have a Material Adverse Effect, there are no Environmental Claims pending or, to the Knowledge of Target, threatened, with respect to the Companies.

(iv)     Except as disclosed by the Environmental Reports, and except for conditions that do not have a Material Adverse Effect, no Hazardous Substances are or have been present in, on, or under, the Real Estate in such forms or quantities so as to create any material unpaid liability of Mervyn's under any Environmental Law.

(v)     Target has made available to Buyer copies of the Environmental Reports but makes no representation or warranty as to the accuracy of any aspect of the Environmental Reports.

(vi)     Except as disclosed by the Environmental Reports, there is no material order, decree, injunction or other arrangement with any governmental entity or third party with respect to the business of the Companies relating to any Environmental Claim or Environmental Law, which is reasonably likely to prevent, for more than 10 days, the operation of the business of the Companies.

(s)     Employee and Labor Relations.  As of the date hereof, neither Company is a party to or is bound by any collective bargaining agreements or other contracts with any labor union representing employees of either Company.  No labor strikes, lockouts, or material labor disputes or work stoppages are pending or, to the Knowledge of Target, have been threatened from January 1, 2002 to the date of this Agreement against or affecting employees of either Company.  To the Knowledge of Target, no union organizational campaign has occurred from January 1, 2002 to the date of this Agreement with respect to the employees of either Company.

(t)     Absence of Undisclosed Liabilities.  The Companies have no liabilities or obligations (other than Permitted Exceptions and other liabilities or obligations arising under Leased Real Estate or Leases as to which no representation is made pursuant to this Section 4(t)) arising out of the transactions, actions or circumstances existing at or prior to the Closing Date except (i) liabilities and obligations disclosed in this Agreement or on the Disclosure Schedule, (ii) liabilities or obligations arising under Plans disclosed in Section 4(o) of the Disclosure Schedule, under contracts and commitments existing on the date hereof described on Section 4(l) of the Disclosure Schedule, or under contracts and commitments existing on the date hereof not required to be disclosed thereon due to specific dollar thresholds, termination rights or length of performance or under contracts or commitments entered into after the

-28-

Tar.A041

date hereof in compliance with this Agreement, (iii) liabilities and obligations reflected on the liability side of the Interim Statement of Net Assets or arising in the ordinary course of business after the date of the Interim Statement of Net Assets and (iv) liabilities and obligations that would not have a Material Adverse Effect.

(u) <u>Mervyn's Inc</u>. Mervyn's Inc., a wholly owned subsidiary of Target, does not have any properties, assets, rights, titles or interests (of any kind or nature) and it is not a party to any contracts, agreements or other instruments.

5. <u>Covenants of Target</u>. Target covenants as follows:

(a) <u>Access</u>. Subject to Buyer's obligations under the Confidentiality Agreement (as defined in Section 7(a)), before the Closing, Target will, and will cause each Company to, give Buyer and its officers, employees, agents, representatives and lenders reasonable access, during normal business hours and upon reasonable notice, to the personnel, properties, books, and records of the Companies including, without limitation the right to contact the landlord under the Leases for purposes of attempting to obtain landlord lien waivers, estoppel certificates and such other agreements (which shall not bind Mervyn's unless the Closing occurs) as may be requested by such lenders with the consent of Target, which consent shall not be unreasonably withheld, and preparation of surveys and conduct of Phase I environmental site assessments, provided such activities are coordinated with Target in advance; and provided further, however, that:

(i) such access shall not unreasonably disrupt the normal operations of Target or the Companies;

(ii) neither Buyer nor any of its officers, employees, agents, or representatives shall have access to any personnel of the Companies or any other businesses of any Target Affiliate other than the employees identified in Section 5(a) of the Disclosure Schedule without Target's prior written consent, which may not be unreasonably withheld; and

(iii) neither Buyer nor any of its officers, employees, agents, or representatives may contact any landlord or vendor of Mervyn's without Target's prior written consent (which consent shall not be unreasonably withheld).

(b) <u>Ordinary Conduct</u>. Except as set forth in Section 5(b) of the Disclosure Schedule or as contemplated by this Agreement, from the date hereof through the Closing Date, Target will cause the Companies to conduct their businesses and use, operate, maintain and repair the Real Estate in the ordinary course in substantially the same manner as presently conducted and will maintain proper business and accounting records, repair and maintain its Real Estate in accordance with past

Tar.A042

practices, and make all reasonable efforts consistent with past practices to preserve the business organization of the Companies and relationships of the Companies with their material suppliers, officer-level employees, and others with whom they have a material business relationship. In addition, except as set forth in Section 5(b) of the Disclosure Schedule or as contemplated by this Agreement, Target will not permit any Company to do any of the following without the prior written consent of Buyer:

      (i)      amend its articles of incorporation or by-laws;

      (ii)      redeem or otherwise acquire any shares of its capital stock or issue any capital stock or any option, warrant, or right relating thereto;

      (iii)      declare or make any distribution of any of its non-cash assets with respect to the equity securities of Brands (it being understood that the Companies distribute directly or indirectly to Target on a daily basis substantially all of their cash (other than "register cash" in an amount as is necessary to open the Mervyn's stores on the day after the Closing Date, determined by reference to Mervyn's historical practices, which in any event shall not be less than $3,800,000) and that such intercompany distributions will be subject to Section 8(g)); provided, however, that distributions (as dividends, loans, or advances) of assets may be made by Brands to Mervyn's at any time before the Closing Date;

      (iv)      adopt or amend in any material respect any Plan;

      (v)      enter into any collective bargaining agreement;

      (vi)      other than retention agreements not extending past the Closing Date, grant to any officer or director-level employee any increase in compensation or other material benefits (including, without limitation, any retention agreements), except as may be required under existing agreements or in the ordinary course of business consistent with past practice;

      (vii)      incur or assume any liabilities, obligations, or indebtedness for borrowed money or guarantee any such liability, obligation, or indebtedness, other than in the ordinary course of business consistent with past practice;

      (viii)      grant any mortgage, pledge, lien, or encumbrance on, or agree to the imposition of any restriction or charge of any kind with respect to, any material assets, other than (A) pursuant to purchase money agreements, conditional sales contracts, capital leases, operating leases, or Licenses the non-disclosure of which in Section 4(l) of the Disclosure Schedule would not constitute a misrepresentation under Section 4(l) and (B) such mortgages,

Tar.A043

pledges, liens, or encumbrances which are not material, individually or in the aggregate, to the Companies as a whole;

(ix)    purchase or otherwise acquire any assets or make any capital expenditures that are material, individually or in the aggregate, to the Companies as a whole (other than (A) purchases of inventory in the ordinary course of business consistent with past practice, (B) such capital expenditures that, together with all other such capital expenditures made by the Companies since the date of the Interim Statement of Net Assets, do not exceed $75 million in the aggregate, (C) capital expenditures required under Real Estate Agreements for capital improvements that are not controlled exclusively by Target or the Companies, and (D) capital expenditures required by any governmental or regulatory authority);

(x)    acquire by merging or consolidating with, or by purchasing a substantial portion of the stock or assets of, or by any other manner, any business or any corporation, partnership, association, or other business organization or division thereof;

(xi)    sell, license or otherwise dispose of assets that are material, individually or in the aggregate, to the Companies as a whole (other than sales or other dispositions of (A) inventory in the ordinary course of business consistent with past practices, (B) the stores set forth in Section 5(b)(xi) of the Disclosure Schedule that are subject to a listing or sales agreement as of the date of this Agreement; provided, however, Target will not dispose, sell or lease such assets without Buyer's consent and Buyer hereby agrees to indemnify and hold Target and the Company harmless from any costs or liability incurred for failure to proceed with such transactions (such indemnification obligation shall survive the Closing or termination of this Agreement), (C) Mervyn's Riverside, California property in the manner described in Section 5(b) of the Disclosure Schedule; provided, however, Mervyn's sublease with Target shall provide for customary non-disturbance protection for Mervyn's and Target will request from those parties holding senior interests, similar non-disturbance protection for Mervyn's, and (D) the Minnesota Stores, as defined in Section 8(m));

(xii)    subject to Section 5(f), terminate any Real Estate Agreement, except terminations upon expiration of the term for which there are no renewals and extensions thereof of such Real Estate Agreement;

(xiii)    make any material change in accounting methods, principles or credit policies or procedures, cash management practices, tax elections that do not relate to Target's consolidated Income Tax returns or reporting methods, or materially delay or postpone the payment of any accounts payable or other

Tar.A044

accrued expenses (other than those being contested in good faith) beyond the date such expenses would have customarily been paid;

(xiv) accelerate the collection of, or discount, any accounts receivable or defer revenue or otherwise accelerate cash collections of any type, or take any actions or omit to take any actions, in any of such events with the intent or the purpose of increasing the Net Assets as of the Closing Date; or

(xv) agree to do any of the foregoing.

(c) Confidentiality. Target will keep confidential and cause the other Target Affiliates to keep confidential all non-public information relating to the Companies that does not also relate to any of the other businesses of any Target Affiliate, except for disclosures required by law or administrative process (including disclosures required in Tax returns or in other governmental filings) and disclosures in the defense of any Third-Party Claim (as defined in Section 11(e)) or the contest of any Tax Claim (as defined in Section 10(h)); provided that Target shall provide Buyer with reasonable notice of any required disclosure, to the extent practicable, and except for information that becomes public other than as a result of a breach of this Section 5(c) or is disclosed by Target in the defense of any claim by Buyer or any of its affiliates against Target.

(d) Insurance and Insurance Proceeds. Target shall keep, or cause to be kept, all insurance policies of Target relating to the Companies, or equivalent replacements therefor, in full force and effect through the Closing Date. To the extent that Target has in force any policies of property and casualty insurance insuring the Companies, any proceeds of insurance payable (in excess of any deductible, retention, or self-insurance amount) in respect of any event that occurs from and after the date of this Agreement and on or before the Closing Date shall be received by Target in trust for Buyer and, to the extent the damage to which the proceeds pertain has not been repaired or restored, shall be paid over to Buyer at the Closing, or, if no proceeds have been received before the Closing, Target shall assign any of its claims thereto to Buyer promptly following the Closing Date, and in each such case, the amount of the proceeds shall be included in the determination of Final Net Assets. Subject to the terms of Target's liability insurance policies, Target shall use commercially reasonable efforts so that Buyer will have the right, power, and authority, in the name of Target, to make directly to the insurer any request for payment under Target's liability insurance policies of any claim relating to the Companies. Buyer may make such a request for payment only to the extent that a person of ordinary prudence in like circumstances would make a claim under the person's own insurance policy.

(e) Exclusivity. Unless and until this Agreement is terminated pursuant to its terms (the "Exclusivity Period"), Target agrees that Buyer shall have the exclusive

Tar.A045

right to consummate the transactions contemplated by this Agreement or any other similar transaction with Target. During the Exclusivity Period, Target shall not, and Target shall not authorize any of Target's affiliates, officers, directors, employees or agents (including any investment banker, attorney or accountant retained by any of the foregoing) to, (i) solicit, initiate or encourage the submission of any proposal or offer from any person (including any of Target's affiliates, officers, directors, employees, agents or other representatives) relating to (A) a sale of all or any portion of the Shares or Securities (as the case may be), (B) a sale of all or a substantial portion of the assets (other than sales of inventory in the ordinary course of business) of any of the Companies or (C) any similar transaction or business combination involving the Shares or Securities (as the case may be) or such assets, (ii) enter into any agreement or commitment related to any such transaction or (iii) furnish to any other person any information with respect to or assist or participate in or facilitate in any other manner any effort to do or seek to do, any of the foregoing. Target shall use reasonable efforts to ensure that none of the events set forth in clauses (i) - (iii) above occur. Target shall immediately cease and cause to be terminated any and all contacts, discussions and negotiations with third parties regarding any of the foregoing, and Target shall promptly notify Buyer of any proposal with respect to the foregoing (including providing the identity of the person making such proposal and copies of such proposal), or any inquiry or contact with any person with respect thereto.

(f)     Real Estate. From the date hereof until the Closing Date, Target shall exercise all renewal and extension options currently existing with respect to all Real Estate Agreements, provided that Target shall not be required to cause the exercise of such options if the time for exercise would not expire prior to the Closing and except as provided in Section 5(b)(xi), shall not sell, transfer or encumber any Real Estate or assign, sublease, encumber or terminate any Real Estate Agreement, without Buyer's prior written consent. Target shall, from time to time and in each case upon written request and as directed by Buyer, cause Mervyn's or any other Company to exercise any other rights of renewal or extension, rights of first offer, rights of first refusal, or purchase options, or similar rights or options under any Real Estate Agreement or any other material agreement with respect to the Real Estate to which Mervyn's or any other Company is a party; provided that Target shall not be required to cause the exercise of any such rights if the time for exercise would not expire prior to the Closing and, if Buyer has so directed Mervyn's to exercise such rights, Buyer shall provide any funds required to be paid or deposited in connection therewith when due. Buyer shall indemnify Target from and against any and all actual costs incurred in connection with the exercise of any rights by Buyer under this Section 5(f), including, without limitation, any option or purchase price paid in connection therewith and any exercise of any renewal right or extension option that Target would have otherwise not exercised and such indemnification obligation shall survive the Closing or termination of this Agreement.

-33-

Tar.A046