# APPENDIX – PART 2

(g) <u>Indebtedness</u>. Each of the Companies shall have no outstanding Indebtedness as of immediately prior to the Closing Date other than as set forth in Section 5(g) of the Disclosure Schedule. As applied to each of the Companies, "Indebtedness" means indebtedness for borrowed money, whether current or funded, or secured or unsecured, including without limitation, (i) all indebtedness of any such Company for the deferred purchase price of property or services, whether or not represented by a note, (ii) all indebtedness of any such Company created or arising under any conditional sale or other title retention agreement with respect to property acquired by such person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (iii) all indebtedness of any such Company secured by a purchase money mortgage or other lien to secure all or part of the purchase price of the property subject to such mortgage or lien, (iv) all interest, fees and other expenses and amounts owed with respect to the indebtedness referred to above, and (v) all indebtedness referred to above which is directly or indirectly guaranteed by such Company or which such Company has agreed (contingently or otherwise) to purchase or otherwise acquire or in respect of which it has otherwise assured a creditor against loss. Notwithstanding the foregoing, "Indebtedness" shall not include customer down-payments for goods or services provided or to be provided by each of the Companies, or any intercompany indebtedness (which pursuant to Section 8(g) hereof shall be paid in full or canceled).

(h) <u>No Post-Conversion Tax Election</u>. After the Mervyn's Conversion and Brands Conversion, neither Target nor any Company will make any election or take any action to cause either Company to be treated as a corporation for U.S. federal Income Tax purposes.

6. <u>Representations and Warranties of Buyer</u>. Buyer hereby represents and warrants to Target as follows:

(a) <u>Organization and Authority of Buyer</u>. Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of Delaware. Buyer has all requisite company power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. All company acts and proceedings required to be taken to authorize the execution, delivery, and performance by Buyer of this Agreement and the consummation by Buyer of the transactions contemplated hereby have been duly and properly taken. This Agreement has been duly executed and delivered by Buyer and, assuming due authorization, execution, and delivery of this Agreement by Target, constitutes a valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium, and other similar laws affecting creditors' rights generally and by general principles of equity.

Tar.A047

(b)  Non-Contravention. The execution, delivery, and performance by Buyer of this Agreement and all agreements, instruments and other documents referred to herein to be entered into by Buyer do not, and the consummation by Buyer of the transactions contemplated hereby and thereby will not, (i) conflict with. or result in any violation of, any provision of the limited liability company agreement (or other organizational documents) of Buyer, or (ii) conflict with, result in any violation of, or constitute a default under, any instrument, contract, commitment. agreement. or arrangement to which Buyer is a party or by which Buyer or the property or assets of Buyer is bound, or any judgment, order, writ, injunction, or decree to which Buyer has been specifically identified as subject, or result in any violation of any statute, law, ordinance, rule, or regulation applicable to Buyer or its property or assets (except where such conflict, violation, or default would not materially impair the ability of Buyer to consummate the transactions contemplated hereby). No material consent, approval, license, permit, order, or authorization of, or registration, declaration. or filing with, any court, administrative agency or commission, or other governmental authority or instrumentality, domestic or foreign, is required to be obtained or made by or with respect to Buyer in connection with the execution, delivery, and performance by Buyer of this Agreement or the consummation by Buyer of the transactions contemplated hereby, other than compliance with and filings under the HSR Act.

(c)  Litigation. There are no actions, lawsuits, proceedings, or investigations pending (with respect to which Buyer has been served or otherwise notified) or, to the knowledge of Buyer, threatened against Buyer as of the date of this Agreement that, if decided adversely to Buyer, would materially impair the ability of Buyer to consummate the transactions contemplated hereby.

(d)  Commitment Letters. Attached as Exhibit D hereto are equity and debt commitment letters (the "Commitment Letters") from Buyer's financing sources in an aggregate amount that exceeds the sum of the Purchase Price, the estimated transaction expenses arising from the transactions contemplated hereby and the on-going working capital requirements of the Companies. As of the date of this Agreement, the Commitment Letters are in full force and effect and have not been amended or modified. Buyer has no reason to expect as of the date of this Agreement that any of the conditions set forth in the Commitment Letters will not be satisfied.

(e)  Securities Laws. The Securities purchased by Buyer pursuant to this Agreement are being acquired for investment only and not with a view to any public distribution thereof, and Buyer will not offer to sell or otherwise dispose of the Securities so acquired by it in violation of any of the registration requirements of the Securities Act of 1933, as amended.

-35-

Tar.A048

7.   Covenants of Buyer.  Buyer covenants as follows:

(a)   Confidentiality Agreement.  Buyer acknowledges that the information being provided to it by Target is subject to the terms of a confidentiality agreement between Buyer's equity holders and Target dated March 17 and April 8, 2004 (the "Confidentiality Agreement"), the terms of which are incorporated herein by reference.  The Confidentiality Agreement shall remain in effect after the Closing Date except that, following the Closing Date, Evaluation Material (as defined therein) shall be deemed not to include any information owned by either Company or licensed or leased to either Company, in each case as of the Closing Date.

(b)   No Representations or Warranties.  Buyer acknowledges that neither Target nor any other person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Companies not expressly included in this Agreement or in any certificate signed by Target and delivered pursuant hereto, and neither Target nor any other person will have or be subject to any liability to Buyer or any other person resulting from the distribution to Buyer, or Buyer's use, of any such information except in the case of intentional fraud.

(c)   Certain Claims.  From and after the Effective Time, Buyer shall cause the applicable Company to pay Target, whenever received, the amount of any recovery by the Company (net of expenses of the Companies incurred after the Cut-Off Date) with respect to  the litigation captioned In re Visa Check/Master Money Antitrust Litigation .  The applicable Company shall assign all such recoveries to Target effective immediately before the Effective Time, Target shall have the right to take all actions to effect such recoveries, and the applicable Company shall take all commercially reasonably actions requested by Target to effect such recoveries for the benefit of Target (at Target's sole cost and expense).

(d)   Commitment Letters.  Buyer will not agree to the termination or amendment of any of the Commitment Letters or grant any waiver thereunder without the prior written consent of Target and will use its reasonable best efforts to enforce the terms of the Commitment Letters for the benefit of Target.

8.   Mutual Covenants.  Each of Target and Buyer covenants as follows:

(a)   Consents.  Buyer acknowledges that (i) certain consents (including consents contingent on the fulfillment of certain conditions), approvals, waivers, agreements, or actions of, or (with or without lapse of time) notice to, third parties relating to the transactions contemplated by this Agreement may be required under instruments, contracts, commitments, agreements, or arrangements (the "Required Consents"), which Required Consents have not been obtained or are themselves subject to conditions not fulfilled as of the Closing, and (ii) certain new governmental

-36-

Tar.A049

franchises, approvals, permits, licenses, orders, registrations, certificates, variances, and similar rights may be required in order for Buyer to conduct the businesses of the Companies following the Cut-Off Date in the same manner in which the businesses of the Companies were conducted before the Cut-Off Date. Except as otherwise expressly provided in this Section 8(a), Target shall not have any liability whatsoever to Buyer arising out of or relating to the failure to obtain any Required Consents or any such new governmental franchises, approvals, permits licenses, orders, registrations, certificates, variances, or similar rights that may be required so long as Target has not otherwise breached any of its representations and warranties in Section 4(d). No representation, warranty, or covenant of Target contained herein shall be breached or deemed breached, and no condition shall be deemed not satisfied, based on (A) the failure to obtain any such Required Consents or any such new governmental franchises, approvals, permits licenses, orders, registrations, certificates, variances, or similar rights, or (B) any lawsuit, action, claim, proceeding, or investigation commenced or threatened by or on behalf of any person arising out of or relating to the failure to obtain any such Required Consents or any such new governmental franchises, approvals, permits licenses, orders, registrations, certificates, variances, or similar rights so long as Target has not otherwise breached any of its representations and warranties in Sections 4(d); provided, however, that nothing stated herein shall supersede the conditions set forth in Sections 3(a)(iv), 3(a)(v), 3(b)(ii), or 3(b)(iii) or the obligations of Target under this Section 8(a). Target shall cooperate with Buyer in any reasonable manner in connection with Buyer obtaining any Required Consents and any new governmental franchises, approvals, permits licenses, orders, registrations, certificates, variances, or similar rights; provided, however, that such cooperation shall not include any requirement of any Target Affiliate to make any payment or offer or grant any accommodation (financial or otherwise) to any third party unless, in the case of payment, Buyer makes such payment and, in any other case, Target shall cooperate only if Buyer agrees to reimburse such Target Affiliate for its reasonable out-of-pocket costs with respect thereto and such reimbursement would fully compensate such Target Affiliate for the offer or grant of the accommodation.

(b)    Cooperation; Further Assurances.

(i)    Buyer and Target shall cooperate with each other and shall cause their respective affiliates and the officers, employees, agents, and representatives of themselves and their respective affiliates to cooperate with each other after the Closing Date through and including March 31, 2005 to ensure the orderly transition of the Companies from Target's ownership of the Securities to Buyer's ownership of the Securities and to minimize any disruption to the respective businesses of Target or Buyer that might result from the transactions contemplated hereby. Each party shall reimburse the other for reasonable out-of-pocket expenses (but not compensation payments to

Tar.A050

employees) incurred in assisting the other pursuant to this Section 8(b). Neither party shall be required by this Section 8(b) to take any action that would unreasonably interfere with the conduct of its or its affiliates' businesses.

(ii)    Without limiting the provisions of any other Section hereof, after the Closing, upon reasonable written notice, Buyer and Target agree to furnish or cause to be furnished to each other and each other's officers, employees, agents, and representatives access, during normal business hours, to such information relating to the Companies and such other assistance as is reasonably necessary for financial reporting, accounting, and other reasonably appropriate purposes; provided, however, that such access or assistance shall not unreasonably disrupt the normal operations of Target, Buyer, or the Companies. Without limiting the generality of the foregoing, Target and its representatives shall have the right to reasonable access to the books and records maintained by the Companies or by Buyer relating to the Companies at reasonable times during normal working hours upon reasonable notice to Buyer for so long after the Closing as Buyer or the Companies retain such books and records for the purpose of examining such books and records and making copies thereof, provided that Buyer shall retain books and records relating to Taxes or Tax Returns for at least seven years after the Closing and its other books and records in accordance with its customary document retention policies, and, if at least seven years but less than ten years after the Closing, Buyer or the Companies desire to destroy such books and records relating to Taxes or Tax Returns, Buyer or the Companies may destroy them only if before their destruction Buyer offers in writing to return such books and records to Target and Target either rejects such written offer or fails to respond to such written offer within 30 days after receipt thereof.

(iii)    From time to time after the Closing, as and when requested by a party hereto, the other party shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions (subject to the limitation set forth in Section 8(a)), as the requesting party may reasonably deem necessary or desirable to give full effect to this Agreement.

(iv)    Nothing in this Section 8(b) shall affect the rights and obligations of the Target Affiliates and Buyer under the Transition Services Agreement.

(c)    Certain IP Matters.

(i)    As used in this Agreement, "Retained Names and Marks" means the name of any Target Affiliate, or any trade name, trademark, service mark,

Tar.A051

or logo of any Target Affiliate. For avoidance of doubt, the Retained Names and Marks do not include "Mervyn's" or any other trade names, trademarks, service marks, or logos of the Companies.

(ii)     Buyer shall cause the Companies to cease promptly, but in no event later than 30 days after the Closing Date, using any (A) advertising or promotional materials and (B) any stationery, business cards, business forms, and other similar items owned by either of the Companies as of the Closing Date, in each case that contain anywhere thereon any of the Retained Names and Marks; provided, however, that Buyer shall cause the Companies, when using items referred to in clause (B) in the context of entering into or conducting contractual relationships, to make reasonably clear to all other applicable parties that Buyer or one of the Companies, rather than any Target Affiliate, is the party entering into or conducting the contractual relationship, and further provided that Buyer shall ensure that personnel of the Companies using such items shall not, and shall have no authority to, hold themselves out as officers, employees, or agents of any Target Affiliate.

(iii)     Buyer shall cause the Companies to cease promptly, but in no event later than 90 days after the Closing Date, using any packaging materials owned by Mervyn's as of the Closing Date that contain anywhere thereon any of the Retained Names and Marks, unless such materials are changed to completely and permanently cover, delete, or obliterate the Retained Names and Marks or any Marks confusingly similar thereto.

(iv)     Mervyn's shall have the right to exhaust all inventories of finished products owned by Mervyn's as of the Closing Date that contain as part of the physical products themselves (e.g., embroidered on a shirt or a label on a shirt, but not product packaging covered by clause (iii) above) any of the Retained Names and Marks, provided that Buyer shall cause Mervyn's to use its commercially reasonable efforts to dispose of such finished products promptly after the Closing Date.

(v)     At the Closing, Target shall present (or shall cause one of its affiliates to present) Mervyn's with a short term trademark and trade name license agreement that grants Mervyn's the short term right, subject to the restrictions and as set forth in clause (ii) through (iv) above, to use the Retained Names and Marks for the time periods set forth in clauses (ii) through (iv) above.

(vi)     Other than as permitted under clauses (ii) through (iv) above, Buyer shall cause the Companies not to use, without the prior written consent of Target, any of the Retained Names and Marks (or anything confusingly similar thereto) in any manner whatsoever.

-39-

**Tar.A052**

(vii)   Target will cause the Companies to enter into a short term trademark and trade name license agreement that grants the Target Affiliates the right to use the Companies' trademarks and trade names in a manner similar to the manner in which the Target Affiliates use such trademarks and trade names as of the date of this Agreement for a period of up to 90 days following the Closing Date.

(viii)   If the Closing occurs before the closing of Target's sale of its Marshall Field's business, then Buyer shall cause one of the Companies (with a guaranty by the other Company) to enter into a short-term, royalty-bearing license agreement with Target relating to the private-label products of Mervyn's listed on Exhibit E, effective at or before the Effective Time, containing terms and conditions substantially as set forth in Exhibit E, which license Target intends to assign to the buyer of the Marshall Field's business upon the closing of such sale.  If the Closing does not occur before the closing of Target's sale of its Marshall Field's business, then Target will cause one of the Companies (with a guaranty by the other Company) to enter into a short-term, royalty-bearing license agreement with the owner of the Marshall Field's business relating to the private-label products of Mervyn's listed on Exhibit E, effective at or before the effective time of the Marshall Field's closing, containing terms and conditions substantially as set forth in Exhibit E.

(ix)   Target shall cause one of the Companies to enter into a royalty-bearing license agreement with Target Brands, Inc. pursuant to which Target Brands, Inc. grants the Companies a right to use the "In Due Time" brand, effective at or before the Effective Time and expiring on January 31, 2005, containing terms and conditions substantially as set forth in Exhibit F.

(x)   At or prior to the Closing, Target shall cause Target Brands, Inc. to assign to Mervyn's or Brands (as determined by Buyer) its License to use the "Sideout" brand, effective at or before the Effective Time.

(xi)   Notwithstanding anything to the contrary in Section 8(i), as of the Effective Time Target shall cause Target Brands, Inc. to assign to Brands that certain trademark license agreement between Target Brands, Inc. and The Associated Merchandising Corporation regarding the use of the "Sprocket's" brand by The Associated Merchandising Corporation in connection with sales to its customer Boscov's Department Store LLC.

(xii)   Target will cause the Companies to enter into an intellectual property license between them, effective at or before the Effective Time, containing terms and conditions substantially as set forth in Exhibit G, pursuant to which Brands shall grant Mervyn's a license to use the Company Intellectual Property owned or licensed by Brands.

Tar.A053

(xiii)   Buyer and Target acknowledge and agree that Brands owns the mervyns.com and similar URLs set forth on Section 4(k)(i) of the Disclosure Schedule, but that (i) neither Company owns any of the associated technology (including the other non-content aspects of web pages and templates), (ii) Mervyn's shall retain all Intellectual Property rights owned by Mervyn's in the Mervyn's-specific content (other than technology including the other non-content aspects of web pages and templates) currently located at such URLs and (iii) as of the Effective Time, Target shall cause all such Mervyn's-specific content to be removed from all Web sites operated by or on behalf of Target or a Target Affiliate.  To the extent Target or a Target Affiliate own any right, title or interest in or to any Intellectual Property rights in the Mervyn's-specific content (other than technology, including the other non-content aspects of web pages and templates) located at the URLs set forth on Section 4(k)(i) of the Disclosure Schedule, Target hereby assigns to Mervyn's all such right, title and interest in and to such content as of the Effective Time.

(xiv)   As of the Closing Date, Target shall have caused (a) Mervyn's, Inc., a wholly-owned subsidiary of Target, to be dissolved or (b) the name of Mervyn's, Inc. to be changed to a name which does not contain the words "Mervyn's" or any name or names confusingly similar thereto.

(xv)   As of the Closing Date, Target shall assign to Target Brands, Inc., which in turn shall assign to Brands, any Future Intellectual Property (as such term is defined in the Sublicense Agreement between Target and Mervyn's dated February 2, 2003 (the "Target-Mervyn's License")) that was conveyed, assigned or transferred to Target pursuant to Section 5(a) of the Target-Mervyn's License and which has not previously been so conveyed, transferred or assigned to Target Brands, Inc. and subsequently to Brands.

(xvi)   With respect to any software owned by (rather than licensed by) Target or any Target Affiliate that both (A) relates solely to the operation of Mervyn's business and (B) is set forth in Exhibit K as being "Owned by Target," Target shall, on or before the Closing Date, assign all of its right, title and interest in and to such software to Mervyn's.

(d)   Publicity.  Effective from the date of this Agreement, no public release or announcement concerning the transactions contemplated hereby shall be issued by Target (and Target shall cause the Companies not to make any such public release or announcement) or Buyer on or before the Closing Date without the prior written consent of the other party, except as such release or announcement may be required by law or the rules or regulations of any United States or foreign securities exchange, in which case the party required to make the release or announcement shall, if

-41-

Tar.A054

practicable under the circumstances, allow the other party reasonable time to comment on such release or announcement in advance of such issuance.

(e) <u>Reasonable Best Efforts</u>. Subject to the terms and conditions of this Agreement (including the limitations set forth in Section 8(a)), each party will use its reasonable best efforts as promptly as practicable to satisfy all conditions to Closing of the other party set forth in this Agreement that are within such party's control.

(f) <u>Antitrust Notification</u>. Each of Target and Buyer (or its ultimate parent) will as promptly as practicable, but in no event later than seven days following the execution and delivery of this Agreement, file with the United States Federal Trade Commission (the "FTC") and the United States Department of Justice (the "DOJ") the notification and report form required for the transactions contemplated hereby and any supplemental information required in connection therewith pursuant to the HSR Act. Each party represents and warrants that such notification and report form and all such supplemental information submitted by such party or its ultimate parent, and any additional supplemental information filed by such party or its ultimate parent after the date of the original filing, will be in substantial compliance with the requirements of the HSR Act. Each of Buyer and Target shall furnish to the other such necessary information and reasonable assistance as the other may request in connection with its preparation of any filing or submission that is necessary under the HSR Act. Target and Buyer shall keep each other apprised of the status of any communications with, and inquiries or requests for additional information from, the FTC or the DOJ, and shall use their reasonable best efforts to comply promptly with any such inquiry or request. Each of Target and Buyer will use its reasonable best efforts to cause the expiration or early termination of the waiting period required under the HSR Act as a condition to the purchase and sale of the Securities and shall use its reasonable best efforts to defend against any action of the FTC or the DOJ to enjoin the sale of the Securities to Buyer. Nothing stated in this Agreement shall require Buyer to agree to, or permit Target to agree to, the divestiture of any assets of Buyer or any of the Companies to obtain termination of the waiting period under the HSR Act.

(g) <u>Intercompany Accounts</u>. All intercompany accounts in effect immediately prior to the Effective Time between any Target Affiliate, on the one hand, and either Company, on the other hand, shall, be paid in full or canceled (as determined by Target) without payment effective at or before the Effective Time. The Bid Net Assets and the Final Net Assets shall be determined without giving effect to any intercompany accounts or the payment or cancellation thereof.

(h) <u>Transition Services</u>. At the Closing, one or more Target Affiliates and Mervyn's shall enter into an agreement substantially in the form of <u>Exhibit H</u> providing for certain transition services (including software licenses and sublicenses)

-42-

**Tar.A055**

by such Target Affiliates for Mervyn's after the Effective Time (the "Transition Services Agreement").

    (i)    <u>Certain Contracts.</u>

    (i)    Except as otherwise provided in Section 8(i)(v), with respect to each contract or agreement that relates solely to the operation of Mervyn's business or the ownership of its assets to which Target but not Mervyn's is a party, Target will use reasonable commercial efforts before the Closing Date to cause such contract or agreement to be assigned to Mervyn's.

    (ii)    Except as otherwise provided in Section 8(i)(v), with respect to each contract or agreement that relates solely to the operation of Mervyn's business or the ownership of its assets to which both Target and Mervyn's are parties, Target will assign all of its rights and obligations thereunder to Mervyn's as of the Effective Time.

    (iii)    With respect to each contract or agreement that does not relate solely to the operation of Mervyn's business or the ownership of its assets to which Target and Mervyn's are parties, Mervyn's will assign all of its rights and obligations thereunder to Target as of the Effective Time.

    (iv)    With respect to each contract or agreement entered into by Target on behalf of it and its wholly owned subsidiaries, Buyer acknowledges that, except as set forth herein, neither Company has any rights thereunder and Buyer will not permit either Company to claim otherwise.

    (v)    Notwithstanding anything to the contrary in Section 8(i)(i) or (ii), as of the Effective Time, Mervyn's shall assign to Target all rights and obligations of Mervyn's under any contract or agreement (including a license agreement) relating to software of any kind, other than the software identified in <u>Exhibit I</u> as being "Licensed to Mervyn's," (a "Retained Software Agreement") to which Mervyn's is a party.

    (vi)    As of the Effective Time, Mervyn's shall assign to a Target Affiliate all lease agreements relating to stores or distribution centers formerly operated by Mervyn's that have been closed before the Closing Date, other than the Hialeah, Florida store.

    (vii)    Notwithstanding anything to the contrary in this Section 8(i), if (A) any contract or agreement is not capable of being assigned as provided in this Section 8(i) in the absence of the approval, consent, or waiver of any other person without conflicting with, violating, constituting a default under, or breaching the contract or agreement, and (B) all necessary approvals, consents,

Tar.A056

and waivers of all parties to the contract or agreement have not been obtained at or before the Closing, then the contract or agreement shall not be assigned; provided that the purported assignee shall assume the obligations and liabilities of the purported assignor under the contract or agreement after the Effective Time (but not the contract or agreement itself), and the claims, rights, and benefits of such assignor arising under the contract or agreement or resulting therefrom after the Effective Time (but not the contract or agreement itself) shall be assigned to such assignee (and any benefits received by such assignor therefrom after the Effective Time shall immediately be transferred by such assignor to such assignee), and such assignor shall, following the Closing, use commercially reasonable efforts to assist such assignee in attempting to obtain the necessary approvals, consents, and waivers, and shall promptly execute all documents necessary to complete the transfer of the contract or agreement if such approvals, consents, and waivers are obtained.

(viii)  Notwithstanding anything to the contrary in this Section 8(i), neither party shall be required to make any payments or offer or grant any accommodation (financial or otherwise) to any third party to obtain any approval, consent, or waiver to any assignment of a contract or agreement hereunder, unless, in the case of payment, the other party makes such payment and, in any other case, the other party agrees to reimburse such party and its affiliates for their reasonable out-of-pocket costs with respect thereto and such reimbursement would fully compensate such party and its affiliates for the offer or grant of the accommodation.

(j)  Intercompany Agreements.  Except for agreements relating to any parcel of Real Estate, the licenses granted pursuant to Section 8(c), the Transition Services Agreement, the agreements set forth on Section 8(j) of the Disclosure Schedule and as provided in Section 10(e), all contracts, agreements, arrangements, obligations and liabilities between any Target Affiliate, on the one hand, and either Company, on the other hand, shall automatically be terminated without liability, waived and released as of the Closing Date, including the amended and restated merchant services agreement dated February 1, 2004 between Target National Bank and Mervyn's, the License and IP Brokerage Agreement, dated February 2, 2003, between Brands and Target Brands, Inc. and the Target-Mervyn's License.

(k)  Guarantee Arrangements.  Following the Closing Date, Buyer shall use commercially reasonable efforts to do all things necessary or desirable to cause (i) the applicable Target Affiliate to be unconditionally released from any guarantee or other obligation to ensure the performance of either Company made or given by any Target Affiliate or (ii) Buyer or one or more of its affiliates to be substituted for the applicable Target Affiliate as guarantor under any such guarantee or other obligation; provided, however, that the foregoing provisions of this sentence shall not apply with

-44-

Tar.A057

respect to any guarantee or other obligation made or given by Target to a third-party vendor or licensor in connection with securing consent to Target's provision of the transition services contemplated by the Transition Services Agreement. Buyer shall execute and deliver such documents, certificates, agreements, and other instruments and to take such other actions as may be reasonably necessary or desirable in order to implement such release or substitution. Notwithstanding the other provisions of this Section 8(k), all liabilities and obligations (including those referenced in the above proviso) of any Target Affiliate under such guarantees and obligations shall be subject to Section 11(b)(iii), and, with respect to those referenced in the above proviso, also to the indemnification provisions of the Transition Services Agreement.

(l)     Disclosure Supplements. From time to time before the Closing, Target may supplement or amend the Disclosure Schedule with respect to any matter that would make any representation or warranty set forth in Section 4 inaccurate if updated immediately before the Closing or as is necessary to correct any information in the Disclosure Schedule or in any representation or warranty of Target made in Section 4. For purposes of determining the fulfillment of the condition set forth in Section 3(a)(i) as of the Closing and the accuracy of the representations and warranties contained in Section 4 if the Closing does not occur, the Disclosure Schedule shall be deemed to include only that information contained therein on the date of this Agreement and shall be deemed to exclude any information contained in any subsequent supplement or amendment thereto. However, for purposes of determining the accuracy of the representations or warranties of Target contained in Section 4 or the liability of Target with respect thereto under Section 11(a)(i) should the Closing occur, the Disclosure Schedule shall be deemed to include all information contained in any subsequent supplement or amendment thereto.

(m)     Minnesota Stores. Buyer acknowledges that, before the Closing, Target will cause ownership solely of the nine Mervyn's stores located in the State of Minnesota (the "Minnesota Stores") to be transferred to one or more Target Affiliates or third parties (with the proceeds of any such transfer to be for the account of Target). For all purposes under this Agreement, all references to one or more Companies or to Mervyn's (including in Section 4) shall be deemed to exclude the Minnesota Stores in all respects. Without limiting the generality of the foregoing, the Minnesota Stores will be excluded from the definitions of "Owned Real Estate," "Leased Real Estate," and "Real Estate" for all purposes under this Agreement; all contracts and agreements relating to the Minnesota Stores shall be assigned to a Target Affiliate or to a third party; all inventory, equipment, furniture, and other tangible assets located at the Minnesota Stores shall be transferred to a Target Affiliate or to a third party; and no employee located at a Minnesota Store shall be subject to Section 9.

Tar.A058

(n)    Software Issues.

(i)    Prior to the Closing, Target and Buyer shall cooperate to obtain written consents and acknowledgements from each third-party licensor of each piece of software identified in Exhibit I as being "Licensed to Target" evidencing that Target can assign the applicable license agreement (or applicable portion thereof) to Mervyn's in connection with the transactions contemplated by this Agreement; provided, however, that Target shall have no obligation to pay money or grant any accommodation in order to obtain any such consents and acknowledgements.

(ii)    Except for items for which consent and acknowledgement under Section 8(n)(i) has been obtained prior to the Closing: (A) prior to the Closing, Target and Buyer shall cooperate to obtain written consents and acknowledgements from each third-party licensor of each piece of software identified on Section 8(n) of the Disclosure Schedule evidencing that Mervyn's has or will have by the Closing either a license with such third-party licensor, or a sublicense under the Transition Services Agreement, sufficient to allow Mervyn's to use such software during the Transition Period (as such term is defined in the Transition Services Agreement) and to allow a change of control of Mervyn's without obligating Target or Mervyn's to remove such software from any equipment before such change of control; provided, however, that Target shall have no obligation to pay money or grant any accommodation in order to obtain any such consents and acknowledgements; and (B) with respect to any item identified on Section 8(n) of the Disclosure Schedule for which the applicable third-party licensor would not provide such consents and acknowledgements prior to the Closing, then Target shall have the right to remove such identified software from such equipment before the Closing Date.

(iii)    At the Closing, Target and Mervyn's will execute a nonexclusive, perpetual, sublicensable, royalty-free license agreement granting Target Affiliates rights to the software owned by (as opposed to licensed to) Mervyn's, containing terms and conditions substantially as set forth in Exhibit J hereto.

(o)    Customer Data. To the extent Target or a Target Affiliate own any rights in any customer data collected at or through Mervyn's stores at the Closing Date, Target or a Target Affiliate, as the case may be, shall assign all rights in such data to Mervyn's, other than customer data of persons who, as of the Closing Date, have requested that their information not be shared with non-affiliated third parties via the Target online privacy policy or via any other channel of communication with Target or a Target Affiliate and customer data expressly assigned to Portfolio Buyer pursuant to the Portfolio Purchase Agreement . With respect to all e-mail addresses

-46-

**Tar.A059**

collected at or through any Mervyn's-specific area of any Web site operated by or on behalf of Target or any Target Affiliate, Target shall provide Mervyn's, on or before the Closing Date, a copy of all such e-mail addresses, in the form reasonably requested by Buyer; and Target hereby grants Mervyn's a non-exclusive, royalty-free, perpetual, irrevocable, transferable license, with right to sublicense to use such e-mail addresses in connection with the conduct of its business. Notwithstanding the foregoing, neither Target or a Target Affiliate shall provide Mervyn's such data (including e-mail addresses) to the extent the provision of such data would violate any contractual obligation or violate any applicable law or regulation. In addition, (i) Mervyn's agrees that such customer data shall only be used for lawful purposes; (ii) its use of such information will be in accordance with all federal, state, and local laws and regulations governing the privacy and security of such customer data; and (iii) Mervyn's agrees it shall honor all customer opt out request flags transferred with such customer data and identified to Buyer in connection therewith, including "do not mail, "do not telephone" and any sublicense shall provide for such restrictions. Target shall, on or before the Closing Date, notify Buyer in writing of the terms and conditions under which Target or a Target Affiliate collected any customer data assigned or licensed to Mervyn's hereunder. Except in the case of e-mail addresses described above, Mervyn's understands and agrees that Target will not provide any customer data residing in the Target guest database to Mervyn's.

(p)     Third-Party Confidentiality Agreements. From and after the Closing Date, Target shall take commercially reasonable efforts to enforce the terms of the Third-Party Confidentiality Agreements for the benefit of Buyer; provided that Buyer shall reimburse Target for all out-of-pocket expenses (including attorneys' fees) incurred by Target in undertaking such enforcement. For purposes of this Section 8(p), "Third-Party Confidentiality Agreements" means the confidentiality agreements that Target entered into with prospective purchasers (other than Buyer) of the business of the Companies.

(q)     Conversion Documents. After the Closing, Target shall deliver to Mervyn's the certificates of conversion (or such other documents) it receives from the California and Minnesota Secretaries of State evidencing the Mervyn's Conversion and Brands Conversion, respectively.

9.     Employees and Employee Benefits.

(a)     Offers of Employment. Buyer will cause Mervyn's to continue the employment effective immediately after the Closing Date of all hourly employees and all salaried employees who are employed by Mervyn's on the Closing Date, including each such employee on medical, disability, family, or other leave of absence as of the Closing Date, except employees located at Minnesota Stores and except those persons identified in Section 9(a) of the Disclosure Schedule as persons who will be

-47-

**Tar.A060**

transferred to a Target Affiliate. Within ten business days prior to the Closing Date, Target will provide to Buyer a list showing the names of each such employee on leave (and such list shall be updated as of the Closing Date)). The continued employment immediately following the Closing Date shall in each case provide base wages and salary and bonus opportunity (other than employee benefits, which are subject to Section 9(b)) that are comparable to the base wages and salary and bonus opportunity (but excluding any equity based compensation) provided to each such employee on the Closing Date. The employees who continue as employees of Mervyn's are referred to as "Retained Employees." Nothing in this Section 9(a) shall obligate Buyer or Mervyn's to continue the employment of any such Retained Employee for any specific period, or to maintain base wages and salary and bonus opportunity at any particular level, following the Closing Date.

(b)   Buyer's Employee Benefit Plans Generally. As of the Closing Date, Buyer shall provide (through the Transition Services Agreement or otherwise), or shall cause Mervyn's to provide, each Retained Employee with employee benefits that are at least comparable, in the aggregate, to the Plans (other than the Plans described in Sections 9(j) and (k)) provided to such Retained Employee by Mervyn's immediately prior to the Effective Time ("Buyer's Plans"). After the Closing Date, the following shall apply:

(i)   Except as otherwise provided in the following subsections of this Section 9, as of the Effective Time, Buyer will assume, or will cause Mervyn's or Buyer's Plans to assume, all liabilities and obligations for benefits payable under each Plan specifically set forth on Section 9(b)(i) of the Disclosure Schedule to or with respect to (A) any current employee employed by Mervyn's immediately prior to the Closing Date, including any employee on medical, disability, family, or other leave of absence as of the Closing Date, (B) any former employee of Mervyn's who was on the payroll of Mervyn's on the date the individual's most recent termination of employment from Target and all of the affiliates of Target occurred, and (C) any dependent or former dependent of any such employee or former employee, including any dependent or former dependent entitled to COBRA coverage assumed by Buyer under Section 9(g) hereof (collectively, "Covered Persons"). Such assumed liabilities include liabilities that relate to events occurring or expenses incurred at or prior to the Effective Time but that have not been paid as of the Effective Time, including benefits paid by Target or a Plan by check or bank draft on or before the Cut-Off Date, which check or bank draft has not cleared by the Cut-Off Date. Any such benefits related to events occurring or expenses incurred after the Effective Time shall be determined under the terms of Buyer's Plans, except as provided to the contrary in the following subsections of this Section 9.

Tar.A061

(ii)     Buyer shall give, or cause Mervyn's to give. each Retained Employee credit under Buyer's Plans or personnel policies that cover the Retained Employee, including any vacation, sick leave and severance policies. for purposes of eligibility, vesting and entitlement to vacation. sick leave and severance benefits (excluding accrual of benefits under any defined benefit pension plan) for the Retained Employee's service with Target and its affiliates prior to the Effective Time, shall allow such Retained Employees to participate in each such Buyer's Plan providing medical benefits without regard to preexisting-condition limitations, waiting periods, evidence of insurability. or other exclusions or limitations not imposed on the Retained Employee by the corresponding Plans immediately prior to the Effective Time, and shall credit the Retained Employee with any expenses that were covered by the Plans for purposes of determining deductibles, co-pays, and other applicable limits under Buyer's Plans. To the extent any Retained Employee or covered dependent is hospitalized as of the Closing Date (or the latest date medical coverage is provided to such employee or dependent under any Target medical plan pursuant to the Transition Services Agreement), such person will continue to be covered under the medical coverage provided by Target until the date they are released from the hospital and Mervyn's shall reimburse Target for any expenses associated with such extended hospital stay that are incurred after the Effective Time.

(iii)    No portion of the assets of any trust or other fund maintained by Target for the purpose of paying benefits under any of the Plans will be transferred to Buyer, the Companies, or any Buyer's Plan.

(c)     Severance Benefits.  If any Retained Employee is involuntarily terminated by Buyer or Mervyn's within 12 months following the Closing Date under circumstances that would have qualified the Retained Employee for severance benefits under any of the severance plans or practices listed in Section 4(o) of the Disclosure Schedule, other than the Target Income Continuance Policy ("Mervyn's Severance Practices") if the Retained Employee had been terminated involuntarily under the same circumstances by Mervyn's at or prior to the Closing Date (except that "same circumstances" shall not be deemed to include any requirement under Mervyn's Severance Practices that the termination have been made in connection with the consideration of the transaction that is the subject of this Agreement), Buyer will provide, or cause Mervyn's to provide, to the Retained Employee under Buyer's Plans benefits that are at least equal to the severance pay and other benefits provided under the applicable Mervyn's Severance Practices.  Buyer shall assume, or cause Mervyn's to assume, the responsibility for all benefits that are payable under the Target Income Continuance Policy following the Closing Date to (i) any Retained Employee, or (ii) any former employee who was on the payroll of Mervyn's at the time the person's employment with Mervyn's terminated; provided that, as a

-49-

Tar.A062

condition to any such person's receipt of benefits under the Target Income Continuance Policy, Buyer shall require the person to execute an instrument releasing all claims the person may have against Buyer, Target, or Mervyn's.

(d) <u>Vacation Pay and Personal Holidays</u>. Buyer shall cause Mervyn's to continue to credit to each Retained Employee all vacation and personal holiday pay that the Retained Employee is entitled to use but has not used as of the Effective Time (including any earned vacation or personal holiday pay to be used in future years), and shall assume all liability for the payment of such amounts pursuant to the Target vacation and personal holiday pay policies listed in Section 4(o) of the Disclosure Schedule.

(e) <u>Disability Benefits and Leaves</u>. Buyer will, or will cause Mervyn's to, assume all liabilities payable under the Mervyn's Disability Plus program, whether related to a disability that occurred before or after the Effective Time . Except as provided in the previous sentence, (i) Target and the Plans shall retain the liability for all long-term disability benefits payable to any Covered Person under the terms of Target's long-term disability plans after the Effective Time with respect to any disability that occurred prior to the Effective Time (but not with respect to any reoccurrence of such a disability after the Effective Time ), (ii) Buyer, Mervyn's, or a Buyer's Plan shall assume the liability for all short-term disability benefits payable to any Retained Employee under Target's short-term disability plans that are payable following the Effective Time with respect to any disability that occurred prior to the Effective Time (determined under the terms of the Plan or personnel policy that applies to the disabled Retained Employee immediately prior to the Effective Time ) until the date, if any, on which the Retained Employee qualifies for benefits under the Target long-term disability plans, and (iii) Buyer's Plans will govern the determination of what, if any, short-term and long-term disability benefits will be paid to any Retained Employee whose disability occurs after the Effective Time (or which reoccurs after the Effective Time ). If any Retained Employee is on any form of leave of absence on the Closing Date (including any leave subject to the Family and Medical Leave Act of 1993 or comparable state law), Buyer shall reinstate, or shall cause Mervyn's to reinstate, such Retained Employee to active employment upon the expiration of the leave to the extent such reinstatement is required by any applicable law or regulation or by Mervyn's personnel policies and shall satisfy any other obligation with respect to such Retained Employee as required under any applicable law or regulation or the Mervyn's personnel policies (copies of which have been provided to Buyer) upon the expiration of such leave.

(f) <u>Medical and Dental Plan Liabilities</u>. Buyer shall, or shall cause Mervyn's or the applicable Buyer's Plan to, assume and pay any benefits or expenses covered by the group medical and dental plans included within the Plans that were incurred with respect to services performed for Covered Persons prior to the Effective

-50-

Tar.A063

Time but have not been paid by the Plans prior to the Effective Time , including benefits paid by Target or a Plan by check or bank draft on or before the Cut-Off Date, which check or bank draft has not cleared by the Cut-Off Date. If Buyer provides such Buyer's Plans to a Retained Employee following Effective Time , Buyer shall pay or shall cause the applicable Buyer's Plan to pay any such benefits or expenses that are incurred with respect to services performed for the Retained Employee or the Retained Employee's dependents after the Effective Time .

(g)    COBRA Coverage. Effective as of the Effective Time , Buyer shall provide (through the Transition Services Agreement or otherwise), or shall cause Mervyn's to, assume and satisfy (or cause a Buyer's Plan to satisfy) all entitlements under Code Section 4980B, Part 6 or 7 of Title I of ERISA, or any similar state law (collectively, "COBRA") with respect to any Plan subject to COBRA of any employee or former employee of Mervyn's, or any dependent or former dependent of any such employee or former employee of Mervyn's, whose qualifying event occurred prior to the Effective Time at a time when the employee or former employee was on the payroll of Mervyn's (or whose qualifying event occurs at the Effective Time as a result of the transactions covered by this Agreement), including any obligations to individuals currently on such COBRA continuation coverage and any obligations to any individual whose period for electing such COBRA continuation coverage has not yet expired.

(h)    Retiree Medical Obligations. Target shall retain, indemnify and hold harmless Buyer and Mervyn's from all liabilities and obligations applicable to Retained Employees and current and former employees of Mervyn's (including any dependents or beneficiaries thereof) for retiree medical or life insurance benefits under any of the Plans set forth in Section 4(o) of the Disclosure Schedule ("Target Medical Plans") to which such individual is entitled prior to or as of the Cut-Off Date. Buyer and Mervyn's will not offer retiree medical or life insurance benefits to any current or former employees of Mervyn's (including any dependent or beneficiary thereof).

(i)    Flexible Spending Accounts. Buyer will, or will cause Mervyn's to, credit each Retained Employee (and any former employee of Mervyn's or dependent or former dependent of an employee or former employee who has COBRA rights described in Section 9(g) with respect to flexible spending accounts) under a health care and dependent care flexible spending account plan or plans maintained by Buyer or Mervyn's ("Buyer's Flex Plans") with a balance (positive or negative) as of the Effective Time equal to the balance credited to the individual under the applicable health care and dependent care flexible spending account plans of Target listed in Section 4(o) of the Disclosure Schedule ("Target Flex Plans") as of the Effective Time ("Aggregate Flex Plan Balances"), and will reimburse each such individual  for expenses incurred during the current plan year of such Target Flex Plan (whether

-51-

**Tar.A064**

incurred before or after the Effective Time) that had not been reimbursed under such Target Flex Plan prior to the Effective Time (to the same extent such eligible expense would have been reimbursable under such Target Flex Plan). As soon as reasonably practicable following the Closing Date, Target shall transfer Net Assets to Buyer's Flex Plan equal to the Aggregate Flex Plan Balances and Buyer, Mervyn's, and Target will treat the arrangement described in this Section 9(i) as a spin-off of the applicable portions of the Target Flex Plans and a merger of such portions into Buyer's Flex Plans.

(j)  Qualified Retirement and 401(k) Plans. Buyer and Mervyn's will have no liability for benefits payable under the Target Corporation 401(k) Plan, the Target Corporation Pension Plan, the Mervyn's Pension Plan, or The Retirement Plan of the J. L. Hudson Company (collectively, "Target Retirement Plans"). Prior to the Closing Date, Target will assume sponsorship of and all liabilities relating to the Mervyn's Pension Plan. Target shall take or cause to be taken all actions necessary to fully vest Retained Employees under all Target Retirement Plans and all other Plans that are deferred compensation or supplemental retirement plans. Buyer either currently maintains, or will establish or cause Mervyn's to establish, not later than 90 days after the Closing Date, one or more qualified defined contribution plans ("Buyer's DC Plan") that will contain all provisions necessary for the acceptance of direct rollovers (in the form of cash and notes relating to plan participant loans) of "eligible rollover distributions" as defined in the Code and applicable regulations that Retained Employees are eligible to receive from the Target Retirement Plans without adversely affecting the qualified status of any Target Retirement Plan. Buyer's DC Plan will contain provisions to permit any such direct rollover to include the promissory note or notes representing any Plan loans outstanding to the Retained Employee under the Target Corporation 401(k) Plan on the date of the direct rollover, and Buyer, Mervyn's and Target will cooperate with each other to enable such direct rollovers to occur before such loans become defaulted. Target agrees not to place any such loans in default for at least 90 days following the Closing Date.

(k)  Other Retained Plans. Target will retain any and all liabilities and obligations with respect to benefits payable to or with respect to any individual under the Plans listed in Section 9(k) of the Disclosure Schedule.

(l)  Retiree Merchandise Discount Programs. Following the Closing Date, Buyer shall or shall cause Mervyn's to provide under a Mervyn's retiree discount program (which shall be generally similar to Target's retiree discount program) retiree discounts (only with respect to merchandise purchased at Mervyn's stores) to each retiree, or spouse or dependent of a retiree, who retired from Mervyn's and who is eligible for such programs under Target's retiree discount program eligibility guidelines.

**Tar.A065**

(m)  Workers' Compensation Liabilities. As of the Effective Time, Buyer will cause the Companies to assume (or reimburse Target and the other Target Affiliates for) all liabilities and obligations relating to compensation and benefits under any state workers' compensation or similar law payable following the Effective Time to or with respect to any Retained Employee, or to any former employee of either Company, who in either case was employed by either Company on the date the claim arose or the incident on which the claim is based occurred.

(n)  No Third-Party Beneficiaries. Without limiting the generality of Section 13, none of the preceding subsections of this Section 9 shall confer any rights or remedies upon any employee or former employee of Target, Mervyn's, or Buyer, or upon any other person other than the parties hereto and their respective successors and assigns.

10.  Tax Matters.

(a)  Tax Payments and Returns. Target shall include the income of the Companies (including any deferred items triggered into income by Treasury Regulations Section 1.1502-13 and any excess loss account taken into income under Treasury Regulations Section 1.1502-19) on Target's consolidated federal Income Tax Returns for all periods through the Cut-Off Date. The Companies, on or before the Cut-Off Date, or Target at any time, shall pay or cause to be paid all Target Taxes, and shall file or cause to be filed all Tax Returns with respect to all Target Taxes other than Target Taxes for a Straddle Period. Except as provided in Section 10(b), in the case of Taxes other than Income Taxes, the Companies shall (i) pay or cause to be paid on or before the Cut-Off Date any such Taxes that the Companies would pay on or before the Cut-Off Date in the ordinary course of business, consistent with past practices and (ii) file or cause to be filed on or before the Cut-Off Date all Tax Returns then due with respect to such Taxes. Buyer shall, or shall cause the Companies after the Cut-Off Date to, pay all Taxes other than Target Taxes and Taxes to be paid by the Companies on or before the Cut-Off Date as described in the preceding sentence and shall file all Tax Returns not required to be filed by the Companies on or before the Cut-Off Date or by Target pursuant to this Agreement. All Tax Returns described in this Section 10(a) for Tax periods beginning before the Closing Date shall be prepared in accordance with past practice (unless a contrary position is required by law).

(b)  Transfer Taxes. Buyer shall pay all sales, use, value-added, business, goods and services, transfer, documentary, conveyancing or similar Taxes or expenses and all recording fees that may be imposed as a result of (i) the conversion of the Companies into limited liability companies as contemplated by Section 3(a)(xi), and (ii) the sale and transfer of the Securities under this Agreement, including any stamp, duty, or other Tax chargeable in respect of any instrument transferring property,

-53-

**Tar.A066**

together with any fines, penalties, interest, and additions to Tax with respect thereto ("Transfer Taxes"). Target, Buyer, and the Companies shall cooperate in timely making all filings, returns, reports, and forms as may be required to comply with the provisions of such Tax laws.

(c)   Refunds and Carrybacks.

(i)   Target shall be entitled to any refunds or credits of or against any Target Taxes, and any other Taxes to the extent the Taxes were paid by a Target Affiliate at any time, were paid by a Company on or before the Cut-Off Date, or were accrued on the Statement, except to the extent the refund or credit is shown as an asset on the Statement (in each case plus any interest received with respect thereto), and Buyer shall, at Target's expense, cause the Companies to file, or cause to be filed, any claims for such refunds or credits reasonably requested by Target.

(ii)   Except to the extent set forth in Section 10(c)(i), the Companies shall be entitled to any refunds or credits of Taxes attributable to the Companies (plus any interest received with respect thereto).

(iii)   Buyer or the Companies shall promptly forward to Target or reimburse Target for any refund or credits due Target (pursuant to the terms of this Section 10(c)) after receipt or use thereof, and Target shall promptly forward to the Companies or reimburse the Companies for any refunds or credits due the Companies (pursuant to the terms of this Section 10(c)) after receipt or use thereof.

(iv)   Refunds or credits of Income Taxes for a Straddle Period shall be allocated in the manner in which Income Taxes are allocated in Section 10(g)(iii).

(v)   Neither Buyer, the Companies, nor any of their affiliates shall elect to carry back any item of loss, deduction, or credit of Buyer, a Company, or any of their affiliates that arises in any Tax period or portion thereof ending after the Cut-Off Date into any Tax period or portion thereof of Target, either of the Companies, or any of their affiliates ending on or before the Cut-Off Date.

(d)   Cooperation. Each of Target, Buyer, and the Companies shall reasonably cooperate, and shall cause their respective affiliates, officers, employees, agents, auditors, and other representatives to reasonably cooperate, in preparing and filing all Tax Returns relating to Taxes of the Companies, including maintaining and making available to each other all records necessary in connection with such Taxes

-54-

**Tar.A067**

and in resolving all disputes and audits with respect to all taxable periods relating to such Taxes. Each of Buyer and Target recognizes that the other party and its affiliates will need access from time to time after the Closing Date to certain accounting and Tax records and information held by such party and its affiliates to the extent such records and information pertain to events occurring on or before the Closing Date. Therefore, each of Buyer and Target shall, and Buyer shall cause each of the Companies to:

   (i)  properly retain and maintain such records and information as provided in Section 8(b)(ii), or if longer, in accordance with the past custom and practice of such corporation until such time as the other party agrees that such retention and maintenance is no longer necessary, which agreement shall not be unreasonably withheld; and

   (ii)  allow the other party, its affiliates and their agents and representatives, at times and dates mutually acceptable to the parties, to inspect, review and make copies of such records and information as such other party in good faith may deem necessary or appropriate from time to time, such activities to be conducted during normal business hours and at the other party's expense; provided however, that the party to whom the request is made shall have the right to excise any information that is not reasonably related to the request.

  (e)  <u>Termination of Tax-Sharing Agreement</u>. Target shall cause any Tax-sharing agreement relating to Taxes (other than real estate Taxes and assessments) to which a Company is a party to be terminated as to such Company at or before the Closing Date.

  (f)  <u>Purchase Price Allocation</u>. Within 150 days after the Closing Date, Buyer shall deliver to Target an allocation of the Purchase Price (and all other amounts comprising the "seller's consideration" as such term is defined in Treasury Regulations Section 1.1060-1(c)(1)) among the assets of the Companies (the "Price Allocation"), which allocation shall be binding on the parties; provided, however, that no less than an aggregate of $75,000,000 will be allocated among the assets of Brands. Notwithstanding the previous sentence, Buyer shall use commercially reasonable efforts to deliver to Target the Price Allocation with respect to the Owned Real Estate no later than 20 days prior to the Closing Date; and Target shall use reasonable commercial efforts in assisting Buyer in determining such portion of the Price Allocation within such time frame. Target and Buyer agree to act in accordance with the Price Allocation in the preparation and filing of any Tax Return, and shall not voluntarily take any action inconsistent therewith upon examination of any Tax Return, in any refund claim, in any litigation, or otherwise with respect to such Tax

-55-

Tar.A068

Returns without the consent of the other party, which consent shall not be unreasonably withheld.

(g) <u>Tax Indemnification</u>.

(i) Target shall indemnify Buyer and its affiliates (including the Companies) against (A) all liability of the Companies for Target Taxes; (B) all Income Taxes of any member of any affiliated, consolidated, combined or unitary group of which any of the Companies is or was a member on or prior to the Closing Date, including pursuant to Treasury Regulations Section 1.1502-6 or any similar state, local, or foreign law or regulation; (C) any and all Income Taxes of any person (other than the Companies) imposed on any of the Companies as a transferee or successor, by contract or pursuant to any law, rule, or regulation, which Income Taxes relate to an event or transaction occurring on or before the Closing Date; (D) all liability for breaches of the representations and warranties set forth in Section 4(g) (but in the case of the representations and warranties in Section 4(g)(ii), only to the extent that they relate to Income Taxes) or the covenant in Section 5(h); and (E) all liability for reasonable legal fees and expenses attributable to any item in clauses (A) and (D) above. Notwithstanding the foregoing, Target shall not indemnify Buyer or Buyer's affiliates (including the Companies) against any liability for Taxes attributable to a breach by Buyer of its obligations under this Agreement.

(ii) Buyer shall, and shall cause the Companies to, indemnify Target and its affiliates against (A) all liability of the Companies for Taxes other than Taxes indemnified by Target pursuant to Section 10(g)(i) and except to the extent required to be paid by the Companies pursuant to the third sentence of Section 10(a); (B) all liability for Taxes attributable to a breach by Buyer of its obligations under this Agreement; and (C) all liability for reasonable legal fees and expenses attributable to any item in clauses (A) through (B) above.

(iii) In the case of any Straddle Period, the portion of the Income Taxes attributable to the Companies for any Pre-Cut-Off Tax Period (which are subject to indemnification by Target as Target Taxes to the extent set forth in Section 10(g)(i)) shall be computed by using a closing-of-the-books method as if such taxable period ended on the Cut-Off Date.

(iv) Target's indemnity obligation in respect of unpaid Target Taxes for a Straddle Period shall be effected by its payment to Buyer of such unpaid Target Taxes within 10 days after the Tax Return with respect to the liability for such Taxes is required to be filed (or, if later, is actually filed). The payment to be made pursuant to this paragraph by Target with respect to any Straddle Period shall be appropriately adjusted to reflect any final

-56-

**Tar.A069**

determination within the meaning of Section 1313(a) of the Code with respect to Income Taxes for such Straddle Period.

(h)    Procedures Relating to Indemnification of Tax Claims.

(i)    If a claim is made by any Taxing Authority that, if successful, might result in an indemnity payment to Buyer or Target under Section 10(g), the indemnified party shall within 10 days of receipt of such claim notify the indemnifying party in writing of the claim (a "Tax Claim"). If notice of a Tax Claim received by the indemnified party after the Closing Date is not given to the indemnifying party within such period of time, the indemnifying party shall not be liable to the indemnified party to the extent that the indemnifying party's position is actually prejudiced as a result thereof.

(ii)    The indemnifying party shall control, at its sole expense, all proceedings taken in connection with any Tax Claim (except to the extent the Tax Claim relates to Income Taxes of the Companies for a Straddle Period) and, without limiting the foregoing, may in its sole discretion pursue or forego any and all administrative appeals, proceedings, hearings, and conferences with any Taxing Authority with respect thereto and either pay the Tax claimed and sue for a refund where applicable law permits such refund suits or contest the Tax Claim in any permissible manner; provided, however, that the indemnifying party shall not settle any such audit in a manner that would adversely affect the indemnified party without the prior written consent of the indemnified party, which consent shall not be unreasonably withheld. Notwithstanding the foregoing, Target shall control, in its sole discretion and at its sole expense, all proceedings relating to Income Tax Returns that include one or more of the Companies for periods ending on or before the Cut-Off Date. The indemnified party and the indemnifying party shall jointly control all proceedings taken in connection with any Tax Claim to the extent it relates to Income Taxes of one or more of the Companies for a Straddle Period. Each of the indemnified party and the indemnifying party and their respective affiliates shall cooperate in contesting any Tax Claim (with reimbursement by the indemnifying party of reasonable out-of-pocket expenses (but not compensation payments to employees) of any indemnified party incurred in connection therewith), which cooperation shall include the retention and the provision of records and information that are reasonably relevant to the Tax Claim, and making employees available on a mutually convenient basis to provide additional information or explanation of any material provided hereunder or to testify at proceedings relating to the Tax Claim.

(iii)    In no case shall the indemnified party or the indemnifying party or their respective affiliates admit any liability with respect to, or settle,

-57-

Tar.A070

compromise, or discharge, any Tax Claim without prior written consent of the other party, which shall not be unreasonably withheld; provided, that Target may admit any liability with respect to, or settle, compromise. or discharge any Tax Claim relating to Income Taxes of the Companies for a Pre-Cut-Off Tax Period (other than, with respect to Income Taxes, for the portion of a Straddle Period ending on the Cut-Off Date) without the consent of Buyer.

11.   Indemnification.

(a)   Indemnification by Target.  Target shall indemnify Buyer and its affiliates, officers, directors, employees, equityholders, agents, successors. assigns and affiliates against any loss, liability, claim, damage, or out-of-pocket expense (including reasonable legal fees and expenses), except as otherwise provided in Sections 11(c), 11(d), and 11(e), suffered or incurred by any such indemnified party to the extent caused proximately by:

(i)   any breach of any representation or warranty of Target contained in this Agreement (other than any representations or warranties contained in Section 4(g), all of which are the subject of Section 10) or in the certificates delivered by Target pursuant Section 3(a)(iii) and 3(a)(xii),

(ii)   any breach of any covenant of Target contained in this Agreement, including the covenants of Target contained in Section 9,

(iii)   any liability or obligation relating to the operation or ownership of the Minnesota Stores, or

(iv)   any liability or obligation relating to stores or distribution centers formerly owned or operated by Mervyn's that have been closed or sold prior to the date of the Interim Statement of Net Assets (other than the Hialeah, Florida store),

provided, however, that:

(A)   Target shall not have any liability under clause (i) above (except for breaches of the first and second sentence of Section 4(a) and Sections 4(b), 4(c), 4(g), 4(o), 4(u) or 22) unless the loss, liability, claim, damage, or expense under clause (i) for which Target would, but for this clause (A), be liable (1) exceeds $50,000 on an individual basis and (2) the aggregate of all such losses, liabilities, claims, damages, and expenses that individually exceed $50,000 exceeds, on a cumulative basis, an amount equal to 2% of the Adjusted Purchase Price, and then only to the extent of any such excess,

Tar.A071

(B)     Target shall not have any liability under clause (i) above (except for breaches of the first and second sentence of Section 4(a) and Sections 4(b), 4(c), 4(g), 4(o), 4(u) or 22) to the extent the aggregate of all losses, liabilities, claims, damages, and expenses under clause (i) for which Target would, but for the provisions of this clause (B), be liable exceeds, on a cumulative basis, an amount equal to 5% of the Adjusted Purchase Price, and

(C)     Target shall not have any liability under this Section 11(a) for any loss, liability, claim, damage, or expense to the extent (and in the same amount) such loss, liability, claim, damage, or expense has been included in the final determination of Final Net Assets.

(v)     Except in the case of claims in respect of Taxes, which are the subject of Section 10, and in the case of intentional fraud, Buyer's sole and exclusive remedy with respect to any and all claims relating to the subject matter of this Agreement (including claims for breaches of representations, warranties, covenants, and agreements contained in this Agreement) shall be pursuant to the indemnification provisions set forth in this Section 11(a). In furtherance of the foregoing, Buyer hereby waives, to the fullest extent permitted under applicable law, any and all rights, claims, and causes of action of Buyer against Target as a matter of equity or under or based upon any federal, state, provincial, local or foreign statute, law, ordinance, rule, or regulation (including those relating to Environmental Laws) or arising under or based upon common law or otherwise, except to the extent provided with respect to Target in this Section 11(a) or in Section 10 with respect to Taxes.

(vi)     Notwithstanding anything in this Agreement, for purposes of this Section 11 only in determining losses, liabilities, claims, damages and expenses pursuant to this Section 11, each representation and warranty shall be read without regard for, and without giving effect to, the terms "material" or "Material Adverse Effect," or other terms of similar impact or effect contained in such representation or warranty (i.e., as if such word were deleted from such representation and warranty).

(b)     Indemnification by Buyer. Buyer shall indemnify the Target Affiliates against any loss, liability, claim, damage, or expense (including reasonable legal fees and expenses), except as otherwise provided in Section 11(c), 11(d), or 11(e)) suffered or incurred by any such indemnified party to the extent caused proximately by:

(i)     any breach of any representation or warranty of Buyer contained in this Agreement or in the certificate delivered pursuant Section 3(b)(i);

-59-

Tar.A072

(ii)     any breach of any covenant of Buyer contained in this Agreement or the Confidentiality Agreement, including the covenants of Buyer contained in Section 9;

(iii)     any guarantee or obligation to ensure performance given or made by any Target Affiliate with respect to any obligation of either Company, including with respect to letters of credit, without any right of set off or contribution against any Target Affiliate;

(iv)     any claim with respect to products sold by Mervyn's. whether before or after the Closing Date;

(v)     any liability or obligation under or in respect of any contract or agreement assigned to Mervyn's pursuant to Section 8(i); or

(vi)     any liability or obligation to the extent solely related to the operation of the Companies' businesses or the ownership of their assets before or after the Closing Date (other than those items for which Buyer is entitled to indemnification from Target under Section 11(a)), including with respect to, or in settlement of, any action, lawsuit, hearing, arbitration, proceeding. or governmental investigation, whether arising before or after the Closing Date, or with respect to, or in settlement of, any claims by current or former employees of Mervyn's for acts or omissions occurring before or after the Closing Date (except to the extent that Target retains liability for certain employee benefits under Section 9(e), (j), or (k)).

(c)     Adjustments; Remedial Actions.

(i)     The amount of any loss, liability, claim, damage. or expense for which indemnification is provided under Section 10 or this Section 11 shall be net of any amounts (net of any collection costs, fees and expenses of the indemnified party and any premium increases, premiums retroactively assessed that directly result from the payment by the insurer of the claim, co-payments and the like applicable to the indemnified party) actually recovered (regardless of time) by the indemnified party under insurance policies (including the title insurance policy issued under the Title Commitments, which policies Buyer agrees to obtain promptly following the Closing) with respect to such loss, liability, claim, damage, or expense (and such indemnified party shall use commercially reasonable efforts to recover such amounts under such insurance policies), and shall be (A) increased to take account of any net Tax cost actually incurred by the indemnified party arising from the receipt of indemnity payments hereunder (grossed up for such increase), but excluding additional Income Tax incurred by Target as a result of realizing additional gain on the transactions completed hereunder, and (B) reduced to take account of any net

-60-

**Tar.A073**

Tax benefit actually realized by the indemnified party arising from the incurrence or payment of any such loss, liability, claim, damage, or expense. In computing the amount of any such Tax cost or Tax benefit, the indemnified party shall be deemed to use all other items of income, gain, loss, deduction, or credit before using any item arising from the incurrence or payment of any indemnified loss, liability, claim, damage, or expense or of any indemnity payment pursuant to Section 10 or this Section 11. Any indemnity payment made pursuant to Section 10 or this Section 11 will be treated as an adjustment to the Adjusted Purchase Price for Tax purposes, unless a final determination (which shall include the execution of a Form 870-AD or successor form) with respect to the indemnified party causes any such payment not to constitute an adjustment to the Adjusted Purchase Price for federal Income Tax purposes.

(ii)     Notwithstanding anything to the contrary stated herein, if remedial action is required to correct a situation giving rise to any loss, liability, claim, damage or expense for which a party is entitled to indemnification pursuant to Section 10 or this Section 11, then the indemnifying party shall in no event be obligated with respect to the costs and expenses of such remedial action (A) in the case of any contamination or other condition at the Real Estate the existence of which constitutes a breach of any representation or warranty of Target set forth in Section 4(r), to the extent such costs and expenses exceed those that would have been incurred had Buyer taken only such actions to remediate such contamination or other condition as are required under applicable law, and (B) in all other cases, to the extent such costs and expenses exceed those that would have been incurred had the indemnified party taken only such actions to correct such situation that a person of ordinary prudence under like circumstances who was not entitled to indemnification for the costs and expenses of such remedial action would have reasonably taken.

(d)     Termination of Indemnification. The obligations to indemnify and hold harmless a party hereto, (i) pursuant to Sections 11(a)(i) and 11(b)(i), shall terminate when the applicable representation or warranty terminates pursuant to Section 15, and (ii) pursuant to Section 10 or the other clauses of Sections 11(a) and 11(b), shall not terminate until 30 days after the expiration of the applicable statute of limitations; provided, however, that such obligations to indemnify and hold harmless shall not terminate with respect to any item as to which the person to be indemnified shall have, before the expiration of the applicable period, previously made a claim by delivering a notice to the party to be providing the indemnification.

(e)     Procedures Relating to Indemnification.

(i)     In order for a party (the "indemnified party") to be entitled to any indemnification provided for under this Agreement in respect of, arising

-61-

out of, or involving a claim or demand made by any third party against the indemnified party (a "Third-Party Claim"), such indemnified party shall notify the other party (the "indemnifying party") in writing of the Third-Party Claim. and deliver to the indemnifying party copies of all notices and documents accompanying or constituting the Third-Party Claim, within ten business days after obtaining notice thereof; provided, however, that failure to give such notification shall not affect the indemnification provided hereunder. except to the extent the indemnifying party shall have been actually prejudiced as a result of such failure and except that the indemnifying party shall not be liable for any expenses incurred during the period in which the indemnified party failed to give such notice. Thereafter, the indemnified party shall deliver to the indemnifying party, within five business days after the indemnified party's receipt thereof, copies of all notices and documents (including court papers) received by the indemnified party relating to the Third-Party Claim; provided. however that failure to deliver such copies shall not affect the indemnification provided hereunder except to the extent the indemnifying party shall have been actually prejudiced as a result of such failure.

(ii)     If a Third-Party Claim is made against an indemnified party. the indemnifying party will be entitled to participate in the defense thereof and, if it so chooses, to assume the defense thereof with counsel selected by the indemnifying party and reasonably satisfactory to the indemnified party, provided that (A) counsel for the indemnifying party shall not have given the indemnifying party written notice that such counsel has determined, in the exercise of its reasonable discretion, that a conflict of interest makes separate representation by the indemnified party's own counsel advisable and (B) such Third-Party Claim  does not seek an injunction or other equitable relief, involve criminal or quasi-criminal allegations or involve a claim that is  reasonably likely to have an adverse determination that would be detrimental to or injure the indemnified party's or any of its affiliates' reputation or future business prospects. Should the indemnifying party so elect to assume the defense of a Third-Party Claim, which election must be made within ten business days (in the case of a Third-Party Claim with respect to which a complaint has been filed) or 30 days (in the case of all other Third-Party Claims) after the indemnifying party receives notice of the Third-Party Claim from the indemnified party, the indemnifying party will not be liable to the indemnified party for legal expenses incurred by the indemnified party in connection with the defense thereof. If the indemnifying party assumes such defense, the indemnified party shall have the right, but not the obligation, to participate in the defense thereof and to employ counsel, at its own expense, separate from the counsel employed by the indemnifying party, it being understood that the indemnifying party shall control such defense. If the indemnifying party has not assumed the defense of a Third-Party Claim within the applicable time

-62-

Tar.A075

period set forth herein, the indemnifying party shall be liable for the reasonable fees and expenses of counsel employed by the indemnified party. If, after meeting the requirements set forth herein, the indemnifying party chooses to defend or prosecute any Third-Party Claim, the indemnified party shall cooperate in the defense or prosecution thereof with reimbursement by the indemnifying party of reasonable out-of-pocket expenses of the indemnified party incurred in connection therewith. Such cooperation shall include the retention and (upon the indemnifying party's request) the provision to the indemnifying party of records and information that are reasonably relevant to such Third-Party Claim, and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. If the indemnifying party has assumed the defense of a Third-Party Claim, the indemnified party shall not admit any liability with respect to, or settle, compromise or discharge, such Third-Party Claim without the indemnifying party's prior written consent, which consent shall not be unreasonably withheld. If the indemnifying party has assumed the defense of a Third-Party Claim and subsequently fails to vigorously defend or prosecute such Third-Party Claim, the indemnified party shall be entitled to assume the defense of such Third-Party Claim (without any limitation on its ability to admit any liability with respect to, or settle, compromise or discharge, such Third-Party Claim) at the expense of the indemnifying party.

(f)    Tax Indemnification. Notwithstanding anything to the contrary in this Section 11, indemnification of Buyer or Target with respect to Tax matters shall be governed by Section 10, except to the extent specific reference is made to Section 10 in this Section 11.

12.    Assignment. This Agreement and the rights hereunder shall not be assignable or transferable by Buyer or Target without the prior written consent of the other party hereto, which consent may be withheld in a party's sole discretion, provided that Buyer may assign this Agreement, in whole or in part, to its lenders for collateral security purposes, to any of its affiliates and to any purchaser or purchasers of all or substantially all of assets, provided that no such assignment shall relieve Buyer of any obligations or liabilities under this Agreement.

13.    No Third-Party Beneficiaries. Except as expressly provided in Sections 10(g) and 11 with respect to affiliates of Target and Buyer, this Agreement is for the sole benefit of the parties and their successors and permitted assigns, and nothing herein expressed or implied shall give or be construed to give to any person, other than the parties and such successors and assigns, any legal or equitable rights hereunder.

**Tar.A076**

14.    Termination.

(a)    Anything contained herein to the contrary notwithstanding, this Agreement may be terminated and the transactions contemplated hereby abandoned at any time before the Closing:

(i)    by mutual written consent of Target and Buyer;

(ii)    by Target upon five business days' notice if any of the conditions set forth in Section 3(b) shall have become incapable of fulfillment at the Closing, and shall not have been waived in writing by Target;

(iii)    by Buyer upon five business days' notice if any of the conditions set forth in Section 3(a) shall have become incapable of fulfillment at the Closing, and shall not have been waived in writing by Buyer; or

(iv)    by Target or Buyer, if the Closing does not occur on or before November 15, 2004;

provided, however, that the failure to satisfy the conditions or consummate the transactions contemplated by this Agreement did not result from the breach in any material respect by the party seeking termination pursuant to clause (ii), (iii), or (iv) of any of its representations, warranties, covenants, or agreements contained in this Agreement.

(b)    In the event of termination by Target or Buyer pursuant to this Section 14, written notice thereof shall forthwith be given to the other party and the transactions contemplated by this Agreement shall be terminated, without further action by any party. If the transactions contemplated by this Agreement are terminated as provided herein:

(i)    Buyer shall return to Target all documents and other material received from or on behalf of Target relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof; and

(ii)    all confidential information received by Buyer shall be treated in accordance with the Confidentiality Agreement, which shall remain in full force and effect in accordance with the terms thereof notwithstanding the termination of this Agreement and notwithstanding anything to the contrary in the Confidentiality Agreement.

(c)    If this Agreement is terminated and the transactions contemplated hereby are abandoned as described in this Section 14, this Agreement shall become void and of no further force and effect, except for the provisions of (i) Section 7(a) relating to the obligation of Buyer to keep confidential certain information and data

-64-

Tar.A077

obtained by it from Target, (ii) Section 16 relating to certain expenses.
(iii) Section 8(d) relating to publicity, (iv) Section 22 relating to finder's fees and broker's fees and commissions, (v) Section 24 and (vi) this Section 14. Upon any termination pursuant to this Section 14, no party shall have any further liability or obligation hereunder other than for any pre-termination willful or intentional breach by such party of the terms and provisions of this Agreement or for pre-termination breach of any payment obligations under this Agreement.

(d)     Notwithstanding anything in this Section 14 to the contrary, if (i) this Agreement is terminated by Target pursuant to Section 14(a)(ii) due to the failure of the condition set forth in Section 3(b)(iv) to be satisfied or (ii) this Agreement is terminated by Target pursuant to Section 14(a)(iv) at such time as both (A) the condition set forth in Section 3(b)(iv) shall not have been satisfied but all other conditions in Section 3(b) shall have been satisfied or shall have been waived by Target and (B) Buyer is not in material breach of this Agreement, then in either case Target shall within five business days of such termination pay to Buyer an amount equal to the reasonably documented costs and out-of-pocket expenses incurred by Buyer in connection with its legal, environmental, accounting and business due diligence and the preparation and negotiation of this Agreement up to a maximum of $5,000,000 (the "Expense Reimbursement"); provided that the Expense Reimbursement will not be owed by Target in the event that Target waives in writing the condition set forth in Section 3(b)(iv).

15.     Survival of Representations.  Except as provided in this Section 15, the representations and warranties in this Agreement and in any certificate delivered pursuant hereto shall survive the Closing solely for purposes of Section 11 until the close of business 12 months following the Closing Date, whereupon such representations and warranties shall terminate.  The representations and warranties in the first and second sentence of Section 4(a) and Sections 4(b), 4(c), 4(g), 4(o), 4(u) and 22 shall terminate 30 days after the expiration of the applicable statute of limitations.

16.     Expenses.  Whether or not the transactions contemplated hereby are consummated, and except as otherwise provided in this Agreement, all costs, fees and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs, fees or expenses; provided that all costs, fees and expenses incurred by the Companies on or prior to the Closing in connection with the negotiation, execution and consummation of this Agreement and the transactions contemplated hereby, shall be paid by Target.

17.     Amendments.  No amendment to this Agreement shall be effective unless it shall be in writing and signed by all parties hereto.

18.     Notices.  All notices or other communications required or permitted to be given hereunder shall be in writing and shall be delivered by hand, or sent by telecopy, or

Tar.A078

sent, postage prepaid, by United States registered, certified or express mail, or reputable overnight courier service, and shall be deemed given, if delivered by hand, when so delivered, or if sent by telecopy, when received, or if sent by mail, three business days after mailing (two business days in the case of express mail), or if sent by overnight courier service, one business day after delivery to such service, as follows:

(i)     Mervyn's Holdings, LLC
        c/o Sun Capital Partners Group, Inc.
        5200 Town Center Circle, Suite 470
        Boca Raton, Florida 33486
        Attention:    Marc J. Leder, Rodger R. Krouse
                      and C. Deryl Couch
        Telephone:    (561) 394-0550
        Facsimile:    (561) 394-0540

        with a copy to:

        Cerberus Capital Management, L.P.
        299 Park Avenue, 22nd Floor
        New York, New York 10171
        Attention:    Lenard Tessler
        Telephone:    (212) 909-1464
        Facsimile:    (212) 755-3009

        Lubert-Adler Real Estate Fund IV, L.P.
        1811 Chestnut Street, 8th Floor
        Philadelphia, Pennsylvania 19103
        Attention:    Dean Adler
        Telephone:    (215) 972-2203
        Facsimile:    (215) 972-2246

        Kirkland & Ellis LLP
        200 East Randolph Drive
        Chicago, IL 60601
        Attention:    Douglas C. Gessner
        Telephone:    (312) 861-2000
        Facsimile:    (312) 861-2200

-66-

Tar.A079

(ii)    if to Target, to

> Target Corporation
> 1000 Nicollet Mall
> TPN - 1446
> Minneapolis, MN  55403
> Attention:  Chief Financial Officer
> Facsimile No.:  (612) 761-5555

> with a copy to:

> Target Corporation
> 1000 Nicollet Mall
> TPS - 3255
> Minneapolis, MN  55403
> Attention: General Counsel
> Facsimile No.:  (612) 696-6909

Any party may change the address to which notices and other communications are to be delivered or sent by giving the other party notice in the manner herein set forth.

19.   Interpretation.  In this Agreement, the Disclosure Schedule, and any exhibits hereto:

(a)    words denoting the singular include the plural and vice versa and words denoting any gender include all genders;

(b)    "including" means "including without limitation";

(c)    "affiliate" has the meaning set forth in Rule 12b-2 of the General Rules and Regulations under the Securities Exchange Act of 1934, as amended;

(d)    "business day" means any day other than a Saturday, Sunday, or a day that is a statutory holiday under the laws of the United States or the State of Minnesota;

(e)    "person" means an individual, partnership, joint venture, corporation, limited liability company, trust, unincorporated organization, government, governmental department or agency, or other entity;

(f)    the use of headings is for convenience of reference only and shall not affect the meaning or interpretation of this Agreement, the Disclosure Schedule, or any exhibits hereto;

Tar.A080

(g)     when calculating the period of time within which or following which any act is to be done or step taken, the date that is the reference day in calculating such period shall be excluded and, if the last day of such period is not a business day, the period shall end on the next day that is a business day;

(h)     all dollar amounts are expressed in United States funds, and all amounts payable hereunder shall be paid in United States funds;

(i)     money shall be tendered by wire transfer of immediately available federal funds to the account designated in writing by the party that is to receive such money; and

(j)     the words "hereof," "hereby," "herein," "hereunder" and similar terms in this Agreement refer to this Agreement as a whole and not only to a particular Section in which such words appear.

20.     <u>Counterparts</u>. This Agreement may be executed in counterparts, all of which shall be considered one and the same agreement, and shall become effective when counterparts have been signed by each of the parties and delivered to the other parties.

21.     <u>Entire Agreement</u>. This Agreement (including the Disclosure Schedule and the exhibits hereto) and the Confidentiality Agreement contain the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings relating to such subject matter.

22.     <u>Brokerage Fees</u>. Target hereby represents and warrants that (a) the only brokers or finders that have acted for Target in connection with this Agreement or the transactions contemplated hereby or that may be entitled to any brokerage fee, finder's fee, or commission in respect thereof are Goldman, Sachs & Co., and (b) Target will pay all fees or commissions that may be payable to Goldman, Sachs & Co. Buyer hereby represents that no brokers or finders have acted for Buyer in connection with this Agreement or the transactions contemplated hereby .

23.     <u>Severability</u>. If any provision of this Agreement or the application of any such provision to any person or circumstance shall be held invalid, illegal, or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other provision hereof.

24.     <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware applicable to agreements made and to be performed entirely within such state, without regard to the conflicts-of-law principles of such state.

Tar.A081

25.    Specific Performance.  The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with its terms and that the parties shall be entitled to an injunction to prevent breaches of this Agreement or to enforce specifically the performance of the terms hereof, in addition to any other remedy to which the parties are entitled.

26.    Disclosure Schedule.  Matters reflected in the Disclosure Schedule are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedule.  Such additional matters are set forth for informational purposes and do not necessarily include other matters of a similar nature.  Matters disclosed by Target to Buyer pursuant to any Section of this Agreement or the Disclosure Schedule shall be deemed to be disclosed with respect to all Sections of this Agreement and the Disclosure Schedule to the extent this Agreement requires such disclosure and to the extent such disclosure reasonably relates to such Section of this Agreement or the Disclosure Schedule.  Nothing in the Disclosure Schedule shall be deemed adequate to disclose any matter, including an exception to a representation or warranty or covenant made herein, however, unless the Disclosure Schedule identifies the matter in a manner reasonably sufficient to inform Buyer of the nature of the matter.

27.    Waiver.  Without limiting any of the rights of Target pursuant to this Agreement, if Buyer brings any action, suit, proceeding, complaint, claim or demand against Target pursuant to this Agreement or any of the other agreements executed and delivered in connection herewith or in connection with any of the transactions contemplated hereby or thereby, Target shall not make any claim for indemnification or contribution against Mervyn's, by reason of the fact that Target is or was a stockholder or agent of Mervyn's or any of its affiliates or is or was serving at the request of Mervyn's or any of its affiliates as a partner, trustee or agent of another entity.  In no event shall Buyer or any of its affiliates have any liability or obligation whatsoever to Target for any breaches of the representations, warranties, agreements or covenants of Target hereunder, and in any event Target may not seek contribution from Buyer or any of its affiliates in respect of any payments required to be made by Target pursuant to this Agreement.

28.    Knowledge.  For all purposes of this Agreement, "Knowledge" of Target or a similar phrase means the actual knowledge (which means the conscious awareness of facts or other information and shall not include constructive knowledge of any matters) of any executive officer of Target or of the President, Chief Financial Officer or Senior Vice President of Mervyn's.

[Signature Page Follows]

Tar.A082

IN WITNESS WHEREOF, the parties have caused this Equity Purchase Agreement to be duly executed as of the date first written above.

TARGET CORPORATION

By _Gerald L. Storch_

Name: _Gerald L. Storch_

Title: _Vice Chairman_

MERVYN'S HOLDINGS, LLC

By _____

Name: _____

Title: _____

Tar.A083

IN WITNESS WHEREOF, the parties have caused this Equity Purchase Agreement to be duly executed as of the date first written above.

TARGET CORPORATION

By_____
Name:_____
Title:_____


MERVYN'S HOLDINGS, LLC

By_____
Name: RADGER R. KROUSE
Title: VICE PRESIDENT

ABLECO FINANCE LLC
299 Park Avenue, 23rd Floor
New York, New York 10171

July 29, 2004

Mervyn's Holdings, LLC
c/o 5200 Town Center Circle
Suite 470
Boca Raton, Florida 33486
Attention: Marc J. Leder and Rodger R. Krouse

Re:    Financing Commitment

Ladies and Gentlemen:

Mervyn's Holdings, LLC, a Delaware limited liability company (the "Parent" and, together with each of the Loan Parties (as defined in the Term Sheet referred to below), collectively, the "Companies"), has advised Ableco Finance LLC (the "Lender"), that the Parent requires financing (i) to purchase (the "Acquisition") all of the issued and outstanding shares of capital stock (or, if such entity is converted into a limited liability company prior to closing, membership interests) of Mervyn's ("Mervyn's" and, together with its subsidiaries, the "Acquired Companies"), (ii) to pay transaction fees and expenses and (iii) for working capital purposes. We are pleased to advise you that the Lender is willing to provide the Companies with a revolving credit facility of up to $300,000,000 (the "Financing Facility"), substantially on the terms and conditions set forth in the Outline of Terms and Conditions attached hereto as Exhibit A (the "Term Sheet"). The obligations of the Companies under the Financing Facility will be secured by a first priority lien on, and security interest in, substantially all accounts receivable, inventory, equipment, general intangibles and other assets of the Companies (other than a pledge of (x) the equity interests of New Mervyns (converted LLC) and (y) owned and leased real estate). The Lender's commitment to provide the Financing Facility is subject in all respects to satisfaction of the terms and conditions contained in this commitment letter and in the Term Sheet.

The Parent, on behalf of itself and the Companies, acknowledges that the Term Sheet is intended as an outline only and does not purport to summarize all the conditions, covenants, representations, warranties and other provisions which would be contained in definitive legal documentation for the Financing Facility. The loan documentation for the Financing Facility will include, in addition to the provisions that are summarized in this commitment letter and the Term Sheet, provisions that, in the reasonable opinion of the Lender, are customary or typical for this type of financing transaction and other provisions that the

9685989.4

**Tar.A085**

Lender in consultation with the Parent determines to be appropriate in the context of the proposed transaction.

By its execution hereof and its acceptance of the commitment contained herein, the Parent agrees to indemnify and hold harmless the Lender and each of its assignees, its affiliates and its directors, officers, members, employees and agents (each an "Indemnified Party") from and against any and all losses, claims, damages, liabilities or other expenses to which such Indemnified Party may become subject, insofar as such losses, claims, damages, liabilities (or actions or other proceedings commenced or threatened in respect thereof) or other expenses arise out of or in any way relate to or result from, this commitment letter, the commitments made herein or the extension of the Financing Facility contemplated by this commitment letter, or in any way arise from any use or intended use of this commitment letter or the proceeds of the Financing Facility contemplated by this commitment letter, and the Parent agrees to reimburse each Indemnified Party for any reasonable legal or other out-of-pocket expenses incurred in connection with investigating, defending or participating in any such loss, claim, damage, liability or action or other proceeding (whether or not such Indemnified Party is a party to any action or proceeding out of which indemnified expenses arise), but excluding therefrom all expenses, losses, claims, damages and liabilities which are finally determined in a non-appealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of the Indemnified Party. In the event of any litigation or dispute involving this commitment letter or the Financing Facility, the Lender shall not be responsible or liable to the Parent or any Company, or any other person for any special, indirect, consequential, incidental or punitive damages. In addition, the Parent agrees to reimburse the Lender for all reasonable fees and out-of-pocket expenses (the "Expenses") incurred by or on behalf of the Lender in connection with the negotiation, preparation, execution and delivery of this commitment letter, the Term Sheet and any and all definitive documentation relating to the Financing Facility, including, but not limited to, the reasonable fees and expenses of counsel to the Lender and the reasonable fees and expenses incurred by the Lender in connection with any legal due diligence. The obligations of the Parent under this paragraph shall remain effective notwithstanding any termination of this commitment letter, but shall terminate upon the execution of definitive loan documentation by the Companies and the Lender.

Upon the Parent's execution of this commitment letter, the Parent shall be obligated to pay a break-up fee equal to $1,500,000, which fee shall be payable, in immediately available funds, on the date on which the Companies elect to not close the Financing Facility and, instead, receive financing (i.e., senior secured, mezzanine, subordinated, equity capital or any combination thereof) from a third-party unaffiliated with the Lender for the purpose of funding, in whole or in part, the acquisition of the Acquired Companies.

The Lender's commitment to provide the Financing Facility is subject to (i) the negotiation, execution and delivery of definitive loan documentation in form and substance reasonably satisfactory to the Lender, the Parent and their respective counsel, and (ii) such other customary conditions as set forth in the Term Sheet. If, as a result of Lender's own due diligence investigation, Lender's findings are materially inconsistent with the Companies' representations regarding their respective properties or any material aspect of the underlying transactions, or if prior to closing Lender determines in its sole and absolute discretion that there has been a material adverse change in the financial or other condition of any material portion of the

**Tar.A086**

collateral for the Financing Facility, the Parent, any Company or in the economy or capital markets, or if there is a new outbreak or escalation of hostilities involving the United States or the declaration by the United States of a national emergency or war or the occurrence of any other calamity or crisis which, in the judgment of Lender, makes it impracticable or inadvisable to proceed with the Financing Facility, then although Lender shall not have the right to terminate this commitment letter as a result of any of the foregoing (except as provided below), Lender shall have the right to increase the interest rate on the Loans to reflect the then current market pricing for loans similar to the Loans, as such pricing is determined by Lender is its sole but good faith judgment, provided further, however, that any such increase shall not exceed 300 basis points above the interest rate set forth in the Term Sheet. In addition, the Lender shall have the right to terminate this commitment letter if any condition to the Parent's obligation to close under the purchase agreement relating to the Acquisition is not satisfied in all material respects.

The Parent represents and warrants that (i) except for any projections referenced in clause (ii) below, all written information and other materials concerning the Parent and the Companies (collectively, the "Information") which has been, or is hereafter, made available by, or on behalf of the Parent or any Company is, or when delivered will be, when considered as a whole, complete and correct in all material respects and does not, or will not when delivered, contain any untrue statement of material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading in light of the circumstances under which such statement has been made and (ii) any projections (which have been, or are hereafter, made available by or on behalf of the Parent or any Company) were prepared in good faith on the basis of (A) assumptions, methods and tests stated therein which are believed by the Parent and the Companies to be reasonable and (B) information believed by the Parent and the Companies to have been accurate based upon the information available to the Parent and the Companies at the time such projections were furnished to the Lender; it being understood that projections by their nature are inherently uncertain and actual results may differ from the projections provided to the Lender and such differences may be material .

This commitment letter is delivered to the Parent upon the condition that, prior to its acceptance of this offer, neither the existence of this commitment letter or the Term Sheet, nor any of their contents, shall be disclosed by the Parent or any Company, except (i) to the seller of the Acquired Companies and such seller's advisors and agents and (ii) as may be compelled to be disclosed in a judicial or administrative proceeding or as otherwise required by law or, on a confidential and "need to know" basis, solely to the directors, officers, employees, lenders, advisors and agents of the Parent. In addition, the Parent agrees that it will (i) consult with the Lender prior to the making of any filing in which reference is made to the Lender or the commitment of the Lender contained herein, and (ii) obtain the prior approval of the Lender (which shall not be unreasonably withheld or delayed) before releasing any public announcement in which reference is made to the Lender or to the commitment of the Lender contained herein. The Parent acknowledges that the Lender and its affiliates may now or hereafter provide financing or obtain other interests in other companies in respect of which the Parent or its affiliates may be business competitors, and that the Lender and its affiliates will have no obligation to provide to the Parent or any of its affiliates any confidential information obtained from such other companies.

Tar.A087

The offer made by the Lender in this commitment letter shall expire, unless otherwise agreed by the Lender in writing, at 5:00 p.m. (New York City time) on July 28, 2004, unless prior thereto the Lender has received a copy of this commitment letter, signed by the Parent accepting the terms and conditions of this commitment letter and the Term Sheet. The commitment by the Lender to provide the Financing Facility shall expire at 5:00 p.m. (New York City time) on November 15, 2004, unless prior thereto, definitive loan documentation shall have been agreed to in writing by all parties and the conditions set forth therein shall have been satisfied (it being understood that the Parent's obligation to pay all amounts in respect of indemnification and Expenses shall survive termination of this commitment letter).

Should the terms and conditions of the offer contained herein meet with your approval, please indicate your acceptance by signing and returning a copy of this commitment letter to the Lender.

This commitment letter, including the attached Term Sheet (i) supersedes all prior discussions, agreements, commitments, arrangements, negotiations or understandings, whether oral or written, of the parties with respect thereto, (ii) shall be governed by the law of the State of New York, (iii) shall be binding upon the parties and their respective successors and assigns, (iv) may not be relied upon or enforced by any other person or entity, and (v) may be signed in multiple counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. If this commitment letter becomes the subject of a dispute, each of the parties hereto hereby waives trial by jury. This commitment letter may be amended, modified or waived only in a writing signed by the parties hereto.

Very truly yours,

ABLECO FINANCE LLC

By: _____
Name: Kevin Genda
Title: Senior Vice President

Agreed and accepted on this
____ day of July 2004:

MERVYN'S HOLDINGS, LLC

By: _____
Name:
Title:

9685989.4

**Tar.A088**

This commitment letter, including the attached Term Sheet (i) supersedes all prior discussions, agreements, commitments, arrangements, negotiations or understandings, whether oral or written, of the parties with respect thereto, (ii) shall be governed by the law of the State of New York, (iii) shall be binding upon the parties and their respective successors and assigns, (iv) may not be relied upon or enforced by any other person or entity, and (v) may be signed in multiple counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. If this commitment letter becomes the subject of a dispute, each of the parties hereto hereby waives trial by jury. This commitment letter may be amended, modified or waived only in a writing signed by the parties hereto.

Very truly yours,

ABLECO FINANCE LLC

By: _____
   Name:
   Title:

Agreed and accepted on this
___ day of July 2004:

MERVYN'S HOLDINGS, LLC

By: _____
   Name: ROBBER R. KRUSE
   Title: V.P.

9685989.4

Exhibit A

Mervyn's

Outline of Terms and Conditions for Financing Facility

This Outline of Terms and Conditions is part of the Commitment Letter, dated July 29, 2004 (the "Commitment Letter"), addressed to Mervyn's Holdings, LLC (the "Parent") by Ableco Finance LLC (the "Lender") and is subject to the terms and conditions of the Commitment Letter. Capitalized terms used herein shall have the meanings set forth in the Commitment Letter unless otherwise defined herein.

BORROWER:          One or more subsidiaries of the Parent.

GUARANTORS:        All domestic material subsidiaries of the Borrower as required by Lender (each a "Guarantor" and collectively, the "Guarantors" and, together with the Borrower, each a "Loan Party" and collectively, the "Loan Parties").

LENDERS:           The Lender and its affiliates and such other lenders designated by the Lender.

FINANCING FACILITY:  A $300,000,000 (the "Maximum Revolver Amount") revolving credit facility (the "Financing Facility"), with a sub-facility for the issuance of one or more letters of credit (the "Letters of Credit") in an aggregate amount not to exceed $200,000,000. The aggregate principal amount of all Loans under the Financing Facility (the "Loans") and the Letters of Credit will be limited to the lesser of (i) the Maximum Revolver Amount and (ii) the Borrowing Base. The Borrowing Base shall be equal to the sum of the lesser of (a) 50% of the lower of cost or market value of eligible finished goods inventory of the Borrowers and (y) 85% of the GOB Liquidation Value Rate (as defined below) of eligible finished goods inventory of the Borrowers as determined by an independent third party appraiser reasonably acceptable to the Lender. Eligible finished goods inventory shall be defined in a manner reasonably satisfactory to the Lender. In addition, the Lender will have the right to establish reserves in the reasonable business judgment of the Lender which it deems customary in transactions of this nature. Amounts repaid under the Financing Facility may be reborrowed.

"GOB Liquidation Value Rate" shall mean the percentage, determined from the most recent appraisal of the Borrowers' inventory as determined by an independent appraiser acceptable to the Lender to reflect the appraiser's estimate of the net recovery rate on such inventory in the event of an in-store going-

Tar.A090

out of business liquidation of such inventory (net of costs and expenses, including rent, incurred in connection with such liquidation).

**LETTER OF CREDIT:** The Letters of Credit will be issued by a bank selected by the Lender and shall have expiry dates that are not later than five days prior to the Maturity Date (as hereinafter defined) unless on or prior to the Maturity Date such Letters of Credit shall be cash collateralized in an amount equal to 110% of the face amount of such Letters of Credit. The Borrowers will be bound by the usual and customary terms contained in the Letter of Credit issuance documentation of the issuing bank and the Lender.

**TERM:** The Financing Facility will terminate on October 1, 2006 (the "Maturity Date").

**MANDATORY AND OPTIONAL PREPAYMENTS:** Mandatory prepayments to be included in the Loan Documents including, without limitation, (i) immediately to the extent the Loans exceed the Borrowing Base, (ii) upon the issuance of indebtedness or stock, and (iii) non-ordinary course sales or other dispositions of assets, casualty and condemnation events, tax refunds, proceeds of judgments and settlements.

The Borrowers may repay the Loans in whole or in part at any time without penalty or premium.

**CLOSING DATE:** The first date on which all definitive loan documentation satisfactory to the Lender (the "Loan Documents") is executed by the Loan Parties and the Lender, which date shall not be later than November 15, 2004, unless otherwise agreed in writing by the Lender and the Parent (the "Closing Date").

**COLLATERAL:** All obligations of the Loan Parties to the Lender shall be secured by a perfected, first priority (subject to customary exceptions), lien on and security interest in substantially all of the Loan Parties now owned and hereafter acquired tangible and intangible assets, including, but not limited to, accounts receivable, inventory, and other machinery and equipment, trademarks and tradenames, copyrights, patents and other intellectual property, general intangibles, chattel paper, 100% of the shares of all capital stock of each subsidiary of the Borrower and all proceeds of the foregoing (the "Collateral"), but excluding the Loan Parties' fee and leasehold interests in real property.

All borrowings by the Borrower, all interest on the foregoing, all reimbursement obligations with respect to the Letters of Credit, all costs, fees and reasonable expenses of the Lender and all

**Tar.A091**

other obligations owed to the Lender shall be secured as described above and shall be charged to the loan account to be established under the Financing Facility.

**INTEREST:**

The Loans shall bear interest at a rate per annum equal to the Reference Rate plus the Applicable Margin (as defined below). Interest on such Loans shall be payable monthly in arrears.

As used herein, "Reference Rate" means the rate of interest publicly announced from time to time by JPMorgan Chase Bank in New York, New York as its reference rate, base rate or prime rate. All interest and fees shall be computed on the basis of a year of 360 days for the actual days elapsed. If any event of default shall occur and be continuing, interest shall accrue at a rate per annum equal to 2% in excess of the rate of interest otherwise in effect.

"Applicable Margin" shall mean a rate per annum equal to 4.00%, which rate shall increase by 1.00% at the end of each sixty-day period commencing on the sixty day anniversary of the Closing Date until the Applicable Margin shall equal 8.00%.

**CASH MANAGEMENT:**

All proceeds of accounts receivable of the Loan Parties shall be deposited in lockbox accounts under the sole dominion and control of the Lender. In the event Excess Availability (as defined below) is less that $50,000,000 at any time, all funds deposited in such lockbox accounts will be transferred to the Lender on each business day and applied to repay the outstanding Loan obligations of the Borrowers until such time as Excess Availability exceeds $50,000,000. Collections will be credited to the obligations on the day received in the lockbox accounts conditional on final payment to the Lender and the Lender shall charge one collection day for interest calculation purposes with respect to all collections.

**FEES:**

| | |
|---|---|
| Closing Fee: | $6,000,000 earned in full, non-refundable and payable on the Closing Date. |
| Unused Line Fee: | Three-eighths of one percent (0.375%) per annum multiplied by the average daily unused portion of the Financing Facility, earned and payable monthly in arrears. |
| Letter of Credit Fee: | The Applicable Margin *times* the face amount of each Letter of |

Tar.A092

|                    | Credit, payable on issuance, plus the customary letter of credit charges imposed by the Letter of Credit issuing bank. |
| :--- | :--- |
| Servicing Fee: | $10,000 per month, payable on the Closing Date and monthly in advance. |
| Field Examination Fee: | $1,500 per day per examiner plus reasonable out-of-pocket expenses and charges of third party appraisers and professionals employed by the Lender to review, audit and monitor the Loan Parties' assets. |

**USE OF PROCEEDS:**    The Loans under the Financing Facility shall be used solely (i) to fund a portion of purchase price of the Acquisition, (ii) for general working capital requirements and other corporate purposes of the Borrowers and (iii) to pay fees and expenses related to the Acquisition and this transaction.

**CONDITIONS PRECEDENT:**    The obligation of the Lender to make any Loans under the Financing Facility will be subject to customary conditions precedent for credit facilities of this type including, without limitation, the following special conditions precedent:

(a)    Execution and delivery of appropriate legal documentation, in form and substance satisfactory to the Lender, and completion of Lender's legal due diligence.

(b)    Each of the Loan Parties shall be in good standing in its state of organization and be duly qualified to do business in any other state where any material portion of the Collateral is located.

(c)    The Lender shall have been granted a perfected, first priority (subject to customary exceptions acceptable to Lender) lien on all Collateral, and shall have received UCC, tax and judgment lien searches and other appropriate evidence of the absence of any other liens on the Collateral, except any liens reasonably acceptable to the Lender.

(d)    Opinions from the Loan Parties' counsel as to such matters as the Lender and its counsel may reasonably request.

Tar.A093

(e)    Insurance reasonably satisfactory to the Lender; such insurance to include liability insurance for which the Lender will be named as an additional insured and property insurance with respect to the Collateral for which the Lender will be named as sole loss payee.

(f)    All necessary governmental and third party approvals, consents, licenses and permits in connection with the Loans and the operations by the Loan Parties of their businesses shall have been obtained and remain in full force and effect.

(g)    There shall exist no claim, action, suit, investigation, litigation or proceeding, pending or, to the knowledge of any Loan Party, threatened in any court or before any arbitrator or governmental instrumentality which relates to the Financing Facility or which, in the opinion of the Lender, has any reasonable likelihood of having a material adverse effect on (i) the financial condition, operations, properties, assets, liabilities or business of the Loan Parties, (ii) the ability of any of the Loan Parties to perform their obligations under the Loan Documents or (iii) the ability of the Lender to enforce the loan documentation.

(h)    Borrowers shall have, at the closing, a minimum unused but available borrowing capacity under the Financing Facility of not less than $75,000,000 ("Excess Availability"), after (i) giving effect to the initial Loans made on the Closing Date, (ii) accounting for the Acquisition and (iii) the payment of all fees and expenses related to the Financing Facility and the Acquisition.

(i)    The Lender shall have received such financial and other information regarding the Loan Parties as the Lender may reasonably request, including, without limitation, interim financial statements and monthly availability projections, in each case which shall be reasonably satisfactory to the Lender.

(j)    The Lender shall have the right to terminate its commitment to provided the Financing Facility if any condition to the Parent's obligation to close under the purchase agreement relating to the Acquisition is not satisfied in all material respects.

Tar.A094

**REPRESENTATIONS AND WARRANTIES:** Usual representations and warranties, including, but not limited to, corporate existence and good standing, authority to enter into loan documentation, governmental approvals, non-violation of other agreements, financial statements, litigation, compliance with environmental, pension and other laws, taxes, insurance, absence of Material Adverse Change, absence of default or unmatured default under the Financing Facility and priority of the Lender's liens.

**COVENANTS:** Usual covenants, including, but not limited to, provision of financial statements, notices of litigation, defaults and unmatured defaults and other information, compliance with laws, permits and licenses, inspection of properties, books and records, maintenance of insurance, limitations with respect to liens and encumbrances, dividends (subject to carve-outs to be negotiated in good faith prior to closing) and retirement of capital stock, guarantees, sale and lease back transactions, consolidations and mergers, investments, capital expenditures, loans and advances, indebtedness, compliance with pension, labor, environmental and other laws, transactions with affiliates and prepayment of other indebtedness and amendments to material agreements, if any.

Financial covenants to be: minimum EBITDA and minimum fixed charge coverage, which shall be reasonably determined by the Lender.

Financial reporting to include: (i) annual, audited financial statements, (ii) quarterly, internally prepared, financial statements, (iii) monthly, internally prepared, financial statements, (iv) annual projections, including monthly balance sheet, profit and loss and cash flow figures, (v) weekly borrowing base certificate, and (vi) other reporting as reasonably required by the Lender.

**EVENTS OF DEFAULT:** Usual events of default, including, but not limited to, payment, cross-default, violation of covenants, breach of representations or warranties, bankruptcy or insolvency, judgment, ERISA, change of control and material adverse change.

**GOVERNING LAW:** All documentation in connection with the Financing Facility shall be governed by the laws of the State of New York.

**Tar.A095**

**ASSIGNMENTS,
PARTICIPATIONS:**

The Lender may sell or assign its loans or commitments under the Financing Facility without the consent of the Loan Parties. The Lender may also sell participations in its loans and commitments under the Financing Facility without the consent of the Borrowers or the Guarantors.

**OUT-OF-POCKET
EXPENSES:**

Without limitation to the terms of the Commitment Letter, all fees, including legal fees, costs and expenses of counsel to the Lender, and all reasonable out-of-pocket expenses associated with the transaction are to be paid by the Loan Parties.

Tar.A096