# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MERVYN'S HOLDINGS, LLC, *et al.* | ) | Case No. 08-11586 (KG) |
| | ) | |
| Debtors. | ) | |
| | ) | |
| MERVYN'S LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 08-51402 (KG) |
| | ) | |
| LUBERT-ADLER GROUP IV, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | **Re Dkt No. 43** |

## MEMORANDUM OPINION[1]

## INTRODUCTION

The matter before the Court is Defendant Target Corporation's Motion to Dismiss (the "Motion") the adversary proceeding brought against it by Mervyn's LLC ("Debtor") acting through the Official Committee of Unsecured Creditors (the "Committee").[2]

---

[1] This Opinion constitutes the findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent any of the following findings of fact are determined to be conclusions of law, they are adopted, and shall be construed and deemed, conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted, and shall be construed and deemed, as findings of fact.

[2] The Committee has brought this adversary proceeding on behalf of the Debtor pursuant to an Order which the Court entered on December 30, 2008 (D.I. 1330), granting it standing.

## STATEMENT OF FACTS[3]

### I.      Background

Debtor, a California limited liability company, was a nationwide retailer of affordable

fashion and home décor products which at one time operated 177 retail stores in the Midwest,

South and Pacific Northwest. (Am. Compl. ¶ 42).  In 1978, the Dayton Hudson Corporation

("DHC") acquired Mervyn's which became a wholly-owned subsidiary of DHC. DHC also

owned several "higher end" department stores, including Target Stores which became such

a successful chain of discount retail stores that DHC changed its corporate name to "Target

Corporation" ("Target").  By 2003, Target owned and operated three department store chains:

Marshall Field's, Mervyn's and Target Stores.  Target's board of directors had decided to

focus solely upon the Target chain and therefore decided to sell both Marshall Field's and

Mervyn's.

### II.      Private Equity Sale

After a competitive auction process, Target entered into an Equity Purchase

Agreement (the "Agreement") on July 29, 2004, with a group of private equity firms that

formed one of the Debtor entities "Mervyn's Holdings LLC," ("Mervyn's Holdings").

---

[3]  The operative complaint is the First Amended Complaint which the Committee filed on
December 22, 2008 (Adv. Dkt. 7).  The Court denied leave to the Committee to file a Second
Amended Complaint (Adv. Dkt. 178 and 179), which does not impact the Motion.  The well-pleaded
facts are deemed true for purposes of the Motion.  *See* Standard of Review, *infra*.

Mervyn's Holdings is a Delaware limited liability company that was formed by three private equity groups (collectively, "PE Sponsors.") In order to spin-off Debtor's valuable real estate assets from Debtor, the PE Sponsors formed defendant "MDS Companies," bankruptcy remote entities. (Am. Compl. ¶¶ 62-63). The Agreement itself called for Target to convey 100% of its ownership interest in Debtor to Mervyn's Holdings for $1.175 billion. (Agreement, ¶ 1). Mervyn's Holdings represented to Target that it had equity and debt commitment letters from external funding sources indicating that it had arranged loans and letters of credit from outside sources. *Id.*, ¶ 6(d). The Agreement did not require the sale of Debtor's real estate either by Target or anyone else. *Id.*, ¶ 5(b). Instead, the Agreement expressly prohibited Target from selling or transferring any of Debtor's real estate and also required Target to convert Debtor from a corporation to a limited liability company ("LLC"). *Id.*

## III.   <u>The Sale Transaction</u>

On September 2, 2004 the sale closed (the "2004 Sale"). Am Compl. ¶¶ 56-57. The parties satisfied or waived the Agreement's conditions. Mervyn's Holdings and PE Sponsors borrowed using Debtor's real estate as collateral and incurred substantial obligations in order to fund the 2004 Sale. (Am. Compl. ¶ 46). Debtor received no residual interest in its own real estate and "all or substantially all of the loan proceeds were paid over

to Target." (Am. Compl. ¶¶ 46, 59).[4]  Mervyn's Holdings also leased the real estate back to Debtor at a "substantially increased rate to both service the acquisition debt and to continue to extract over time the significant excess value of the real estate assets over the debt piled onto those assets." (Am. Compl.¶ 49).  Debtor claims that Mervyn's Holdings' actions destroyed the Debtor's value and led to filing of the Chapter 11 petition with the Court on July 29, 2008.

## CAUSES OF ACTION

On September 2, 2008, Mervyn's brought this adversary proceeding against Target and 38 other defendants by filing a complaint alleging that Target and the other defendants

---

[4] According to Mervyn's Amended Complaint, the 2004 Sale was funded by three sources:

1.  Pursuant to that certain Loan Agreement dated September 2, 2004, Greenwich and Archon, as lenders (the "Senior Real Estate Secured Lenders"), advanced $675,000,000 to Realty I, Realty II, Texas Realty I and Texas Realty II. Repayment of these loans was secured by the Unitary Leases held by the listed borrowers, mortgages, liens, assignments of rents and deeds of trust with respect to the real estate assets that had been transferred to the borrowers by Debtor. Mervyn's Holdings used all or substantially all of the loan proceeds to pay the purchase price of the 2004 Sale.
2.  Pursuant to the Mezzanine Loan Agreement dated September 2, 2004, Greenwich and GS Mortgage (the "Mezzanine Real Estate Secured Lenders"), advanced $125,000,000 to Holdings I, Holdings II, Texas Properties I and Texas Properties II. Repayment of these loans was secured by certain pledges and security interests provided by such borrowers. Mervyn's Holdings used all or substantially all of the loan proceeds to pay the purchase price.
3.  Pursuant to the Securities Purchase Agreement, dated September 2, 2004, Mervyn's Holdings purchased 100% of the interests in Holdings I and Holdings II for $429,746,414,84. At the closing, Mervyn's Holdings used these funds to pay the purchase price.

(Am. Compl. ¶ 58).

engaged in a fraudulent transaction and that Target, among others, breached their fiduciary duty to Debtor and its creditors. Thereafter, Debtor filed its Amended Complaint on December 22, 2008, containing the following claims against Target:

**Count I:** Mervyn's Holdings caused Debtor's real estate assets to be transferred with the actual intent to hinder, delay, or defraud creditors or without adequate consideration, in violation of the applicable provisions of the Uniform Fraudulent Transfer Act (UFTA) or Uniform Fraudulent Conveyance Act (UFCA), and Bankruptcy Code Sections 544(b) and 550. Target is liable as a transferee of the proceeds.

**Count II:** Mervyn's Holdings caused Debtor's to pledge its real estate assets with the actual intent to hinder, delay, or defraud creditors or without adequate consideration, in violation of the applicable provisions of the UFTA or the UFCA, and Sections 544 (b) and 550. Target is liable as a transferee of the proceeds.

**Count V:** That the owners of Debtor (which changed over time), including Target, each breached the fiduciary duties that they owed to Debtor and its creditors at the respective times that they owned it.

Target responded to the Amended Complaint by filing the Motion on April 3, 2009. On May 20, 2009, the adversary proceeding was stayed pending the resolution of a motion to disqualify Kirkland & Ellis LLP, as counsel to Sun Capital Defendants, which the Court denied. (Adv. Dkt. 125).

Target now seeks an order from this Court dismissing the claims against it in the Amended Complaint, with prejudice, pursuant to Rules 8, 9 (b), and 12 (b)(6) of the Federal Rules of Civil Procedure, made applicable by Rules 7008, 7009, and 7012 of the Federal

Rules of Bankruptcy Procedure.

## <u>STANDARD OF REVIEW</u>

Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable here by Federal Rule of Bankruptcy Procedure 7012(b), governs a motion to dismiss for failure to state a claim upon which relief can be granted. "The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case." *Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.)*, 496 F. Supp. 2d 404, 407 (D. Del. 2007) (citing *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993)). The complaint "must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory." *Bell Atlantic Corp. v. Twombly,* 127 S. Ct. 1955, 1969 (2007) (quoting *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1106 (7th Cir. 1984)) (emphasis in original).

In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to the plaintiff. *Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651, 653 (3d Cir. 2003). The court may not consider matters outside of the pleadings unless the court is willing to treat the matter as a motion for summary judgment. Fed. R. Civ. P. Rule 12(d). A complaint need not contain detailed factual allegations, but "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

. . . Factual allegations must be enough to raise a right to relief above the speculative level."

*Twombly*, 127 S. Ct. at 1964-65 (internal citations omitted).

The relevant record under consideration consists of the complaint and any "document integral or explicitly relied upon in the complaint." *U.S. Express Lines, Ltd. v. Higgins,* 281 F.3d 383, 388 (3d Cir. 2002) (citing *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir. 1997)). When considering a motion to dismiss, "[i]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.,* 836 F.2d 173, 181 (3d Cir. 1988) (citing *Car Carriers,* 745 F.2d at 1107). The movant carries the burden of demonstrating that dismissal is appropriate. *Intel Corp.*, 496 F. Supp. 2d at 408.

However, Bankruptcy Rule 7009 further provides that Fed.R.Civ.P. 9 applies in adversary proceedings. While Fed.R.Civ.P. 9(b) provides that: "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," Rule 9(b) ***only*** applies to allegations of actual fraud. Furthermore, this Court takes the view that claims of constructive fraud, i.e. fraudulent transfers, are evaluated using Rule 8(a)(2). [5]

---

[5]     *Brandt v. B.A. Capital Co. LP* (*In re Plassein Int'l Corp.*), 352 B.R. 36, (Bankr. D. Del. 2006) ("Accordingly, the Court joins with those decisions that have (either implicitly or explicitly) evaluated fraudulent transfer complaints using Rule 8(a)(2)'s notice pleading standard") *Id.* at 40-41. *See. e.g., Giuliano v. U.S. Nursing Corp. (In re Lexington Healthcare Group, Inc.),* 339 B.R. 570, 574-75 (Bankr.D.Del.2006) (applying "liberal notice pleading standard"); *AstroPower,* 335 B.R. at 333 (holding that a fraudulent transfer complaint "need only set forth the facts with sufficient particularity to apprise the defendant fairly of the charges made against him"); *Official Comm. of Unsecured Creditors v. DVI Bus. Credit, Inc. ( In re DVI, Inc.),* 326 B.R. 301, 305-306 (Bankr.D.Del.2005) (applying Rule 8(a) (2)); *Tese-Milner v. TPAC, LLC ( In re Ticketplanet.com),*
(continued...)

A fraudulent transfer complaint "need only set forth the facts with sufficient particularity to apprise the defendant fairly of the charges made against him." *In re Astro Power Liquidating Trust*, 335 B.R. 309, 333 (Bankr. D. Del. 2005) (holding that a constructive fraud count need not comply with Rule 9's heightened pleading standard). Fed.R.Civ.P. 8(a), made applicable to this proceeding by Fed. R. Bankr.P. 7008, requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." A plaintiff need not set out in detail the facts upon which he bases his claim, so long as he gives the defendant(s) fair notice of what the claim is and the grounds upon which it rests. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 167, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (quoting *Conley,* 355 U.S. at 47, 78 S.Ct. 99). In reference to a constructive fraud claim, the Court has stated: "[a]ll that is needed at this stage is an allegation that there was a transfer for less than reasonably equivalent value at a time when the Debtors were insolvent." *In re DVI,* 2008 WL 4239120, at *9 (Bankr. D. Del. Sept. 16, 2008) (finding complaint sufficient because "the Trustee has identified the transfer by date and face amount and has alleged that it was for no consideration").

---

(...continued)

313 B.R. 46, 68 (Bankr.S.D.N.Y.2004) ( "While there is authority to the contrary, the better and majority rule is that a claim for constructive fraud .. need not be pleaded with particularity ...."); *Nisselson v. Drew Indus. (In re White Metal Rolling & Stamping Corp.*), 222 B.R. 417, 429 (Bankr.S.D.N.Y.1998) ("[T]he sole consideration should be whether, consistent with the requirements of Rule 8(a), the complaint gives the defendant sufficient notice to prepare an answer, frame discovery and defend against the charges.").

## DISCUSSION

The claims against Target in Counts I and II of the Amended Complaint are for fraudulent transfer, and Count V of the Amended Complaint alleges a breach of fiduciary duty. In reference to the fraudulent transfer issue, Debtor alleges actual fraud and constructive fraud through a series of transactions that occurred in September 2004.

### The Court Will Not Consider Some Documents in Target's Appendix

As a preliminary matter, Target attached an Appendix with exhibits in support of the Motion, including press releases, affidavits, wire transfer documents, Debtor's operating agreement and a cash flow statement. Target claims that these exhibits fall under the Third Circuit's "integral exception" doctrine because they are all a part of the Agreement. In *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410 (3d. Cir. 1997), the Third Circuit formulated a narrow exception to Fed.R.Civ.P. 12 (d). The court held that " a document integral to or explicitly relied upon in the complaint may be considered without converting the motion into one for summary judgment." *Id.* at 1426. Additionally, another exception to Rule 12(b) exists and that is the public record exception. In the Third Circuit, courts may take judicial notice of public records to acknowledge that the facts contained in the records existed in the public realm at that time. *Benak v. Alliance Capital Mgmt L.P.*, 435 F.3d 396, 401 (3d Cir. 2006). The court may not, however, consider the truth of the information in the records. *Id.*

The Court will take judicial notice of the press releases and will further consider the commitment letters and the Agreement; however, the affidavit, operating agreement, cash flow statement and wire transfer documents will be excluded in considering the Motion. The Court is taking judicial notice of the press releases because they are public documents. However, the documents will not be considered for truth or veracity. *Benak*, 435 F.3d at 401; *see also In re Nuvelo, Inc., Sec. Litig.,* 2008 WL 5114325, at *2 (N.D. Cal. Dec. 4, 2008)(the court took judicial notice of SEC filings and press releases but not for the purposes of truth or veracity.).

The Court will also consider the Agreement and commitment letters because these documents fall within the "integral" exception. As the Third Circuit stated in *Burlington Coat*, "the rationale underlying this exception is that the primary problem raised by looking to documents outside the complaint-lack of notice to the plaintiff-is dissipated." *Burlington Coat*, 114 F.3d at 1426. Here, both parties are on notice as to the Agreement and commitment letters. Not only has Target relied upon them in the Motion, but Debtor heavily relies on these documents in its Amended Complaint. If these documents did not give Debtor notice or were in any way inaccurate, Debtor would not have relied on them in the Amended Complaint. Debtor did not rely upon the affidavit, wire transfers, operating agreement and cash flow statements in the Amended Complaint.

### Counts I & II
### The Amended Complaint Alleges Sufficient
### Facts to Find the 2004 Sale was a Fraudulent Transfer

In the Motion, Target argues that the 2004 Sale is not governed by either the Uniform Fraudulent Transfer Act ("UFTA") or Delaware's codified statute, 6 Del. C. § 1304, based on five assertions. [6]

Target contends that the 2004 Sale fails to fall within the confines of the UFTA and state law because: 1) Target sold its membership interest in Debtor, not Debtor's property; 2) Target was not a transferee or subsequent transferee of Debtor's property; and 3) was not a guarantor or an initial transferee for whose benefit the transfers were made. According to Section 17300 of the California Corporations Code, "a membership interest and an economic interest in a limited liability company constitute personal property of the member or assignee." Because Debtor was a California limited liability company, Target claims it only possessed a membership interest and not a direct stake. Furthermore, Target claims that Mervyn's Holdings (instead of Debtor) paid the purchase price to Target through various loan obligations (Am. Compl. ¶58, 59) and therefore Target was neither a guarantor nor an obligee of any initial transferee when the Agreement was executed.

_____

[6] Since the Delaware bankruptcy court has jurisdiction over this matter, the Court should apply the "most significant relationship" choice of law standard to determine which state law applies to the fraudulent transfer claim. *Travelers Indemn. Co. v. Lake*, 594 A.2d 38, 47 (Del. 1991). There are three possible state's laws that can apply: 1) Delaware, the state of reorganization and incorporation for Mervyn's Holdings; or 2) California, where the Agreement was executed and is Debtor's state of incorporation and headquarters; or 3) Minnesota, the state of incorporation and headquarters for Target. All three states have similarly adopted the UFTA, and therefore the result is the same regardless of the choice of law issue.

Target's fourth argument for why Debtor's claims do not come within the purview of the UFTA is that the transaction did not render Debtor insolvent. In the Motion, Target asserts that the 2004 Sale was merely a change in ownership and that Mervyn's Holdings represented to Target that it had adequate capital for the purchase price.

Lastly, Target asserts that the 2004 Sale was not made to "hinder, delay, or defraud" creditors. Instead, Target's aim was to promote the "Target" brand.

The Court is satisfied that in deciding the Motion, it must collapse the events integral to the 2004 Sale, including the execution of the Agreement, the stripping of the real estate assets, and the leases, into a single conveyance. The Court will take the totality of the circumstances approach by looking at the overall economic consequences of the 2004 Sale.

In the Third Circuit, the leading authority on the propriety of collapsing multiple individual transactions when determining whether a transaction constitutes a fraudulent transfer is *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1302 (3d Cir. 1986). The court in *Tabor Court Realty* held that when a series of transactions were "part of one integrated transaction," courts may look "beyond the exchange of funds" and "collapse" the individual transactions of a leveraged buyout. *Id.* Instead of focusing on one of several transactions, a court should consider the overall financial consequences these transactions have on the creditors. *In re Hechinger Inv. Co.*, 327 B.R. 537, 546-47 (Bankr. D. Del. July 19, 2005). To make this determination, courts consider three factors in their analysis. First, whether all of the parties involved had knowledge of the multiple transactions. *Id.* Second,

whether each transaction would have occurred on its own. *Id.* And third, whether each transaction was dependent or conditioned on other transactions. *Id.*

While the Court will not rule on the merits as to whether the 2004 Sale was a fraudulent transaction, the Court does find after considering the factors listed in *Tabor* and *Hechinger*, that the Amended Complaint states facts to support a finding that Target is liable as a transferee in the alleged fraudulent conveyance. As to the first requirement, knowledge of the multiple transactions, Debtor's facts establish the ability to show that Target had constructive knowledge of the transactions that were going to take place subsequent to the conveyance of their membership interest in Debtor. Target was aware of the identity of Mervyn's Holdings and acknowledged in the Motion that it was comprised of a group of private investment firms. The Agreement refers to the commitment letters. In fact, in the Motion, Target admits to receiving the actual commitment letters from Mervyn's Holdings addressed from the various banks. The clauses requiring Debtor's conversion to a limited liability company and prohibiting the sale of real estate assets also evidence Target's knowledge. Certainly, all of the transactions comprising the 2004 Sale required the execution of the Agreement. Of particular concern is the clause requiring Target to convert Debtor into an LLC. Without this conversion, Target would not have been able to transfer its membership interest, a major factor in the fraudulent transfer claim. The actions of the parties (including converting Debtor into an LLC, the clause prohibiting the sale of Mervyn's

real estate assets, the letters of credit from the banks, the execution of the sale and the substantial increase in the rents) were each dependent on the others.

Pursuant to *Tabor Court Realty* the Court must also examine the overall financial consequences the transactions have had on creditors. Here, they were devastating, including the stripping of Debtor's real estate assets, the increasing of rent from the leases to enable Mervyn's Holdings to meet its acquisition debt, and the creation of a conflict of economic interest for Mervyn's Holdings as the owner and managing member of Debtor because the ultimate owners of Mervyn's Holdings and the owners of MDS Companies were one and the same—the PE owners acting through the PE Sponsors. Debtor was subsequently left with working capital as little as $22 million and acquired additional debt totaling over $800 million. (Am. Compl., *passim*).

For the above-mentioned reasons, Debtor has successfully established a valid claim under *Tabor Realty* and *Hechinger* for collapsing the transactions surrounding the 2004 Sale such that the Court can find a fraudulent transfer upon proof.

### The Amended Complaint Satisfies Rules 8 (a) and 9 (b)

In the Amended Complaint, Debtor asserts fraudulent transfer claims based on both actual and constructive fraud that are respectively subject to Fed.R.Civ.P. 8 (a) and 9 (b). The basic notice pleading standard applies to the constructive fraudulent transfer claim because "[a]ll that is needed at this stage is an allegation that there was a transfer for less

than reasonably equivalent value at a time when the Debtors were insolvent." *In re DVI*, 2008 WL 4239120, at *9 (Bankr. D. Del., Sept. 16, 2008).

Debtor specified facts to describe the 2004 Sale, the property and dates involved in the transaction, the value of the transfers made, the amount of money transferred to Target, the source of the funds and the negative implications of the 2004 Sale. (Am. Compl. ¶¶ 17, 62-71, 76, 100-102, 129-137, 139-147).

Similar to the constructive fraud argument, the Amended Complaint also satisfies the heightened Rule 9(a) requirement for the actual fraud claim. Rule 9(a) is satisfied on the basis that there is an opinion letter quoted in the Amended Complaint describing in definitive terms the Debtor's allegations that the leases demonstrate Target's knowledge and fraudulent intentions of separating Debtor from its real estate assets. (Am. Compl. ¶ 92). The Court therefore finds that both Rules 8(a) and 9(b) are satisfied.

### The "Settlement Payment" Exception of Section 546(e) is not Applicable

Target asserts that even if the 2004 Sale was considered a fraudulent transfer, the Debtor is barred from avoiding the transaction because the transaction falls within the safe harbor of section 546(e). Target contends it satisfied all of the requirements of 546(e): 1) properly received a settlement payment from a financial institution via wire transfer; and 2) the "settlement payment" fits the definition of section 741(8). Target further argues that the fact that the transaction did not involve a publicly traded entity is irrelevant because the Court in *In re Plassein Int'l Corp.*, 366 B.R. 318 (Bankr. D. Del. 2007) found that the "broad

application of what constitutes a settlement payment mandated in *Resorts* covers . . . purchases of non-public securities." *Id.* at 325.

Section 544(b) of the Bankruptcy Code authorizes the Trustee to "avoid any transfer of interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law." 11 U.S.C. § 544(b). Section 546(e), however, provides that, notwithstanding section 544, "the Trustee may not avoid a transfer that is a . . . settlement payment, as defined by section 101 or 741 of [the Bankruptcy Code], made by or to a . . . financial institution." 11 U.S.C. § 546(e).. . . "settlement payment" is defined under section 741(8) to include "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." 11 U.S.C. § 741(8). Put simply, "a settlement payment is generally the transfer of cash or securities made to complete a securities transaction." *Lowenschuss v. Resorts International, Inc. (In re Resorts International, Inc.),* 181 F.3d 505, 515 (3d Cir.1999). The Court of Appeals for the Third Circuit has repeatedly held that this definition is "extremely broad" and encompasses almost all securities transactions. *In re Resorts International*, 181 F.3d at 515 (quoting *Bevill, Bresler & Schulman Asset Management Corporation v. Spencer Savings & Loan Association*, 878 F.2d 742, 751 (3d Cir.1989)). In *Resorts*, the Third Circuit held that a payment to a shareholder for his shares as part of a leveraged buyout was "obviously a common securities transaction" and, therefore, a settlement payment under section 546(e). *In re Resorts*

*International*, 181 F.3d at 516; *see also Hechinger,* 274 B.R. at 87 (applying *Resorts* and holding that payment for shares of stock was an unavoidable settlement payment).

The second prong of section 546(e) requires that payment for the securities must be made by or to a financial institution. "So long as a financial institution is involved, the payment is an unavoidable 'settlement payment.' " *Hechinger,* 274 B.R. at 87. The term "financial institution" is defined under the Bankruptcy Code as "a Federal Reserve bank or an entity that is a commercial or savings bank . . . when any such Federal Reserve bank . . . or entity is acting as agent or custodian for a customer . . . in connection with a securities contract." 11 U.S.C. § 101(22)(A). This requirement is satisfied when a leveraged buyout payment is made by wire transfer. *In re Resorts International,* 181 F.3d. at 515. Indeed, federal regulations require that a wire transfer *must* be performed by a bank; thus, a wire transfer must be made through a financial institution. *See In re Loranger Mfg. Corp.,* 324 B.R. 575 (Bankr.W.D.Pa.2005) (taking judicial notice of federal regulation requiring that a wire transfer must be accomplished by a bank, rejecting plaintiff's arguments that bank's involvement was "mere facilitation" and holding that debtor's leveraged buyout of defendant's shares was a "settlement payment" under § 546(e) because payment was made by wire transfer).

The Court previously held that a "settlement payment" includes privately held securities in *In re Plassein Int'l Corp.*, 366 B.R. 318, 326 (Bankr. D. Del. 2007), *aff'd,* 590 F.3d 252 (3d Cir. 2009). Therefore, the only issue within Target's 546(e) claim that the

Court must address is whether section 546(e) even applies to the 2004 Sale. The Court believes that section 546(e) does not apply.

First, as a general rule, section 546(e) does not apply to "collapsed" transactions. The conveyance in *In re Plassein Int'l Corp.*, was not collapsed because "the complaint [did] not allege fraud or bad faith . . . and the Trustee conceded he [was] not claiming actual fraud. The complaint also [did] not allege any relationship whatsoever among the transactions or the [s]hareholders. Moreover, there [were] no allegations calling into question the good faith of the [s]hareholders." 366 B.R. at 326. Debtor's case could not be more different. The Amended Complaint contains pointed allegations of actual fraud and how the events surrounding the 2004 Sale were interdependent.

Second, although "settlement payments" include non-publicly traded securities, section 546(e) does not apply to the other transactions surrounding the sale because they do not fall within the section 741 definition of "settlement payment." The Court firmly believes that because of the multiple conveyances made surrounding the 2004 Sale, section 546(e) does not apply. Target's attempt to have this Court apply section 546(e) to a single conveyance within the entire transaction is not persuasive. In the Motion, Target represents to the Court that the 2004 Sale involved only transferring the loan proceeds from MDS to Target. Target fails to recognize that this was only one part of the 2004 Sale. The other transactions to this sale do not fall within the parameters of section 546(e). For instance, when Debtor transferred its real estate assets to MDS for virtually no consideration, this was

not a conveyance of a "preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment or any other similar payment commonly used in the securities trade." The conveyance was conditioned on the subsequent transaction of MDS securitizing the real estate assets to obtain financing.

## Count V - Breach of Fiduciary Duty Claim

### a. California law imposes a fiduciary duty upon a member of a Limited Liability Company

Target contends that because there is "zero" case law addressing whether a sole member of a California LLC owes fiduciary duties to the LLC or to its creditors, that no such duties exist. In a majority shareholder context, Target also argues, in relying on *Trenwick America Litigation Trust v. Ernst & Young, LLP*, 906 A.2d 168, 173 (Del. Ch. 2006), *aff'd*, 931 A.2d 438 (Del. 2007), that wholly owned subsidiaries (such as Debtor in this case) are expected to act for the benefit of the parent corporation and for this reason parent corporations do not owe fiduciary duties to subsidiaries. *See also*, *Official Committee of Unsecured Creditors v. Nat'l Amusements, Inc.*, 2010 WL 399295 (Bankr. D. Del. Jan. 29, 2010).

At the outset, the Court recognizes that California, not Delaware, corporation law applies to this matter. The internal affairs doctrine directs federal courts sitting in Delaware to apply the law of the state of organization to claims that implicate an organization's internal

affairs. *In re PHP Healthcare Corp.*, 128 Fed. Appx. 839, 843 (3d Cir. 2005). In this case, because a breach of fiduciary duty is alleged, this matter directly relates to Debtor's internal affairs. Therefore, the Court will apply California law.

While no California court has directly and explicitly stated that a sole member of an LLC owes the company fiduciary duties, the Court believes that were the California Supreme Court to decide that issue, that court is more likely to find that such duties are owed to the LLC. According to *First American Real Estate Information Services, Incorporated, v. Consumer Benefit Services, Incorporated*, 2004 WL 5203206, at *6 (S.D. Cal. Apr. 23, 2004), although the California Code is silent, a court is likely to find that a member of a California LLC does owe the LLC fiduciary duties:

> While California law does permit the members of the LLC to specifically vest managers with the duties of managing the LLC, *see* Cal. Corp.Code § 17151(b), that act does not extinguish the members' fiduciary duties to each other and to the LLC. *See* Cal. Corp.Code § 17150 (stating that where members manage a LLC, the members shall have the same rights and be subject to all duties and obligations of managers as set forth in this title; but silent on whether members otherwise have fiduciary duties).

*Id.* at *6.

Although no case directly addresses this issue, the *First American Real Estate* decision sufficiently indicates that a member of a California LLC owes fiduciary duties to the entity and its other members. Secondly, the Court rejects Target's reliance upon *Trenwick* because *Trenwick* is a Delaware Court of Chancery opinion interpreting Delaware corporation law and is thus inapplicable. Target also argues that fiduciary duties are not

owed to creditors when the company is insolvent. However, California law takes the opposite view. There are two cases, *In re Jacks*, 243 B.R. 385, 390 (Bankr. C.D. Cal. 1999) and *Carramerica Realty Corp.*, 2006 WL 2868979, at *5 (Bankr. N.D. Cal., Sept. 29, 2006) that definitively recognize a member's duty to a company's creditors when the company is insolvent. According to *In re Jacks*:

> A corporation's directors and officers owe no fiduciary duty to creditors under California law until the corporation becomes insolvent. *In re Jacks,* 243 B.R. 385, 390 (Bankr.Ct.C.D.Cal.1999), *aff'd in part, rev'd in part,* 266 B.R. 728 (9th Cir.B.A.P.2001). "Because a director's fiduciary duties to creditors do not arise until the corporation is insolvent, the timing of the insolvency is critical." *In re Jacks,* 266 B.R. at 738. The time of insolvency as determined under California law is the point at which the corporation is unlikely to be able "to meet its liabilities ... as they mature." *Id.* ( *quoting* Cal. Corp.Code § 501).

California law appears to be clear that Target, as a member of Debtor, owed a fiduciary duty to Debtor's creditors. The Amended Complaint sufficiently pleads that at the time the Agreement was executed, Debtor was or became insolvent due to the stripping of the real estate assets. Consequently, Target, which was in control of Debtor at the time of the closing, owed fiduciary duties to Debtor's creditors. (Am. Compl. ¶ 43).

**b. <u>The exculpatory clause is not a proper defense</u>**

Target argues in the Motion that even if it owed a fiduciary duty, an exculpation clause in Debtor's operating agreement provides that Target cannot be held liable to Debtor for conduct that is "at worst, negligent, or grossly negligent."

The Third Circuit has been clear that "protection of an exculpatory charter provision appears to be in the nature of an affirmative defense. As we have said, affirmative defenses generally will not form the basis for dismissal under Rule 12(b)(6)." *In re Tower Air, Inc.*, 416 F.3d 229, 242 (3d Cir. 2005). The Delaware District Court has taken an even more rigid approach by refusing to even consider the defense on a motion to dismiss. *Ad Hoc. Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F.Supp. 2d 538, 561 (D. Del. 2008). This Court arrived at the same conclusion: "The [c]ourt agrees . . . [t]he exculpation clause is an affirmative defense and the determination of the viability of that defense is not proper at this stage." *In re The Brown Schools*, 368 B.R. 394 (Bankr. D. Del. 2007).[7]

c.      **Debtor timely filed the breach of fiduciary claim**

Target contends that Delaware's statute of limitations applies and that the that Mervyn's breach of fiduciary duty claim is barred. In the alternative, Target argues that Delaware's "borrowing" statute impedes the breach of fiduciary duty claim pursuant to 10 Del. C. §8121. In Delaware, the limitation period for breach of fiduciary duty claims is three years. 10 Del. C. § 8106. In California, there is a four year period for such claims. Cal.

---

[7]   In *In re Fedders North America, Inc.*, 405 B.R. 527, 543 (Bankr. D. Del. 2009), Judge Shannon dismissed a duty of care claim and applied the exculpation clause. However, unlike *Fedders*, the breach of fiduciary claims here are "inextricably intertwined" with other claims. The Amended Complaint pleads with particularity that the 2004 Sale resulted in a fraudulent transfer which triggered a breach of the fiduciary duties of care, loyalty, and good faith. All of these alleged breaches, as cited in the Amended Complaint, arise from the same transaction and therefore are "inextricably intertwined" which each other. (Am. Compl. ¶¶ 172, 175, 176, 178-180). Moreover, the Court is not considering the operating agreement per its earlier ruling.

Code Civ. Proc. § 343. Debtor commenced this adversary proceeding more than three years but less than four years after the 2004 Sale.

The Court must apply Delaware's choice of law rules to determine which statute of limitations applies. *See, e.g., In re PHP Healthcare Corp.,* 128 Fed.Appx. 839, 843 (3d Cir.2005) (applying the choice of law rules of the state in which the bankruptcy court sits); *In re Garden Ridge Corp.,* 338 B.R. 627, 632 (Bankr. D. Del. 2006) ("To determine which state's law to apply, the Court turns to Delaware choice of law rules."). Delaware's choice of law rules require application of "the law of the state of incorporation to issues involving corporate internal affairs." *VantagePoint Venture Partners 1996 v. Examen, Inc.,* 871 A.2d 1108, 1115 (Del. 2005). A breach of fiduciary duty involves the internal affairs of the corporation. *Coleman v. Taub,* 638 F.2d 628, 629 n. 1 (3d Cir.1981). Delaware has a borrowing statute that in pertinent part states:

> [w]here a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such cause of action after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose, for bringing an action upon such cause of action.

10 Del. C. §8121.

However, the Delaware Supreme Court in *Saudi Basic Industries Corp. v. Mobil Yanbu Petrochemical Company, Incorporated*, 866 A.2d 1, 16 (Del. 2005), *cert. denied*, 546 U.S. 936 (2005) (emphasis added), explained that the rationale of the Delaware borrowing statute is to help prevent forum shopping:

Borrowing statutes are typically designed to address a specific kind of forum shopping scenario-cases where a plaintiff brings a claim in a Delaware court that (i) arises under the law of a jurisdiction other than Delaware and (ii) is barred by that jurisdiction's statute of limitations but would not be time-barred in Delaware, which has a longer statute of limitations.

*Id.*

In another Delaware Bankruptcy Court case where this issue arose, Judge Walrath reasoned that because the internal affairs doctrine applied, the statute of limitations of the state law in the state of incorporation applied to the breach of fiduciary claims. *In re Circle Y of Yoakum, Texas*. 354 B.R. 349, 359 (Bankr. D. Del. 2006) The Debtor was a Texas corporation, with a mailing address in Yoakum, Texas. Therefore, despite the trustee's contention that Delaware law applied, the court ruled that Texas law governed the applicable limitations period. *Id.*

The breach of fiduciary duty claim is not barred by the Delaware statute of limitations because California law applies. As in *In re Circle Y of Yoakum Texas*, the Court will apply the internal affairs doctrine and concludes that the Delaware statue does not apply. This is not a case where forum shopping might even remotely be an issue. Debtor, the plaintiff in this adversary proceeding, came to Delaware with a shorter (instead of longer) statute of limitations period and chose Delaware for the Chapter 11 case and not for the adversary proceeding which the Committee brought. There is absolutely no threat of forum shopping and the Delaware "borrowing" statute is inapplicable.

## **CONCLUSION**

The Amended Complaint contains detailed facts which, if proven true, make a troubling case of wrongdoing. Although Target points at others to blame, it is at the center of the 2004 Sale. The Motion is denied in all respects.

Dated: March 17, 2010

KEVIN GROSS, U.S.B.J.