## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MERVYN'S HOLDINGS, LLC, et al. | Case No. 08-11586 (KG) |
| Debtors. | Jointly Administered |

| | |
|---|---|
| MERVYN'S, LLC; MERVYN'S HOLDINGS, LLC; and MERVYN'S BRANDS, LLC, | |
| Plaintiffs, | Adv. Proc. No. 08-51402 KG |
| - against - | |

LUBERT-ADLER GROUP IV, LLC; LUBERT-ADLER
GROUP IV, L.P.; LUBERT-ADLER REAL ESTATE
FUND IV, L.P.; LUBERT-ADLER REAL ESTATE
PARALLEL FUND IV, L.P.; LUBERT-ADLER
CAPITAL REAL ESTATE FUND IV, LP;
KLA/MERVYN'S, L.L.C.; ACADIA MERVYN'S
INVESTORS I, LLC; ACADIA MERVYN'S
INVESTORS II, LLC; ACADIA REALTY TRUST;
MERVYN'S/KLAFF EQUITY, L.L.C.; MERVYN'S
OPPORTUNITIES, L.L.C.; CERBERUS CAPITAL
MANAGEMENT, L.P.; CERBERUS MERVYN'S
INVESTORS, LLC; CERBERUS PARTNERS, L.P.;
GABRIEL CAPITAL, L.P.; CERBERUS ASSOCIATES,
L.L.C.; ABLECO FINANCE LLC; MADELEINE L.L.C.;
SUN CAPITAL PARTNERS, INC.; SUN CAPITAL
SECURITIES FUND, LP; SUN CAPITAL SECURITIES
OFFSHORE FUND, LTD.; SCSF MERVYN'S (US),
LLC; SCSF MERVYN'S (OFFSHORE), INC.; MDS
REALTY HOLDINGS I, LLC; MDS REALTY
HOLDINGS II, LLC; MDS REALTY I, LLC; MDS
REALTY II, LLC; MDS REALTY III, LLC; MDS
REALTY IV, LLC; MDS TEXAS REALTY I, LP; MDS
TEXAS REALTY II, LP; MDS TEXAS REALTY I,
LLC; MDS TEXAS REALTY II, LLC; MDS TEXAS
PROPERTIES I, LLC; MDS TEXAS PROPERTIES II,
LLC; GREENWICH CAPITAL FINANCIAL
PRODUCTS, INC.; ARCHON FINANCIAL LP;
GOLDMAN SACHS COMMERCIAL MORTGAGE
CAPITAL, L.P., fka ARCHON FINANCIAL, LP;
GOLDMAN SACHS MORTGAGE COMPANY;
CITIGROUP GLOBAL MARKETS REALTY CORP.;

{BAY:01517944v1}

SUN CAPITAL SECURITIES MANAGEMENT,
LLC.; LKM LENDER, LLC, as agent for the 2009
Secured Real Estate Lenders; and TARGET
CORPORATION.

                                Defendants.

## SECOND AMENDED COMPLAINT

Plaintiffs Mervyn's, LLC ("**Mervyn's LLC**"), Mervyn's Holdings, LLC

("**MH**") and Mervyn's Brands, LLC ("**Mervyn's Brands**") (collectively, the "**Debtors**"

or "**Mervyn's**"), by undersigned counsel, alleges, upon knowledge, information and

belief, as follows:

### Nature of the Action

1.      This is a fraudulent transfer action.  In this case, Mervyn's

valuable real estate assets - - owned real estate and various leases - - were stripped out of

Mervyn's and used to finance the September 2, 2004 acquisition of Mervyn's by a

consortium of private equity players.  Hundreds of millions of dollars of loans were made

against those real estate assets, with few or none of the proceeds of these loans going to

Mervyn's.  Moreover, by separating Mervyn's real estate assets from its retail operations,

the private equity players made sure that any residual value or upside in such real estate

assets were reserved for themselves and not for Mervyn's and its creditors.

2.      Not content to simply cut such real estate assets out of Mervyn's,

the private equity players also caused Mervyn's to enter into new leasing arrangements

on its previously owned real estate and substantially more expensive leasing

arrangements on its previously leased real estate.  Mervyn's would not have entered into

leasing arrangements containing such adverse economic terms but for the private equity

players' domination and control of Mervyn's.  These leasing arrangements were

manufactured to both service the acquisition debt and to continue to extract over time the significant excess value of such real estate assets over the debt piled onto those assets, all for the benefit of the private equity players, their affiliates, and a consortium of lenders. These private equity players thereby converted Mervyn's from a retailer with valuable leases and valuable owned real estate into a shrunken operating company whose remaining capital consisted largely of inventory, cash, credit card receipts, and intellectual property.

3.      To further extract value from Mervyn's after the 2004 Transaction (as defined herein), the private equity players caused Mervyn's to pay exorbitant management fees, consulting fees, dividends, distributions and other charges, for which Mervyn's received less than reasonably equivalent value or no value at all.  The amounts of such management fees, consulting fees, dividends, distributions and other charges were not negotiated at arm's length between the private equity players and Mervyn's. Rather, Mervyn's made such payments only because the private equity players dominated and controlled Mervyn's.

4.      Regardless of whether the multiple interrelated transfers and transactions involved in the 2004 Transaction are collapsed into a single transaction or dual transactions, or viewed as a series of steps to a fraudulent conclusion, the 2004 Transaction is a fraudulent transfer.

5.      Payments and transfers made after the 2004 Transaction, including rent, so-called "notional rent," management fees, consulting fees, dividends, distributions and other payments to the lenders and private equity players, are also fraudulent transfers.

## The Parties

**Mervyn's**

6.      Plaintiff Mervyn's LLC is a limited liability company organized under the laws of the State of California.  Plaintiff MH is a limited liability company organized under the laws of the State of Delaware.  Plaintiff Mervyn's Brands is a limited liability company organized under the laws of the State of Minnesota.  Mervyn's operated or managed the assets of the retail department stores at all relevant times.  On July 29, 2008 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  The Debtors continue to manage their assets as debtors-in-possession pursuant to Bankruptcy Code Sections 1007 and 1108.

**The Private Equity Sponsors**

7.      Defendant KLA/Mervyn's L.L.C., is a limited liability company, which sponsored and/or participated in the 2004 Transaction and the subsequent transactions and actions described below.

8.      Defendant Cerberus Mervyn's Investors, LLC, is a limited liability company, which sponsored and/or participated in the 2004 Transaction and the subsequent transactions and actions described below.

9.      Defendant SCSF Mervyn's (US), LLC, is a limited liability company which sponsored and/or participated in the 2004 Transaction and the subsequent transactions and actions described below.

10.      Defendant SCSF Mervyn's (Offshore), Inc., is a corporation, which sponsored and/or participated in the 2004 Transaction and the subsequent transactions and actions described below.

11.    Defendant KLA/Mervyn's L.L.C., Defendant Cerberus Mervyn's Investors, LLC, Defendant SCSF Mervyn's (US), LLC and Defendant SCSF Mervyn's (Offshore), Inc. are collectively referred to as the "**PE Sponsors.**" The PE Sponsors and the PE Owners (as defined herein) organized MH for the purpose of acquiring Mervyn's in the 2004 Transaction.

**The Private Equity Owners**

12.    Defendant Lubert-Adler Group IV, LLC, Defendant Lubert-Adler Group IV, L.P., Lubert-Adler Real Estate Fund IV, L.P., Defendant Lubert-Adler Real Estate Parallel Fund IV, L.P., Defendant Lubert-Adler Capital Real Estate Fund IV, LP, Defendant Acadia Mervyn's Investors I, LLC, Defendant Acadia Mervyn's Investors II, LLC, Defendant Acadia Realty Trust, Defendant Mervyn's/Klaff Equity, L.L.C. and Defendant Mervyn's Opportunities, L.L.C. (collectively, the "**KLA PE Owners**") own, directly or indirectly, all of the equity and/or membership interests in Defendant KLA/Mervyn's L.L.C. (one of the aforementioned PE Sponsors).

13.    The KLA PE Owners and KLA/Mervyn's L.L.C. shall hereinafter be collectively referred to as "**KLA**".

14.    Defendant Lubert-Adler Group IV, LLC is the general partner of Defendant Lubert-Adler Group IV, L.P.

15.    Defendant Lubert-Adler Group IV, L.P. is the general partner of Defendant Lubert-Adler Real Estate Fund IV, L.P., Defendant Lubert-Adler Real Estate Parallel Fund IV, L.P. and Defendant Lubert-Adler Capital Real Estate Fund IV, L.P.

16.     Defendant Acadia Realty Trust is the direct or indirect owner of Defendant Acadia Mervyn Investors I, LLC and Defendant Acadia Mervyn Investors II, LLC.

17.     Defendant Cerberus Capital Management, L.P. is the direct or indirect owner of Defendant Cerberus Mervyn's Investors, LLC, Defendant Cerberus Partners, L.P., Defendant Cerberus Associates, L.L.C., Defendant Gabriel Capital, L.P., Defendant Ableco (defined below) and Defendant Madeleine (defined below).

18.     Defendant Cerberus Capital Management, L.P., Defendant Cerberus Partners, L.P., Defendant Gabriel Capital, L.P. and Defendant Cerberus Associates, L.L.C. (collectively, the "**Cerberus PE Owners**") own, directly or indirectly, all of the equity and/or membership interests in Defendant Cerberus Mervyn's Investors, LLC (one of the aforementioned PE Sponsors).

19.     The Cerberus PE Owners, Cerberus Mervyn's Investors, LLC, Ableco and Madeline shall hereinafter be collectively referred to as "**Cerberus**".

20.     Sun Capital Partners, Inc., Sun Capital Securities Offshore Fund, Ltd. and Sun Capital Securities Fund, LP (collectively, the "**Sun PE Owners**") own, directly or indirectly, all the equity and/or membership interests of SCSF Mervyn's (Offshore), Inc. and SCSF Mervyn's (US), LLC (two of the aforementioned PE Sponsors).

21.     Defendant Sun Capital Securities Offshore Fund, Ltd., owns all of the equity in Defendant SCSF Mervyn's (Offshore), Inc.

22.     Defendant Sun Capital Securities Fund, LP, owns all of the equity in Defendant SCSF Mervyn's (US), LLC.

23.     Defendant Sun Capital Partners, Inc., is the direct or indirect owner of Defendant SCSF Mervyn's (US), LLC, Defendant SCSF Mervyn's (Offshore), Inc., Defendant Sun Capital Securities Offshore Fund, Ltd., Defendant Sun Capital Securities Fund, LP and Defendant Sun Capital Securities Management, LLC.

24.     The Sun PE Owners, SCSF Mervyn's (Offshore), Inc., SCSF Mervyn's (US), LLC and Sun Capital Securities Management, LLC shall hereinafter be collectively referred to as "**Sun**".

25.     The KLA PE Owners, the Cerberus PE Owners and the Sun PE Owners shall hereinafter be collectively referred to as the "**PE Owners.**"

**The MDS Companies**

26.     Defendant MDS Realty Holdings I, LLC ("**Holdings I**"), is a Delaware limited liability company directly or indirectly owned and organized by the PE Sponsors and the PE Owners in connection with the 2004 Transaction.

27.     Defendant MDS Realty Holdings II, LLC ("**Holdings II**"), is a Delaware limited liability company directly or indirectly owned and organized by the PE Sponsors and the PE Owners in connection with the 2004 Transaction.

28.     Defendant MDS Realty I, LLC ("**Realty I**"), is a Delaware limited liability company directly or indirectly owned and organized by the PE Sponsors and the PE Owners in connection with the 2004 Transaction.

29.     Defendant MDS Realty II, LLC ("**Realty II**"), is a Delaware limited liability company directly or indirectly owned and organized by the PE Sponsors and the PE Owners in connection with the 2004 Transaction.

30.    Defendant MDS Realty III, LLC ("**Realty III**"), is a Delaware limited liability company directly or indirectly owned and organized by the PE Sponsors and the PE Owners in connection with the 2004 Transaction.

31.    Defendant MDS Realty IV, LLC ("**Realty IV**"), is a Delaware limited liability company directly or indirectly owned and organized by the PE Sponsors and the PE Owners in connection with the 2004 Transaction.

32.    Defendant MDS Texas Realty I, LP ("**Texas Realty I**"), is a Delaware limited partnership directly or indirectly owned and organized by the PE Sponsors and the PE Owners in connection with the 2004 Transaction.

33.    Defendant MDS Texas Realty II, LP ("**Texas Realty II**"), is a Delaware limited partnership directly or indirectly owned and organized by the PE Sponsors and the PE Owners in connection with the 2004 Transaction.

34.    Defendant MDS Texas Realty I, LLC ("**TR-I**"), is a Delaware limited liability company directly or indirectly owned and organized by the PE Sponsors and the PE Owners in connection with the 2004 Transaction.

35.    Defendant MDS Texas Realty II, LLC ("**TR-II**"), is a Delaware limited liability company directly or indirectly owned and organized by the PE Sponsors and the PE Owners in connection with the 2004 Transaction.

36.    Defendant MDS Texas Properties I, LLC ("**Texas Properties I**"), is a Delaware limited liability company directly or indirectly owned and organized by the PE Sponsors and the PE Owners in connection with the 2004 Transaction.

37.     Defendant MDS Texas Properties II, LLC ("**Texas Properties II**"), is a Delaware limited liability company directly or indirectly owned and organized by the PE Sponsors and the PE Owners in connection with the 2004 Transaction.

38.     Defendants Holdings I, Holdings II, Realty I, Realty II, Realty III, Realty IV, Texas Realty I, Texas Realty II, TR-I, TR-II, Texas Properties I and Texas Properties II are collectively referred to as the "**MDS Companies.**"

**The Real Estate Secured Lenders**

39.     Defendant Greenwich Capital Financial Products, Inc. ("**Greenwich**"), is a corporation which, directly and/or through its affiliates, provided secured financing to the MDS Companies that was used for the benefit of the PE Sponsors, the PE Owners, and the MDS Companies in connection with the 2004 Transaction.

40.     Defendant Archon Financial LP ("**Archon**") is a limited partnership which, directly and/or through affiliates, provided secured financing to the MDS Companies that was used for the benefit of the PE Sponsors, the PE Owners, and the MDS Companies in connection with the 2004 Transaction.

41.     Defendant Goldman Sachs Commercial Mortgage Capital, L.P. ("**GSCMC**"), is the successor to Defendant Archon.

42.     Defendant Goldman Sachs Mortgage Company ("**GS Mortgage**") is a corporation which either, directly and/or through its then affiliate Archon, provided secured financing to the MDS Companies that was used for the benefit of the PE Sponsors, the PE Owners, and the MDS Companies in connection with the 2004

Transaction, or accepted an assignment of all the loans made by Defendant Archon in connection with the 2004 Transaction.

43.     Defendant Greenwich, Defendant Archon, Defendant GSCMC, and Defendant GS Mortgage are referred to collectively as the "**2004 Real Estate Secured Lenders.**"

44.     Defendant Bank of America, N.A. ("**Bank of America**"), as successor by merger to LaSalle Bank National Association ("**LaSalle**"), is the trustee for the Registered Holders of Greenwich Capital Commercial Funding Corp., Commercial Mortgage Trust 2004-FL2, Commercial Mortgage Pass-Through Certificates, Series 2004-FL2 a/k/a Commercial Mortgage Trust 2004-FL2, Commercial Mortgage Pass-Through Certificates, Series 2004-FL2 (the "**Trust**"). LaSalle, as original trustee of the Trust, accepted an assignment of all or a portion of the loans made and related liens held by Greenwich in connection with the 2004 Transaction.

45.     Defendant Citigroup Global Markets Realty Corp. ("**Citigroup**"), is a corporation which, directly and/or through its affiliates, provided a portion of the 2005 refinancing to the MDS Companies that was used for the benefit of the PE Sponsors, the PE Owners, and the MDS Companies.

46.     Defendant Greenwich, Defendant GSCMC, Defendant GS Mortgage and Defendant Citigroup are referred to collectively as the "**2005 Real Estate Secured Lenders.**"

47.     Defendant LKM Lender, LLC ("**LKM Lender**"), for itself and as agent for the 2009 Real Estate Secured Lenders (as defined herein), is a limited liability company which, directly and/or through its affiliates, provided a portion of the 2009

{BAY:01517944v1}                                    10

refinancing to the MDS Companies that was used for the benefit of the PE Sponsors, the

PE Owners, and the MDS Companies.  LKM Lender is affiliated with, and owned and/or

controlled by, KLA.

**The Selling Shareholder**

48.    Defendant Target Corporation ("**Target**") is a corporation which

sold Mervyn's to an acquisition vehicle - - MH - - owned by the PE Sponsors (and

controlled by the PE Owners) as part of the 2004 Transaction and which had knowledge

of, participated in, or acquiesced in all of the arrangements comprising the 2004

Transaction.

**Other Defendants**

49.    Defendant Ableco Finance LLC ("**Ableco**") and Defendant

Madeleine LLC ("**Madeleine**") are affiliates of the Cerberus PE Owners and Cerberus

Mervyn's Investors, LLC.

50.    Defendant Sun Capital Securities Management, LLC ("**Sun**

**Management**") is an affiliate of the Sun PE Owners, SCSF Mervyn's (Offshore), Inc.

and SCSF Mervyn's (US), LLC.

### Jurisdiction and Venue

51.    The Court has jurisdiction over this action under 28 U.S.C.

sections 157(a) and 1334.  This proceeding is a core proceeding within the meaning of

28 U.S.C. Section 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C.

sections 1408 and 1409.

### Background

52.    At all relevant times, Mervyn's was a family-friendly, promotional

department store offering fashion and home décor at affordable prices. Mervyn's traces its roots to a mid-range department store opened by Mervin Morris in San Lorenzo, California in 1949. Over the last 60 years, Mervyn's grew into a retail chain that, as of the Petition Date, employed more than 18,000 people and operated 177 retail stores in California and six states in the southwestern United States. Mervyn's retail stores averaged 80,000 retail square feet and were located primarily in community shopping centers, regional malls and freestanding locations. For the fiscal year ended February 2, 2008, Mervyn's recorded net sales of approximately $2.5 billion and incurred a net loss of approximately $64 million.

53.    In or about 1978, Mervyn's became a wholly-owned subsidiary of Dayton Hudson Corporation (now known as Target Corporation or Target). In early 2004, Defendant Target decided to sell or otherwise realize upon the value of Mervyn's. To do this, Target engaged Goldman Sachs as its investment banker, and eventually accepted a bid from the PE Sponsors (acting for the benefit of themselves and the PE Owners) to purchase Mervyn's.

54.    On or about July 29, 2004, MH, an acquisition vehicle owned, controlled and formed by the PE Sponsors and the PE Owners for the purpose of purchasing Mervyn's from Target, entered into an Equity Purchase Agreement, dated as of July 29, 2004 (the "**EPA**") with Target for the acquisition of the Securities (as defined herein). On or about August 27, 2004, Target converted Mervyn's from a corporation into a California limited liability company in conjunction with the 2004 Transaction.

### Overview of the 2004 Transaction, Mervyn's
### Rent and So-Called "Notional Rent" Obligations

55.     The 2004 Transaction was similar to a leveraged buyout ("**LBO**"). In general, a LBO is a method of acquiring a company by which the acquirer borrows against the assets of the target company in order to finance the purchase of the target company's shares from the selling shareholder. Much of the equity in the acquired company is typically replaced by debt, and the company's capital structure changes such that former shareholders of the company are replaced by secured creditors. From the perspective of unsecured creditors, LBO's may be disadvantageous because such creditors bear the increased risk that the LBO will leave the acquired company in a financial condition which leads to bankruptcy.

56.     On September 2, 2004, the PE Sponsors and the PE Owners, through MH, purchased Mervyn's from Target pursuant to a plan they conceived as a series of simultaneous, integrated transactions that, as a matter of economic substance, were similar to a LBO. In a traditional LBO structure, Mervyn's would have retained its assets and incurred the debt normally associated with a leveraged transaction. In that scenario, Mervyn's also would have retained for its own benefit the residual value of its assets in excess of the debt placed against them, and those assets would have remained with Mervyn's following repayment of the debt. Here, however, Mervyn's real estate assets and the residual value of those assets were stripped away completely from Mervyn's, while Mervyn's incurred substantial additional obligations (as described below) in order to help service the debt incurred to finance the transaction. In the transaction as structured, Mervyn's had no residual interest in its real estate; those assets

were gone. The purchase and sale of the Securities, the formation of the MDS

Companies and the transfer of the real estate assets of Mervyn's to the MDS Companies,

the execution and delivery of the Unitary Leases (as defined herein), the imposition on

Mervyn's of so-called "notional rent" and the other related transactions described in

paragraphs 55 through 64 and 67 through 91 are referred to herein collectively as the

"**2004 Transaction**".

        57.     To effect the complete separation of Mervyn's valuable real estate

assets from Mervyn's, the PE Sponsors and PE Owners formed the MDS Companies –

bankruptcy-remote entities specially created for the 2004 Transaction. At the closing of

the 2004 Transaction, the PE Sponsors and the PE Owners caused Mervyn's to transfer

approximately 158 owned properties and 16 leases that were assignable at the time

(collectively, the "**2004 Transferred Real Estate**") to the newly-formed MDS

Companies. The MDS Companies, in concurrent and related transactions, granted liens

on the 2004 Transferred Real Estate to the 2004 Real Estate Secured Lenders. All or

substantially all of the loan proceeds were paid directly to Target. Few or none of the

loan proceeds were paid or delivered to Mervyn's or used for its benefit. Mervyn's

retained the remaining real estate assets, consisting of approximately 92 leases that were

not assignable at the closing of the 2004 Transaction (the "**Restricted Leases**"), but, as

described below, Mervyn's was now obligated to make new payments of so-called

"notional rent" with respect to the subject leases.

        58.     As part of the interrelated transfers that were implemented at the

closing of the 2004 Transaction, the 2004 Transferred Real Estate was bundled together

and subjected to three (3) Unitary Leases. Under the Unitary Leases, the 2004

Transferred Real Estate (i.e., all of Mervyn's real estate assets other than the Restricted Leases) were leased back to Mervyn's.

59.    The occupancy costs charged by the MDS Companies to Mervyn's under the Unitary Leases (which also included rents that were newly imposed upon Mervyn's for the occupancy of approximately 158 previously owned properties) were substantially greater than what had been payable by Mervyn's immediately before the 2004 Transaction. The PE Sponsors and the PE Owners caused the occupancy costs to rise to what they claimed were "market" rents. The occupancy cost mark-up of the 2004 Transferred Real Estate "to market" (without any justification for or consideration paid to Mervyn's on account of such mark-ups) was imposed upon Mervyn's by the PE Sponsors and the PE Owners, and deprived Mervyn's of the benefit of rent-free occupancy on the properties it owned and the lower rents it had enjoyed on the properties it leased by virtue of its leverage as an anchor tenant or the age of such leases.    Mervyn's received neither reasonably equivalent value nor fair consideration in exchange for its payment of substantially increased occupancy costs under the Unitary Leases. The foregoing actions were orchestrated by the PE Sponsors and the PE Owners, with the knowledge, participation, or acquiescence of Target and the 2004 Real Estate Secured Lenders - - all of whom profited or benefited from such actions.

### So-Called "Notional Rent"

60.    Under arrangements also put into place in connection with the 2004 Transaction, in addition to the rent that Mervyn's paid to its third-party landlords under the Restricted Leases (i.e., those leases that could not be transferred to the MDS Companies at the closing of the 2004 Transaction), Mervyn's was caused by the PE

Sponsors and the PE Owners to make additional payments to MH referred to as so-called "notional rent." These additional payments were amounts that the PE Sponsors and the PE Owners claimed reflected the rent mark-up that the MDS Companies would have imposed on Mervyn's had the Restricted Leases been transferred to the MDS Companies, bundled into the Unitary Leases and leased back to Mervyn's at the closing of the 2004 Transaction. In reality, the so-called "notional rent" was not rent at all, was not payable to any of the landlords under the Restricted Leases and bore no relationship to the occupancy expenses thereunder. The so-called "notional rent" payment obligations represented yet another form of payment extracted from Mervyn's for no value at all. The PE Sponsors, the PE Owners and the 2004 Real Estate Secured Lenders crafted an elaborate documentary fiction in connection with these so-called "notional rent" payments. First, Mervyn's was required to make these so-called "notional rent" payments to MH as special distributions under the Amended and Restated Limited Liability Company Agreement of Mervyn's, LLC, made as of September 2, 2004 (the "**Mervyn's LLC Agreement**"). Then, MH, under the Limited Liability Company Agreement of Mervyn's Holdings, LLC, made as of September 2, 2004 (the "**MH LLC Agreement**"), was required to distribute such payments to the PE Sponsors. Finally, the PE Sponsors, in turn, were required, pursuant to side letter agreements with the 2004 Real Estate Secured Lenders, made as of September 2, 2004, to pay over the so-called "notional rent" to the 2004 Real Estate Secured Lenders. However, in reality, the PE Sponsors and the PE Owners caused Mervyn's to make some or all of the so-called "notional rent" payments directly into bank accounts that, while in the name of the MDS Companies, were controlled by and pledged to the 2004 Real Estate Secured Lenders and

later Bank of America and the 2005 Real Estate Secured Lenders as well. This

accomplished in one step what was laid out in the documentary fiction crafted by the PE

Sponsors, the PE Owners and the 2004 Real Estate Secured Lenders. As with the

transfers of the 2004 Transferred Real Estate from Mervyn's and the creation of the

Unitary Leases, the arrangements for the payment of so-called "notional rent" on the

Restricted Leases was imposed upon Mervyn's by the PE Sponsors for the benefit of

themselves and the PE Owners, with the knowledge, participation, or acquiescence of

Target and the 2004 Real Estate Secured Lenders - - all of whom profited or benefited

from such arrangements.

        61.     The so-called "notional rent" payments were not negotiated at

arm's length between the MDS Companies and Mervyn's. Such so-called "notional rent"

payment obligations would not have been imposed on Mervyn's but for the PE Sponsors'

and the PE Owners' domination and control of Mervyn's. Mervyn's received no value

on account of those payments.

        62.     Although the rents charged to Mervyn's under the Unitary Leases

were alleged by the PE Sponsors and the PE Owners to be at "market rates," this does not

take into account that before the 2004 Transaction, Mervyn's either owned its store

locations and paid no rent or it leased its store locations at favorable lease rates that were

based on its long term tenant status and/or status as an anchor tenant. In reality, the PE

Sponsors and the PE Owners imposed such increased rents on Mervyn's, not based on

prevailing market rates, but instead in order to service the debt they incurred in acquiring

Mervyn's, to provide a return to the PE Sponsors and the PE Owners on that acquisition

and to later sell Mervyn's real estate assets for considerable profit. Mervyn's received

neither reasonably equivalent value nor fair consideration for the payment of those increased rents. Mervyn's would not have agreed to pay such increased rents but for the PE Sponsors' and the PE Owners' domination and control of both the MDS Companies and Mervyn's.

63.     The PE Sponsors and the PE Owners caused Mervyn's to make the rent payments under the Unitary Leases directly into bank accounts that, while in the name of the MDS Companies, were controlled by and pledged to the 2004 Real Estate Secured Lenders and later Bank of America.

64.     The rent markups under the Unitary Leases and the creation of the so-called "notional rent" imposed upon Mervyn's by the PE Sponsors and the PE Owners -- done without any input from Mervyn's management -- increased Mervyn's costs and payments to amounts that far exceeded what Mervyn's had been paying prior to the 2004 Transaction, and left Mervyn's at a competitive disadvantage. These increases left no margin for error and impaired Mervyn's ability to weather economic downturns or combat increased competition. In the 2004 Transaction and in the subsequent 2005 refinancing (described below), where further rent increases were imposed on Mervyn's, the PE Sponsors and the PE Owners sacrificed the health and well being of Mervyn's retail operations for the financial advantage and benefit of the MDS Companies - - companies that were separately owned by the PE Sponsors and the PE Owners as a result of the 2004 Transaction.

## 2005 Refinancing

65.     The burden on Mervyn's retail operations was increased further when, as part of the 2005 refinancing, the PE Sponsors and the PE Owners caused

Mervyn's to enter into amended and restated versions of the Unitary Leases (the
"**Amended and Restated Unitary Leases**") for essentially the same aggregate rent paid
under the original Unitary Leases but for fewer store locations than those included under
the original Unitary Leases.  The increased payments on a per store basis under the
Amended and Restated Unitary Leases were used by the PE Sponsors and the PE Owners
to service the significantly increased obligations owing under the new 2005 loans.
Mervyn's received neither reasonably equivalent value nor fair consideration in exchange
for its payment of substantially increased rent on a per store basis under the Amended
and Restated Unitary Leases.  Mervyn's would not have agreed to this increase in rent but
for the PE Sponsors' and the PE Owners' domination and control of both the MDS
Companies, as landlords, and Mervyn's, as tenant, under the Amended and Restated
Unitary Leases.

66.    In connection with the 2005 refinancing, the PE Sponsors and the
PE Owners caused Mervyn's to make the rent payments under the Amended and Restated
Unitary Leases directly into bank accounts that, while in the name of the MDS
Companies, were controlled by and pledged to the 2005 Real Estate Secured Lenders.

## The Equity Purchase Agreement

67.    The EPA was an equity purchase agreement as opposed to an asset
purchase agreement.  Pursuant to the EPA, MH acquired all of the outstanding
membership interests (the "**Securities**") of Mervyn's from Target.

68.    Target converted Mervyn's from a California corporation to a
California limited liability company immediately prior to MH's acquisition of the
Securities from Target.

69.    The purchase price paid by MH to Target for the Securities was $1.175 billion in cash, subject to adjustments as set forth in the EPA (the "**Purchase Price**").  The closing of the EPA occurred on September 2, 2004.

### Source of Funds

70.    The funds for the 2004 Transaction came from essentially three sources:

- Pursuant to the Loan Agreement dated as of September 2, 2004 (the "**Loan Agreement**"), Greenwich and Archon, as lenders (the "**2004 Senior Real Estate Secured Lenders**") loaned $675 million to Realty I, Realty II, Texas Realty I and Texas Realty II. Repayment of these loans was secured by the Unitary Leases held by the listed borrowers, and mortgages, liens, assignments of rents and deeds of trust with respect to the real estate assets that had been transferred to the borrowers by Mervyn's.  All or substantially all of the loan proceeds were used by MH on behalf or for the benefit of the PE Sponsors and the PE Owners to pay a portion of the Purchase Price under the EPA.  Shortly after the closing of the 2004 Transaction, Greenwich assigned all or some of its interests in the loans, and corresponding liens, on Mervyn's former real estate assets, to Bank of America.

- Pursuant to the Mezzanine Loan Agreement dated as of September 2, 2004 (the "**Mezzanine Loan Agreement**") Greenwich and GS Mortgage (the "**2004 Mezzanine Real Estate Secured Lenders**") loaned $125 million to Holdings I, Holdings II, Texas Properties I and Texas Properties II. Repayment of these loans were secured by certain pledges and security interests provided by such borrowers.  All or substantially all of the loan proceeds were used by MH on behalf or for the benefit of the PE Sponsors and the PE Owners to pay a portion of the Purchase Price under the EPA.

- Pursuant to the Securities Purchase Agreement, dated as of September 2, 2004, the PE Sponsors purchased 100% of the membership interests in Holdings I and Holdings II for $429,746,414.84.  At the closing of the EPA, these funds were used by MH on behalf or for the benefit of the PE Sponsors and the PE Owners to pay a portion of Purchase Price under the EPA.

71.    Of the $1,263,853,000 distributed at the closing of the EPA,

$1,175,230,000 was paid to Target with only $8.3 million allocated to Mervyn's, despite

Mervyn's losing all of the 2004 Transferred Real Estate and becoming burdened with

substantially increased rent under the Unitary Leases and so-called "notional rent"

payments under the Mervyn's LLC Agreement.  More than $58 million was paid to the

PE Sponsors, the PE Owners, their professionals and others as "fees" at the closing.

Since the date of the closing of the EPA, in addition to stripping out Mervyn's valuable

real estate assets, the 2004 Transaction has resulted in hundreds of millions of dollars in

payments, transfers, or distributions by Mervyn's in the form of increased occupancy

expenses, so-called "notional rent" payments, dividends, management fees, consulting

fees and other transfers or distributions.

72.    In order to obtain the funds to acquire Mervyn's from Target, the

PE Sponsors and the PE Owners  orchestrated a series of related transactions that had the

effect of taking Mervyn's valuable real estate assets for little or no consideration and

encumbering these assets with $800 million of debt.  These actions are outlined below.

### Step 1 - - Formation of MDS Companies

73.    In order to accomplish the separation of Mervyn's valuable real

estate assets from its retail business, the PE Sponsors and the PE Owners, through their

ownership and control of MH, caused the following special purpose entities -- the MDS

Companies -- to be formed to own Mervyn's real estate and lease it back to Mervyn's, to

occur concurrently with MH's acquisition of the Securities:

- Holdings I was formed on August 20, 2004.  Its sole equity
  members at the time of formation were the PE Sponsors.

- Holdings II was formed on August 20, 2004. Its sole equity members at the time of formation were the PE Sponsors.

- Realty I was formed on August 20, 2004. Its sole equity member at formation was Holdings I.

- Realty II was formed on August 20, 2004. Its sole equity member at formation was Holdings II.

- Realty III was formed on August 20, 2004. Its sole equity member at the time of formation was Realty I.

- Realty IV was formed on August 20, 2004. Its sole equity member at the time of formation was Realty II.

- Texas Realty I was formed on September 2, 2004. At formation, the general partner was Texas Realty I and its limited partner was Texas Properties I.

- Texas Realty I was formed on August 20, 2004. Its sole equity member at formation was Holdings I.

- Texas Properties I was formed on August 20, 2004. Its sole equity member at formation was Holdings I.

- Texas Realty II was formed on September 2, 2004. At formation, it general partner was Texas Realty II and its limited partner was Texas Properties II.

- Texas Realty II was formed on August 20, 2004. Its sole equity member at formation was Texas Properties II.

- Texas Properties II was formed on August 20, 2004. Its sole equity member at formation was Holdings I.

74.    Each of the MDS Companies was established as a bankruptcy-remote special purpose entity to, among other things, shield those entities from exposure to Mervyn's creditors. The attorneys representing the MDS Companies, the PE Sponsors and the PE Owners in connection with the closing of $800 million of loans under the Loan Agreement and the Mezzanine Loan Agreement, gave the 2004 Real Estate Secured Lenders a "true lease" legal opinion regarding the Unitary Leases to assure those lenders

that the scheme put into place at the integrated closing of the EPA and the secured loans would prevent Mervyn's or its creditors from ever reaching the real estate assets stripped away from Mervyn's and transferred to the MDS Companies. The requirement that the MDS Companies be established as bankruptcy-remote entities demonstrates the intent of the PE Sponsors and the PE Owners, who exercised control over Mervyn's, to ensure that neither Mervyn's nor its creditors could ever reach the real estate assets stripped out of Mervyn's or the $800 million of loan proceeds borrowed against those assets.

### Step 2 - - The Agency Agreement and the Transfer of the Real Estate Assets

75.    In order to strip the real estate assets out of Mervyn's, MH used the MDS Companies to institute a series of interrelated transfers that occurred at the closing of the EPA. The road map used by MH was the Agency Agreement (the "**Agency Agreement**"), dated as of September 2, 2004, between and among MH and each of the MDS Companies. According to the Agency Agreement, the MDS Companies engaged MH to function as their "agent" to acquire the real estate assets on behalf of and for the benefit of the MDS Companies. The steps undertaken pursuant to the Agency Agreement were as follows:

- Contemporaneously with MH's acquisition of Mervyn's from Target under the EPA, MH (as the duly authorized organizer of Realty I and Realty II) assigned to Mervyn's all the equity interests of Realty I (the owner of all the membership interests of Realty III) and Realty II (the owner of all the membership interests of Realty IV) so that (for a split-second) such entities became wholly-owned subsidiaries of Mervyn's.

- Contemporaneously with MH's acquisition of Mervyn's from Target under the EPA, MH caused Mervyn's to transfer to the MDS Companies the 2004 Transferred Real Estate.

- Certain of the 2004 Transferred Real Estate as specified by the PE Sponsors and the PE Owners was conveyed from Mervyn's to Realty I.

- Certain of the 2004 Transferred Real Estate as specified by the PE Sponsors and the PE Owners was conveyed from Mervyn's to Realty II.

- Certain of the 2004 Transferred Real Estate as specified by the PE Sponsors and the PE Owners was assigned from Mervyn's to Realty III.

- Certain of the 2004 Transferred Real Estate as specified by the PE Sponsors and the PE Owners was assigned from Mervyn's to Realty IV.

- Certain of the 2004 Transferred Real Estate as specified by the PE Sponsors and the PE Owners was conveyed from Mervyn's to Texas Realty I.

- Certain of the 2004 Transferred Real Estate as specified by the PE Sponsors and the PE Owners was conveyed from Mervyn's to Texas Realty II.

76.    Immediately upon making the conveyances and transfers identified above:

- MH caused the equity interests in Realty I to be conveyed by Mervyn's to Holdings I.

- MH caused the equity interests in Realty II to be conveyed by Mervyn's to Holdings II.

77.    The Restricted Leases stayed with Mervyn's, but MH was obligated under the Agency Agreement to cause Mervyn's to seek to remove the transfer restrictions and to transfer the Restricted Leases to the MDS Companies upon removal of the restrictions. Subsequent to the closing of the 2004 Transaction, some or all of the Restricted Leases (the "**Post-2004 Transferred Real Estate**"; and together with the 2004

Transferred Real Estate, the "**Transferred Real Estate**") were transferred to the MDS Entities.

78.    In sum, with respect to the 2004 Transferred Real Estate:

- The 2004 Transferred Real Estate was transferred from Mervyn's to the MDS Companies.

- The MDS Companies were owned and controlled by the PE Sponsors and the PE Owners.

- The PE Sponsors and the PE Owners owned and controlled MH.

- MH owned and controlled Mervyn's.

- Mervyn's was paid little or nothing for the transfer.

79.    Mervyn's received little or no consideration for these transfers. All of the funds borrowed by the MDS Companies or contributed by the PE Sponsors and the PE Owners to the MDS Companies were paid to Target as part of the Purchase Price for the Securities under the EPA or paid as fees to the PE Sponsors, the PE Owners or their professionals.

80.    The Agency Agreement is a fictitious, complex web of agreements used by the PE Sponsors and the PE Owners to make it appear as though MH had served as the agent of the MDS Companies and acquired Mervyn's real estate assets from Target while acting solely as their agent.  However, the MDS Companies and Target were not in privity of contract - - the EPA was solely between MH and Target.  The documents used to paper the transaction create the appearance of back-to-back assignments in which MH caused the "rights" to the real estate assets under the EPA to be simultaneously assigned from MH to Mervyn's and from Mervyn's to the MDS Companies.  This paper trail was designed to make it appear as though the MDS Companies were purchasing the real

{BAY:01517944v1}                                          25

estate assets from Target through use of their "agent" MH. In reality, the real estate

assets were owned not by Target but by Mervyn's and Mervyn's was paid little or

nothing for transferring those assets.

81.    The foregoing "assignments" were accomplished pursuant to an

Agreement of Assignment dated as of September 2, 2004, between MH and Mervyn's

and a second Agreement of Assignment dated as of September 2, 2004, between

Mervyn's and the MDS Companies. The assignment of the "rights" to the real estate

assets under the EPA pursuant to the foregoing Agreements of Assignment is another

fiction because the EPA is an equity purchase agreement, that did not effectuate any

transfer of Mervyn's real estate assets (or any other assets of Mervyn's). These multiple

transfers and transactions had no purpose or effect other than to obscure the fraudulent

transfers that occurred at the closing of the 2004 Transaction.

82.    Mervyn's began the day of the closing with more than $1 billion of

real estate and, within the blink of an eye, it was gone. Mervyn's received little or no

consideration in return.

### Step 3 - - Bundling of the Real Estate Assets and Creation of the Unitary Leases

83.    Concurrently with the transfer of the 2004 Transferred Real Estate

by Mervyn's to the MDS Companies, such real estate assets formerly owned by

Mervyn's were bundled by the MDS Companies into three (3) Unitary Leases and leased

back to Mervyn's:  Unitary Lease by and between Realty II, Texas Realty II, and Realty

IV, as landlord, and Mervyn's as tenant ("**Unitary Lease I**"); Unitary Lease by and

between Realty II, as landlord, and Mervyn's, as tenant ("**Unitary Lease II**"), and

Unitary Lease by and between Realty I, Texas Realty I, Realty II, Texas Realty II, Realty III, and Realty IV, as landlord, and Mervyn's, as tenant (the "**Unitary Lease III**").

84.    The annual basic rent under Unitary Lease I is stated as $46,115,448; the annual basic rent under Unitary Lease II is stated as $2,940,281; and the Annual Base Rent under Unitary Lease III is stated as $2,137,033. In addition, each Unitary Lease provides for the payment by Mervyn's of percentage rent, CAM charges, and impositions (i.e., taxes) and the payment to third-party landlords of all base, fixed and additional rents that are payable pursuant to the terms of all of the "Overleases" (i.e., the original underlying leases between Mervyn's and the original third-party landlords). Based upon just the annual basic rent of the Unitary Leases alone, the increased occupancy costs to Mervyn's in excess of Mervyn's occupancy expenses before the 2004 Transaction were approximately $50 million. This increase consisted of amounts selected by the PE Sponsors and the PE Owners to mark up to alleged "market" the rents in the Overleases - - that Mervyn's still had to pay to the underlying landlords - - and the rent that was now being charged to Mervyn's to occupy the fee properties that it had owned before the transfers. When so-called "notional rent" for the Restricted Leases and other additional charges are added, the increased expenses to Mervyn's amounted to tens of millions of dollars per year. The increase was designed to be 130% of the aggregate monthly debt service on the acquisition debt owed to the 2004 Real Estate Secured Lenders. Mervyn's would not have executed leases containing such adverse economic terms but for the PE Sponsors' and the PE Owners' domination and control of both the MDS Companies and Mervyn's.

### Step 4 - - The Restricted Leases

85.    The PE Sponsors and the PE Owners caused Mervyn's to adopt

provisions in the Mervyn's LLC Agreement that forced Mervyn's to make "priority

distribution(s)" to MH from "Retail Net Cash flow" in amount(s) equal to the additional

rent that <u>would</u> <u>have</u> <u>been</u> <u>charged</u> to Mervyn's on top of the rent it was already paying

for each Restricted Lease store location as if each such Restricted Lease had been

transferred to the MDS Companies on September 2, 2004, bundled into the Unitary

Leases and leased back to Mervyn's.  As with the rents set under the Unitary Leases,

these so-called "notional rents" were not the result of arm's length negotiations.

Moreover, Mervyn's received no consideration for having this additional obligation

imposed upon it, and it derived no benefit from making such payments.

86.    A parallel provision of the MH LLC Agreement (section 9.5)

provides that so long as the Restricted Leases are held by Mervyn's, the distributions

made by Mervyn's to MH as required under Section 8.5 of Mervyn's LLC Agreement

would be distributed to the PE Sponsors.  The PE Sponsors executed letters of agreement

with the 2004 Real Estate Secured Lenders as part of the 2004 Transaction that require

the PE Sponsors to "direct and agree to cause [MH] (x) to enforce the obligations of

Mervyn's to distribute [to MH]  the [so-called "notional rent" payments] as and when

required under Section 8.5 of the Mervyn's LLC Agreement and (y) upon receipt of [such

so-called "notional rent" payments], to immediately pay the same directly to the [2004

Real Estate Secured Lenders]."

87.    In reality, as required by the 2004 Real Estate Secured Lenders,

and later the 2005 Real Estate Secured Lenders, some or all of the so-called "notional

rent" payments were made by Mervyn's directly into various bank accounts that, while in the names of the MDS Companies, were in fact controlled by and pledged to the 2004 Real Estate Secured Lenders and later Bank of America and the 2005 Real Estate Secured Lenders.

## Step 5 - - The Leverage

88.     As noted in paragraphs 70 and 83 above, concurrent with the transfer of the 2004 Transferred Real Estate to the MDS Companies and the creation of the Unitary Leases, the real estate assets were used as collateral security to support $800 million of secured loans from the 2004 Real Estate Secured Lenders. All or substantially all of the proceeds of the loans were used by MH to pay Target for the Securities that MH purchased under the EPA.

89.     In substance, Mervyn's provided the collateral but received few if any of the loan proceeds.

## Step 6 - - Final Separation of Real Estate Assets from Mervyn's

90.     In a series of interrelated and concurrent transactions that each occurred on September 2, 2004, under the legal fiction constructed by the PE Sponsors and the PE Owners, Realty I and Realty II were assigned and transferred to Mervyn's. At a moment in time on September 2, 2004, Mervyn's owned Realty I, Realty II, Realty III and Realty IV. The PE Sponsors and the PE Owners caused Mervyn's to transfer the 2004 Transferred Real Estate to Realty I, Realty II, Realty III, Realty IV, Texas Realty I and Texas Realty II. Finally, the PE Sponsors and the PE Owners, through MH, caused Mervyn's to assign and transfer (i) 100% of its membership interests in Realty I to Holdings I and (ii) 100% of its membership interests in Realty II to Holdings II. As a

result of the foregoing transfers of membership interests, Realty I and Realty II were converted from wholly-owned subsidiaries of Mervyn's to wholly-owned subsidiaries of Holdings I and Holdings II. Because Realty I owned 100% of the interests in Realty III, and Realty II owned 100% of the interests in Realty IV, those entities were also transferred from Mervyn's and over to the MDS Companies at the time of the closing of the EPA.

91.    The amputation of the 2004 Transferred Real Estate legs from the body of the retail operations was complete -- and it was all done in a split-second series of concurrent transfers orchestrated by the PE Sponsors and the PE Owners for the benefit of themselves and the 2004 Real Estate Secured Lenders, with the knowledge, participation, or acquiescence of Target and the 2004 Real Estate Secured Lenders - - all of whom profited or benefited from such transfers.

### The Negative Effects on Mervyn's

92.    The results of the 2004 Transaction were devastating for Mervyn's. In order to both service the $800 million debt incurred by the MDS Companies to the 2004 Real Estate Secured Lenders, and to fully extract the value of the real estate assets from Mervyn's, the PE Sponsors and the PE Owners caused several adjustments to be made -- all to the detriment of Mervyn's and its creditors.

93.    First, the 2004 Transferred Real Estate was marked up to purported "market rates," bundled together, and leased back to Mervyn's through the Unitary Leases. In reality, the rent that Mervyn's had been paying under the un-bundled leases was increased by the PE Sponsors and the PE Owners in an amount sufficient to service the debt placed on the MDS Companies to fund MH's acquisition of the Securities, and to

generate excess cash flow for the MDS Companies and its owners (the PE Sponsors and the PE Owners). This arrangement caused a large and detrimental increase in Mervyn's occupancy costs even though the underlying landlords had no right to increase Mervyn's rent. The bundling under the Unitary Leases masked the actual increases because, under each Unitary Lease, Mervyn's had a single monthly basic rent payment (as well as obligations to pay percentage rent, CAM charges, taxes and other impositions). The 2004 Transferred Real Estate transferred to the MDS Companies also included Mervyn's owned and mostly unencumbered real estate. These formerly owned properties were now leased back to Mervyn's, increasing Mervyn's occupancy costs for such stores from no rent to purported "market rent." Further, because the Unitary Leases were triple net leases, Mervyn's now had the dual burdens of ownership and tenancy foisted upon it.

94.    Second, MH caused Mervyn's to pay to MH, an extra amount for each Restricted Lease purportedly equal to the additional mark up that the MDS Companies would have imposed upon Mervyn's had such Restricted Lease been transferred to the MDS Companies for bundling into the Unitary Leases along with the 2004 Transferred Real Estate. This payment was required under the terms of the Mervyn's LLC Agreement (as designed by and executed at the direction of the PE Sponsors and the PE Owners) to be "distributed" by Mervyn's to MH. MH would distribute these payments to its "Restricted Lease Members" (i.e., to the PE Sponsors) who in turn paid these funds over to the 2004 Real Estate Secured Lenders (though in reality some or all of these payments were made directly into accounts controlled by and pledged to the 2004 Real Estate Secured Lenders). Mervyn's received no benefit from

paying the so-called "notional rent" to MH as required under the Mervyn's LLC Agreement.

95.     Third, the bundling of the 2004 Transferred Real Estate into the Unitary Leases prevented Mervyn's from closing stores without the consent of the PE Sponsors, the PE Owners, the 2004 Real Estate Secured Lenders and later Bank of America and the 2005 Real Estate Secured Lenders, and would purport to prevent Mervyn's from rejecting individual store leases in any subsequent bankruptcy case.

96.     Fourth, the bundling of the 2004 Transferred Real Estate into the Unitary Leases delivered massive bargaining power and leverage to the 2004 Real Estate Secured Lenders, Bank of America, the 2005 Real Estate Secured Lenders, the PE Sponsors and the PE Owners, which left Mervyn's as a helpless pawn.  For example, if Mervyn's struggled to pay rent, a shortage of even $1.00 under a Unitary Lease imperiled all of the stores included under that lease, while before the bundling, a shortage of $1.00 would only affect a single lease for a single store.  Mervyn's was turned into little more than a vehicle to pay debt service for the benefit of the PE Sponsors and the PE Owners who had stripped away and leveraged Mervyn's former real estate assets.

97.     Fifth, because the PE Sponsors and the PE Owners owned both the retail business (through the PE Sponsors' ownership of MH and Mervyn's) and the real estate assets (through the PE Sponsors' ownership of the MDS Companies), the PE Sponsors and the PE Owners had conflicts of interest whenever they made a decision affecting Mervyn's interests with respect to such real estate assets.  On occasions such as those described in paragraphs 129 through 135 below, the PE Sponsors and the PE Owners made decisions affecting Mervyn's solely with regard for how to best protect the

value of the real estate portfolio even though such decisions were not in the best interests of Mervyn's.

98.    In sum, Mervyn's was disadvantaged in at least the following ways -- for the benefit of the PE Sponsors and the PE Owners:

- Valuable real estate assets were stripped out of Mervyn's.

- Store occupancy costs were increased to support the debt heaped onto the MDS Companies and to generate cash for the PE Sponsors and the PE Owners.

- Although there was excess value in the 2004 Transferred Real Estate above the debt owed to the 2004 Real Estate Secured Lenders, by stripping such real estate assets out of Mervyn's, that excess value was no longer part of Mervyn's capital and unavailable to Mervyn's.

- With respect to the Unitary Leases, rent mark-ups were required by the PE Sponsors and the PE Owners to be paid by Mervyn's to the MDS Companies to meet debt service and to make distributions to the owners of the MDS Companies (though in reality, some or all of these payments were made directly into accounts controlled by and pledged to the 2004 Real Estate Secured Lenders, and later Bank of America and the 2005 Real Estate Secured Lenders).

- With respect to the Restricted Leases, payments in the form of so-called "notional rent" were required by the PE Sponsors and the PE Owners to be paid by Mervyn's to MH for the benefit of the PE Sponsors and the PE Owners each month for delivery to the MDS Companies to enable the MDS Companies to meet their debt service (though in reality, some or all of these payments were made directly into accounts controlled by and pledged to the 2004 Real Estate Secured Lenders, and later Bank of America and the 2005 Real Estate Secured Lenders).

- The separation of the 2004 Transferred Real Estate from Mervyn's caused by the PE Sponsors and the PE Owners created conflicts of economic interest for MH as the owner and managing member of Mervyn's because the ultimate owners of MH and the ultimate owners of the MDS Companies were one and the same - - the PE Owners acting through the PE Sponsors.

99.    Through their control of MH, the PE Sponsors and the PE Owners used Mervyn's most valuable assets - - its real estate leases (many of which had rent

{BAY:01517944v1}                                      33

payments based in part on Mervyn's status as an anchor tenant and in part on the age of the leases) and its valuable owned real estate (mostly unencumbered) - - to borrow $800 million of the Purchase Price from the 2004 Real Estate Secured Lenders.

100.    Rather than simply maintaining Mervyn's retail business and the integrated real estate assets in which the retail stores were operated and leveraging the real estate assets as would have been done under a traditional LBO transaction, the PE Sponsors and the PE Owners separated the real estate assets from Mervyn's at the closing of the EPA.  The PE Sponsors and the PE Owners thereby converted Mervyn's from a retailer with valuable leases and valuable owned real estate into a shrunken operating company whose remaining capital consisted largely of inventory, cash, credit card receipts, and intellectual property.

101.    To do this, MH caused Mervyn's to transfer the 2004 Transferred Real Estate to the newly-formed MDS Companies for little or no consideration and those entities simultaneously bundled the real estate assets into the Unitary Leases, leased the affected properties back to Mervyn's at increased rates, and hypothecated the Unitary Leases and other real estate assets to the 2004 Real Estate Secured Lenders as collateral security for the repayment of $800 million of loans used by MH to purchase the Securities from Target.

102.    The result of the foregoing was to disadvantage Mervyn's upon the closing of the EPA and in the years that followed.

**The PE Sponsors, the PE Owners and the 2004 Real Estate Secured Lenders**
**Acknowledged, Knew and Intended that Mervyn's Would Be Separated**
**from Its Valuable Real Estate Assets**

103.    The lawyers for the PE Sponsors and the PE Owners delivered a

"true lease" opinion to the 2004 Real Estate Secured Lenders in connection with the 2004

loans made to the MDS Companies.  The apparent purpose of that legal opinion was to

assure the 2004 Real Estate Secured Lenders that the Unitary Leases would be treated as

unexpired leases rather than disguised financings in any future bankruptcy case of

Mervyn's.

104.    The opinion letter highlights some of the economic aspects of the

2004 Transaction and the Unitary Leases and demonstrates the interrelatedness of the

2004 transfers and transactions, and the absence of consideration to and the detrimental

impact upon, Mervyn's.  These provisions, set forth verbatim from the full text of the

opinion letter, are as follows (emphasis added):

> Each of the MDS Entities is a single-purpose entity whose
> sole business consists of the ownership, operation,
> development and sale of the fee or leasehold estates in the
> Properties held by such MDS Entity, subject, in all events,
> to the terms of the applicable Unitary Lease.
>
> Pursuant to Section 1.3 of the Agency Agreement,
> Mervyn's Holdings has caused New Mervyn's to
> simultaneously sell, assign, transfer and convey all of the
> Properties (other than New Mervyn's leasehold interest in
> the Restricted Leases) to the MDS Entities.  **The proceeds**
> **arising from the sale of the Properties to the MDS**
> **Entities by New Mervyn's (including the proceeds of the**
> **Acquisition Loan, which will be used to finance the**
> **MDS Entities' acquisition of such Properties) will be**
> **distributed to Target by Mervyn's Holdings, such that**
> **New Mervyn's (and Mervyn's Holdings, as the new**
> **owner of New Mervyn's) will not retain any of the**
> **proceeds of such sale (or such financing).**

The Properties, upon being acquired by the MDS Entities, will be simultaneously leased (or subleased, as the case may be) to New Mervyn's, the former owner of the Properties, pursuant to three separate but related Unitary Leases. **Each such Unitary Lease will demise more than one Property but will, by its terms, be treated as a single lease and the monthly rent payable thereunder will be a single, aggregate monthly amount (i.e., there will not be a separately identified monthly rent allocable to each location demised under such Unitary Lease and the tenant's failure to pay any portion of the monthly rent could result in the termination of the entire lease by the landlord thereunder).**

**Each of the Unitary Leases will be a so-called "triple net" lease pursuant to which the tenant will have sole responsibility for the payment of all costs and expenses (including, without limitation, real estate taxes, insurance premiums and maintenance costs) associated with the premises demised pursuant to such lease.**

The initial term of one of the Unitary Leases (the "**Ten Year Lease**") will be ten years and five months and **New Mervyn's will have the right, at its option, to renew the lease, at the greater of (x) the then prevailing market rental rate, or (y) 110% of the lease rate in effect at the beginning of the extension term,** pursuant to two consecutive five year extension options.

New Mervyn's has no obligation to pay any monies to Lender, on account of the Unitary Leases or otherwise, and, pursuant to the instructions of the applicable MDS Entities, **all amounts due, from time to time, pursuant to the Unitary Leases, are payable directly to an account of the applicable MDS Entity (the "Designated Account").**

As a consequence of the divergent economic interests of the parties, the terms of the Unitary Leases were negotiated on an arm's-length basis and **the rent payable pursuant thereto reflects the current fair market rental value of the Properties** covered by the Unitary Lease with a Ten Year term. In this regard, we note that Cushman & Wakefield has performed certain investigations with respect to the rental markets in which the Properties are located and has concluded that (i) the rent payable for the Properties demised pursuant to the **Ten Year Lease**, taken

as a whole, is within the reasonable range of current fair market rental values for such Properties, and (ii) **there is material residual value in the Properties subject to such lease.** The rent payable for the Properties demised pursuant to the Seventeen Month Lease and the Three Year Lease, while not capable of being evaluated in terms of a "market" rent that would apply to longer term leases, is not inconsistent with provisions to be expected in a short-term lease of "big box" retail space.

**According to Cushman & Wakefield, the residual value of the Properties demised pursuant to the Seventeen Month Lease and the Three Year Lease is greater, on a percentage basis, than the residual value of the Properties demised pursuant to the Ten Year Lease.[1]**

**The MDS Entities acquired the Properties with the expectation that the Properties would have significant residual equity value at the expiration or earlier termination of the Unitary Leases.**

**The aggregate monthly rent payable pursuant to the three Unitary Leases is significantly in excess of the scheduled monthly debt service owed to Lender on account of the Acquisition Loan.**

Accordingly, **all monthly rent received in excess of monthly debt service** owed to Lender on account of the Acquisition Loan **will belong solely to the applicable MDS Entities.**

**Title to all improvements at the Properties (including all alterations and additions installed or constructed by New Mervyn's during the term of the Unitary Leases) will belong to the applicable MDS Entity at the expiration or earlier termination of the Unitary Leases**

---

[1] The reference to Cushman & Wakefield is to an appraisal letter from Cushman & Wakefield attached to the opinion letter as an exhibit. In that letter, Cushman & Wakefield states its belief that the residual value of the Properties contained within the short term Unitary Leases -- Unitary Leases II and III - - will have "even greater" residual value than the Properties subject to the Ten Year [Unitary] Lease. The reason is obvious. After the expiration of the Unitary Lease, the underlying owned real estate and the underlying long-term below market leases will revest to the MDS Companies to capitalize upon, not to Mervyn's. These locations can be re-let by the MDS Companies to Mervyn's at still higher rates or leased to third parties.

without any reimbursement or other compensation to New Mervyn's.

The MDS Entities project that **the aggregate monthly rent payable** pursuant to the Unitary Leases **will exceed the aggregate monthly amount payable to Lender** with respect to the Acquisition Loan.  Absent a default under the Acquisition Loan or the events giving rise to the Cash Trap referred to above, **the MDS Entities will be permitted to receive and retain such excess rental proceeds without restriction.**

**The MDS Entities retain a reversionary interest in the Properties that has significant value** and the MDS Entities bear the economic risk of fluctuations in that value.

Upon the occurrence of an event of default under the Unitary Leases, the applicable MDS Entity, as lessor, will have the right to enter the demised premises, dispossess the lessee therefrom and otherwise exercise all of the rights and remedies available to a landlord under applicable law.

Upon the expiration or earlier termination of the Unitary Leases, **New Mervyn's, as lessee, must surrender the demised premises to the applicable MDS Entity, free and clear of all liens other than those specifically permitted by the applicable Unitary Lease.**

**The Acquisition, the Unitary Leases and the Acquisition Loan are being entered into contemporaneously and were planned and are being implemented as related transactions.**

**The Sponsors control the MDS Entities and New Mervyn's.**

Although New Mervyn's has no legal obligation to make any payments to or for the benefit of the Lender, **New Mervyn's is committed, under its Operating Agreement, to make certain mandatory dividends to Mervyn's Holdings for the exclusive benefit of the "Real Estate" series of membership interests in Mervyn's Holdings, and the Sponsors have directed Mervyn's Holdings, in writing, to remit all such dividends, upon receipt, to MDS Realty Holdings I, LLC for the benefit of Borrowers.**

**Each Unitary Lease is a "triple net" lease** pursuant to which the lessee will pay or perform a significant number of obligations relating to the applicable Properties which would typically be paid or performed by the owner of the Properties.

**The most significant factors creating risk that the Unitary Leases could be recharacterized as financing pertain, in our view, to the fact that the Sponsors, as a group, own and control New Mervyn's and each of the MDS Entities, the fact that the Acquisition, the Unitary Leases and the Acquisition Loan constitute a related series of transactions, and the fact that New Mervyn's, as a "net" lessee, will be obligated to pay or perform a significant number of obligations relating to the Properties which would typically be paid or performed by the owner of the Properties.**

We note, for example, the parties' unambiguously expressed intent to create a lease; **the MDS Entities' ownership of a valuable residual interest in the Properties; the absence of any purchase option in favor of New Mervyn's**; the fact that the Unitary Leases will be treated as an operating lease for tax and financial reporting purposes by New Mervyn's and each of the MDS Entities; **the fact that the MDS Entities will receive and retain a significant amount of net excess rent under the Unitary Leases during the term of the Acquisition Loan**; and the fact that the rents payable pursuant to the Unitary Leases are at market or are otherwise reflective of an arm's-length, negotiated leasing arrangement.

105.    The foregoing legal opinion by counsel to the PE Sponsors and the PE Owners confirms that:

- The vast majority of the proceeds from the loans made by the 2004 Real Estate Secured Lenders were distributed to Target by MH (thus disregarding the fiction of the Agency Agreement).

- The Unitary Lease structure is contrary to Mervyn's best interests because a payment default imperils the multiple stores bundled into these leases.

- The Unitary Leases raised the rents under Mervyn's existing leases and imposed new rent on previously owned real estate in amounts

needed to service debt, operate various entities, create a return on the acquisition and assure the highest value when sold to third parties, and thereby deprived Mervyn's of its former competitive advantage of lower occupancy costs on its existing leases consistent with its position as a long standing anchor tenant and rent-free occupancy on its previously owned real estate.

- The loss of significant residual values for the real estate assets deprived Mervyn's of the opportunity or ability to realize that value for itself, particularly if its liquidity were to become constrained.

- The "excess" rent burden and payment of the so-called "notional rent" represented by the difference between Mervyn's pre-transaction and post-transaction costs exceeds even the debt service payments to the 2004 Real Estate Secured Lenders.

- The Unitary Leases permitted the landlords to dispossess Mervyn's at the end of the lease terms even though the terms of the Unitary Leases were not coterminous with the underlying leases. This could have resulted in Mervyn's losing its right to occupy its store premises, including premises it had owned before the 2004 Transaction.

- The multiple transfers and transactions were integrated and interdependent.

- The triple net lease aspect of the Unitary Leases puts the full economic burden of ownership on Mervyn's with none of the benefits.

106.    The "true lease" legal opinion also demonstrates the actual intent of the parties to separate Mervyn's real estate assets from the retail business. The PE Sponsors and the PE Owners who exercised control over Mervyn's intended that the "true lease" structure of the Unitary Leases would prevent the MDS Companies and the 2004 Real Estate Secured Lenders from getting entangled in a Mervyn's bankruptcy proceeding. As lessors of commercial real property, the MDS Companies could insist upon timely payment of rent and other items due under the Unitary Leases and avoid the issues that would exist if the Unitary Leases were found to be disguised financings.

**Bank of America Had Knowledge of the 2004 Transaction**

107.    Bank of America also had knowledge of the structure and purpose of the 2004 Transaction, as prior to the securitization by Bank of America of the loans assigned by Greenwich in relation to the 2004 Transaction, rating agencies had issued presale reports for the securities.  These reports, of which Bank of America knew or should have known, detailed the 2004 Transaction (including the fact that the transaction caused the separation of the real estate assets from Mervyn's and that very little of the value of the transaction was assigned to the retail operations) and the intent of the PE Sponsors and the PE Owners to maximize the value of the real estate assets separately from Mervyn's retail operations.

## Transaction Fees Paid by Mervyn's

108.    Although the 2004 Transaction provided little or no benefit to Mervyn's and included substantial detriments, the PE Sponsors and the PE Owners caused Mervyn's to pay $58,622,427 of transaction fees (the "**Transaction Fees**") of various kinds to the PE Sponsors, the PE Owners and/or on their behalf or for their benefit in closing the 2004 Transaction.  For example:  $16 million was paid to Cerberus or its affiliates (including $2.5 million of sponsor-related fees to Cerberus or its affiliates, and $1.5 million to Ableco and $12 million to Madeleine for break-up fees or commitment fees relating to a proposed real estate financing), $2.5 million was paid to KLA or its affiliates, $2.5 million was paid to Sun or its affiliates, $4 million was paid to the 2004 Senior Real Estate Secured Lenders and $4 million was paid to the 2004 Mezzanine Real Estate Secured Lenders (in both cases, exclusive of legal fees also paid).  In addition, direct payments were made of professional fees incurred by the PE Sponsors,

the PE Owners and their affiliates of approximately $5 million. A chart based upon the

closing schedule (and therefore subject to adjustment) is attached hereto as Exhibit A and

is incorporated herein by this reference.

109.    Mervyn's received no benefit from the payment of the foregoing

fees.

### Management, Consulting and Other Fees Paid by Mervyn's

110.    Not content to simply extract value from Mervyn's through its

previously owned and leased real estate, the PE Sponsors and the PE Owners also caused

Mervyn's LLC to enter into three separate Management Services Agreements, dated

September 2, 2004, with KLA/Mervyn's, L.L.C., Cerberus Mervyn's Investors, LLC, and

Sun Management, (collectively the "**PE Managers**") whereby Mervyn's LLC was

required to make payments totaling at least $3 million a year ($1 million to each entity).

The services that the PE Managers claimed to be providing to Mervyn's involved

duplicative services and functions including  services in relation to obligations

undertaken by KLA/Mervyn's, L.L.C. under the MH LLC Agreement that solely

benefited the MDS Companies, the PE Sponsors and the PE Owners.

111.    In addition, the PE Sponsors, for the sole benefit of the PE Owners

and themselves, charged Mervyn's for "consulting" services separate and apart from the

management services ostensibly provided under the management agreements.

112.    Further, in the year prior to the Petition Date, while Mervyn's

struggled to pay its debts to other creditors as they came due, Mervyn's continued to pay

management and consulting fees, and made additional payments of approximately

$253,000 to or for the benefit of Cerberus and/or Sun in or around October 2007 and approximately $2.5 million to or for the benefit of Sun in or around November 2007.

113.    The payments of management, consulting and other fees were made into accounts owned, controlled and/or pledged to the PE Managers and the PE Sponsors, for the benefit of the PE Sponsors and the PE Owners.

114.    In November 2007, the PE Sponsors and the PE Owners caused Mervyn's LLC to enter into an Amended and Restated Management Services Agreement with Sun Management. Pursuant to this new agreement, Mervyn's made payments to Sun Management for the benefit of Sun, while Mervyn's was struggling to pay its debts to other creditors as they became due.

115.    The management, consulting and other fees were not the result of arm's length negotiation between Mervyn's and the PE Managers, the PE Sponsors and the PE Owners. Mervyn's received less than reasonably equivalent value or no value for these fees, and would not have paid the fees but for the domination and control of the PE Sponsors and the PE Owners over Mervyn's.

116.    The imposition of the management, consulting and other fees represented yet another way in which the PE Sponsors and the PE Owners profited from their acquisition at the expense of Mervyn's and its creditors.

### The PE Sponsors and the PE Owners Completely Dominated Mervyn's With Respect to the Transfers and Transactions at Issue

117.    At all relevant times, following MH's acquisition of Mervyn's, the PE Sponsors and the PE Owners completely dominated Mervyn's with respect to the transfers and transactions at issue. As of the closing of the 2004 Transaction and

thereafter, the PE Sponsors and the PE Owners owned all of the equity of MH, and MH owned all of the equity of Mervyn's. The PE Sponsors and the PE Owners installed their designees as members of the Board of Managers of MH. The MH Board of Managers, who were charged with overseeing Mervyn's affairs, represented the interests of the PE Sponsors and the PE Owners. The PE Sponsors and the PE Owners selected employees and/or consultants to oversee Mervyn's and advance the interests of the PE Sponsors and the PE Owners with respect to Mervyn's.

118.    The PE Sponsors and the PE Owners caused Mervyn's to transfer the 2004 Transferred Real Estate to the MDS Companies for little or no consideration. The PE Sponsors and the PE Owners caused the MDS Companies to grant liens to the 2004 Real Estate Secured Lenders on such real estate assets in exchange for loans of $800 million. The PE Sponsors and the PE Owners caused the proceeds of such loans to be conveyed to Target. The PE Sponsors and the PE Owners caused Mervyn's to enter into the Unitary Leases at substantially increased rents, and to pay so-called "notional rent" in the form of distributions to MH for the benefit of the PE Sponsors and the PE Owners. The PE Sponsors and the PE Owners caused Mervyn's to pay management fees, transaction fees and other fees to or for the benefit of the PE Sponsors and the PE Owners. And, the PE Sponsors and the PE Owners caused Mervyn's to make distributions and other payments to MH under the LLC Agreement to or for the benefit of the PE Sponsors and the PE Owners.

119.    In 2005 the PE Sponsors and the PE Owners refinanced some of the 2004 loans. In connection with the 2005 refinancing, the PE Sponsors and the PE

Owners caused the MDS Companies to grant liens to the 2005 Real Estate Secured Lenders on real estate assets previously owned by Mervyn's.

120.    The 2004 Transaction and the transactions and actions that followed only benefitted the PE Sponsors and the PE Owners, and were self-dealing transfers and transactions imposed upon Mervyn's by the PE Sponsors and the PE Owners. Such transfers and transactions benefited the PE Sponsors and the PE Owners, who stood on all sides of such transfers and transactions, because they were the sole owners of the MDS Companies and Mervyn's, and they benefitted from the loans made to the MDS Companies by the 2004 Real Estate Secured Lenders, and later the 2005 Real Estate Secured Lenders, the transaction fees, and the other fees and distributions paid by Mervyn's.

## Effect of the 2004 Transaction on Mervyn's Financial Condition

121.    After the PE Sponsors and the PE Owners stripped the 2004 Transferred Real Estate from Mervyn's retail business, Mervyn's balance sheet reflected only $672,503,000 of assets and $664,203,000 of liabilities. Included in the assets were $48,939,000 of "Intangibles" (comprised of brand names, license agreements and credit card program), $59,506,000 of "Property, Plant and Equipment" (including certain costs related to the acquisition and development of software, construction in progress and store fixtures) and $18,581,000 of "Other Current Assets" (prepaid expenses and deposits). Mervyn's was insolvent as of September 2, 2004, because, given the nature of Mervyn's assets, the fair value of its assets did not exceed the fair value of its liabilities, some of which were not reflected on its balance sheet.

122.    Mervyn's was also left with *negative* working capital of over $22.2 million.

123.    Notwithstanding the fact that Mervyn's only source of working capital was to incur debt, the 2004 Transaction burdened Mervyn's with <u>additional</u> annual expenses and increased distribution requirements to the PE Sponsors and the PE Owners.  Significant assets, which could have been utilized for working capital purposes, were no longer available to Mervyn's.

### The Common Ownership of Mervyn's and the MDS Companies Created Conflicts of Interest

124.    The MH LLC Agreement divides the ownership of MH and the operation and management of MH's businesses between the retail business operated by Mervyn's (the "**Retail Business**") and the handling of the Restricted Leases (the "**Restricted Leases Business**").  Among the prime purposes of the Restricted Lease Business was the capture of the so-called "notional rent" so that it could be paid over to the 2004 Real Estate Secured Lenders and later Bank of America and the 2005 Real Estate Secured Lenders, and the prompt transfer of the Restricted Leases to the MDS Companies.

125.    The ownership of MH is divided between those members of the limited liability company holding "Retail Percentage Interests" and "Restricted Lease Percentage Interests."  The Restricted Lease Interests are further divided between common and preferred interests.

126.    Mervyn's is set up in a similar manner under the Mervyn's LLC Agreement, with ownership, operation and management split between the Retail Business

and the Restricted Leases Business.  MH holds 100% of the Retail Percentage Interests and 100% of the Restrictive Lease Percentage Interests.  Once again, among the prime purposes of the Restricted Lease Business was the capture of the so-called "notional rent" so that it could be paid over to the 2004 Real Estate Secured Lenders and later Bank of America and the 2005 Real Estate Secured Lenders, and the prompt transfer of the Restricted Leases to the MDS Companies.

127.    Because both the Retail Percentage Interests and the Restrictive Lease Percentage Interests of Mervyn's are held by MH, and MH has a split in its internal ownership percentages (with some of the PE Sponsors and the PE Owners more heavily vested in the Retail Business and others more heavily vested in the Restricted Lease Business), this resulted in conflicts of interest between Mervyn's Retail Business and the Restricted Lease Business.  There were also conflicts that resulted from the PE Sponsors and the PE Owners owning MH and also owning Mervyn's former real estate assets through the MDS Companies.  Because MH was the sole member and sole manager of Mervyn's, the PE Sponsors and the PE Owners could use their ownership of MH to cause Mervyn's to act in ways that enhanced the value of the real estate assets owned by the MDS Companies.

128.    At the time of the 2004 Transaction and thereafter, the cash flow multiples generally used to value real estate assets were much higher than the cash flow multiples generally used to value a retail operating company.  This difference provided an incentive to the PE Sponsors and the PE Owners to maximize the income of the  MDS Companies at the expense of Mervyn's.  If every additional dollar of income at the MDS Companies was worth a multiple of $10.00 to $12.00, while a corresponding reduction of

$1.00 at Mervyn's resulted in a loss of only $5.00 to $6.00 of value, then, taking a dollar

from Mervyn's was more than offset by adding a dollar to the MDS Companies. In

addition to imposing excessive rents on Mervyn's in order to enhance the value of the

real estate portfolio owned by the PE Sponsors and the PE Owners through the MDS

Companies, other examples of how this conflict harmed Mervyn's are as follows:

### Valencia Lease

129.    In order to evade the restrictions on transfer contained in the

Restricted Lease for the Valencia store, the PE Sponsors and the PE Owners caused

Mervyn's to agree to a transaction structure that required the resulting lease to be treated

by Mervyn's as a capital lease, thus adding $10 million of debt to Mervyn's balance

sheet. This transaction was done solely to benefit the PE Sponsors and the PE Owners

because, as a result of the restructuring of the lease, the Valencia Lease was sold to a

third party and the proceeds were paid to an entity owned by the PE Sponsors and the PE

Owners.

### Headquarters Sale

130.    In order to sell Mervyn's headquarters building, the property --

itself a converted department store -- was taken from Mervyn's in the 2004 Transaction,

put into a Unitary Lease, and leased back to Mervyn's at purported "market" rent for an

initial 20 year term. This unattractive long-term lease was imposed upon Mervyn's to

enable the headquarters building to be sold to a third party who would have Mervyn's

tied up as a tenant for the same 20 year term. In addition, the rent that the PE Sponsors

and the PE Owners forced Mervyn's to agree to pay to the new third party owner was

even greater than the rent that had been imposed upon Mervyn's under the Unitary Lease.

{BAY:01517944v1}                                     48

The new lease also contained a penalty clause that required Mervyn's to pay up to an additional $25 million to the new owner if the Mervyn's chain was sold and the headquarters was no longer needed by the buyer. As with the Valencia Lease, this transaction was done solely to benefit the PE Sponsors and the PE Owners who indirectly owned the real estate through the MDS Companies.

### Third Party Sale Transactions

131.    Following the closing of the 2004 Transaction, the PE Sponsors and the PE Owners began to realize upon the valuable real estate they had stripped out of Mervyn's. To that end, in the years following the 2004 Transaction, the MDS Companies entered into a series of sales transactions with third parties pursuant to which the MDS Companies sold, assigned, and transferred Mervyn's real estate assets acquired in the 2004 Transaction and after the closing of the 2004 Transaction to new owners .

132.    In such third party sale transactions, the MDS Companies, acting for the benefit of the PE Sponsors and the PE Owners, sold real estate assets formerly owned by Mervyn's to various buyers for more than $1 billion dollars. These third party sale transactions were possible because the economic benefits of the increased rent obligations imposed upon Mervyn's under the Unitary Leases were transferred to the purchasers. In exchange, the purchasers paid large premiums to the MDS Companies in order to be able to continue to collect the increased rents from Mervyn's and also to gain control of the valuable development and other real estate rights formerly owned by Mervyn's. In this manner, the PE Sponsors and the PE Owners used the rents and other occupancy costs imposed on Mervyn's in the 2004 Transaction (and later in the 2005 refinancing) to exploit Mervyn's real estate assets by, among other things, locking in

{BAY:01517944v1}                                    49

Mervyn's long term rent obligations that made Mervyn's real estate assets more saleable to these third party real estate purchasers who paid premiums to the MDS Companies for the benefit of the PE Sponsors and the PE Owners.

133.    In some instances, these third party real estate purchasers owned or operated the shopping centers where the Mervyn's stores were located.  In almost every instance, new individual leases were entered into between Mervyn's and the "new" owner of the transferred fee property or transferred leasehold interest and, as to purchasers of multiple fee or leasehold interests, such new leases were cross-defaulted in favor of such purchaser, in order to maintain the same type of unequal bargaining power over Mervyn's that existed under the Unitary Leases.

134.    As a result of these third party sale transactions and the new leases that resulted from those transactions, Mervyn's continued to be obligated to pay rent at least equivalent to the increased rents that had been imposed upon it under the Unitary Leases, but now the increased rents were paid to the transferees of the MDS Companies under such new leases that captured the economics and other attributes of the Unitary Leases.  The purpose and effect of such new leases was to facilitate these third party sales transactions by locking Mervyn's into long term obligations as the tenant of the purchaser, thus enabling the MDS Companies, acting on behalf and for the benefit of the PE Sponsors, the PE Owners and for the benefit of the 2004 Real Estate Secured Lenders and later for the benefit of Bank of America and the 2005 Real Estate Secured Lenders, to realize hundreds of millions of dollars for Mervyn's former real estate assets while it became increasingly difficult for Mervyn's to operate its retail business and pay its occupancy costs.

135.    Little or none of the hundreds of millions of dollars of proceeds paid to the MDS Companies for the benefit of the PE Sponsors and the PE Owners were shared with Mervyn's, and the PE Sponsors and the PE Owners caused MH to cause Mervyn's to cut back on operating expenses other than rent, to the detriment of its retail operations, so that Mervyn's could continue to service its burdensome lease obligations.

### The 2005 Refinancing of the Real Estate Debt

136.    On or about December 22, 2005, the PE Sponsors and the PE Owners caused the MDS Companies to refinance some or all of the indebtedness with the 2004 Real Estate Secured Lenders under the Loan Agreement and the Mezzanine Loan Agreement described in paragraph 70.

137.    Pursuant to a Loan Agreement, dated as of December 22, 2005, by and among Greenwich, Goldman Sachs Commercial Mortgage Capital, L.P., and Citigroup Global Markets Realty Corp., as senior lenders, and Realty I, Realty II, Texas Realty I, and Texas Realty II, as borrowers, the foregoing senior lenders loaned $575 million to the foregoing borrowers.  In addition, pursuant to a Mezzanine Loan Agreement, dated as of December 22, 2005, by and between Greenwich, GS Mortgage, and Citigroup Global Markets Realty Corp., as mezzanine lenders, and Holdings I, Holdings II, Texas Properties I, and Texas Properties II, as borrowers, the foregoing mezzanine lenders loaned $375 million to the foregoing borrowers.

138.    The $950 million in proceeds of the 2005 refinancing were used to repay a portion of the original $800 million loan borrowed by the MDS Companies as part of the 2004 Transaction. Since only a portion of the $800 million loan made in 2004

was refinanced in 2005 by the $950 million loan, the total indebtedness as of 2005 on the real estate previously owned by Mervyn's was much greater than $950 million.

139.    Also in connection with the 2005 refinancing, Unitary Lease I, Unitary Lease II, and Unitary Lease III were amended and restated into the Amended and Restated Unitary Leases.

140.    The increased occupancy costs under the Amended and Restated Unitary Leases were used in part to cover debt service on the $950 million borrowed by the MDS Companies from the 2005 Real Estate Secured Lenders in the 2005 refinancing, and continued debt service payments owed to Bank of America under the 2004 financing.

141.    Because of the sale of Mervyn's former real estate assets by the MDS Companies pursuant to the third party sales transactions, by the time of the 2005 refinancing, the MDS Companies owned fewer real estate assets than they acquired when the 2004 Transaction closed.  As a result, the Amended and Restated Unitary Leases included fewer store locations than the original Unitary Leases even though the rent payable thereunder was basically the same as the rent paid under the original Unitary Leases.  Consequently, the rents on a per store basis were substantially higher under the Amended and Restated Unitary Leases than under the original Unitary Leases.  This aggregate increase on a per store basis represented a further increase in Mervyn's total occupancy costs, even though the Amended and Restated Unitary Leases included fewer store locations than the original Unitary Leases.

142.    By the time of the 2005 refinancing, when the occupancy costs attributable to the stores transferred to new owners/landlords under third party sales transactions are added to the occupancy costs attributable to the stores included by the

Amended and Restated Unitary Leases and to the so-called "notional rents" still paid pursuant to the Mervyn's LLC Agreement, the annual costs for all of Mervyn's stores increased by tens of millions of dollars per year from its costs immediately following the rent increases attributable to the 2004 Transaction.

### Special $60 Million Dividend and Other Distributions

143.    In 2006 the PE Sponsors and the PE Owners, caused Mervyn's to borrow money on its lines of credit in order to pay a "special dividend" to themselves in a lump sum payment even though the original calculation supporting that dividend was an error.

144.    Under the Mervyn's LLC Agreement, the PE Sponsors and PE Owners caused Mervyn's, either in their own name or through MH, to make additional distributions totaling approximately $20 million in fiscal year 2005, and approximately $116 million (including the $60 million "special dividend") in fiscal year 2006, for the benefit of the PE Sponsors and the PE Owners.

### The Domination and Control of Mervyn's by the PE Sponsors and the PE Owners Harmed Mervyn's

145.    The PE Sponsors and the PE Owners owned and completely dominated and controlled Mervyn's and used such domination and control to impose the transactions described herein upon Mervyn's for their own benefit.  These transactions included the transfer of Mervyn's real estate assets to the MDS Companies, the creation of the Unitary Leases and later the Amended and Restated Unitary Leases, the imposition of increased occupancy costs on Mervyn's through such leases, the imposition of the so-called "notional rent" payments upon Mervyn's, the payment of distributions,

management, consulting and other fees, the Valencia Lease transaction, the Headquarters

Lease transaction, and third party sale transactions. The foregoing transactions all

benefited the PE Sponsors and the PE Owners - - who owned and controlled Mervyn's

through their ownership and control of MH and who concurrently owned and controlled

the MDS Companies. The MDS Companies were the vehicles through which the PE

Sponsors and the PE Owners realized upon many of the foregoing benefits. These

benefits included the value of the real estate assets transferred to the MDS Companies,

the rents and so-called "notional rents" paid to the MDS Companies, the distributions,

management, consulting and other fees paid to the PE Sponsors and the PE Owners, or

MH on behalf of the PE Sponsors and the PE Owners, and the proceeds of third party

sales transaction paid to the MDS Companies, none of which benefited Mervyn's or its

creditors.

### The PE Sponsor's and The PE Owners' Fraudulent Intent can be imputed to Mervyn's at the time of the Relevant Transfers

146.    The 2004 Transferred Real Estate was transferred to the MDS

Companies by the PE Sponsors and the PE Owners and bundled into the Unitary Leases

(and later the Amended and Restated Unitary Leases) in order to impose occupancy costs

on Mervyn's in excess of what it had been paying immediately before the 2004

Transaction. The bundling of separate properties into the Unitary Leases (and later into

Amended and Restated Unitary Leases) was intended by the PE Sponsors and the PE

Owners to prevent Mervyn's from closing stores or missing rent payments without

imperiling multiple store locations. The "true lease" opinion obtained by the PE

Sponsors and the PE Owners for the MDS Companies demonstrates that the PE Sponsors

and the PE Owners, acting as the owners of the MDS Companies, wanted assurance that the leases would receive favorable treatment - - ahead of unsecured creditors - - in any bankruptcy proceeding of Mervyn's and assurance that the value of the leases and the underlying real estate would not be subject to the claims of Mervyn's creditors.

147.    The structure of the Unitary Leases and the Amended and Restated Unitary Leases was part of an overall plan by the PE Sponsors and the PE Owners to impair Mervyn's ability to pay its other creditors as opposed to the payment of its obligations under the Unitary Leases, the Amended and Restated Unitary Leases, and the leases transferred as part of third party sale transactions, and to elevate the rights and enhance the leverage of the MDS Companies and other lessors against Mervyn's as compared to other creditors.  The obligations created under the Unitary Leases and the Amended and Restated Unitary Leases, and thus the payments made by Mervyn's to the MDS Companies under those leases, or under any successor leases to those leases, were made with actual intent to hinder, delay or defraud creditors.

148.    Mervyn's was dominated and controlled by the PE Sponsors and the PE Owners who, while acting for their own benefit, imposed the transactions described herein upon Mervyn's and caused Mervyn's to enter into such transactions and to make the transfers described herein.  The PE Sponsors and the PE Owners took the actions described herein with actual intent to hinder, delay or defraud creditors.  As a result of such domination and control by the PE Sponsors and the PE Owners, any requisite intent for actual fraud is implied, imputed, inferred, or transferred from the PE Sponsors and the PE Owners to Mervyn's at the time of the relevant transfers because the

PE Sponsors and the PE Owners, as insiders in control of Mervyn's, supply any intent required on the part of the transferor or obligor.

### The 2009 Refinancing of the Real Estate Debt

149.    On or about February 27, 2009, the PE Sponsors and the PE Owners caused the MDS Companies to refinance some or all of the loans made by the 2005 Real Estate Secured Lenders.

150.    Pursuant to a Loan Agreement, dated as of February 27, 2009, by and among LKM Lender, as agent and lender, and any other lenders party thereto (collectively, the "**2009 Real Estate Secured Lenders**"), as lenders, and certain of the MDS Companies, as borrowers, the foregoing lenders loaned up to $40 million to the foregoing borrowers in connection with the refinancing of a portion of the $950 million loan borrowed by the MDS Companies in 2005 from the 2005 Real Estate Secured Lenders.

151.    The foregoing loan was secured by a lien for the benefit of LKM Lender, as agent for the 2009 Real Estate Secured Lenders, on Mervyn's previously held real estate.

152.    The foregoing loan and liens granted thereunder were made for the benefit of the PE Sponsors, the PE Owners, the MDS Companies, and the 2009 Secured Real Estate Lenders.

## COUNT I

**(Avoidance of Transfer of Real Property Assets and Recapture of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against the MDS Companies, the PE Sponsors, the PE Owners and Target – Actual Fraud)**

153.    Plaintiffs repeat and reallege their allegations set forth in the above paragraphs.

154.    All of the participants and lenders involved in the 2004 Transaction intended and planned that all transactions would occur simultaneously and were interdependent, related transactions.  All of those transactions should be collapsed into a single, integrated transaction, or into two separate transactions (the sale of Target's equity in Mervyn's and the stripping of the real estate assets by the PE Sponsors and the PE Owners), for purposes of determining whether those transactions were fraudulent to Mervyn's and it's creditors.

155.    The transfer of the 2004 Transferred Real Estate to the MDS Companies represented a transfer of an interest of Mervyn's in property.

156.    At all relevant times, Mervyn's had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

157.    The transfer of the 2004 Transferred Real Estate to the MDS Companies was made with actual intent to hinder, delay or defraud creditors of Mervyn's.  The requisite intent can be imputed to Mervyn's from the the PE Sponsors' and the PE Owners' domination and control of Mervyn's.  From the perspective of the PE Sponsors and the PE Owners, the primary purpose of the 2004 Transaction was to

separate Mervyn's from its real estate assets in so-called "bankruptcy-remote" entities

such that the PE Sponsors and the PE Owners could exploit those assets for their own

benefit without having those assets be available to, and reachable by, creditors of

Mervyn's or a Mervyn's bankruptcy trustee.

158.    The Uniform Fraudulent Transfer Act lists eleven, non-exclusive

factors that may be considered, although none need be present, in determining whether to

infer fraudulent intent from the circumstances of a transfer.  At least five of those so-

called "badges of fraud" would apply to the transfers of the 2004 Transferred Real Estate

to the MDS Companies: (i) the transfer was to an "insider" as both Mervyn's and the

MDS Companies were owned by the PE Sponsors and the PE Owners; (ii) Mervyn's

transfer to the MDS Companies of the 2004 Transferred Real Estate pursuant to the 2004

Transaction was disguised and concealed by the Agency Agreement which created the

appearance that, when MH purchased Mervyn's, it did not actually acquire Mervyn's real

estate assets because those assets were transferred to the MDS Companies by MH as their

"agent;" (iii) the 2004 Transaction included the transfer of all of Mervyn's owned

valuable real estate assets; (iv) Mervyn's received little or no value or consideration in

exchange for transferring the 2004 Transferred Real Estate; and (v) Mervyn's was or

became insolvent at the time of the transfer of the 2004 Transferred Real Estate.

159.    Mervyn's transfer to the MDS Companies of the 2004 Transferred

Real Estate was made for the benefit of Target, as the seller of Mervyn's, and for the

benefit of the PE Sponsors and the PE Owners, as the buyers of Mervyn's.

160.    Mervyn's transfers to the MDS Companies of the 2004 Transferred

Real Estate should be avoided pursuant to applicable provisions of the Uniform

Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

161.    Under Bankruptcy Code section 550, Plaintiffs may recover the 2004 Transferred Real Estate, the value thereof or the Purchase Price paid to Target from the MDS Companies, the PE Sponsors, the PE Owners and/or Target.

## COUNT II

**(Avoidance of Transfer of Real Property Assets and Recapture of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against the MDS Companies, the PE Sponsors, the PE Owners and Target – Constructive Fraud - Insolvency)**

162.    Plaintiffs repeat and reallege their allegations set forth in the above paragraphs.

163.    The transfer of the 2004 Transferred Real Estate to the MDS Companies was a transfer of an interest of Mervyn's in property.

164.    Mervyn's did not receive reasonably equivalent value or fair consideration in exchange for transferring the 2004 Transferred Real Estate to the MDS Companies.

165.    At the time of Mervyn's transfer of the 2004 Transferred Real Estate to the MDS Companies, Mervyn's was insolvent or was rendered insolvent by the transfer of the 2004 Transferred Real Estate.

166.    At all relevant times, Mervyn's had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

167.    Mervyn's transfer to the MDS Companies of the 2004 Transferred Real Estate was made for the benefit of Target, as the seller of Mervyn's, and for the benefit of the PE Sponsors and the PE Owners, as the buyers of Mervyn's

168.    Mervyn's transfer to the MDS Companies of the 2004 Transferred Real Estate should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act and Bankruptcy Code section 544(b).

169.    Under Bankruptcy Code section 550, Plaintiffs may recover the 2004 Transferred Real Estate, the value thereof or the Purchase Price paid to Target from the MDS Companies, the PE Sponsors, the PE Owners and/or Target.

## COUNT III

**(Avoidance of Transfer of Real Property Assets and Recapture of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against the MDS Companies, the PE Sponsors, the PE Owners and Target – Constructive Fraud – Unreasonably Small Capital)**

170.    Plaintiffs repeat and reallege their allegations set forth in the above paragraphs.

171.    The transfer of the 2004 Transferred Real Estate to the MDS Companies was a transfer of an interest of Mervyn's in property.

172.    Mervyn's did not receive reasonably equivalent value or fair consideration in exchange for transferring the 2004 Transferred Real Estate to the MDS Companies.

173.    At the time of Mervyn's transfer of the 2004 Transferred Real Estate to the MDS Companies, Mervyn's was engaged or was about to engage in a

business for which its remaining assets and/or capital were unreasonably small in relation to its business.

174.    At all relevant times, Mervyn's had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

175.    Mervyn's transfer to the MDS Companies of the 2004 Transferred Real Estate was made for the benefit of Target, as the seller of Mervyn's, and for the benefit of the PE Sponsors and the PE Owners, as the buyers of Mervyn's.

176.    Mervyn's transfer to the MDS Companies of the 2004 Transferred Real Estate should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

177.    Under Bankruptcy Code section 550, Plaintiffs may recover the 2004 Transferred Real Estate, the value thereof or the Purchase Price paid to Target from the MDS Companies, the PE Sponsors, the PE Owners and/or Target.

## COUNT IV

**(Avoidance of Transfer of Real Property Assets and Recapture of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against the MDS Companies, the PE Sponsors, the PE Owners and Target – Constructive Fraud – Inability to Pay Debts as Matured)**

178.    Plaintiffs repeat and reallege their allegations set forth in the above paragraphs.

179.    The transfer of the 2004 Transferred Real Estate to the MDS Companies was a transfer of an interest of Mervyn's in property.

180.    Mervyn's did not receive reasonably equivalent value or fair consideration in exchange for transferring the 2004 Transferred Real Estate to the MDS Companies.

181.    At the time of Mervyn's transfer of the 2004 Transferred Real Estate to the MDS Companies, Mervyn's intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

182.    At all relevant times, Mervyn's had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

183.    Mervyn's transfer to the MDS Companies of the 2004 Transferred Real Estate was made for the benefit of Target, as the seller of Mervyn's, and for the benefit of the PE Sponsors and the PE Owners, as the buyers of Mervyn's.

184.    Mervyn's transfer to the MDS Companies of the 2004 Transferred Real Estate should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

185.    Under Bankruptcy Code section 550, Plaintiffs may recover the 2004 Transferred Real Estate, the value thereof or the Purchase Price paid to Target from the MDS Companies, the PE Sponsors, the PE Owners and/or Target.

## COUNT V

**(Avoidance of Transfer of Real Property Assets and Recapture of Value Under 11
U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or
Uniform Fraudulent Conveyance Act; Against the MDS Companies, the
PE Sponsors, the PE Owners and Target – Actual Fraud)**

186.    Plaintiffs repeat and reallege their allegations set forth in the above
paragraphs.

187.    The transfer of the Post-2004 Transferred Real Estate to the MDS
Companies represented a transfer of an interest of Mervyn's in property.

188.    At all relevant times, Mervyn's had actual creditors holding
unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and
544(b).

189.    The transfer of the Post-2004 Transferred Real Estate to the MDS
Companies was made with actual intent to hinder, delay or defraud creditors of
Mervyn's.  The requisite intent can be imputed to Mervyn's from the PE Sponsors' and
the PE Owners' domination and control of Mervyn's.  From the perspective of the
PE Sponsors and the PE Owners, the primary purpose of the transfer of the Post-2004
Transferred Real Estate was to continue the separation of Mervyn's from its real estate
assets in so-called "bankruptcy-remote" entities such that the PE Sponsors and the PE
Owners could exploit those assets for their own benefit without having those assets be
available to, and reachable by, creditors of Mervyn's or a Mervyn's bankruptcy trustee.

190.    The Uniform Fraudulent Transfer Act lists eleven, non-exclusive
factors that may be considered, although none need be present, in determining whether to
infer fraudulent intent from the circumstances of a transfer.  At least four of those so-

called "badges of fraud" would apply to the transfers of the Post-2004 Transferred Real Estate to the MDS Companies: (i) the transfer was to an "insider" as both Mervyn's and the MDS Companies were owned by the PE Sponsors and the PE Owners; (ii) Mervyn's transfer to the MDS Companies of the Post-2004 Transferred Real Estate in furtherance of the 2004 Transaction was disguised and concealed by the Agency Agreement which created the appearance that, when MH purchased Mervyn's, it did not actually acquire Mervyn's real estate assets because those assets were transferred to the MDS Companies by MH as their "agent;" (iii) Mervyn's received little or no value or consideration in exchange for transferring the Post-2004 Transferred Real Estate; and (iv) Mervyn's was or became insolvent at the time of the transfer of the Post-2004 Transferred Real Estate.

191.    Mervyn's transfer to the MDS Companies of the Post-2004 Transferred Real Estate was made for the benefit of Target, as the seller of Mervyn's, and for the benefit of the PE Sponsors and the PE Owners, as the buyers of Mervyn's.

192.    Mervyn's transfer to the MDS Companies of the Post-2004 Transferred Real Estate should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

193.    Under Bankruptcy Code section 550, Plaintiffs may recover the Post-2004 Transferred Real Estate, the value thereof or the Purchase Price paid to Target from the MDS Companies, the PE Sponsors, the PE Owners and/or Target.

## COUNT VI

**(Avoidance of Transfer of Real Property Assets and Recapture of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against the MDS Companies, the PE Sponsors, the PE Owners and Target – Constructive Fraud - Insolvency)**

194.    Plaintiffs repeat and reallege their allegations set forth in the above paragraphs.

195.    The transfer of the Post-2004 Transferred Real Estate to the MDS Companies was a transfer of an interest of Mervyn's in property.

196.    Mervyn's did not receive reasonably equivalent value or fair consideration in exchange for transferring the Post-2004 Transferred Real Estate to the MDS Companies.

197.    At the time of Mervyn's transfer of the Post-2004 Transferred Real Estate to the MDS Companies, Mervyn's was insolvent or was rendered insolvent by the transfer of the Post-2004 Transferred Real Estate.

198.    At all relevant times, Mervyn's had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

199.    Mervyn's transfer to the MDS Companies of the Post-2004 Transferred Real Estate was made for the benefit of Target, as the seller of Mervyn's, and for the benefit of the PE Sponsors and the PE Owners, as the buyers of Mervyn's.

200.    Mervyn's transfer to the MDS Companies of the Post-2004 Transferred Real Estate should be avoided pursuant to applicable provisions of the

Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act and

Bankruptcy Code section 544(b).

201.    Under Bankruptcy Code section 550, Plaintiffs may recover the

Post-2004 Transferred Real Estate, the value thereof or the Purchase Price paid to Target

from the MDS Companies, the PE Sponsors, the PE Owners and/or Target.

## COUNT VII

**(Avoidance of Transfer of Real Property Assets and Recapture of Value Under 11
U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or
Uniform Fraudulent Conveyance Act; Against the MDS Companies, the
PE Sponsors, the PE Owners and Target – Constructive Fraud – Unreasonably
Small Capital)**

202.    Plaintiffs repeat and reallege their allegations set forth in the above

paragraphs.

203.    The transfer of the Post-2004 Transferred Real Estate to the MDS

Companies was a transfer of an interest of Mervyn's in property.

204.    Mervyn's did not receive reasonably equivalent value or fair

consideration in exchange for transferring the Post-2004 Transferred Real Estate to the

MDS Companies.

205.    At the time of Mervyn's transfer of the Post-2004 Transferred Real

Estate to the MDS Companies, Mervyn's was engaged or was about to engage in a

business for which its remaining assets and/or capital were unreasonably small in relation

to its business.

206.    At all relevant times, Mervyn's had actual creditors holding

unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and

544(b).

207.    Mervyn's transfer to the MDS Companies of the Post-2004 Transferred Real Estate was made for the benefit of Target, as the seller of Mervyn's, and for the benefit of the PE Sponsors and the PE Owners, as the buyers of Mervyn's.

208.    Mervyn's transfer to the MDS Companies of the Post-2004 Transferred Real Estate should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

209.    Under Bankruptcy Code section 550, Plaintiffs may recover the Post-2004 Transferred Real Estate, the value thereof or the Purchase Price paid to Target from the MDS Companies, the PE Sponsors, the PE Owners and/or Target.

## COUNT VIII

**(Avoidance of Transfer of Real Property Assets and Recapture of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against the MDS Companies, the PE Sponsors, the PE Owners and Target – Constructive Fraud – Inability to Pay Debts as Matured)**

210.    Plaintiffs repeat and reallege their allegations set forth in the above paragraphs.

211.    The transfer of the Post-2004 Transferred Real Estate to the MDS Companies was a transfer of an interest of Mervyn's in property.

212.    Mervyn's did not receive reasonably equivalent value or fair consideration in exchange for transferring the Post-2004 Transferred Real Estate to the MDS Companies.

213.    At the time of Mervyn's transfer of the Post-2004 Transferred Real Estate to the MDS Companies, Mervyn's intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

214.    At all relevant times, Mervyn's had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

215.    Mervyn's transfer to the MDS Companies of the Post-2004 Transferred Real Estate was made for the benefit of Target, as the seller of Mervyn's, and for the benefit of the PE Sponsors and the PE Owners, as the buyers of Mervyn's.

216.    Mervyn's transfer to the MDS Companies of the Post-2004 Transferred Real Estate should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

217.    Under Bankruptcy Code section 550, Plaintiffs may recover the Post-2004 Transferred Real Estate, the value thereof or the Purchase Price paid to Target from the MDS Companies, the PE Sponsors, the PE Owners and/or Target.

## COUNT IX

**(Avoidance of Liens and Recapture of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against Greenwich, Archon, GSCMC and GS Mortgage – Actual Fraud)**

218.    Plaintiffs repeat and reallege their allegations set forth in the above paragraphs.

219.    All of the participants and lenders involved in the 2004 Transaction intended and planned that all transactions related thereto would occur simultaneously and were interdependent, related transactions. All of those transactions should be collapsed into a single, integrated transaction, or into two separate transactions (the sale of Target's equity in Mervyn's and the stripping of the real estate assets by the PE Sponsors and the PE Owners), for purposes of determining whether those transactions were fraudulent to Mervyn's and its creditors.

220.    The granting of liens on Mervyn's real property assets to the 2004 Real Estate Secured Lenders represented a transfer of an interest of Mervyn's in property.

221.    At all relevant times, Mervyn's had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

222.    The granting of liens on Mervyn's real property assets to the 2004 Real Estate Secured Lenders in conjunction with the 2004 Transaction was part of an overall plan to implement the 2004 Transaction and related transactions with actual intent to hinder, delay or defraud creditors of Mervyn's. The requisite intent can be imputed to Mervyn's through: (i) the 2004 Real Estate Secured Lenders' involvement in the planning of the 2004 Transaction with the PE Sponsors, the PE Owners and Mervyn's; (ii) the 2004 Real Estate Secured Lenders' lending requirement that the 2004 Transferred Real Estate be transferred out of Mervyn's and into the bankruptcy-remote MDS Companies, pledged to them and leased back to Mervyn's under the Unitary Leases; and (iii) the legal opinion required by the 2004 Real Estate Secured Lenders that the Unitary Leases would be treated as unexpired leases rather than disguised financings in any future bankruptcy

{BAY:01517944v1}                                    69

case of Mervyn's so that the value of the Unitary Leases and the underlying real estate would not be subject to the claims of Mervyn's creditors.

223.    The Uniform Fraudulent Transfer Act lists eleven, non-exclusive factors that may be considered, although none need be present, in determining whether to infer fraudulent intent from the circumstances of a transfer.  At least five of those so-called "badges of fraud" would apply to the granting of liens on the 2004 Transferred Real Estate to the 2004 Real Estate Secured Lenders in connection with  the implementation of the 2004 Transaction: (i) the 2004 Transferred Real Estate, the subject of the liens granted to the 2004 Real Estate Secured Lenders, was transferred to "insiders" of Mervyn's as a condition to the closing of the $800 million loan made by the 2004 Real Estate Secured Lenders; (ii) Mervyn's transfer to the MDS Companies of the 2004 Transferred Real Estate pursuant to the 2004 Transaction was disguised and concealed by the Agency Agreement which created the appearance that, when MH purchased Mervyn's, it did not actually acquire Mervyn's real estate assets because those assets were transferred to the MDS Companies by MH as their "agent;" (iii) the 2004 Transaction included the transfer was of all of Mervyn's owned valuable real estate assets; (iv) Mervyn's received little or no value or consideration in exchange for transferring its valuable real estate assets or the pledging of liens to secure borrowings against those assets; and (v) Mervyn's was or became insolvent at the time of the liens were granted to the 2004 Real Estate Secured Lenders.

224.    The liens granted to the 2004 Real Estate Secured Lenders as security for the acquisition financing were transferred for the benefit of the 2004 Real Estate Secured Lenders, the MDS Companies, the PE Sponsors and the PE Owners.

225.    The liens granted to the 2004 Real Estate Secured Lenders as security for the acquisition financing should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

226.    Under Bankruptcy Code section 550, Plaintiffs may recover a monetary judgment from Greenwich, Archon, GSCMC and/or GS Mortgage in an amount to determined at trial.

## COUNT X

**(Avoidance of Liens and Recapture of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against Greenwich, Archon, GSCMC and GS Mortgage – Constructive Fraud - Insolvency)**

227.    Plaintiffs repeat and reallege their allegations set forth in the above paragraphs.

228.    The granting of liens on the 2004 Transferred Real Estate to the 2004 Real Estate Secured Lenders was a transfer of an interest of Mervyn's in property.

229.    Mervyn's did not receive reasonably equivalent value or fair consideration in exchange for the liens granted to the 2004 Real Estate Secured Lenders.

230.    At the time the 2004 Real Estate Secured Lenders obtained liens on the 2004 Transferred Real Estate, Mervyn's was insolvent or was rendered insolvent by the transfer of the 2004 Transferred Real Estate.

231.    At all relevant times, Mervyn's had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

232.    The liens granted to the 2004 Real Estate Secured Lenders were transferred for the benefit of the 2004 Real Estate Secured Lenders, the MDS Companies, the PE Sponsors and the PE Owners.

233.    The liens granted to the 2004 Real Estate Secured Lenders should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

234.    Under Bankruptcy Code section 550, Plaintiffs may recover a monetary judgment from Greenwich, Archon, GSCMC and/or GS Mortgage in an amount to be determined at trial.

## COUNT XI

**(Avoidance of Liens and Recapture of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against Greenwich, Archon, GSCMC and GS Mortgage – Constructive Fraud – Unreasonably Small Capital)**

235.    Plaintiffs repeat and reallege their allegations set forth in the above paragraphs.

236.    The granting of liens on the 2004 Transferred Real Estate to the 2004 Real Estate Secured Lenders was a transfer of an interest of Mervyn's in property.

237.    Mervyn's did not receive reasonably equivalent value or fair consideration in exchange for the liens granted to the 2004 Real Estate Secured Lenders.

238.    At the time the 2004 Real Estate Secured Lenders obtained liens on the 2004 Transferred Real Estate, Mervyn's was engaged or was about to engage in a business for which its remaining assets and/or capital were unreasonably small in relation to its business.

{BAY:01517944v1}                                72

239.    At all relevant times, Mervyn's had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

240.    The liens granted to the 2004 Real Estate Secured Lenders were transferred for the benefit of the 2004 Real Estate Secured Lenders, the MDS Companies, the PE Sponsors and the PE Owners.

241.    The liens granted to the 2004 Real Estate Secured Lenders should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

242.    Under Bankruptcy Code section 550, Plaintiffs may recover a monetary judgment from Greenwich, Archon, GSCMC and/or GS Mortgage in an amount to be determined at trial.

## COUNT XII

**(Avoidance of Liens and Recapture of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against Greenwich, Archon, GSCMC and GS Mortgage – Constructive Fraud – Inability to Pay Debts as Matured)**

243.    Plaintiffs repeat and reallege their allegations set forth in the above paragraphs.

244.    The granting of liens on the 2004 Transferred Real Estate to the 2004 Real Estate Secured Lenders was a transfer of an interest of Mervyn's in property.

245.    Mervyn's did not receive reasonably equivalent value or fair consideration in exchange for the liens granted to the 2004 Real Estate Secured Lenders.

246.    At the time the 2004 Real Estate Secured Lenders obtained liens on the 2004 Transferred Real Estate, Mervyn's intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

247.    At all relevant times, Mervyn's had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

248.    The liens granted to the 2004 Real Estate Secured Lenders were transferred for the benefit of the 2004 Real Estate Secured Lenders, the MDS Companies, the PE Sponsors and the PE Owners.

249.    The liens granted to the 2004 Real Estate Secured Lenders should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

250.    Under Bankruptcy Code section 550, Plaintiffs may recover a monetary judgment from Greenwich, Archon, GSCMC and/or GS Mortgage in an amount to be determined at trial.

## COUNT XIII

**(Avoidance of Liens and Recapture of Value Under 11 U.S.C. §550; Against Bank of America – Subsequent Transferee)**

251.    Plaintiffs repeat and reallege their allegations set forth in the above paragraphs.

252.    Bank of America was an immediate or mediate transferee of the liens granted to Greenwich in conjunction with the 2004 Transaction.

253.    To the extent Plaintiffs avoid the liens granted to Greenwich pursuant to Counts IX, X, XI and/or XII, Plaintiffs may avoid the liens assigned to Bank of America from Greenwich and recover from Bank of America a monetary judgment in an amount to be determined at trial pursuant to Section 550(a)(2) of the Bankruptcy Code.

## COUNT XIV

**(Avoidance of Liens and Recapture of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against Greenwich, GSCMC and GS Mortgage – Actual Fraud)**

254.    Plaintiffs repeat and reallege their allegations set forth in the above paragraphs.

255.    As set forth herein, the 2004 Transaction, the transfer of Mervyn's real estate assets and the liens imposed upon such assets in 2004 should be avoided, and Mervyn's should recover such assets pursuant to section 550 of the Bankruptcy Code.

256.    The granting of liens on the 2004 Transferred Real Estate to Greenwich, GSCMC and GS Mortgage in conjunction with the 2005 refinancing represented a transfer of an interest of Mervyn's in property.

257.    At all relevant times, Mervyn's had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

258.    The liens granted to Greenwich, GSCMC and GS Mortgage in conjunction with the 2005 refinancing were granted with actual intent to hinder, delay or defraud creditors of Mervyn's. The requisite intent can be imputed to Mervyn's through: (i) the involvement of Greenwich, GSCMC and GS Mortgage in the planning of the 2004

{BAY:01517944v1}                    75

Transaction with the PE Sponsors and the PE Owners; (ii) the lending requirement of

Greenwich, GSCMC and GS Mortgage that the 2004 Transferred Real Estate be

transferred out of Mervyn's and into the bankruptcy-remote MDS Companies, pledged to

them and leased back to Mervyn's under the Unitary Leases; and (iii) the legal opinion

required by Greenwich, GSCMC and GS Mortgage that the Unitary Leases would be

treated as unexpired leases rather than disguised financings in any future bankruptcy case

of Mervyn's so that the value of the Unitary Leases and the underlying real estate would

not be subject to the claims of Mervyn's creditors.

259.    The Uniform Fraudulent Transfer Act lists eleven, non-exclusive

factors that may be considered, although none need be present, in determining whether to

infer fraudulent intent from the circumstances of a transfer. At least five of those so-

called "badges of fraud" would apply to the granting of liens on the 2004 Transferred

Real Estate to the Greenwich, GSCMC and GS Mortgage in connection with the

implementation of the 2005 refinancing: (i) the 2004 Transferred Real Estate, the subject

of the liens granted to Greenwich, GSCMC and GS Mortgage, was transferred to

"insiders" of Mervyn's as a condition to the closing of the $950 million loan made by

Greenwich, GSCMC and GS Mortgage in connection with the 2005 refinancing; (ii)

Mervyn's transfer to the MDS Companies of the 2004 Transferred Real Estate pursuant

to the 2004 Transaction was disguised and concealed by the Agency Agreement which

created the appearance that, when MH purchased Mervyn's, it did not actually acquire

Mervyn's real estate assets because those assets were transferred to the MDS Companies

by MH as their "agent;" (iii) the 2004 Transaction included the transfer of all of

Mervyn's owned valuable real estate assets; (iv) Mervyn's received little or no value or

{BAY:01517944v1}

consideration in exchange for transferring its valuable real estate assets or for the pledging of liens to secure borrowings against those assets; and (v) Mervyn's was or became insolvent at the time of the 2005 refinancing.

260.    The liens granted to the 2004 Real Estate Secured Lenders in conjunction with the 2005 refinancing were transferred for the benefit of Greenwich, GSCMC, GS Mortgage, the MDS Companies, the PE Sponsors and the PE Owners.

261.    The liens granted to the 2004 Real Estate Secured Lenders in connection with the 2005 refinancing should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

262.    Under Bankruptcy Code section 550, Plaintiffs may recover a monetary judgment from Greenwich, GSCMC and/or GS Mortgage in an amount to be determined at trial.

## COUNT XV

**(Avoidance of Liens and Recapture of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against Greenwich, GSCMC and GS Mortgage – Constructive Fraud - Insolvency)**

263.    Plaintiffs repeat and reallege their allegations set forth in the above paragraphs.

264.    As set forth herein, the 2004 Transaction, the transfer of Mervyn's real estate assets and the liens imposed upon such assets in 2004 should be avoided, and Mervyn's should recover such assets pursuant to section 550 of the Bankruptcy Code.

265. The granting of liens on the 2004 Transferred Real Estate to Greenwich, GSCMC and GS Mortgage in connection with the 2005 refinancing was a transfer of an interest of Mervyn's in property.

266. Mervyn's did not receive reasonably equivalent value or fair consideration in exchange for the liens granted to Greenwich, GSCMC and GS Mortgage in connection with the 2005 refinancing.

267. At the time of the 2005 refinancing, Mervyn's was insolvent or was rendered insolvent by the granting of liens to Greenwich, GSCMC and GS Mortgage in connection with the 2005 refinancing.

268. At all relevant times, Mervyn's had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

269. The liens granted to Greenwich, GSCMC and GS Mortgage in connection with the 2005 refinancing were transferred for the benefit of Greenwich, GSCMC, GS Mortgage, the MDS Companies, the PE Sponsors and the PE Owners.

270. The liens granted to Greenwich, GSCMC and GS Mortgage in connection with the 2005 refinancing should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

271. Under Bankruptcy Code section 550, Plaintiffs may recover a monetary judgment from Greenwich, GSCMC and/or GS Mortgage in an amount to be determined at trial.

## COUNT XVI

**(Avoidance of Liens and Recapture of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against Greenwich, GSCMC and GS Mortgage – Constructive Fraud – Unreasonably Small Capital)**

272.    Plaintiffs repeat and reallege their allegations set forth in the above paragraphs.

273.    As set forth herein, the 2004 Transaction, the transfer of Mervyn's real estate assets and the liens imposed upon such assets in 2004 should be avoided, and Mervyn's should recover such assets pursuant to section 550 of the Bankruptcy Code.

274.    The granting of liens on the 2004 Transferred Real Estate to Greenwich, GSCMC and GS Mortgage in connection with the 2005 refinancing was a transfer of an interest of Mervyn's in property.

275.    Mervyn's did not receive reasonably equivalent value or fair consideration in exchange for the liens granted to Greenwich, GSCMC and GS Mortgage in connection with the 2005 refinancing.

276.    At the time Greenwich, GSCMC and GS Mortgage obtained liens as security for the 2005 refinancing, Mervyn's was engaged or was about to engage in a business for which its remaining assets and/or capital were unreasonably small in relation to its business.

277.    At all relevant times, Mervyn's had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and ·544(b).

278.    The liens granted to Greenwich, GSCMC and GS Mortgage in connection with the 2005 refinancing were transferred for the benefit of Greenwich, GSCMC, GS Mortgage, the MDS Companies, the PE Sponsors and the PE Owners.

279.    The liens granted to Greenwich, GSCMC and GS Mortgage in connection with the 2005 refinancing should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

280.    Under Bankruptcy Code section 550, Plaintiffs may recover a monetary judgment from Greenwich, GSCMC and/or GS Mortgage in an amount to be determined at trial.

### COUNT XVII

**(Avoidance of Liens and Recapture of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against Greenwich, GSCMC and GS Mortgage – Constructive Fraud – Inability to Pay Debts as Matured)**

281.    Plaintiffs repeat and reallege their allegations set forth in the above paragraphs.

282.    As set forth herein, the 2004 Transaction, the transfer of Mervyn's real estate assets and the liens imposed upon such assets in 2004 should be avoided, and Mervyn's should recover such assets pursuant to section 550 of the Bankruptcy Code.

283.    The granting of liens on the 2004 Transferred Real Estate to Greenwich, GSCMC and GS Mortgage in connection with the 2005 refinancing was a transfer of an interest of Mervyn's in property.

284.    Mervyn's did not receive reasonably equivalent value or fair consideration in exchange for the liens granted to Greenwich, GSCMC and GS Mortgage in connection with the 2005 refinancing.

285.    At the time Greenwich, GSCMC and GS Mortgage obtained liens as security for the 2005 refinancing, Mervyn's intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

286.    At all relevant times, Mervyn's had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

287.    The liens granted to Greenwich, GSCMC and GS Mortgage enders in connection with the 2005 refinancing were transferred for the benefit of Greenwich, GSCMC, GS Mortgage, the MDS Companies, the PE Sponsors and the PE Owners.

288.    The liens granted to Greenwich, GSCMC and GS Mortgage in connection with the 2005 refinancing should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

289.    Under Bankruptcy Code section 550, Plaintiffs may recover a monetary judgment from Greenwich, GSCMC and/or GS Mortgage in an amount to be determined at trial.

## COUNT XVIII

**(Avoidance of Transaction Fees and Recapture of Value Under 11 U.S.C. §§544(b)
and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform
Fraudulent Conveyance Act; Against the PE Sponsors, the PE Owners, Ableco and
Madeleine – Actual Fraud)**

290.    Plaintiffs repeat and reallege their allegations set forth in the above

paragraphs.

291.    The payment of Transaction Fees represented a transfer of interest

of Mervyn's in property.

292.    At all relevant times, Mervyn's had actual creditors holding

unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and

544(b).

293.    At all relevant times, Ableco and Madeline were under the direct

or indirect ownership or control of one of more of the PE Owners.

294.    The payment of the Transaction Fees to or for the benefit of the PE

Sponsors, the PE Owners,  Ableco and Madeleine, was part of an overall plan to

implement the 2004 Transaction and related transactions with actual intent to hinder,

delay or defraud creditors of Mervyn's.  The requisite intent can be imputed to Mervyn's

from the PE Sponsors' and PE Owners' domination and control of Mervyn's, Ableco and

Madeline.  From the perspective of the PE Sponsors and the PE Owners, the primary

purpose of the Transaction Fees was to extract further value from Mervyn's in connection

with the 2004 Transaction.

295.    The Uniform Fraudulent Transfer Act lists eleven, non-exclusive

factors that may be considered, although none need be present, in determining whether to

infer fraudulent intent from the circumstances of a transfer.  At least five of those so-called "badges of fraud" would apply to Mervyn's payment of the Transaction Fees in connection with the implementation of the 2004 Transaction: (i) the Transaction Fees were paid to "insiders" of Mervyn's, as Mervyn's was owned and controlled by the PE Sponsors and the PE Owners; (ii) Mervyn's transfer to the MDS Companies of the 2004 Transferred Real Estate pursuant to the 2004 Transaction was disguised and concealed by the Agency Agreement which created the appearance that, when MH purchased Mervyn's, it did not actually acquire Mervyn's real estate assets because those assets were transferred to the MDS Companies by MH as their "agent;" (iii) the 2004 Transaction included the transfer of all of Mervyn's owned valuable real estate assets; (iv) Mervyn's received little or no value or consideration in exchange for paying the Transaction Fees, for transferring its valuable real estate assets or for the pledging of liens to secure borrowings against those assets; and (v) Mervyn's was or became insolvent at the time of the payment of the Transaction Fees.

296.    Mervyn's payment of the Transaction Fees to or for the benefit of the PE Sponsors, the PE Owners, Ableco and Madeleine should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

297.    Under Bankruptcy Code section 550, Plaintiffs may recover a monetary judgment from the PE Sponsors, the PE Owners, Ableco and/or Madeleine in an amount to be determined at trial.

## COUNT XIX

**(Avoidance of Transaction Fees and Recapture of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against the PE Sponsors, the PE Owners, Ableco and Madeleine – Constructive Fraud - Insolvency)**

298.    Plaintiffs repeat and reallege their allegations set forth in the above paragraphs.

299.    The payment of the Transaction Fees was a transfer of an interest of Mervyn's in property.

300.    The Transaction Fees were paid by Mervyn's to or for the benefit of the PE Sponsors, the PE Owners, Ableco and Madeline.

301.    Mervyn's did not receive reasonably equivalent value or fair consideration in exchange for its payment of the Transaction Fees.

302.    At the time of Mervyn's payment of the Transaction Fees, Mervyn's was insolvent or was rendered insolvent by the payment of the Transaction Fees and the transfer of the 2004 Transferred Real Estate.

303.    At all relevant times, Mervyn's had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

304.    Mervyn's payment of the Transaction Fees to or for the benefit of the PE Sponsors, the PE Owners, Ableco and Madeleine should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

305.    Under Bankruptcy Code section 550, Plaintiffs may recover a

monetary judgment from the PE Sponsors, the PE Owners, Ableco and/or Madeleine in

an amount to be determined at trial.

## COUNT XX

**(Avoidance of Transaction Fees and Recapture of Value Under 11 U.S.C. §§544(b)
and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform
Fraudulent Conveyance Act; Against the PE Sponsors, the PE Owners, Ableco and
Madeleine – Constructive Fraud – Unreasonably Small Capital)**

306.    Plaintiffs repeat and reallege their allegations set forth in the above

paragraphs.

307.    The payment of the Transaction Fees was a transfer of an interest

of Mervyn's in property.

308.    The Transaction Fees were paid by Mervyn's to or for the benefit

of the PE Sponsors, the PE Owners, Ableco and Madeline.

309.    Mervyn's did not receive reasonably equivalent value or fair

consideration in exchange for its payment of the Transaction Fees.

310.    At the time of Mervyn's payment of the Transaction Fees,

Mervyn's was engaged or was about to engage in a business for which its remaining

assets and/or capital were unreasonably small in relation to its business.

311.    At all relevant times, Mervyn's had actual creditors holding

unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and

544(b).

312.    Mervyn's payment of the Transaction Fees to or for the benefit of

the PE Sponsors, the PE Owners, Ableco and Madeleine should be avoided pursuant to

applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

313.    Under Bankruptcy Code section 550, Plaintiffs may recover a monetary judgment from the PE Sponsors, the PE Owners, Ableco and/or Madeleine in an amount to be determined at trial.

## COUNT XXI

**(Avoidance of Transaction Fees and Recapture of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against the PE Sponsors, the PE Owners, Ableco and Madeleine – Constructive Fraud – Inability to Pay Debts as Matured)**

314.    Plaintiffs repeat and reallege their allegations set forth in the above paragraphs.

315.    The payment of the Transaction Fees was a transfer of an interest of Mervyn's in property.

316.    The Transaction Fees were paid by Mervyn's to or for the benefit of the PE Sponsors, the PE Owners, Ableco and Madeline.

317.    Mervyn's did not receive reasonably equivalent value or fair consideration in exchange for its payment of the Transaction Fees.

318.    At the time of Mervyn's payment of the Transaction Fees, Mervyn's intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

319.    At all relevant times, Mervyn's had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

320.    Mervyn's payment of the Transaction Fees to or for the benefit of the PE Sponsors, the PE Owners, Ableco and Madeleine should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

321.    Under Bankruptcy Code section 550, Plaintiffs may recover a monetary judgment from the PE Sponsors, the PE Owners, Ableco and/or Madeleine in an amount to be determined at trial.

## COUNT XXII

**(Avoidance of Rent Payments, So-Called "Notional Rent" Payments, Occupancy Cost Increases, and Other Transfers and Recapture of Value Under 11 U.S.C. §§544(b), 548 and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against the MDS Companies, the PE Sponsors, the PE Owners and Sun Management – Actual Fraud)**

322.    Plaintiffs repeat and reallege their allegations set forth in the above paragraphs.

323.    Mervyn's made payments or transfers under the Unitary Leases and the Amended and Restated Unitary Leases that reflected an increase of Mervyn's rent payments and other occupancy costs for its stores and other premises above what Mervyn's had been paying to its third party landlords, or paying with respect to fee properties that had been owned by Mervyn's, prior to the 2004 Transaction (the "**Occupancy Cost Increases**").

324.    Mervyn's paid management, consulting and other fees, payments, transfers, dividends or distributions, including the $60 million dividend under the Mervyn's LLC Agreements (the "**Other Transfers**") to the PE Owners, the PE Sponsors and/or Sun Management.

325. Mervyn's was caused by the PE Sponsors and the PE Owners to make payments to MH referred to as so-called "notional rent." These so-called "notional rent" payments, the Occupancy Cost Increases and the Other Transfers shall be collectively referred to herein as the "**Count 22-25 Transfers**".

326. The Count 22-25 Transfers were transfers of interests of Mervyn's in property.

327. The Count 22-25 Transfers were made by Mervyn's to or for the benefit of the PE Sponsors, the PE Owners, the MDS Companies and/or Sun Management.

328. At all relevant times, Mervyn's had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

329. The Count 22-25 Transfers were made by Mervyn's with actual intent to hinder, delay or defraud creditors of Mervyn's. The requisite intent can be imputed to Mervyn's through the PE Sponsors' and the PE Owners' domination and control of Mervyn's.

330. The Uniform Fraudulent Transfer Act lists eleven, non-exclusive factors that may be considered, although none need be present, in determining whether to infer fraudulent intent from the circumstances of a transfer. At least four of those so-called "badges of fraud" would apply to the Count 22-25 Transfers: (i) the Count 22-25 Transfers were made by Mervyn's to or for the benefit of an "insider" of Mervyn's, as Mervyn's, MH and the MDS Companies were all owned and controlled by the PE Sponsors and the PE Owners; (ii) Mervyn's received little or no value or consideration in

exchange for making the Count 22-25 Transfers; (iii) Mervyn's was or became insolvent

at the time and/or as a result of the Count 22-25 Transfers and other transactions made in

connection with the 2004 Transaction; and (iv) the PE Sponsors and the PE Owners

caused Mervyn's to make the $60 million dividend only months after they caused

Mervyn's to incur substantially increased occupancy costs in connection with the 2005

refinancing.

        331.    The Count 22-25 Transfers should be avoided pursuant to

applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent

Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

        332.    Under Bankruptcy Code section 550, Plaintiffs may recover a

monetary judgment from the PE Sponsors, the PE Owners, the MDS Companies and/or

Sun Management in an amount to be determined at trial.

## COUNT XXIII

**(Avoidance of Rent Payments, So-Called "Notional Rent" Payments, Occupancy
Cost Increases, and Other Transfers and Recapture of Value Under 11 U.S.C.
§§544(b), 548 and 550 and, as applicable, Uniform Fraudulent Transfer Act or
Uniform Fraudulent Conveyance Act; Against the MDS Companies, the
PE Sponsors, PE Owners and Sun Management – Constructive Fraud - Insolvency)**

        333.    Plaintiffs repeat and reallege their allegations set forth in the above

paragraphs.

        334.    The Count 22-25 Transfers were transfers of interest of Mervyn's

in property.

        335.    Mervyn's did not receive reasonably equivalent value or fair

consideration in exchange for the Count 22-25 Transfers.

336.    The Count 22-25 Transfers were made by Mervyn's to or for the benefit of the PE Sponsors, the PE Owners, the MDS Companies and/or Sun Management.

337.    Mervyn's was insolvent when the Count 22-25 Transfers were made or was rendered insolvent as a result of the Count 22-25 Transfers and/or .

338.    At all relevant times, Mervyn's had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

339.    The Count 22-25 Transfers should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550

340.    Under Bankruptcy Code section 550, Plaintiffs may recover a monetary judgment from the PE Sponsors, the PE Owners, the MDS Companies and/or Sun Management in an amount to be determined at trial.

## COUNT XXIV

**(Avoidance of Rent Payments, So-Called "Notional Rent" Payments, Occupancy Cost Increases, and Other Transfers and Recapture of Value Under 11 U.S.C. §§544(b), 548 and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against the MDS Companies, the PE Sponsors, PE Owners and Sun Management – Constructive Fraud – Unreasonably Small Capital)**

341.    Plaintiffs repeat and reallege their allegations set forth in the above paragraphs.

342.    The Count 22-25 Transfers were transfers of interest of Mervyn's in property.

343.    Mervyn's did not receive reasonably equivalent value or fair consideration in exchange for the Count 22-25 Transfers.

344.    The Count 22-25 Transfers were made by Mervyn's to or for the benefit of the PE Sponsors, the PE Owners, the MDS Companies and/or Sun Management.

345.    Mervyn's was engaged or was about to engage in a business for which its remaining assets and/or capital were unreasonably small in relation to its business when the Count 22-25 Transfers were made.

346.    At all relevant times, Mervyn's had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

347.    The Count 22-25 Transfers should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

348.    Under Bankruptcy Code section 550, Plaintiffs may recover a monetary judgment from the PE Sponsors, the PE Owners, the MDS Companies and/or Sun Management in an amount to be determined at trial.

## COUNT XXV

**(Avoidance of Rent Payments, So-Called "Notional Rent" Payments, Occupancy Cost Increases, and Other Transfers and Recapture of Value Under 11 U.S.C. §§544(b), 548 and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against the MDS Companies, the PE Sponsors, the PE Owners and Sun Management – Constructive Fraud – Inability to Pay Debts as Matured)**

349.    Plaintiffs repeat and reallege their allegations set forth in the above paragraphs.

350.    The Count 22-25 Transfers were transfers of an interest in Mervyn's in property.

351.    Mervyn's did not receive reasonably equivalent value or fair consideration in exchange for the Count 22-25 Transfers.

352.    The Count 22-25 Transfers were made by Mervyn's to or for the benefit of the PE Sponsors, the PE Owners, the MDS Companies and/or Sun Management.

353.    At the time the Count 22-25 Transfers were made, Mervyn's intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

354.    At all relevant times, Mervyn's had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

355.    The Count 22-25 Transfers should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

356.    Under Bankruptcy Code section 550, Plaintiffs may recover a monetary judgment from the PE Sponsors, the PE Owners, the MDS Companies and/or Sun Management in an amount to be determined at trial.

## COUNT XXVI

**(Breach of Fiduciary Duty; Self-Dealing Against the PE Sponsors, the PE Owners and Target)**

357.    Plaintiffs repeat and reallege their allegations set forth in the above paragraphs.

358.    At all relevant times prior to the 2004 Transaction, Target was the owner of all of the equity of Mervyn's and in August 2004, after Target converted Mervyn's from a California corporation to a limited liability company, its sole owner and managing member. As the sole and controlling owner of Mervyn's, Target owed to Mervyn's fiduciary obligations of good faith, care and loyalty.

359.    On and after the closing of the 2004 Transaction, MH became the sole owner and managing member of Mervyn's. The PE Sponsors owned all of the equity of MH in varying percentages, and the PE Sponsors each had two of their designees appointed as managers of the governing boards of MH. The PE Owners, in turn, had and exercised the ability to control the PE Sponsors. The PE Sponsors and the PE Owners owed to Mervyn's fiduciary obligations of good faith, care and loyalty.

360.    At the time Target sold Mervyn's to MH, Mervyn's: (a) was engaged or was about to engage in a business for which its remaining assets and/or capital were unreasonably small in relation to the business; (b) intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as

they became due; and/or (c) was insolvent or would be rendered insolvent by the transactions undertaken in connection with the 2004 Transaction. Because Mervyn's would be rendered insolvent as a result of the 2004 Transaction, Target had a fiduciary obligation to Mervyn's and its unsecured creditors to protect the interests of such creditors. Even if Mervyn's was not insolvent or did not have unreasonably small capital, the PE Owners, the PE Sponsors and Target had duties of loyalty to Mervyn's.

361.    Target had a large financial interest in the sale of Mervyn's because it stood to obtain the purchase price of approximately $1.175 billion. The PE Sponsors and the PE Owners had a correspondingly large financial interest in acquiring Mervyn's because they hoped and planned to profit from the transaction by exploiting Mervyn's real estate assets.

362.    Target had or should have had knowledge, and participated and/or acquiesced in the plan developed by the PE Sponsors and the PE Owners to strip out all of Mervyn's real estate assets, and pledge those assets as security in order to obtain secured loans to finance the purchase price.

363.    Target breached its fiduciary duty by approving, participating in, consummating and acquiescing to the 2004 Transaction whereby Mervyn's transferred away its valuable real estate assets for little or no benefit.

364.    Because the PE Sponsors and the PE Owners owned and controlled Mervyn's and the MDS Companies, they were conflicted when balancing the interests of Mervyn's and its creditors against interests of the MDS Companies.

365.    The PE Sponsors and the PE Owners exploited the ownership structure they created and engaged in self-dealing that enabled them to enhance the value

of the MDS Companies and the real estate assets held by those companies for their own benefit at the expense of Mervyn's.

366.    The PE Sponsors and the PE Owners engaged in self-dealing, had actual conflicts of interest, and breached their fiduciary duties (including the duty of loyalty), and took undue advantage of Mervyn's, by planning, approving and executing the 2004 Transaction whereby Mervyn's transferred away its real estate assets for little or no benefit.

367.    The PE Sponsors and the PE Owners also engaged in self-dealing, had actual conflicts of interest and breached their fiduciary duties (including the duty of loyalty), and took undue advantage of Mervyn's, by causing Mervyn's to make the Count 22-25 Transfers.

368.    The PE Sponsors and the PE Owners also engaged in self-dealing, had actual conflicts of interest and breached their fiduciary duties (including the duty of loyalty), and took undue advantage of Mervyn's, by using their position as the owners and managers of MH to cause MH to cause Mervyn's to enter into economically disadvantageous transactions, such as the Valencia transaction and the headquarters building transaction that enhanced the interests of the PE Sponsors and the PE Owners as the owners of the MDS Companies at the expense and to the detriment of Mervyn's and its creditors.

369.    The PE Sponsors and the PE Owners also engaged in self-dealing, had actual conflicts of interest and breached their fiduciary duties (including the duty of loyalty), and took undue advantage of Mervyn's, by using their position as the owners and managers of MH to cause MH to cause Mervyn's to enter into the Unitary Leases and

the Amended and Restated Unitary Leases by failing to act to remedy the negative effects

on Mervyn's of the obligations imposed upon Mervyn's by such defendants as Mervyn's

retail operations struggled.

370.    Mervyn's incurred substantial damages as a result of the PE

Sponsors', the PE Owners' and Target's breaches of their fiduciary duties (including the

duty of loyalty) and is entitled to the recovery of a monetary judgment in an amount to be

determined at trial.

## COUNT XXVII

**(Avoidance of So-Called "Notional Rent" Payments, and Occupancy Cost Increases,
and Recapture of Value Under 11 U.S.C. §§ 544(b), 548 and 550 and, as applicable,
Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against
Greenwich, Archon, GSCMC and GS Mortgage – Actual Fraud)**

371.    Plaintiffs repeat and reallege their  allegations set forth in the

above paragraphs.

372.    Some or all of the Occupancy Cost Increases and the so-called

"notional rent" payments were made into accounts controlled by and pledged to

Greenwich, Archon, GSCMC and GS Mortgage (the "**Secured Lender Transfers**").

373.    The Secured Lender Transfers were transfers of interest of

Mervyn's in property.

374.    The Secured Lender Transfers were made and incurred with the

actual intent to hinder, delay or defraud Mervyn's and its creditors.

375.    At all relevant times, Mervyn's had actual creditors holding

unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and

544(b).

376.    The Secured Lender Transfers were part of an overall plan to implement the 2004 Transaction and related transactions with actual intent to hinder, delay or defraud creditors of Mervyn's.  The requisite intent can be imputed to Mervyn's through: (i) the involvement of Greenwich, Archon, GSCMC and GS Mortgage in the planning of the 2004 Transaction with the PE Sponsors and the PE Owners who dominated and controlled Mervyn's at all relevant times; (ii) the lending requirement of Greenwich, Archon, GSCMC and GS Mortgage that the Transferred Real Estate be transferred out of Mervyn's and into the bankruptcy-remote MDS Companies, pledged to them and leased back to Mervyn's under the Unitary Leases; and (iii) the legal opinion required by Greenwich, Archon, GSCMC and GS Mortgage that the Unitary Leases would be treated as unexpired leases rather than disguised financings in any future bankruptcy case of Mervyn's so that the value of the Unitary Leases and the underlying real estate would not be subject to the claims of Mervyn's creditors.

377.    The Uniform Fraudulent Transfer Act lists eleven, non-exclusive factors that may be considered, although none need be present, in determining whether to infer fraudulent intent from the circumstances of a transfer. At least three of those so-called "badges of fraud" apply to the Secured Lender Transfers: (i) the Secured Lender Transfers were paid by Mervyn's in satisfaction of the debt service obligations of the MDS Companies who were "insiders" of Mervyn's; (ii) Mervyn's received little or no value or consideration in exchange for making the Secured Lender Transfers; and (iii) Mervyn's was or became insolvent as a result of the Secured Lender Transfers and other transactions made in connection with the 2004 Transaction.

378.     The Secured Lender Transfers should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b), 548 and 550.

379.     Under Bankruptcy Code sections 550, Plaintiffs may recover a monetary judgment from Greenwich, Archon, GSCMC and/or GS Mortgage in an amount to be determined at trial.

## COUNT XXVIII

**(Avoidance of So-Called "Notional Rent" Payments, and Occupancy Cost Increases, and Recapture of Value Under 11 U.S.C. §§ 544(b), 548 and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against Greenwich, Archon, GSCMC, GS Mortgage, Citigroup and Bank of America – Constructive Fraud - Insolvency)**

380.     Plaintiffs repeat and reallege their allegations set forth in the above paragraphs.

381.     The Secured Lender Transfers were made into accounts controlled by and pledged to Greenwich, Archon, GSCMC, GS Mortgage, Citigroup and Bank of America.

382.     The Secured Lender Transfers were transfers of interest of Mervyn's in property.

383.     Mervyn's did not receive reasonably equivalent value or fair consideration in exchange for the Secured Lender Transfers.

384.     The Secured Lender Transfers were made by Mervyn's to or for the benefit of Greenwich, Archon, GSCMC, GS Mortgage, Citigroup and Bank of America.

385.    At all relevant times, Mervyn's had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

386.    Mervyn's was insolvent when the Secured Lender Transfers were made or was rendered insolvent as a result of the Secured Lender Transfers.

387.    The Secured Lender Transfers should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b), 548 and 550.

388.    Under Bankruptcy Code sections 550, Plaintiffs may recover a monetary judgment from Greenwich, Archon, GSCMC, GS Mortgage, Bank of America and/or Citigroup in an amount to be determined at trial.

## COUNT XXIX

**(Avoidance of So-Called "Notional Rent" Payments, and Occupancy Cost Increases, and Recapture of Value Under 11 U.S.C. §§ 544(b), 548 and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against Greenwich, Archon, GSCMC, GS Mortgage, Citigroup and Bank of America – Constructive Fraud – Unreasonably Small Capital)**

389.    Plaintiffs repeat and reallege their  allegations set forth in the above paragraphs.

390.    The Secured Lender Transfers were made into accounts controlled by and pledged to Greenwich, Archon, GSCMC, GS Mortgage, Citigroup and Bank of America.

391.    The Secured Lender Transfers were transfers of interest of Mervyn's in property.

392.   Mervyn's did not receive reasonably equivalent value or fair consideration in exchange for the Secured Lender Transfers.

393.   The Secured Lender Transfers were made by Mervyn's to or for the benefit of Greenwich, Archon, GSCMC, GS Mortgage, Citigroup and Bank of America.

394.   At all relevant times, Mervyn's had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

395.   Mervyn's was engaged or was about to engage in a business for which its remaining assets and/or capital were unreasonably small in relation to its business at the time the Secured Lender Transfers were made.

396.   The Secured Lender Transfers should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b), 548 and 550.

397.   Under Bankruptcy Code sections 550, Plaintiffs may recover a monetary judgment from Greenwich, Archon, GSCMC, GS Mortgage, Bank of America and/or Citigroup in an amount to be determined at trial.

## COUNT XXX

**(Avoidance of So-Called "Notional Rent" Payments, and Occupancy Cost Increases, and Recapture of Value Under 11 U.S.C. §§ 544(b), 548 and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against Greenwich, Archon, GSCMC, GS Mortgage, Citigroup and Bank of America – Constructive Fraud – Inability to Pay Debts as Matured)**

398.   Plaintiffs repeat and reallege their allegations set forth in the above paragraphs.

399.    The Secured Lender Transfers were made into accounts controlled by and pledged to Greenwich, Archon, GSCMC, GS Mortgage, Citigroup and Bank of America.

400.    The Secured Lender Transfers were transfers of interest of Mervyn's in property.

401.    Mervyn's did not receive reasonably equivalent value or fair consideration in exchange for the Secured Lender Transfers.

402.    The Secured Lender Transfers were made by Mervyn's at a time when Mervyn's intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

403.    The Secured Lender Transfers were made by Mervyn's to or for the benefit of Greenwich, Archon, GSCMC, GS Mortgage, Citigroup and Bank of America.

404.    At all relevant times, Mervyn's had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

405.    The Secured Lender Transfers should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b), 548 and 550.

406.    Under Bankruptcy Code sections 550, Plaintiffs may recover a monetary judgment from Greenwich, Archon, GSCMC, GS Mortgage, Bank of America and/or Citigroup in an amount to be determined at trial.

## COUNT XXXI

**(Avoidance and Recovery of Preferential Transfers Under 11 U.S.C. §§ 547 and 550; Against the MDS Companies, the PE Sponsors, PE Owners and Sun Management)**

407.    Plaintiffs repeat and reallege their allegations set forth in the above paragraphs.

408.    On or within one year of the Petition Date, Mervyn's made the Count 22-25 Transfers to or for the benefit of the MDS Companies, the PE Sponsors, the PE Owners and/or Sun Management.

409.    The Count 22-25 Transfers were for or on account of an antecedent debt owed by Mervyn's to the MDS Companies, the PE Sponsors, the PE Owners and/or Sun Management before the Count 22-25 Transfers were made.

410.    The MDS Companies, the PE Sponsors, the PE Owners and/or Sun Management were creditors of Mervyn's within the meaning of section 101(10)(A) of the Bankruptcy Code at the time the Count 22-25 Transfers were made.

411.    The MDS Companies, the PE Sponsors, the PE Owners and/or Sun Management were insiders of Mervyn's within the meaning of section 101(31)(B) of the Bankruptcy Code at the time the Count 22-25 Transfers were made.

412.    Mervyn's was insolvent at the time the Count 22-25 Transfers were made within the meaning of section 101(32) of the Bankruptcy Code.

413.    The Count 22-25 Transfers enabled the MDS Companies, the PE Sponsors, the PE Owners and/or Sun Management, as creditors, to receive more than they would have received if: (i) Mervyn's had not made such Count 22-25 Transfers; (ii) Mervyn's Chapter 11 Case was converted to a case under Chapter 7 of the Bankruptcy

Code; and (iii) the antecedent debts owed to the MDS Companies, Sun Management, the PE Sponsors and the PE Owners were paid to the extent provided by the Bankruptcy Code.

414.    By reason of the foregoing, the Count 22-25 Transfers are avoidable pursuant to section 547(b) of the Bankruptcy Code.

415.    Under Bankruptcy Code section 550, Plaintiffs may recover a monetary judgment from the MDS Companies, the PE Sponsors, the PE Owners and/or Sun Management in an amount to be determined at trial.

## COUNT XXXII

**(Avoidance of Liens and Recapture of Value Under 11 U.S.C. §§549 and 550 Against LKM Lender as agent for the 2009 Real Estate Secured Lenders– Unauthorized Postpetition Transfers)**

416.    Plaintiffs repeat and reallege their allegations set forth in the above paragraphs.

417.    As set forth herein, the transfer of the Transferred Real Estate and the liens imposed upon such assets in 2004 and 2005 should be avoided, and Mervyn's should recover such assets pursuant to section 550 of the Bankruptcy Code.

418.    The PE Sponsors and the PE Owners caused the MDS Companies to grant liens on Mervyn's previously owned real estate to LKM Lender, as agent for the 2009 Real Estate Secured Lenders, to secure the loans advanced under the 2009 refinancing.

419.    At all relevant times, LKM Lender was under the direct or indirect ownership or control of KLA.

420.    The granting of such liens by the MDS Companies subsequent to the Petition Date was not authorized under the Bankruptcy Code and was effected without authorization from the Court.

421.    By reason of the foregoing, the liens granted to LKM Lender, as agent for the 2009 Real Estate Secured Lenders, should be avoided pursuant to section 549 of the Bankruptcy Code.

422.    Under Bankruptcy Code section 550, Plaintiffs may recover a monetary judgment from LKM Lender, as agent for the 2009 Real Estate Secured Lenders, in an amount to be determined at trial.

### Prayer for Relief

**WHEREFORE**, Plaintiffs demand that judgment be entered as follows:

A.    On Counts I through IV, awarding Plaintiffs judgment, pursuant to sections 544(b) and 550 of the Bankruptcy Code and, as applicable, the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, against the MDS Companies, the PE Sponsors, the PE Owners and Target avoiding Mervyn's transfer of the 2004 Transferred Real Estate to the MDS Companies and directing the return of the 2004 Transferred Real Estate to Mervyn's or, alternatively, awarding Plaintiffs monetary judgment against the MDS Companies, the PE Sponsors, the PE Owners and Target, jointly and severally, in an amount to be determined at trial;

B.    On Counts V through VIII, awarding Plaintiffs judgment, pursuant to sections 544(b) and 550 of the Bankruptcy Code and, as applicable, the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, against the MDS Companies, the PE Sponsors, the PE Owners and Target avoiding Mervyn's transfer of

the Post-2004 Transferred Real Estate to the MDS Companies and directing the return of

the Post-2004 Transferred Real Estate to Mervyn's, or, alternatively, awarding Plaintiffs

monetary judgment against the MDS Companies, the PE Sponsors, the PE Owners and

Target, jointly and severally, in an amount to be determined at trial;

        C.      On Counts IX through XII, awarding Plaintiffs judgment, pursuant

to sections 544(b) and 550 of the Bankruptcy Code and, as applicable, the Uniform

Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, against Greenwich,

Archon, GSCMC and GS Mortgage avoiding the liens imposed on the 2004 Transferred

Real Estate and awarding Plaintiffs monetary judgment against Greenwich, Archon,

GSCMC and GS Mortgage in an amount to be determined at trial;

        D.      On Count XIII, awarding Plaintiffs judgment, pursuant to section

550 of the Bankruptcy Code, against Bank of America avoiding the liens and awarding

Plaintiffs monetary judgment against Bank of America in an amount to be determined at

trial;

        E.      On Counts XIV through XVII, awarding Plaintiffs judgment,

pursuant to sections 544(b) and 550 of the Bankruptcy Code and, as applicable, the

Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, against

Greenwich, GSCMC and GS Mortgage avoiding the liens imposed on the 2004

Transferred Real Estate in connection with the 2005 refinancing and awarding Plaintiffs

monetary judgment against Greenwich, GSCMC and GS Mortgage, jointly or severally,

in an amount to be determined at trial;

        F.      On Counts XVIII through XXI, awarding Plaintiffs judgment,

pursuant to sections 544(b) and 550 of the Bankruptcy Code and, as applicable, the

Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, against the PE

Sponsors, the PE Owners, Ableco and Madeleine avoiding the transfer of the Transaction

Fees paid to or for the benefit of the PE Sponsors, the PE Owners, Ableco and Madeleine

and awarding Plaintiffs monetary judgment against the PE Sponsors, the PE Owners,

Ableco and Madeleine, jointly and severally, in an amount to be determined at trial;

        G.      On Counts XXII through XXV, awarding Plaintiffs judgment,

pursuant to sections 544(b), 548 and 550 of the Bankruptcy Code and, as applicable, the

Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, against the PE

Sponsors, the PE Owners, the MDS Companies and Sun Management avoiding the Count

22-25 Transfers made, undertaken or imposed for the benefit of the PE Sponsors, the PE

Owners, the MDS Companies and/or Sun Management and awarding Plaintiffs monetary

judgment against the PE Sponsors, the PE Owners, the MDS Companies and/or Sun

Management, jointly and severally, in an amount to be determined at trial;

        H.      On Count XXVI, awarding Plaintiffs judgment against the PE

Sponsors, the PE Owners and Target, jointly and severally, for damages caused to

Mervyn's resulting from their breach of fiduciary duties in an amount to be determined at

trial;

        I.      On Count XXVII, awarding Plaintiffs judgment, pursuant to

sections 544(b), 548 and 550 of the Bankruptcy Code and, as applicable, the Uniform

Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, against Greenwich,

Archon, GSCMC and GS Mortgage avoiding the Secured Lender Transfers paid to or for

the benefit of Greenwich, Archon, GSCMC and GS Mortgage and awarding Plaintiffs

monetary judgment against Greenwich, Archon, GSCMC and/or GS Mortgage, jointly and severally, in an amount to be determined at trial;

J.      On Counts XXVIII through XXX, awarding Plaintiffs judgment, pursuant to sections 544(b), 548 and 550 of the Bankruptcy Code and, as applicable, the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, against Greenwich, Archon, GSCMC, GS Mortgage, Citigroup and Bank of America avoiding the Secured Lender Transfers paid to or for the benefit of Greenwich, Archon, GSCMC, GS Mortgage, Citigroup and Bank of America and awarding Plaintiffs monetary judgment against Greenwich, Archon, GSCMC, GS Mortgage, Citigroup and/or Bank of America, jointly and severally, in an amount to be determined at trial;

K.      On Count XXXI, awarding Plaintiffs judgment, pursuant to sections 547 and 550 of the Bankruptcy Code, against the MDS Companies, the PE Sponsors, the PE Owners and Sun Management avoiding the Count 22-25 Transfers made to the MDS Companies, the PE Sponsors, the PE Owner and/or Sun Management and awarding Plaintiffs moneltary judgment against the MDS Companies, the PE Sponsors, the PE Owners and/or Sun Management, jointly and severally, in an amount to be determined at trial;

L.      On Count XXXII, awarding Plaintiffs judgment, pursuant to sections 549 and 550 of the Bankruptcy Code, against LKM Lender, as agent for the 2009 Real Estate Secured Lenders, avoiding liens granted on Mervyn's real property assets in connection with the 2009 refinancing and awarding Plaintiffs monetary judgment against LKM Lender, as agent for the 2009 Real Estate Secured Lenders, in an amount to be determined at trial;

M.      Awarding Plaintiffs interest, costs, and its attorney's fees; and

N.      Granting Plaintiffs such other and further relief as the Court deems

just and proper.

Dated:   March 25, 2010

                                        BAYARD, P.A.

                                        */s/ Ashley B. Stitzer, Esq.*
                                        Neil B. Glassman (No. 2087)
                                        Ashley B. Stitzer (No. 3891)
                                        Daniel A. O'Brien (No. 4897)
                                        222 Delaware Avenue, Suite 900
                                        Wilmington, Delaware 19899
                                        Telephone:  (302) 655-5000
                                        Facsimile: (302) 658-6395
                                        nglassman@bayard.com
                                        astitzer@bayard.com
                                        dobrien@bayardlaw.com

                                            - and -

                                        COOLEY GODWARD KRONISH LLP
                                        Ronald R. Sussman
                                        Jay R. Indyke
                                        Cathy Hershcopf
                                        The Grace Building
                                        1114 Avenue of the Americas
                                        New York, NY 10036-7798
                                        Telephone: (212) 479-6000
                                        Facsimile: (212) 479-6275
                                        rsussman@cooley.com

                                        Jennifer L. Stewart
                                        Cooley Godward Kronish LLP
                                        500 Boylston Street
                                        Boston, MA 02116-3736
                                        Telephone: (617) 937-2300
                                        Facsimile: (617) 937-2400
                                        jstewart@cooley.com

                                        *Attorneys for* Plaintiffs